# EXHIBIT A

*Execution Version*

Credit Agreement

dated as of June 30, 2022,

among

BRICKELL INSURANCE HOLDINGS LLC,

the Lenders from time to time parties hereto,

and

BMO Harris Bank N.A.,
as Administrative Agent

BMO Capital Markets Corp., as Sole Lead Arranger and Sole Book Runner

## Table of Contents

SECTION 1.         DEFINITIONS; INTERPRETATION.................................................1

    *Section 1.1*    *Definitions.* ...........................................................................1
    *Section 1.2*    *Interpretation* ...................................................................22
    *Section 1.3*    *Change in Accounting Principles.* .....................................22
    *Section 1.4*    *Interest Rates.* ...................................................................23
    *Section 1.5*    *Divisions.* ..........................................................................23

SECTION 2.         THE CREDIT FACILITIES. ...........................................................23

    *Section 2.1*    *Commitments.* ....................................................................23
    *Section 2.2*    *Applicable Interest Rates.* .................................................23
    *Section 2.3*    *Minimum Borrowing Amounts; Maximum SOFR Loans* ....................24
    *Section 2.4*    *Manner of Borrowing Loans and Designating Applicable Interest Rates.* ...................................................................24
    *Section 2.5*    *[Reserved]* .........................................................................26
    *Section 2.6*    *Maturity of Loans; Scheduled Payments of Loans.* ...........26
    *Section 2.7*    *Prepayments.* .....................................................................26
    *Section 2.8*    *Default Rate.* .....................................................................27
    *Section 2.9*    *Evidence of Indebtedness.* .................................................28
    *Section 2.10*    *Fees.* .................................................................................28
    *Section 2.11*    *Place and Application of Payments.* .................................28
    *Section 2.12*    *Account Debit.* ...................................................................30
    *Section 2.13*    *Incremental Term Loans* ...................................................30
    *Section 2.14*    *Substitution of Lenders.* ....................................................31

SECTION 3.         TAXES; CHANGE IN CIRCUMSTANCES..........................................32

    *Section 3.1*    *Withholding Taxes.* ...........................................................32
    *Section 3.2*    *Payment of Other Taxes by Borrower.* ..............................34
    *Section 3.3*    *Treatment of Certain Refunds.* .........................................34
    *Section 3.4*    *Funding Indemnity.* ...........................................................34
    *Section 3.5*    *Change in Law.* .................................................................35
    *Section 3.6*    *Inability to Determine Rates.* ...........................................35
    *Section 3.7*    *Increased Cost and Reduced Return* .................................36
    *Section 3.8*    *Lending Offices.* ................................................................37
    *Section 3.9*    *Effect of Benchmark Transition Event.* .............................37

SECTION 4.         CONDITIONS PRECEDENT. ..........................................................39

    *SECTION 4.1*    *CONDITIONS PRECEDENT TO CLOSING DATE.* ...............................39

SECTION 5.         REPRESENTATIONS AND WARRANTIES........................................42

| | | |
|---|---|---|
| Section 5.1 | Organization and Qualification. | 42 |
| Section 5.2 | Subsidiaries. | 42 |
| Section 5.3 | Authority and Validity of Obligations. | 42 |
| Section 5.4 | Use of Proceeds; Margin Stock. | 43 |
| Section 5.5 | Financial Reports | 43 |
| Section 5.6 | No Material Adverse Change. | 43 |
| Section 5.7 | Full Disclosure. | 44 |
| Section 5.8 | Intellectual Property, Franchises, and Licenses | 44 |
| Section 5.9 | Governmental Authority and Licensing. | 44 |
| Section 5.10 | Good Title; Insurance. | 44 |
| Section 5.11 | Litigation and Other Controversies. | 44 |
| Section 5.12 | Taxes. | 44 |
| Section 5.13 | Approvals. | 45 |
| Section 5.14 | Affiliate Transactions | 45 |
| Section 5.15 | Investment Company. | 45 |
| Section 5.16 | ERISA; Plan Assets; Prohibited Transactions. | 45 |
| Section 5.17 | Compliance with Laws. | 45 |
| Section 5.18 | Sanctions; Anti-Money Laundering Laws and Anti-Corruption Laws. | 46 |
| Section 5.19 | Other Agreements. | 46 |
| Section 5.20 | Solvency. | 46 |
| Section 5.21 | No Default. | 46 |
| Section 5.22 | No Broker Fees. | 46 |
| Section 5.23 | EEA Financial Institution. | 47 |
| Section 5.24 | Insurance Licenses. | 47 |
| Section 5.25 | Status as Senior Indebtedness. | 47 |
| Section 5.26 | Collateral Documents | 47 |
| SECTION 6. | AFFIRMATIVE COVENANTS. | 47 |
| Section 6.1 | Maintenance of Business. | 47 |
| Section 6.2 | Maintenance of Properties. | 48 |
| Section 6.3 | Taxes and Assessments and other Obligations. | 48 |
| Section 6.4 | Insurance. | 48 |
| Section 6.5 | Financial Reports. | 48 |
| Section 6.6 | Inspection. | 51 |
| Section 6.7 | ERISA. | 51 |
| Section 6.8 | Compliance with Laws | 52 |
| Section 6.9 | Compliance with Anti-Corruption Laws, Anti-Money Laundering Laws and Sanctions | 52 |
| Section 6.10 | Use of Proceeds. | 52 |
| Section 6.11 | Guaranties and Collateral. | 52 |
| Section 6.12 | Status as Senior Debt. | 53 |
| Section 6.13 | Reserve Account. | 53 |
| SECTION 7. | NEGATIVE COVENANTS. | 54 |

| | | |
|---|---|---|
| *Section 7.1* | *Borrowings and Guaranties* | 54 |
| *Section 7.2* | *Liens.* | 55 |
| *Section 7.3* | *Investments, Acquisitions, Loans and Advances.* | 57 |
| *Section 7.4* | *Mergers, Consolidations and Sales.* | 59 |
| *Section 7.5* | *Maintenance of Subsidiaries.* | 61 |
| *Section 7.6* | *Dividends and Certain Other Restricted Payments.* | 61 |
| *Section 7.7* | *Burdensome Contracts With Affiliates* | 61 |
| *Section 7.8* | *No Changes in Fiscal Year.* | 62 |
| *Section 7.9* | *Accounting Changes.* | 62 |
| *Section 7.10* | *Change in the Nature of Business & Organizational Documents.* | 62 |
| *Section 7.11* | *No Restrictive Agreements* | 62 |
| *Section 7.12* | *Subordinated Debt.* | 62 |
| *Section 7.13* | *Use of Proceeds.* | 63 |
| *Section 7.14* | *Financial Covenants.* | 63 |

SECTION 8.      EVENTS OF DEFAULT AND REMEDIES. ............................................. 64

| | | |
|---|---|---|
| *Section 8.1* | *Events of Default.* | 64 |
| *Section 8.2* | *Non Bankruptcy Defaults.* | 67 |
| *Section 8.3* | *Bankruptcy Defaults* | 67 |
| *Section 8.4* | *Reserve Account.* | 67 |

SECTION 9.      ADMINISTRATIVE AGENT. ................................................................ 67

| | | |
|---|---|---|
| *Section 9.1* | *Appointment and Authorization of Administrative Agent.* | 67 |
| *Section 9.2* | *Rights as a Lender.* | 68 |
| *Section 9.3* | *Action by Administrative Agent.* | 68 |
| *Section 9.4* | *Consultation with Experts.* | 69 |
| *Section 9.5* | *Liability of Administrative Agent; Credit Decision.* | 69 |
| *Section 9.6* | *Indemnity.* | 70 |
| *Section 9.7* | *Resignation of Administrative Agent and Successor Administrative Agent* | 70 |
| *Section 9.8* | *Designation of Additional Agents.* | 71 |
| *Section 9.9* | *Authorization to Release or Subordinate or Limit Liens.* | 71 |
| *Section 9.10* | *Authorization to Enter into, and Enforcement of, the Collateral Documents.* | 72 |
| *Section 9.11* | *Delegation of Duties.* | 72 |
| *Section 9.12* | *Administrative Agent may File Proofs of Claim.* | 72 |
| *Section 9.13* | *Certain ERISA Matters.* | 73 |
| *Section 9.14* | *Recovery of Erroneous Payments.* | 74 |

SECTION 10.      [RESERVED]. ..................................................................................... 75

SECTION 11.      MISCELLANEOUS. ............................................................................. 75

| | | |
|---|---|---|
| *Section 11.1* | *No Waiver, Cumulative Remedies.* | 75 |

| | | |
|---|---|---|
| Section 11.2 | Non-Business Days. | 75 |
| Section 11.3 | Survival of Representations. | 75 |
| Section 11.4 | Survival of Indemnity and Certain Other Provisions. | 75 |
| Section 11.5 | Sharing of Set Off. | 75 |
| Section 11.6 | Notices. | 76 |
| Section 11.7 | Counterparts. | 77 |
| Section 11.8 | Successors and Assigns. | 78 |
| Section 11.9 | Participants. | 78 |
| Section 11.10 | Assignments. | 79 |
| Section 11.11 | Amendments. | 81 |
| Section 11.12 | Headings. | 82 |
| Section 11.13 | Costs and Expenses; Indemnification. | 82 |
| Section 11.14 | Set off. | 83 |
| Section 11.15 | Entire Agreement. | 84 |
| Section 11.16 | Governing Law. | 84 |
| Section 11.17 | Severability of Provisions. | 84 |
| Section 11.18 | Excess Interest. | 84 |
| Section 11.19 | Construction. | 85 |
| Section 11.20 | Lender's Obligations Several. | 85 |
| Section 11.21 | Submission to Jurisdiction; Waiver of Venue; Service of Process. | 85 |
| Section 11.22 | Waiver of Jury Trial. | 86 |
| Section 11.23 | USA Patriot Act. | 86 |
| Section 11.24 | Time is of the Essence. | 86 |
| Section 11.25 | Confidentiality. | 86 |
| Section 11.26 | Customary Advertising Material | 87 |
| Section 11.27 | Limited Voting Lender | 87 |
| Section 11.28 | Acknowledgement and Consent to Bail-In of Affected Financial Institutions | 88 |
| Section 11.29 | Acknowledgement Regarding any Supported QFCs | 89 |

## CREDIT AGREEMENT

This Credit Agreement is entered into as of June 30, 2022, by and among Brickell Insurance Holdings LLC, a Delaware limited liability company (the *"Borrower"*), the several financial institutions from time to time party to this Agreement, as Lenders, and BMO Harris Bank N.A., as Administrative Agent as provided herein.  All capitalized terms used herein without definition shall have the same meanings ascribed thereto in Section 1.1.

## PRELIMINARY STATEMENT

Borrower has requested, and the Lenders have agreed to extend to Borrower a term loan facility on the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the mutual agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

## SECTION 1.  DEFINITIONS; INTERPRETATION.

*Section 1.1*        *Definitions.* The following terms when used herein shall have the following meanings:

*"777 Partners"* means 777 Partners LLC, a Delaware limited liability company.

*"777 Re"* means 777 Re LTD, a Bermuda company.

*"Adjusted Term SOFR"* means with respect to any tenor, the per annum rate equal to the sum of (i) Term SOFR *plus* (ii) of 0.10% (10 basis points) for one-month, 0.15% (15 basis points) for three-month, and 0.25% (25 basis points) for six-months; provided, if Adjusted Term SOFR determined as provided above shall ever be less than the Floor, then Adjusted Term SOFR shall be deemed to be the Floor.

*"Administrative Agent"* means BMO Harris Bank N.A., in its capacity as Administrative Agent hereunder, and any successor in such capacity pursuant to Section 9.7.

*"Administrative Questionnaire"* means an Administrative Questionnaire in a form supplied by Administrative Agent.

*"Affected Financial Institution"* means (a) any EEA Financial Institution or (b) any UK Financial Institution.

*"Affected Lender"* has the meaning assigned to it Section 2.14.

*"Affiliate"* means any Person directly or indirectly controlling or controlled by, or under direct or indirect common control with, another Person.  A Person shall be deemed to control another Person for purposes of this definition if such Person possesses, directly or indirectly, the power to direct, or cause the direction of, the management and policies of the other Person, whether

through the ownership of voting securities, common directors, trustees or officers, by contract or otherwise; provided that, in any event for purposes of this definition, any Person that owns, directly or indirectly, 10% or more of the securities having the ordinary voting power for the election of directors or governing body of a corporation or 10% or more of the partnership or other ownership interest of any other Person (other than as a limited partner of such other Person) will be deemed to control such corporation or other Person.

"*Agreement*" means this Credit Agreement, as the same may be amended, restated, supplemented, or otherwise modified from time to time pursuant to the terms hereof.

"*Annual Statement*" means, with respect to any Insurance Subsidiary for any fiscal year, the annual financial statements of such Person as required to be filed with the Applicable Insurance Regulatory Authority of its jurisdiction of domicile and in accordance with the laws of such jurisdiction, together with all exhibits, schedules, certificates and actuarial opinions required to be filed or delivered therewith.

"*Anti-Corruption Laws*" means all Laws of any jurisdiction applicable to a Loan Party or any of their Subsidiaries from time to time concerning or relating to bribery or corruption.

"*Anti-Money Laundering Laws*" means any and all Laws applicable to a Loan Party or its Subsidiaries related to terrorism financing or money laundering, including any applicable provision of the Patriot Act.

"*Applicable Insurance Regulatory Authority*" means, with respect to any Insurance Subsidiary, the Governmental Authority charged with regulating insurance companies or insurance holding companies located in (a) the jurisdiction in which such Person is domiciled or (b) such other jurisdiction which due to the nature of such Insurance Subsidiary's business conducted in such other jurisdiction, has regulatory authority over such Insurance Subsidiary, including any federal Governmental Authority having regulatory authority over such Insurance Subsidiary.

"*Applicable Margin*" means, with respect to Base Rate Loans, 3.5% per annum, and with respect to SOFR Loans, 4.5% per annum.

"*Approved Fund*" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"*Assignment and Acceptance*" means an assignment and acceptance entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 11.10), and accepted by Administrative Agent, in substantially the form of Exhibit E or any other form approved by Administrative Agent.

"*Authorized Representative*" means those persons shown on the list of officers provided by Borrower pursuant to Section 4.1 or on any update of any such list provided by Borrower to

-2-

Administrative Agent, or any further or different officers of Borrower so named by any Authorized Representative of Borrower in a written notice to Administrative Agent.

"*Available Tenor*" means, as of any date of determination and with respect to the then-current Benchmark, as applicable, (x) if such Benchmark is a term rate, any tenor for such Benchmark (or component thereof) that is or may be used for determining the length of an interest period pursuant to this Agreement or (y) otherwise, any payment period for interest calculated with reference to such Benchmark (or component thereof) that is or may be used for determining any frequency of making payments of interest calculated with reference to such Benchmark, in each case, as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to Section 3.9(d).

"*Bail-In Action*" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"*Bail-In Legislation*" means (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation, rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"*Base Rate*" means, for any day, the rate per annum equal to the greatest of: (a) the rate of interest announced or otherwise established by Administrative Agent from time to time as its prime commercial rate, or its equivalent, for U.S. Dollar loans to borrowers located in the United States as in effect on such day, with any change in the Base Rate resulting from a change in said prime commercial rate to be effective as of the date of the relevant change in said prime commercial rate (it being acknowledged and agreed that such rate may not be Administrative Agent's best or lowest rate), (b) the sum of (i) the rate determined by Administrative Agent to be the average (rounded upward, if necessary, to the next higher 1/100 of 1%) of the rates per annum quoted to Administrative Agent at approximately 10:00 a.m. (or as soon thereafter as is practicable) on such day (or, if such day is not a Business Day, on the immediately preceding Business Day) by two or more Federal funds brokers selected by Administrative Agent for sale to Administrative Agent at face value of Federal funds in the secondary market in an amount equal or comparable to the principal amount for which such rate is being determined, plus (ii) 1/2 of 1%, and (c) the sum of (i) Adjusted Term SOFR for a one-month tenor in effect on such day plus (ii) 1.00%. Any change in the Base Rate due to a change in the prime rate, the quoted federal funds rates or Term SOFR, as applicable, shall be effective from and including the effective date of the change in such rate. If the Base Rate is being used as an alternative rate of interest pursuant to Sections 3.5 or 3.9, then the Base Rate shall be the greater of clauses (a) and (b) above and shall be determined without reference to clause (c) above, provided that if Base Rate as determined above shall ever be less than the Floor plus 1.00%, then Base Rate shall be deemed to be the Floor plus 1.00%.

"*Base Rate Loan*" means a Loan bearing interest at a rate specified in Section 2.2(a).

*"Benchmark"* means, initially, the Term SOFR Reference Rate; <u>provided</u> that if a Benchmark Transition Event has occurred with respect to the Term SOFR Reference Rate or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to <u>Section 3.9</u>.

*"Benchmark Replacement"* means, either of the following to the extent selected by Administrative Agent in its sole discretion,

(a)       Daily Simple SOFR plus 0.10%; or

(b)       the sum of: (i) the alternate benchmark rate that has been selected by the Administrative Agent and the Borrower giving due consideration to (A) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (B) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement to the then-current Benchmark for Dollar-denominated syndicated credit facilities and (ii) the related Benchmark Replacement Adjustment.

If the Benchmark Replacement as determined pursuant to clause (a) or (b) above would be less than the Floor, the Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents.

*"Benchmark Replacement Adjustment"* means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Administrative Agent and the Borrower giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (b) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for Dollar-denominated syndicated credit facilities.

*"Benchmark Replacement Date"* means the earliest to occur of the following events with respect to the then-current Benchmark:

(a)       in the case of clause (a) or (b) of the definition of "Benchmark Transition Event", the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof); or

(b)       in the case of clause (c) of the definition of "Benchmark Transition Event", the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by or on behalf of the administrator of such Benchmark (or such

-4-

component thereof) or the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be no longer representative; provided, that such non-representativeness or non-compliance will be determined by reference to the most recent statement or publication referenced in such clause (c) and even if any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (a) or (b) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

*"Benchmark Transition Event"* means the occurrence of one or more of the following events with respect to the then-current Benchmark:

(a)    a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(b)    a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Federal Reserve Board, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(c)    a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) or the regulatory supervisor for the administrator of such Benchmark (or such component thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are no longer, or as of a specified future date will no longer be, representative.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

*"Benchmark Unavailability Period"* means the period (if any) (a) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement

-5-

has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with <u>Section 3.9</u> and (b) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with <u>Section 3.9</u>.

***"Beneficial Ownership Certification"*** means a certification regarding beneficial ownership of the Borrower as required by 31 C.F.R. § 1010.230 (as amended, modified or supplemented from time to time), in form and substance satisfactory to the Administrative Agent.

***"BIH"*** means Brickell Insurance Holdings LLC, a Delaware limited liability company.

***"Borrower"*** is defined in the introductory paragraph of this Agreement.

***"Borrowing"*** means the total of Loans of a single type advanced, continued for an additional Interest Period, or converted from a different type into such type by the Lenders on a single date and, in the case of SOFR Loans, for a single Interest Period. Borrowings of Loans are made and maintained ratably from each of the Lenders according to their Term Loan Percentages. A Borrowing is "advanced" on the day Lenders advance funds comprising such Borrowing to Borrower, is "continued" on the date a new Interest Period for the same type of Loans commences for such Borrowing, and is "converted" when such Borrowing is changed from one type of Loans to the other, all as determined pursuant to <u>Section 2.4</u>.

***"Business Day"*** means any day (other than a Saturday or Sunday) on which banks are not authorized or required to close in New York, New York.

***"Capital and Liquidity Maintenance Agreement"*** means that certain Capital and Liquidity Maintenance Agreement dated as of December 3, 2020 between the 777 Partners and BIH.

***"Capital Lease"*** means any lease of Property which in accordance with GAAP is required to be capitalized on the balance sheet of the lessee.

***"Capitalized Lease Obligation"*** means, for any Person, the amount of the liability shown on the balance sheet of such Person in respect of a Capital Lease determined in accordance with GAAP.

***"Change in Law"*** means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any Law, (b) any change in any Law or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline, interpretation or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

-6-

747351332

***"Change of Control"*** means any of:  (a) 100% of the Voting Stock of Borrower ceases at any time and for any reason (including death or incapacity) to be owned, legally and beneficially by 777 Partners and MTCP, (b) there shall occur any "Change of Control" (or words of like import) under any agreement or indenture relating to any Indebtedness for Borrowed Money pursuant to clause (a) of the definition thereof of Borrower or any Subsidiary that has an aggregate outstanding principal amount exceeding $1,000,000 at the time of determination, and (c) the Borrower ceases to own and control, directly or indirectly, 100% of the Voting Stock of each Insurance Subsidiary.

***"Closing Date"*** means the date of this Agreement or such later Business Day upon which each condition described in <u>Section 4.1</u> shall be satisfied or waived in a manner acceptable to Administrative Agent in its discretion.

***"Code"*** means the Internal Revenue Code of 1986, as amended, and any successor statute thereto.

***"Collateral"*** means all properties, rights, interests, and privileges from time to time subject to the Liens granted to Administrative Agent, or any security trustee therefor, by the Collateral Documents.

***"Collateral Documents"*** means the Security Agreement, the Pledge Agreement, and all other mortgages, deeds of trust, security agreements, pledge agreements, assignments, financing statements and other documents as shall from time to time secure or relate to the Obligations or any part thereof.

***"Commitments"*** means, as to any Lender, the obligation of such Lender to make its Term Loan on the Closing Date in the principal amount not to exceed the amount set forth opposite such Lender's name on <u>Schedule 1</u> attached hereto and made a part hereof.  Borrower and the Lenders acknowledge and agree that the Commitments of the Lenders aggregate $65,000,000 on the date hereof.

***"Compliance Certificate"*** means a compliance certificate substantially in the form attached hereto as <u>Exhibit D</u> or in any other form approved by the Administrative Agent and Borrower.

***"Conforming Changes"*** means with respect to either the use of administration of Term SOFR or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Base Rate," the definition of "Business Day," the definition of "Interest Period," the definition of "U.S. Government Securities Business Day", the timing and frequency of determining rates and making payments of interest, the timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of breakage provisions, and other technical, administrative or operational matters) that the Administrative Agent decides may be appropriate to reflect the adoption and implementation of any such rate or to permit the use and administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such

-7-

market practice is not administratively feasible or if the Administrative Agent determines that no market practice for the administration of any such rate exists, in such other manner of administration as the Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"*Connection Income Taxes*" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"*Consolidated Indebtedness*" means, as of any date of determination, the aggregate (without duplication) of all Indebtedness for Borrowed Money (whether or not reflected on Borrower's balance sheet) of Borrower and its Subsidiaries as of such date, determined on a consolidated basis in accordance with GAAP.

"*Consolidated Net Worth*" means, as of any date of determination, the consolidated shareholders' equity of Borrower and its Subsidiaries determined on a consolidated basis in accordance with GAAP and as reflected on the consolidated financial statements of Borrower and its Subsidiaries; provided the Consolidated Net Worth shall be reduced by the amount of any Relevant Preferred Holding as of such date.

"*Consolidated Total Assets*" means, as of any date of determination, the consolidated total assets of Borrower and its Subsidiaries determined on a consolidated basis in accordance with GAAP and as reflected on the consolidated financial statements of Borrower and its Subsidiaries.

"*Consolidated Total Capital*" means, as of any date of determination, sum of (i) Consolidated Net Worth as of such date, and (ii) Consolidated Indebtedness as of such date.

"*Controlled Group*" means all members of a controlled group of corporations and all trades or businesses (whether or not incorporated) under common control which, together with Borrower, are treated as a single employer under Section 414 of the Code.

"*Daily Simple SOFR*" means, for any day, SOFR, with the conventions for this rate (which will include a lookback) being established by the Administrative Agent in accordance with the conventions for this rate selected or recommended by the Relevant Governmental Body for determining "Daily Simple SOFR" for syndicated business loans; provided, that if the Administrative Agent decides that any such convention is not administratively feasible for the Administrative Agent, then the Administrative Agent may establish another convention in its reasonable discretion.

"*Debt to Capital Ratio*" means the ratio of (i) Consolidated Indebtedness to (ii) Consolidated Total Capital.

"*Debtor Relief Laws*" means the Bankruptcy Code of the United States of America, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect.

*"Default"* means any event or condition the occurrence of which would, with the passage of time or the giving of notice, or both, constitute an Event of Default.

*"Default Rate"* means:

(a)    for any Base Rate Loan bearing interest based on the Base Rate, the sum of 2.0% plus the Applicable Margin plus the Base Rate from time to time in effect; and

(b)    for any SOFR Loan, the sum of 2.0% plus the Applicable Margin for SOFR Loans plus the Adjusted Term SOFR from time to time in effect.

*"Designated Disbursement Account"* means the account of Borrower maintained with Administrative Agent or its Affiliate and designated in writing to Administrative Agent as Borrower's Designated Disbursement Account (or such other account as Borrower and Administrative Agent may otherwise agree).

*"Designated Jurisdiction"* means, at any time, any country, region or territory which is itself the subject or target of any Sanctions.

*"Disposition"* means the sale, lease, conveyance or other disposition (in one transaction or in a series of transactions and whether effected pursuant to a Division or otherwise) of Property, other than sales or other dispositions expressly permitted under Sections 7.4(a), 7.4(b), or 7.4(d).

*"Dividing Person"* has the meaning assigned to it in the definition of "Division."

*"Division"* means the division of the assets, liabilities and/or obligations of a Person (the *"Dividing Person"*) among two or more Persons (whether pursuant to a "plan of division" or similar arrangement), which may or may not include the Dividing Person and pursuant to which the Dividing Person may or may not survive.

*"Division Successor"* means any Person that, upon the consummation of a Division of a Dividing Person, holds all or any portion of the assets, liabilities and/or obligations previously held by such Dividing Person immediately prior to the consummation of such Division.  A Dividing Person which retains any of its assets, liabilities and/or obligations after a Division shall be deemed a Division Successor upon the occurrence of such Division.

*"EBITDA"* means, with reference to any period, Net Income for such period plus all amounts deducted in arriving at such Net Income amount in respect of the following: (a) Interest Expense for such period, (b) federal, state, and local income taxes for such period, (c) depreciation of fixed assets and amortization of intangible assets for such period, (d) non-cash compensation expense, (e) costs, expenses, charges, accruals, or reserves attributable to the undertaking and/or the implementation of cost savings initiatives, operating expense reductions and other strategic initiatives, and (f) extraordinary, non-recurring or unusual losses, charges and expenses (other than such losses, charges and expenses related to insurance claims and insurance policies).

-9-

*"EEA Financial Institution"* means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clause (a) or (b) of this definition and is subject to consolidated supervision with its parent.

*"EEA Member Country"* means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

*"EEA Resolution Authority"* means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any credit institution or investment firm established in any EEA Member Country.

*"Eligible Assignee"* means (a) a Lender, (b) an Affiliate of a Lender, (c) an Approved Fund, and (d) any other Person (other than a natural person) approved by (i) Administrative Agent and (ii) unless an Event of Default has occurred and is continuing, Borrower (each such approval not to be unreasonably withheld or delayed); provided that notwithstanding the foregoing, *"Eligible Assignee"* shall not include Borrower or any Guarantor or any of Borrower's or such Guarantor's Affiliates or Subsidiaries.

*"Enhanced Capital Requirement"* means the higher of an insurer's approved internal capital model/Bermuda Solvency Capital Requirement and the Minimum Margin of Solvency, in each case, as defined in and calculated in accordance with the Bermuda Monetary Authority's Bermuda Capital and Solvency Return 2021 Instruction Handbook for Class E, Class D and Class C Insurers as in effect from time to time      .

*"ERISA"* means the Employee Retirement Income Security Act of 1974, as amended, or any successor statute thereto.

*"EU Bail-In Legislation Schedule"* means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

*"Event of Default"* means any event or condition identified as such in <u>Section 8.1</u>.

*"Excluded Taxes"* means any of the following Taxes imposed on or with respect to such Lender or Administrative Agent or required to be withheld or deducted from a payment to such Lender or Administrative Agent, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of Lender or Administrative Agent being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower) or (ii) such Lender changes its

-10-

lending office, except in each case to the extent that amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to Lender's failure to comply with Section 3.1(d) and (d) any U.S. federal withholding Taxes imposed under FATCA.

*"Existing Note Facility"* means that certain Credit Agreement dated as of December 31, 2018 by and among, *inter alia*, 777 Partners, as borrower and Leadenhall Capital Partners LLP, as administrative agent.

*"FATCA"* means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

*"Federal Funds Rate"* means the fluctuating interest rate per annum described in part (i) of clause (b) of the definition of Base Rate.

*"Fee Letter"* means the letter agreement, dated as of June 30, 2022, by and between Administrative Agent and Borrower.

*"Financial Strength Rating"* means, as to any Person, the rating that has been most recently announced by A.M. Best as the "financial strength rating" of such Person.

*"Fixed Charges"* means, with reference to any period, the sum of (a) all scheduled payments of principal during such period with respect to (i) Indebtedness for Borrowed Money of Borrower and its Subsidiaries and (ii) 777 Partners pursuant to the Subordinated Debt Documents and (b) cash Interest Expense of (i) the Borrower and its Subsidiaries with respect to Indebtedness for Borrowed Money of Borrower and its Subsidiaries and (ii) 777 Partners pursuant to the Subordinated Debt Documents.

*"Floor"* means the rate per annum of interest equal to 0%.

*"FRB"* means the Board of Governors of the Federal Reserve System of the United States.

*"Fund"* means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

*"GAAP"* means generally accepted accounting principles set forth from time to time in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the

747351332

U.S. accounting profession), which are applicable to the circumstances as of the date of determination.

*"Governmental Authority"* means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

*"Guarantor"* means 777 Partners.

*"Guaranty"* means the Guaranty dated as of the date hereof by the Guarantor in favor of the Administrative Agent.

*"Haircut Factor"* means (a) for the period commencing on the Closing Date and ending on December 31, 2022 (inclusive), 0%, (b) for the period commencing on January 1,2023 and ending on March 31, 2023 (inclusive), 25%, (c) for the period commencing on April 1, 2023 and ending on June 30, 2023 (inclusive), 50% and (d) thereafter, 100%.

*"Holding Company Investments"* means any equity (including common and preferred stock) or debt issued by 777 Partners or any other debt or capital instruments secured by such equity or debt issued by 777 Partners, in each case, to the extent held as an investment by the Borrower or any of its Subsidiaries.

*"Increased Amount Date"* is defined in Section 2.13(a).

*"Incremental Request Notice"* is defined in Section 2.13(a).

*"Incremental Term Loans"* is defined in Section 2.13(a).

*"Indebtedness for Borrowed Money"* means for any Person (without duplication) (a) all indebtedness created, assumed or incurred in any manner by such Person representing money borrowed (including by the issuance of debt securities), (b) all indebtedness for the deferred purchase price of property or services (other than trade accounts payable arising in the ordinary course of business which are not more than 45 days past due), (c) all indebtedness secured by any Lien upon Property of such Person, whether or not such Person has assumed or become liable for the payment of such indebtedness, (d) all Capitalized Lease Obligations of such Person, and (e) all obligations of such Person on or with respect to letters of credit, bankers' acceptances and other extensions of credit whether or not representing obligations for borrowed money.

*"Indemnified Taxes"* means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Loan Parties under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

*"Indemnitee"* is defined in <u>Section 11.13</u>.

***"Insurance Contract"*** means any insurance contract or policy issued by an Insurance Subsidiary that is not a Reinsurance Agreement.

***"Insurance License"*** means any license, certificate of authority, permit or other authorization which is required to be obtained from any Governmental Authority in connection with the operation, ownership or transaction of insurance or reinsurance business.

***"Insurance Subsidiary"*** means any Subsidiary of Borrower which is licensed by any Governmental Authority to engage in the insurance and/or reinsurance business.

***"Intercompany Services Agreement"*** means that certain Intercompany Services Agreement dated as of February 28, 2020 by and between BIH and 777 Partners, as amended by that certain Amendment No. 1 to Intercompany Services Agreement dated April 1, 2022 between BIH and 777 Partners, as in effect on the Closing Date.

***"Intercreditor Agreement"*** means that certain Subordination and Intercreditor Agreement between the Administrative Agent, and Leadenhall Capital Partners LLP, as Subordinated Agent (as defined therein), and acknowledged by the Loan Parties and MTCP dated as of the date hereof and in form and substance acceptable to the Administrative Agent.

***"Interest Expense"*** means, with reference to any period, the sum of all interest charges (including imputed interest charges with respect to Capitalized Lease Obligations and all amortization of debt discount and expense) of any Person for such period determined on a consolidated basis in accordance with GAAP.

***"Interest Payment Date"*** means (a) with respect to any Base Rate Loan, the last day of every calendar quarter and on the maturity date, (b) as to any SOFR Loan, the last day of each Interest Period therefor and, in the case of any Interest Period of more than three months' duration, each day prior to the last day of such Interest Period that occurs at three month intervals after the first day of such Interest Period, and on the maturity date; provided that, as to any such Loan, (i) if any such date would be a day other than a Business Day, such date shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such date shall be the next preceding Business Day and (ii) the Interest Payment Date with respect to any Borrowing that occurs on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in any applicable calendar month) shall be the last Business Day of any such succeeding applicable calendar month.

***"Interest Period"*** means the period commencing on the date a Borrowing of SOFR Loans is advanced, continued, or created by conversion and ending on the numerically corresponding day in the calendar month that is one, three or six months thereafter, as specified in the applicable borrowing request or interest election request, *provided,* that:

        i.       no Interest Period shall extend beyond the final maturity date of the relevant Loans;

ii.    no Interest Period with respect to any portion of the Loans shall extend beyond a date on which Borrower is required to make a scheduled payment of principal on the Loans, unless the sum of (a) the aggregate principal amount of Loans that are Base Rate Loans plus (b) the aggregate principal amount of Loans that are SOFR Loans with Interest Periods expiring on or before such date equals or exceeds the principal amount to be paid on the Loans on such payment date;

iii.    whenever the last day of any Interest Period would otherwise be a day that is not a Business Day, the last day of such Interest Period shall be extended to the next succeeding Business Day, provided that, if such extension would cause the last day of an Interest Period for a Borrowing of SOFR Loans to occur in the following calendar month, the last day of such Interest Period shall be the immediately preceding Business Day; and

iv.    for purposes of determining an Interest Period for a Borrowing of SOFR Loans, a month means a period starting on one day in a calendar month and ending on the numerically corresponding day in the next calendar month; provided, that if there is no numerically corresponding day in the month in which such an Interest Period is to end or if such an Interest Period begins on the last Business Day of a calendar month, then such Interest Period shall end on the last Business Day of the calendar month in which such Interest Period is to end; and

v.    no tenor that has been removed from this definition pursuant to Section 3.9 below shall be available for specification in such Notice of Borrowing or interest election request.

**"Investment Management Agreement"** means that certain Amended and Restated Management Agreement dated March 1, 2021, by and between 777 Asset Management LLC and 777 Re, as in effect on the Closing Date.

**"Laws"** means, collectively, all international, foreign, Federal, state and local statutes, treaties, rules, regulations, ordinances, codes, obligatory government orders, decrees and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

**"Lenders"** means the financial institutions from time to time party to this Agreement, including each assignee Lender pursuant to Section 11.10.

**"Lending Office"** is defined in Section 3.7.

**"Lien"** means any mortgage, lien, security interest, pledge, charge or encumbrance of any kind in respect of any Property, including the interests of a vendor or lessor under any conditional sale, Capital Lease or other title retention arrangement.

-14-

***"Limited Voting Lender"*** is defined in <u>Section 11.27.</u>

***"Loan"*** means the Term Loans and includes a Base Rate Loan or a SOFR Loan, each of which is a "type" of Term Loan hereunder.

***"Loan Documents"*** means this Agreement, the Notes (if any), the Collateral Documents, the Intercreditor Agreement, the Guaranty, and each other instrument or document to be delivered hereunder or thereunder or otherwise in connection herewith.

***"Loan Parties"*** means, collectively, Borrower, the Guarantor and any Person that hereafter grants security for, or guarantees any part of, the Obligations.

***"Material Adverse Effect"*** means (a) a material adverse change in, or material adverse effect upon, the operations, business, Property, condition (financial or otherwise) of Borrower or of the Borrower and its Subsidiaries taken as a whole or of any Guarantor and its Subsidiaries taken as a whole, (b) a material impairment of the ability of Borrower or any Loan Party to perform its material obligations under any Loan Document to which it is a party or (c) a material adverse effect upon the legality, validity, binding effect or enforceability against Borrower or any Loan Party of any Loan Document to which it is a party or the rights and remedies of Administrative Agent and the Lenders thereunder.

***"Maturity Date"*** means June 30, 2026.

***"Maximum Rate"*** is defined in <u>Section 11.18</u>.

***"Moody's"*** means Moody's Investors Service, Inc.

***"MTCP"*** means MTCP LLC, a Florida limited liability company.

***"NAIC"*** means the National Association of Insurance Commissioners and any successor thereto.

***"Net Cash Proceeds"*** means, with respect to any offering of equity securities of a Person or the issuance of any Indebtedness for Borrowed Money by a Person, cash and cash equivalent proceeds received by or for such Person's account, net of reasonable legal, underwriting, and other fees and expenses incurred as a direct result thereof.

***"Net Income"*** means, with reference to any period, the net income (or net loss) of Borrower and its Subsidiaries for such period computed on a consolidated basis in accordance with GAAP; provided that there shall be excluded from Net Income (a) the net income (or net loss) of any Person accrued prior to the date it becomes a Subsidiary of, or has merged into or consolidated with, Borrower or another Subsidiary, and (b) the net income (or net loss) of any Person (other than a Subsidiary) in which Borrower or any of its Subsidiaries has an equity interest in, except to the extent of the amount of dividends or other distributions actually paid to Borrower or any of its Subsidiaries during such period.

-15-

*"New Term Loan Commitments"* is defined in Section 2.13(a).

*"New Term Loan Lender"* is defined in Section 2.13(a).

*"Non-Consenting Lender"* means any Lender that does not approve any consent, waiver or amendment that (a) requires the approval of all or all affected Lenders in accordance with the terms of <u>Section 11.11</u> and (b) has been approved by the Required Lenders.

*"Note"* and *"Notes"* each is defined in <u>Section 2.9</u>.

*"Obligations"* means all obligations of Borrower to pay principal and interest on the Loans, all fees and charges payable hereunder, and all other payment obligations of Borrower arising under or in relation to any Loan Document, in each case whether now existing or hereafter arising, due or to become due, direct or indirect, absolute or contingent, and howsoever evidenced, held or acquired.

*"OFAC"* means the United States Department of Treasury Office of Foreign Assets Control.

*"OFAC SDN List"* means the list of the Specially Designated Nationals and Blocked Persons maintained by OFAC.

*"Other Connection Taxes"* means, with respect to the Lender or Administrative Agent, as applicable, Taxes imposed as a result of a present or former connection between such Lender or Administrative Agent and the jurisdiction imposing such Tax (other than connections arising from such Lender or Administrative Agent having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

*"Other Taxes"* means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than pursuant to an assignment request by the Borrower).

*"Patriot Act"* means the USA Patriot Act (Title III of Pub. L. 107 56 (signed into law October 26, 2001)).

*"Payment in Full"* means as of any date of determination, (i) the indefeasible payment in full in cash of all Loans, together with accrued and unpaid interest thereon; (ii) the Commitments are terminated; and (iii) the indefeasible payment in full in cash of all fees, reimbursable expenses and other Obligations (other than contingent indemnification obligations in respect of which no claim for payment has yet been asserted by the Person entitled thereto).

*"PBGC"* means the Pension Benefit Guaranty Corporation or any Person succeeding to any or all of its functions under ERISA.

*"Person"* means an individual, partnership, corporation, limited liability company, association, trust, unincorporated organization or any other entity or organization, including a government or agency or political subdivision thereof.

*"Plan"* means any employee pension benefit plan covered by Title IV of ERISA or subject to the minimum funding standards under Section 412 of the Code that either (a) is maintained by a member of the Controlled Group for employees of a member of the Controlled Group or (b) is maintained pursuant to a collective bargaining agreement or any other arrangement under which more than one employer makes contributions and to which a member of the Controlled Group is then making or accruing an obligation to make contributions or has within the preceding five plan years made contributions.

*"Platform"* means Debt Domain, Intralinks, Syndtrak, DebtX or a substantially similar electronic transmission system.

*"Pledge Agreement"* means that certain Pledge Agreement dated the date of this Agreement among 777 Partners and MTCP and the Administrative Agent, as the same may be amended, modified, supplemented or restated from time to time.

*"Policies"* means all insurance and annuity policies and contracts, guaranteed interest contracts, guaranteed investment contracts, and funding agreements, and similar undertakings or arrangements (including riders to any such policies or contracts, certificates issued with respect to life insurance or annuity contracts and any contracts issued in connection with retirement plans or arrangements) and assumption certificates issued or to be issued (or filed pending current review by applicable Governmental Authorities) by any Insurance Subsidiary and any coinsurance agreements entered into or to be entered into by any Insurance Subsidiary.

*"Property"* means, as to any Person, all types of real, personal, tangible, intangible or mixed property owned by such Person whether or not included in the most recent balance sheet of such Person and its subsidiaries under GAAP.

*"PTE"* means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

*"Register"* is defined in Section 11.10(d).

*"Reinsurance Agreement"* means any agreement, contract, treaty, certificate or other arrangement whereby any Insurance Subsidiary agrees to transfer, cede or retrocede to another insurer or reinsurer all or part of the liability assumed or assets held by such Insurance Subsidiary under a policy or policies of insurance issued by such Insurance Subsidiary.

-17-

"*Related Parties*" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

"*Relevant Governmental Body*" means the FRB and/or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the FRB and/or the Federal Reserve Bank of New York, or any successor thereto.

"*Relevant Preferred Holding*" means, as of any date of determination, the product of (a) the aggregate amount of any Holding Company Investments held by BIH or any of its Subsidiaries as of such date multiplied by (b) the Haircut Factor that applies on such date.

"*Required Equity Contribution*" has the meaning set forth in Section 4.1(k).

"*Required Lenders*" means, as of the date of determination thereof, Lenders whose outstanding Loans constitute more than 50% of the sum of the total outstanding Loans of the Lenders.

"*Rescindable Amount*" is defined in Section 2.11(b).

"*Reserve Account*" is defined in Section 6.13.

"*Resignation Effective Date*" is defined in Section 9.7.

"*Resolution Authority*" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"*Responsible Officer*" means with respect to any Person, the chief executive officer, chief operating officer, chief financial officer, chief actuary, treasurer or other financial officer performing similar functions, president or executive vice president of such Person.

"*Restricted Payments*" is defined in Section 7.5.

"*S&P*" means Standard & Poor's Ratings Services Group, a division of The McGraw Hill Companies, Inc.

"*Sanctioned Person*" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by OFAC (including the OFAC SDN List), the United States Department of State, the United Nations Security Council, the European Union, any European Union member state, Her Majesty's Treasury of the United Kingdom, or any other relevant sanctions authority, (b) any Person located, organized or resident in a Designated Jurisdiction or (c) any Person owned or controlled by any such Person or Persons described in clauses (a) or (b) above.

"*Sanctions*" means all economic or financial sanctions, sectoral sanctions, secondary sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the

United States government (including those administered by OFAC or the United States Department of State), or (b) the United Nations Security Council, the European Union, any European Union member state, Her Majesty's Treasury of the United Kingdom, or any other relevant sanctions authority with jurisdiction over any Loan Party or any of their respective Subsidiaries or Affiliates.

*"SAP"* means, as to any Insurance Subsidiary, the accounting practices prescribed or permitted by NAIC, if then applicable to such Insurance Subsidiary, or the Applicable Insurance Regulatory Authority of the jurisdiction of domicile of such Insurance Subsidiary for the preparation of Annual Statements, interim statements and other financial reports by insurance companies of the same type as such Insurance Subsidiary.

*"Secured Parties"* means (a) Administrative Agent and (b) each Lender.

*"Security Agreement"* means that certain Security Agreement dated the date of this Agreement between Borrower and Administrative Agent, as the same may be amended, modified, supplemented or restated from time to time.

*"Single Exposure"* means an exposure to a single counterparty; provided that for the purposes hereof, a "single counterparty" includes all related or connected counterparties that satisfy either of the following: (i) if a counterparty, directly or indirectly, has control of (as a result of its majority shareholding in or significant influence) the other counterparties (a controller relationship) or (ii) if one of the counterparties were to experience financial difficulties which directly or indirectly affect the ability of any or all of the remaining counterparties to perform their financial obligations (for example where a counterparty becomes unable to fund or repay certain financial contractual obligations, and as a result, other counterparties, are likely to be unable to fund or repay certain obligations imposed on them) (economic inter-dependence).

*"SOFR"* means a rate equal to the secured overnight financing rate as administered by the Federal Reserve Bank of New York or a successor administrator of the secured overnight financing rate.

*"SOFR Loan"* means a Loan bearing interest based on Adjusted Term SOFR, other than pursuant to clause (c) of the definition of "Base Rate."

*"Subordinated Debt"* means (i) all "Obligations" as defined in the Subordinated Debt Documents and (ii) all other Indebtedness for Borrowed Money that is subordinated in right of payment to the prior payment of the Obligations pursuant to Subordination Provisions approved in writing by Administrative Agent and is otherwise pursuant to documentation that is, which is in an amount that is, and which contains interest rates, payment terms, maturities, amortization schedules, covenants, defaults, remedies and other material terms that are, in each case, in form and substance satisfactory to Administrative Agent.

*"Subordinated Debt Documents"* means (a) that certain Subordinated Note Purchase Agreement dated as of the date hereof by and among 777 Partners, the purchasers party thereto, Leadenhall Life SMA III ICAV and Leadenhall Capital Partners LLP and (b) all other principal

documents evidencing or securing the obligations thereunder, in each case under (a) and (b) above, as amended, supplemented, restated or otherwise modified in accordance with the Intercreditor Agreement.

"*Subordination Provisions*" means any provision relating to debt or lien subordination applicable to or contained in any documents evidencing any Subordinated Debt, including as set forth in the Intercreditor Agreement or other applicable intercreditor agreements.

"*Subsidiary*" means, as to any particular parent corporation or organization, any other corporation or organization more than 50% of the outstanding Voting Stock of which is at the time directly or indirectly owned by such parent corporation or organization or by any one or more other entities which are themselves subsidiaries of such parent corporation or organization. Unless otherwise expressly noted herein, the term "Subsidiary" means a Subsidiary of Borrower or of any of its direct or indirect Subsidiaries.

"*Taxes*" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"*Term Loan*" is defined in Section 2.1.

"*Term Loan Percentage*" means, for each Lender, the percentage of the Commitments represented by such Lender's Commitment or, if the Commitments have been terminated or have expired, the percentage held by such Lender of the aggregate principal amount of all Loans then outstanding.

"*Term SOFR*" means, for the applicable tenor, the Term SOFR Reference Rate on the day (such day, the "*Term SOFR Determination Day*") that is two (2) U.S. Government Securities Business Days prior to (a) in the case of SOFR Loans, the first day of such applicable Interest Period, or (b) with respect to Base Rate, such day of determination of the Base Rate, in each case as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Term SOFR Determination Day.

"*Term SOFR Administrator*" means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Administrative Agent in its reasonable discretion).

"*Term SOFR Reference Rate*" means the forward-looking term rate based on SOFR.

-20-

***"UK Financial Institution"*** means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

***"UK Resolution Authority"*** means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

***"Unadjusted Benchmark Replacement"*** means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

***"Unfunded Vested Liabilities"*** means, for any Plan at any time, the amount (if any) by which the present value of all vested nonforfeitable accrued benefits under such Plan exceeds the fair market value of all Plan assets allocable to such benefits, all determined as of the then most recent valuation date for such Plan, but only to the extent that such excess represents a potential liability of a member of the Controlled Group to the PBGC or the Plan under Title IV of ERISA.

***"U.S. Dollars" and "$"*** each means the lawful currency of the United States of America.

***"U.S. Government Securities Business Day"*** means any day except for (i) a Saturday, (ii) a Sunday or (iii) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

***"Voting Stock"*** of any Person means capital stock or other equity interests of any class or classes (however designated) having ordinary power for the election of directors or other similar governing body of such Person, other than stock or other equity interests having such power only by reason of the happening of a contingency.

***"Welfare Plan"*** means a "welfare plan" as defined in Section 3(1) of ERISA.

***"Wholly Owned Subsidiary"*** means a Subsidiary of which all of the issued and outstanding shares of capital stock (other than directors' qualifying shares as required by law) or other equity interests are owned by Borrower and/or one or more Wholly Owned Subsidiaries within the meaning of this definition.

***"Write-Down and Conversion Powers"*** means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that

-21-

any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

Section 1.2    *Interpretation*.  The foregoing definitions are equally applicable to both the singular and plural forms of the terms defined.  The words "hereof", "herein", and "hereunder" and words of like import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." All references to time of day herein are references to New York, New York, time unless otherwise specifically provided.  All terms of accounting or financial nature shall be construed in accordance with GAAP or SAP, as applicable.  The term "shall" shall have the same meaning as the term "will".  All incorporation by reference of covenants, terms, definitions or other provisions from other agreements are incorporated into this Agreement as if such provisions were fully set forth herein, and such incorporation shall include all necessary definitions and related provisions from such other agreements but including only amendments thereto agreed to by the Lenders, and shall survive any termination of such other agreements until Payment in Full.  Any reference to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such Law and any reference to any Law or regulation shall, unless otherwise specified, refer to such Law or regulation as amended, modified or supplemented from time to time and any successor law or regulation.  References to any document, instrument or agreement (a) shall include all exhibits, schedules and other attachments thereto, (b) shall include all documents, instruments or agreements issued or executed in replacement thereof, to the extent permitted hereby and (c) shall mean such document, instrument or agreement, or replacement or predecessor thereto, as amended, supplemented, restated, extended or otherwise modified from time to time to the extent not otherwise stated herein or prohibited hereby and in effect at any given time.

Section 1.3    *Change in Accounting Principles*.  If, after the date of this Agreement, there shall occur any change in GAAP, SAP or application thereof, as applicable, from those used in the preparation of the financial statements referred to in Section 5.5 and such change shall result in a change in the method of calculation of any financial covenant, standard or requirement found in this Agreement, either Borrower or the Required Lenders (acting through the Administrative Agent) may by notice to the Administrative Agent, Lenders and Borrower, respectively, request that the Lenders and Borrower negotiate in good faith to amend such covenants, standards, and requirements so as equitably to reflect such change in GAAP, SAP or application thereof, as applicable, with the desired result being that the criteria for evaluating the financial condition of Borrower and its Subsidiaries shall be the same as if such change had not been made.  No delay by Borrower or the Required Lenders in requesting such negotiation shall limit their right to so request such a negotiation at any time after such a change in accounting principles.  Until any such covenant, standard, or term is amended in accordance with this Section 1.3, financial covenants shall be computed and determined in accordance with GAAP or SAP, as applicable, in effect prior to such change in accounting principles.  Without limiting the generality of the foregoing, Borrower shall neither be deemed to be in compliance with any financial covenant hereunder nor out of compliance with any financial covenant hereunder if such state of compliance or noncompliance, as the case may be, would not exist but for the occurrence of a change in accounting principles after the date hereof.

-22-

747351332

Section 1.4    *Interest Rates*.  The Administrative Agent does not warrant or accept responsibility for, and shall not have any liability with respect to (a) the continuation of, administration of, submission of, calculation of or any other matter related to the Benchmark, any component definition thereof or rates referred to in the definition thereof, or any alternative, successor or replacement rate thereto (including any Benchmark Replacement), including whether the composition or characteristics of any such alternative, successor or replacement rate (including any Benchmark Replacement) will be similar to, or produce the same value or economic equivalence of, or have the same volume or liquidity as, the Benchmark or any other Benchmark prior to its discontinuance or unavailability, or (b) the effect, implementation or composition of any Conforming Changes.  The Administrative Agent and its affiliates or other related entities may engage in transactions that affect the calculation of the Benchmark, any alternative, successor or replacement rate (including any Benchmark Replacement) and/or any relevant adjustments thereto, in each case, in a manner adverse to the Borrower.  The Administrative Agent may select information sources or services in its reasonable discretion to ascertain the Benchmark or any other Benchmark, in each case pursuant to the terms of this Agreement, and shall have no liability to the Borrower, any Lender or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

Section 1.5    *Divisions*.  For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its equity interests at such time

## SECTION 2.  THE CREDIT FACILITIES.

Section 2.1    *Commitments.  Loans*.  Subject to the terms and conditions hereof, each Lender, by its acceptance hereof, severally agrees to make a loan (individually a ***"Term Loan"*** and collectively for all the Lenders the ***"Term Loans"***) in U.S. Dollars to Borrower in the amount of such Lender's Commitment.  The Term Loans shall be advanced in a single Borrowing on the Closing Date and shall be made ratably by the Lenders in proportion to their respective Term Loan Percentages, at which time the Commitments shall expire.

(b)    As provided in Section 2.4(a), Borrower may elect that the Loans be outstanding as Base Rate Loans or SOFR Loans.  No amount repaid or prepaid on any Loan may be borrowed again.

Section 2.2    *Applicable Interest Rates*.

(a)    *Base Rate Loans*.  Each Base Rate Loan made or maintained by a Lender shall bear interest (computed on the basis of a year of 365 or 366 days, as the case may be, when determined based on clause (a) of the definition of Base Rate, and in all other instances on the basis of a year of 360 days, and in each case, the actual days elapsed) on the unpaid principal amount thereof from

-23-

the date such Loan is advanced, or created by conversion from a SOFR Loan, until repayment in full at a rate per annum equal to the sum of the Applicable Margin plus the Base Rate from time to time in effect, payable by Borrower on each Interest Payment Date and at maturity (whether by acceleration or otherwise).

(b)    *SOFR Loans*.  Each SOFR Loan made or maintained by a Lender shall bear interest during each Interest Period it is outstanding (computed on the basis of a year of 360 days and actual days elapsed) on the unpaid principal amount thereof from the date such Loan is advanced or continued, or created by conversion from a Base Rate Loan, until repayment in full at a rate per annum equal to the sum of the Applicable Margin plus the Adjusted Term SOFR applicable to such Interest Period, payable by Borrower on each Interest Payment Date and at maturity (whether by acceleration or otherwise).

(c)    *Rate Determinations*.  Administrative Agent shall determine each interest rate applicable to the Loans hereunder, and its determination thereof shall be conclusive and binding except in the case of manifest error.  In connection with the use or administration of Term SOFR, the Administrative Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.  The Administrative Agent will promptly notify the Borrower and the Lenders of the effectiveness of any Conforming Changes in connection with the use or administration of Term SOFR.

Section 2.3    *Minimum Borrowing Amounts; Maximum SOFR Loans*.  Each Borrowing of Base Rate Loans shall be in an amount not less than $100,000 or such greater amount which is an integral multiple of $50,000.  Each Borrowing of SOFR Loans advanced, continued or converted shall be in an amount equal to $1,000,000 or such greater amount which is an integral multiple of $500,000.  Without Administrative Agent's consent, there shall not be more than three Borrowings of SOFR Loans outstanding hereunder at any one time.

Section 2.4    *Manner of Borrowing Loans and Designating Applicable Interest Rates.*

(a)    *Notice to Administrative Agent*.  Borrower shall give notice to Administrative Agent by no later than 10:00 a.m.:  (i) at least three (3) Business Days before the date on which Borrower requests the Lenders to advance a Borrowing of SOFR Loans and (ii) at least one (1) Business Day before the date Borrower requests the Lenders to advance a Borrowing of Base Rate Loans.  The Loans included in each Borrowing shall bear interest initially at the type of rate specified in such notice of a new Borrowing.  Thereafter, subject to the terms and conditions hereof, Borrower may from time to time elect to change or continue the type of interest rate borne by each Borrowing or, subject to the minimum amount requirement for each outstanding Borrowing set forth in Section 2.3, a portion thereof, as follows:  (i) if such Borrowing is of SOFR Loans, on the last day of the Interest Period applicable thereto, Borrower may continue part or all of such Borrowing as SOFR Loans or convert part or all of such Borrowing into Base Rate Loans or (ii) if such Borrowing is of Base Rate Loans, on any Business Day, Borrower may convert all or part of such Borrowing into SOFR Loans for an Interest Period or Interest Periods specified by Borrower.  Borrower shall give all such notices requesting the advance, continuation or conversion of a Borrowing to Administrative Agent by telephone, telecopy, or other telecommunication

-24-

device acceptable to Administrative Agent (which notice shall be irrevocable once given and, if by telephone, shall be promptly confirmed in writing), substantially in the form attached hereto as Exhibit A (Notice of Borrowing) or Exhibit B (Notice of Continuation/Conversion), as applicable, or in such other form acceptable to Administrative Agent. Notice of the continuation of a Borrowing of SOFR Loans for an additional Interest Period or of the conversion of part or all of a Borrowing of Base Rate Loans into SOFR Loans must be given by no later than 10:00 a.m. at least three (3) Business Days before the date of the requested continuation or conversion. All such notices concerning the advance, continuation or conversion of a Borrowing shall specify the date of the requested advance, continuation or conversion of a Borrowing (which shall be a Business Day), the amount of the requested Borrowing to be advanced, continued or converted, the type of Loans to comprise such new, continued or converted Borrowing and, if such Borrowing is to be comprised of SOFR Loans, the Interest Period applicable thereto. No Borrowing of SOFR Loans shall be advanced, continued, or created by conversion if any Default or Event of Default then exists. Borrower agrees that Administrative Agent may rely on any such telephonic, telecopy or other telecommunication notice given by any person Administrative Agent in good faith believes is an Authorized Representative without the necessity of independent investigation, and in the event any such notice by telephone conflicts with any written confirmation such telephonic notice shall govern if Administrative Agent has acted in reliance thereon.

(b)    *Notice to the Lenders*.  Administrative Agent shall give prompt telephonic, telecopy or other telecommunication notice to each Lender of any notice from Borrower received pursuant to Section 2.4(a) above and the amount of such Lender's Loan to be made as part of the requested Borrowing.

(c)    *Borrower's Failure to Notify*.  If Borrower fails to give notice pursuant to Section 2.4(a) above of the continuation or conversion of any outstanding principal amount of a Borrowing of SOFR Loans prior to the last day of its then current Interest Period within the period required by Section 2.4(a) and such Borrowing is not prepaid in accordance with Section 2.7(a), such Borrowing shall automatically be converted to a Base Rate Loan.

(d)    *Disbursement of Loans*.  Not later than 1:00 p.m. on the date of any requested advance of a new Borrowing, subject to Section 4, each Lender shall make available its Loan comprising part of such Borrowing in funds immediately available at the principal office of Administrative Agent in Chicago, Illinois (or at such other location as Administrative Agent shall designate). Administrative Agent shall make all such funds so received available to Borrower at Administrative Agent's principal office in Chicago, Illinois (or at such other location as Administrative Agent shall designate), by depositing or wire transferring such proceeds to the credit of Borrower's Designated Disbursement Account or as Borrower and Administrative Agent may otherwise agree.

(e)    *Administrative Agent Reliance on Lender Funding*.  Unless Administrative Agent shall have been notified by a Lender prior to (or, in the case of a Borrowing of Base Rate Loans, by 1:00 p.m. on) the date on which such Lender is scheduled to make payment to Administrative Agent of the proceeds of a Loan (which notice shall be effective upon receipt) that such Lender does not intend to make such payment, Administrative Agent may assume that such Lender has made such payment when due and Administrative Agent may (but shall not be required to) in

-25-

reliance upon such assumption make available to Borrower the proceeds of the Loan to be made by such Lender and, if any Lender has not in fact made such payment to Administrative Agent, such Lender shall, on demand, pay to Administrative Agent the amount made available to Borrower attributable to such Lender together with interest thereon in respect of each day during the period commencing on the date such amount was made available to Borrower and ending on (but excluding) the date such Lender pays such amount to Administrative Agent at a rate per annum equal to:  (i) from the date the related advance was made by Administrative Agent to the date two (2) Business Days after payment by such Lender is due hereunder, the Federal Funds Rate for each such day and (ii) from the date two (2) Business Days after the date such payment is due from such Lender to the date such payment is made by such Lender, the Base Rate in effect for each such day.  If such amount is not received from such Lender by Administrative Agent immediately upon demand, Borrower will, on demand, repay to Administrative Agent the proceeds of the Loan attributable to such Lender with interest thereon at a rate per annum equal to the interest rate applicable to the relevant Loan, but without such payment being considered a payment or prepayment of a Loan under Section 3.4 so that Borrower will have no liability under such Section with respect to such payment.

Section 2.5    *[Reserved]*.

Section 2.6    *Maturity of Loans; Scheduled Payments of Loans.*

Borrower shall make principal payments of the Loans (i) on the second anniversary of the Closing Date in an amount equal to 5% of the sum of (A) the amount of the Loans outstanding on the Closing Date plus (B) the amount of any Incremental Term Loans and (ii) on the third anniversary of the Closing Date in an amount equal to 15% of the sum of (A) the amount of the Loans outstanding on the Closing Date plus (B) the amount of any Incremental Term Loans.  A final payment comprised of all principal and interest then outstanding on the Loans shall be due and payable on the Maturity Date.  Each such principal payment shall be applied to the Lenders holding the Loans pro rata based upon their Term Loan Percentages.

Section 2.7    *Prepayments.*

(a)    *Optional Prepayments*.  Borrower may prepay in whole or in part (but, if in part, then:  (i) if such Borrowing is of Base Rate Loans, in an amount not less than $100,000, (ii) if such Borrowing is of SOFR Loans, in an amount not less than $500,000, and (iii) in each case, in an amount such that the minimum amount required for a Borrowing pursuant to Section 2.3 remains outstanding), without premium or penalty, any Borrowing of SOFR Loans at any time upon three (3) Business Days prior notice by Borrower to Administrative Agent or, in the case of a Borrowing of Base Rate Loans, upon one (1) Business Day prior notice delivered by Borrower to Administrative Agent (or, in any case, such shorter period of time then agreed to by Administrative Agent), such prepayment, in each case, to be made by the payment of the principal amount to be prepaid and, in the case of any SOFR Loans, accrued interest thereon to the date fixed for prepayment plus any amounts due the Lenders under Section 3.4.

(b)    *Mandatory Prepayments.*

(i)    If after the Closing Date Borrower or any Subsidiary shall issue new equity securities (whether common or preferred stock or otherwise), other than equity securities issued (A) to 777 Partners and/or MTCP, (B) in connection with the exercise of employee

-26-

stock options, or (C) in connection with capital contributions required or advisable for insurance regulatory purposes, then Borrower shall promptly notify Administrative Agent of the estimated Net Cash Proceeds of such issuance to be received by or for the account of Borrower or such Subsidiary in respect thereof. Promptly upon receipt by Borrower or such Subsidiary of Net Cash Proceeds of such issuance, Borrower shall prepay the Obligations in an aggregate amount equal to 100% of the amount of such Net Cash Proceeds. The amount of each such prepayment shall be applied, subject to Section 2.7(b)(iii), to the outstanding Loans until paid in full. Borrower acknowledges that its performance hereunder shall not limit the rights and remedies of the Lenders for any breach of Section 7.5 (Maintenance of Subsidiaries) or Section 8.1(i) (Change of Control) hereof or any other terms of the Loan Documents.

(ii)     If after the Closing Date Borrower or any Subsidiary shall incur any Indebtedness for Borrowed Money, other than Indebtedness for Borrowed Money permitted by Section 7.1, then promptly upon receipt by Borrower or such Subsidiary of Net Cash Proceeds of such issuance, Borrower shall prepay the Obligations in an aggregate amount equal to 100% of the amount of such Net Cash Proceeds. The amount of each such prepayment shall be applied, subject to Section 2.7(b)(iii), to the outstanding Loans until paid in full. Borrower acknowledges that its performance hereunder shall not limit the rights and remedies of the Lenders for any breach of Section 7.1 or any other terms of the Loan Documents.

(iii)     Unless Borrower otherwise directs, prepayments of Loans under this Section 2.7(b) shall be applied first to Borrowings of Base Rate Loans until payment in full thereof with any balance applied to Borrowings of SOFR Loans in the order in which their Interest Periods expire until payment in full thereof. Each prepayment of Loans under this Section 2.7(b) shall be made by the payment of the principal amount to be prepaid and, in the case of any Loans or SOFR Loans, accrued interest thereon to the date of prepayment together with any amounts due the Lenders under Section 3.4.

(c)     No amount of the Loans paid or prepaid may be reborrowed, and, in the case of any partial prepayment, such prepayment shall be applied to the remaining amortization payments on the relevant Loans in the inverse order of maturity.

Section 2.8     *Default Rate*.

Notwithstanding anything to the contrary contained herein, (i) automatically, upon the occurrence of any Event of Default under Section 8.1(a), (j) or (k) until such Event of Default is no longer continuing all of the Loans, after as well as before judgment, shall accrue interest at a rate per annum equal to the applicable Default Rate and (ii) during the occurrence and continuance of any Event of Default (other than as set forth in clause (i) above), the Required Lenders may, at their option, by notice to the Borrower (which notice may be revoked at the option of the Required Lenders notwithstanding any provision of Section 11.11 requiring the consent of "each Lender affected thereby" for reductions in interest rates), declare that all of the Loans, after as well as before judgment, accrue interest at a rate per annum equal to the applicable Default Rate.

-27-

Section 2.9    *Evidence of Indebtedness.*

(a)    Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of Borrower to such Lender resulting from each Loan made by such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(b)    Administrative Agent shall also maintain accounts in which it will record (i) the amount of each Loan made hereunder, the type thereof and the Interest Period with respect thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from Borrower to each Lender hereunder and (iii) the amount of any sum received by Administrative Agent hereunder from Borrower and each Lender's share thereof.

(c)    The entries maintained in the accounts maintained pursuant to paragraphs (a) and (b) above shall be prima facie evidence of the existence and amounts of the Obligations therein recorded; provided, that the failure of Administrative Agent or any Lender to maintain such accounts or any error therein shall not in any manner affect the obligation of Borrower to repay the Obligations in accordance with their terms.  In the event of any conflict between the records maintained by any Lender and the records maintained by the Administrative Agent in such matters, the records of the Administrative Agent shall control in the absence of manifest error.

(d)    Any Lender may request that its Loans be evidenced by a promissory note or notes in the form of Exhibit C (collectively referred to herein as the ***"Notes"*** and each individually as a ***"Note"***).  In such event, Borrower shall prepare, execute and deliver to such Lender a Note payable to such Lender or its registered assigns in the amount of the relevant Loan.  Thereafter, the Loans evidenced by such Note or Notes and interest thereon shall at all times (including after any assignment pursuant to Section 11.10) be represented by one or more Notes payable to the order of the payee named therein or any assignee pursuant to Section 11.10, except to the extent that any such Lender or assignee subsequently returns any such Note for cancellation and requests that such Loans once again be evidenced as described in subsections (a) and (b) above.

Section 2.10    *Fees.  Administrative Agent Fees.*    Borrower shall pay to Administrative Agent, for its own use and benefit, the fees agreed to between Administrative Agent and Borrower in the Fee Letter, or as otherwise agreed to in writing between them.

Section 2.11    *Place and Application of Payments.* All payments of principal of and interest on the Loans and of all other Obligations payable by Borrower under this Agreement and the other Loan Documents, shall be made by Borrower to Administrative Agent by no later than 12:00 Noon on the due date thereof at the office of Administrative Agent in Chicago, Illinois (or such other location as Administrative Agent may designate to Borrower), for the benefit of the Lender(s) entitled thereto.  Any payments received after such time shall be deemed to have been received by Administrative Agent on the next Business Day.  All such payments shall be made in U.S. Dollars, in immediately available funds at the place of payment, in each case without set off or counterclaim.  Administrative Agent will promptly thereafter cause to be distributed like funds relating to the payment of principal or interest on Loans ratably to the Lenders, and like funds relating to the payment of any other amount payable to any Lender to such Lender, in each case to be applied in accordance with the terms of this Agreement.

-28-

(b)      Unless Administrative Agent shall have received notice from Borrower prior to the date on which any payment is due to Administrative Agent for the account of the Lenders hereunder that Borrower will not make such payment, Administrative Agent may assume that Borrower has made such payment on such date in accordance herewith and may (but shall not be required to) in reliance upon such assumption, distribute to the applicable Lenders the amount due. With respect to any payment that Administrative Agent makes to any Lender or other Secured Party as to which Administrative Agent determines (in its sole and absolute discretion) that any of the following applies (such payment referred to as the *"Rescindable Amount"*): (1) Borrower has not in fact made the corresponding payment to Administrative Agent; (2) Administrative Agent has made a payment in excess of the amount(s) received by it from Borrower either individually or in the aggregate (whether or not then owed); or (3) Administrative Agent has for any reason otherwise erroneously made such payment; then each of the Secured Parties severally agrees to repay to Administrative Agent forthwith on demand the Rescindable Amount so distributed to such Secured Party, in immediately available funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to Administrative Agent, at the greater of the Federal Funds Rate and a rate determined by Administrative Agent in accordance with banking industry rules on interbank compensation.

(c)      Anything contained herein to the contrary notwithstanding (including Section 2.7(b)), all payments and collections received in respect of the Obligations and all proceeds of the Collateral received, in each instance, by Administrative Agent or any of the Lenders after acceleration or the final maturity of the Obligations or termination of the Commitments as a result of an Event of Default shall be remitted to Administrative Agent and distributed as follows:

(i)      first, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (including fees and disbursements and other charges of counsel payable under Section 11.13 and amounts described in Section 2.10(a)) payable to the Administrative Agent in its capacity as such;

(ii)     second, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lenders (including fees and disbursements and other charges of counsel payable under Section 11.13) arising under the Loan Documents, ratably among them in proportion to the respective amounts described in this clause (ii) payable to them;

(iii)    third, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans, ratably among the Lenders in proportion to the respective amounts described in this clause (iii) payable to them;

(iv)     fourth, to payment of that portion of the Obligations constituting unpaid principal of the Loans, ratably among the Lenders in proportion to the respective amounts described in this clause (iv);

(v)      fifth, to the payment in full of all other Obligations, in each case ratably among the Administrative Agent and the Lenders based upon the respective aggregate amounts of all such

-29-

Obligations owing to them in accordance with the respective amounts thereof then due and payable; and

(vi)    finally, the balance, if any, after all Obligations have been indefeasibly paid in full, to the Borrower or as otherwise required by Law.

Section 2.12    *Account Debit*.    Borrower hereby irrevocably authorizes Administrative Agent to charge any of Borrower's deposit accounts maintained with Administrative Agent for the amounts from time to time necessary to pay any then due Obligations; provided that Borrower acknowledges and agrees that Administrative Agent shall not be under an obligation to do so and Administrative Agent shall not incur any liability to Borrower or any other Person for Administrative Agent's failure to do so.

Section 2.13    *Incremental Term Loans*

(a)    Borrower may by written notice to the Administrative Agent before the second anniversary of the Closing Date elect to request the establishment of one or more new term loan commitments (such commitments, the ***"New Term Loan Commitments"*** and the loans made pursuant to this Section 2.13, the ***"Incremental Term Loans"***) by an amount not in excess of $25,000,000 in the aggregate and not less than $5,000,000 individually (or such lesser amount as may be approved by the Administrative Agent) and integral multiples of $1,000,000 in excess of that amount.  Each such notice (an ***"Incremental Request Notice"***) shall specify (i) the date (each, an ***"Increased Amount Date"***) on which Borrower proposes that the New Term Loan Commitments shall be effective, which shall be a date not less than ten Business Days (or such shorter period as agreed by Administrative Agent) after the date on which such notice is delivered to Administrative Agent.  Upon receipt of the Incremental Request Notice, such New Term Loan Commitments shall be offered to all Lenders pro rata according to the respective outstanding principal amounts of the Loans held by such Lenders; provided that Administrative Agent may elect or decline to arrange such New Term Loan Commitments in its sole discretion and any Lender offered to provide all or a portion of the New Term Loan Commitments may elect or decline, in its sole discretion, to provide a New Term Loan Commitment.  If the existing Lenders do not accept the requested New Term Loan Commitments offered to them in its entirety on a pro rata basis within five (5) Business Days of such request and offer, that portion of the New Term Loan Commitments not accepted by the existing Lenders may be offered by the Borrower to any other lenders deemed reasonably acceptable by the Administrative Agent (such acceptance not to be unreasonably withheld).  Such New Term Loan Commitments shall become effective as of such Increased Amount Date pursuant to one or more joinder agreements in form and substance satisfactory to Administrative Agent executed and delivered by Borrower, each Lender providing any New Term Loan Commitment (each a ***"New Term Loan Lender"***) and the Administrative Agent; provided that:  (i) no Default or Event of Default shall have occurred and be continuing on such Increased Amount Date before or after giving effect to such New Term Loan Commitments; (ii) both before and after giving effect to the making of any New Term Loans the representations and warranties of the Loan Parties contained herein and in the other Loan Documents shall be true and correct on and as of the Increased Amount Date (except to the extent such representations and warranties relate solely to an earlier date, in which case such representations and warranties were true and correct as of such earlier date); (iii) after giving effect to such New Term Loans the Borrower shall be in pro forma compliance with each of the financial covenants set forth in

-30-

Section 7.14 as of the last day of the most recently ended fiscal quarter for which financial statements have been delivered; (iv) the Administrative Agent shall have received a Notice of Borrowing pursuant to Section 2.4 with respect to such Incremental Term Loans and (v) Borrower shall deliver or cause to be delivered a certificate as to the foregoing and any legal opinions or other documents reasonably requested by the Administrative Agent in connection with any such transaction.  Each of the New Term Loan Commitments shall be recorded in the Register and each New Term Loan Lender shall be subject to the requirements set forth in Section 3.1(d).  On any Increased Amount Date on which any New Term Loan Commitments are effective, subject to the satisfaction of the foregoing terms and conditions, (i) each New Term Loan Lender shall make a Loan to Borrower (a *"New Term Loan"*) in an amount equal to its New Term Loan Commitment and (ii) each New Term Loan Lender shall become a Lender hereunder with respect to the New Term Loan Commitment and the New Term Loans made pursuant thereto.

(b)      The Administrative Agent shall notify the Lenders promptly upon receipt of each Incremental Request Notice.

(c)      The terms and provisions of the New Term Loans and New Term Loan Commitments shall be identical to the Term Loans.

(d)      The New Term Loans and New Term Loan Commitments shall constitute Loans and Commitments under, and shall be entitled to all the benefits afforded by, this Agreement and the other Loan Documents and shall, without limiting the foregoing, benefit equally and ratably with the Obligations from the Guarantors and security interests created by the Security Documents. The Loan Parties shall take any actions reasonably required by the Administrative Agent to ensure and/or demonstrate that the Lien and security interests granted by the Security Documents continue to be perfected under the Uniform Commercial Code or otherwise after giving effect to the establishment of any such Class of New Term Loans or any such New Term Loan Commitments.

*Section 2.14    Substitution of Lenders*.  In the event (a) Borrower receives a claim from any Lender for compensation under Section 3.6 or 3.1, (b) Borrower receives notice from any Lender of any illegality pursuant to Section 3.4, (c) any Lender is then a Non-Consenting Lender (any such Lender referred to in clause (a), (b) or (c) above being hereinafter referred to as an *"Affected Lender"*), Borrower may, in addition to any other rights Borrower may have hereunder or under applicable Law, require, at its expense, any such Affected Lender to assign, at par, without recourse, all of its interest, rights, and obligations hereunder (including all of its Commitments and the Loans and other amounts at any time owing to it hereunder and the other Loan Documents) to an Eligible Assignee specified by Borrower, provided that (i) such assignment shall not conflict with or violate any Laws, (ii) the Affected Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under Section 3.4) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts), (iii) the assignment is entered into in accordance with, and subject to the consents required by, Section 11.10 (provided any assignment fees and reimbursable expenses due thereunder shall be paid by Borrower), (iv) in the case of any such assignment resulting from a claim for compensation under Section 3.6 or payments required to be made pursuant to Section 3.1, such assignment will result in a reduction

-31-

in such compensation or payments thereafter and (v) in the case of any assignment resulting from a Lender becoming a Non-Consenting Lender, the applicable assignee shall have consented to the applicable amendment, waiver or consent.

## SECTION 3.  TAXES; CHANGE IN CIRCUMSTANCES.

*Section 3.1     Withholding Taxes.*

(a)     *Payments Free of Withholding*.  Except as otherwise required by law and subject to Section 3.1(b), each payment by Borrower and the Guarantors under this Agreement or the other Loan Documents shall be made without withholding or deduction for or on account of any present or future Taxes.  If any such withholding or deduction is so required by law, Borrower or such Guarantor shall make such withholding or deduction and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority, and if such Tax is an Indemnified Tax, then the sum payable by the Borrower or such Guarantor shall be increased as necessary so that after the deduction or withholding has been made (including such deductions or withholding applicable to additional sums payable under this Section 3) the Lender or Administrative Agent receives an amount equal to the sum it would have received had no such withholding or deduction been made.

(b)     *Indemnification by Loan Parties*.  If Administrative Agent or any Lender pays any amount in respect of any such Indemnified Taxes, Borrower or such Guarantor shall reimburse Administrative Agent or such Lender for that payment (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 3) and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority, within 10 days after demand in the currency in which such payment was made.  If Borrower or such Guarantor pays any such Indemnified Taxes, it shall deliver official tax receipts evidencing that payment or certified copies thereof to the Lender or Administrative Agent on whose account such withholding was made (with a copy to Administrative Agent if not the recipient of the original) on or before the thirtieth day after payment.

(c)     *Indemnification by the Lenders*.  Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph.

-32-

(d)      *U.S. Withholding Tax Exemptions*.  Each Lender that is not a United States person (as such term is defined in Section 7701(a)(30) of the Code) shall submit to Borrower and Administrative Agent on or before the date the Loans are made hereunder or, if later, the date such financial institution becomes a Lender hereunder, two duly completed and signed copies of (i) Form W-8-BEN or Form W-8BEN-E (relating to such Lender and entitling it to a complete exemption or reduced rate from withholding under the Code on all amounts to be received by such Lender, including fees, pursuant to the Loan Documents and the Obligations) or Form W-8-ECI (relating to all amounts to be received by such Lender, including fees, pursuant to the Loan Documents and the Obligations) of the United States Internal Revenue Service, (ii) solely if such Lender is claiming exemption from United States withholding tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest", a Form W-8-BEN or Form W-8BEN-E, or any successor form prescribed by the Internal Revenue Service, and a certificate representing that such Lender is not a bank for purposes of Section 881(c) of the Code, is not a 10 percent shareholder (within the meaning of Section 871(h)(3)(B) of the Code) of Borrower and is not a controlled foreign corporation related to Borrower (within the meaning of Section 864(d)(4) of the Code) or (iii) to the extent such Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, IRS Form W-8BEN-E, the certificate referred to in the clause (ii), IRS Form W-9, or other certification documents from each beneficial owner, as applicable.  Thereafter and from time to time, each Lender shall submit to Borrower and Administrative Agent such additional duly completed and signed copies of one or the other of such Forms (or such successor forms as shall be adopted from time to time by the relevant United States taxing authorities) and such other certificates as may be (i) requested by Borrower in a written notice, directly or through Administrative Agent, to such Lender and (ii) required under then current United States law or regulations to avoid or reduce United States withholding taxes on payments in respect of all amounts to be received by such Lender, including fees, pursuant to the Loan Documents or the Obligations.  If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment.  Solely for purposes of the immediate preceding sentence "FATCA" shall include any amendments made to FATCA after the date of this Agreement.  Each Lender that is a United States person (as such term is defined in Section 7701(a)(30) of the Code) shall submit to Borrower and Administrative Agent on or before the date the Loans are made hereunder or, if later, the date such financial institution becomes a Lender hereunder, two duly completed and signed copies of Form W-9 of the United States Internal Revenue Service.

(e)      *Inability of Lender to Submit Forms*.  Each Lender agrees that if any form or certification it previously delivered pursuant to Section 3.1(b) expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification.  If any Lender determines, as

-33-

a result of any change in applicable Law, regulation or treaty, or in any official application or interpretation thereof, that it is unable to submit to Borrower or Administrative Agent any form or certificate that such Lender is obligated to submit pursuant to subsection (b) of this Section 3.1 or that such Lender is required to withdraw or cancel any such form or certificate previously submitted or any such form or certificate otherwise becomes ineffective or inaccurate, such Lender shall promptly notify Borrower and Administrative Agent of such fact and the Lender shall to that extent not be obligated to provide any such form or certificate and will be entitled to withdraw or cancel any affected form or certificate, as applicable.

Section 3.2    *Payment of Other Taxes by Borrower.*  Borrower agrees to timely pay, or at the option of the Administrative Agent, timely reimburse for the payment of, any Other Taxes.

Section 3.3    *Treatment of Certain Refunds.*

If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section (including by the payment of additional amounts pursuant to this Section), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this Section 3.3 (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this paragraph, in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this Section 3.3 the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This Section 3.3 shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

Section 3.4    *Funding Indemnity.*  If any Lender shall incur any loss, cost or expense (including any loss, cost or expense incurred by reason of the liquidation or re-employment of deposits or other funds acquired by such Lender to fund or maintain any SOFR Loan or the relending or reinvesting of such deposits or amounts paid or prepaid to such Lender) as a result of:

(a)    any payment, prepayment or conversion of a SOFR Loan on a date other than the last day of its Interest Period,

(b)    any failure (because of a failure to meet the conditions of Section 4 or otherwise) by Borrower to borrow or continue a SOFR Loan, or to convert a Base Rate Loan into a SOFR Loan on the date specified in a notice given pursuant to Section 2.4(a) or 2.5,

-34-

(c)    any failure by Borrower to make any payment of principal on any SOFR Loan when due (whether by acceleration or otherwise), or

(d)    any acceleration of the maturity of a SOFR Loan as a result of the occurrence of any Event of Default hereunder,

then, upon the demand of such Lender, Borrower shall pay to such Lender such amount as will reimburse such Lender for such loss, cost or expense.  If any Lender makes such a claim for compensation, it shall provide to Borrower, with a copy to Administrative Agent, a certificate setting forth the amount of such loss, cost or expense in reasonable detail (including an explanation of the basis for and the computation of such loss, cost or expense) and the amounts shown on such certificate shall be conclusive and binding on Borrower absent manifest error.

Section 3.5    *Change in Law.*
Notwithstanding any other provisions of this Agreement or any other Loan Document, if at any time any Change in Law or regulation or in the interpretation thereof makes it unlawful for any Lender to make or continue to maintain any SOFR Loans or to perform its obligations as contemplated hereby, such Lender shall promptly give notice thereof to Borrower and such Lender's obligations to make or maintain SOFR Loans under this Agreement shall be suspended until it is no longer unlawful for such Lender to make or maintain SOFR Loans.  Borrower shall prepay on demand the outstanding principal amount of any such affected SOFR Loans, together with all interest accrued thereon and all other amounts then due and payable to such Lender under this Agreement; provided, that, subject to all of the terms and conditions of this Agreement, Borrower may then elect to borrow the principal amount of the affected SOFR Loans from such Lender by means of Base Rate Loans from such Lender, which Base Rate Loans shall not be made ratably by the Lenders but only from such affected Lender and which shall be determined without reference to clause (c) of the definition of "Base Rate".  Upon any such repayment, the Borrower shall also pay any additional amounts required pursuant to Section 3.4.

Section 3.6    *Inability to Determine Rates.*  Subject to Section 3.9, if, on or prior to the first day of any Interest Period for any SOFR Loan:

(a)    the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that "Term SOFR" cannot be determined pursuant to the definition thereof, or

(b)    the Required Lenders determine that for any reason in connection with any request for a SOFR Loan or a conversion thereto or a continuation thereof that Term SOFR for any requested Interest Period with respect to a proposed SOFR Loan does not adequately and fairly reflect the cost to such Lenders of funding such Loan, and the Required Lenders have provided notice of such determination to the Administrative Agent,

then the Administrative Agent will promptly so notify the Borrower and each Lender. Upon notice thereof by the Administrative Agent to the Borrower, any obligation of the Lenders to make or continue SOFR Loans shall be suspended (to the extent of the affected SOFR Loans and, in the case of a SOFR Loan, the affected Interest Periods) until the Administrative Agent

-35-

revokes such notice. Upon receipt of such notice, (i) the Borrower may revoke any pending request for a borrowing of, conversion to or continuation of SOFR Loans (to the extent of the affected SOFR Loans and, in the case of a SOFR Loan, the affected Interest Periods) or, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to Base Rate Loans in the amount specified therein and (ii) any outstanding affected SOFR Loans will be deemed to have been converted into Base Rate Loans immediately or, in the case of a SOFR Loans, at the end of the applicable Interest Period. Upon any such conversion, the Borrower shall also pay any additional amounts required pursuant to <u>Section 3.4</u>.

     *Section 3.7    Increased Cost and Reduced Return*.
(a)     If any Change in Law:

     (i)     shall subject any Lender (or its Lending Office) to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) with respect to its SOFR Loans, its Notes, or its participation in any thereof, or its obligation to make SOFR Loans, or to participate therein, or shall change the basis of taxation of payments to any Lender (or its Lending Office) of the principal of or interest on its SOFR Loans, or participations therein or any other amounts due under this Agreement or any other Loan Document in respect of its SOFR Loans, any participation therein, or its obligation to make SOFR Loans, or acquire participations therein (except for changes in the rate of tax on the overall net income of such Lender or its Lending Office imposed by the jurisdiction in which such Lender's principal executive office or Lending Office is located); or

     (ii)     shall impose, modify or deem applicable any reserve, special deposit or similar requirement (including any such requirement imposed by the FRB) or shall impose on any Lender (or its Lending Office) or on the interbank market any other condition affecting its SOFR Loans, its Notes, or its participation in any thereof, or its obligation to make SOFR Loans, or to participate therein;

and the result of any of the foregoing is to increase the cost to such Lender (or its Lending Office) of making or maintaining any SOFR Loan, or participating therein, or to reduce the amount of any sum received or receivable by such Lender (or its Lending Office) under this Agreement or under any other Loan Document with respect thereto, by an amount deemed by such Lender to be material, then, within 15 days after demand by such Lender (with a copy to Administrative Agent), Borrower shall be obligated to pay to such Lender such additional amount or amounts as will compensate such Lender for such increased cost or reduction.

     (b)     If any Lender determines that any Change in Law affecting such Lender or any lending office of such Lender or such Lender's holding company, if any, regarding capital or liquidity requirements, has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by, such Lender, to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrower will pay

to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)     A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section and delivered to the Borrower, shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

Section 3.8     *Lending Offices.* Each Lender may, at its option, elect to make its Loans hereunder at the branch, office or affiliate specified on the appropriate signature page hereof (each a "Lending Office") for each type of Loan available hereunder or at such other of its branches, offices or affiliates as it may from time to time elect and designate in a written notice to Borrower and Administrative Agent.   To the extent reasonably possible, a Lender shall designate an alternative branch or funding office with respect to its SOFR Loans to reduce any liability of Borrower to such Lender under Section 3.7 or to avoid the unavailability of SOFR Loans under Section 3.6, so long as such designation is not otherwise disadvantageous to the Lender.

Section 3.9     *Effect of Benchmark Transition Event*.  Notwithstanding anything to the contrary herein or in any other Loan Document:

(a)     *Benchmark Replacement*.  Notwithstanding anything to the contrary herein or in any other Loan Document, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred prior any setting of the then-current Benchmark, then (x) if a Benchmark Replacement is determined in accordance with clause (a) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of such Benchmark setting and subsequent Benchmark settings without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document and (y) if a Benchmark Replacement is determined in accordance with clause b(2) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of any Benchmark setting at or after 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the date notice of such Benchmark Replacement is provided to the Lenders without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document so long as the Administrative Agent has not received, by such time, written notice of objection to such Benchmark Replacement from Lenders comprising the Required Lenders.  If the Benchmark Replacement is Daily Simple SOFR, all interest payments will be payable on a quarterly basis.

(b)     *Benchmark Replacement Conforming Changes*.   In connection with the use, administration, adoption or implementation of a Benchmark Replacement, the Administrative Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.

-37-

(c)     *Notice; Standards for Decisions and Determinations.*  The Administrative Agent will promptly notify the Borrower and the Lenders of (i) the implementation of any Benchmark Replacement and  (ii) the effectiveness of any Conforming Changes in connection with the use, administration, adoption or implementation of a Benchmark Replacement.  The Administrative Agent will promptly notify the Borrower of the removal or reinstatement of any tenor of a Benchmark pursuant to this Section 3.9.  Any determination, decision or election that may be made by the Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section 3.9, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this Section 3.9.

(d)     *Unavailability of Tenor of Benchmark.*  Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including the Term SOFR Reference Rate) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion or (B) the administration of such Benchmark or the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will not be representative, then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable, non-representative, non-compliant or non-aligned tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not or will not be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(e)     *Benchmark Unavailability Period*.  Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of SOFR Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to Base Rate Loans.  During a Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of Base Rate based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of Base Rate.

## SECTION 4.  CONDITIONS PRECEDENT.

*Section 4.1*     ***Conditions Precedent to Closing Date.***  The obligation of each Lender to make Loans hereunder is subject to satisfaction or waiver by the applicable party of the following conditions precedent:

(a)     Administrative Agent shall have received each of the following, in each case (i) duly executed by all applicable parties, (ii) dated a date satisfactory to Administrative Agent, and (iii) in form and substance satisfactory to Administrative Agent:

(i)     this Agreement;

(ii)     if requested by any Lender, Notes in compliance with the provisions of Section 2.9;

(iii)     the Collateral Documents, together with (A) original stock certificates or other similar instruments or securities representing all of the issued and outstanding equity interests in the Borrower owned by 777 Partners and MTCP, (B) stock powers for the Collateral described in clause (A) above executed in blank and undated, (C) UCC financing statements to be filed against 777 Partners, MTCP and the Borrower, as debtor, in favor of Administrative Agent, as secured party, (D) patent, trademark, and copyright Collateral Documents, to the extent requested by Administrative Agent, and (E) deposit account and securities account control agreements to the extent requested by Administrative Agent;

(iv)     evidence of insurance required to be maintained under the Loan Documents;

(v)     copies of Borrower's and each other Loan Party's articles of incorporation and bylaws (or comparable organizational documents) and any amendments thereto, certified in each instance by its Secretary or Assistant Secretary;

(vi)     copies of resolutions of Borrower's and each other Loan Party's board of directors (or similar governing body) authorizing the execution, delivery and performance of this Agreement and the other Loan Documents to which it is a party and the consummation of the transactions contemplated hereby and thereby, together with specimen signatures of the persons authorized to execute such documents, all certified in each instance by its Secretary or Assistant Secretary;

(vii)     copies of the certificates of good standing for Borrower and each other Loan Party (dated no earlier than 30 days prior to the date hereof) from the office of the secretary of the state of its incorporation or organization and of each state in which it is qualified to do business as a foreign corporation or organization, except where such failure to be so qualified could not reasonably be expected to have a Material Adverse Effect;

(viii)     the initial fees called for by Section 2.10;

-39-

(ix)    financing statement, tax, and judgment lien search results against the Property of Borrower and each Subsidiary evidencing the absence of Liens on its Property except as permitted by Section 7.2;

(x)    satisfactory pay off and lien release letters from secured creditors of Borrower and each Subsidiary for Indebtedness for Borrowed Money not permitted hereunder, including for the Existing Note Facility, setting forth, among other things, the total amount of indebtedness outstanding and owing to them (or outstanding letters of credit issued for the account of Borrower or any Subsidiary) and containing an undertaking to cause to be delivered to Administrative Agent UCC termination statements and any other lien release instruments necessary to release their Liens on the assets of Borrower and each Subsidiary;

(xi)    the favorable written opinion of (a) counsel to the Loan Parties and (b) Florida counsel to MTCP;

(xii)    a fully executed Internal Revenue Service Form W-9 for Borrower;

(xiii)    (a) audited annual financial statements (including an income statement, a balance sheet, and a cash flow statement) of BIH and its Subsidiaries for the fiscal years 2019 and 2020 and (b) unaudited financial statements (including an income statement, a balance sheet, and a cash flow statement) of BIH and its Subsidiaries for (i) the fiscal quarter ending March 31, 2022 and (ii) the fiscal year ended December 31, 2021;

(xiv)    a fully executed Beneficial Ownership Certification;

(xv)    the Intercreditor Agreement;

(xvi)    a certificate signed by the Chief Financial Officer of the Borrower certifying that, after giving effect to the entering into of the Loan Documents and the consummation of all of the transactions contemplated by this Agreement, the Borrower and its Subsidiaries, taken as a whole, are solvent, able to pay their debts as they become due, and have sufficient capital to carry on their business and all businesses in which they are about to engage;

(xvii)    a certificate signed by the Chief Financial Officer of the Guarantor certifying that, after giving effect to the entering into of the Loan Documents and the consummation of all of the transactions contemplated by this Agreement, the Guarantor is solvent, able to pay its debts as they become due, and has sufficient capital to carry on its business and all businesses in which it is about to engage;

(xviii)    the Subordinated Debt Documents, and evidence that the conditions precedent to funding of the Subordinated Debt thereunder have been, or concurrent with the funding of the Loans will be, satisfied;

-40-

(xix)   a closing certificate certifying as to the matters set forth in Sections 4.1(g), (h) and (i); and

(xx)   such other agreements, instruments, documents, certificates, and opinions as Administrative Agent may reasonably request.

(b)   The capital and organizational structure of the Borrower and its Subsidiaries shall be satisfactory to Administrative Agent and the Lenders.

(c)   The Administrative Agent shall have determined that the Subordinated Debt Documents of 777 Partners contain interest rates, payment terms, maturities, amortization schedules, covenants, defaults, remedies and other material terms that are, in each case, in form and substance satisfactory to the Administrative Agent, including that the maturity date for such Subordinated Debt shall be at least one year after the Maturity Date and the Subordinated Debt Documents for such Subordinated Debt shall provide for interest to be 75% payment-in-kind;

(d)   The Reserve Account shall have been established and be subject to a control agreement in form and substance satisfactory to the Administrative Agent, and such Reserve Account shall have been funded with at least $11,250,000 of proceeds from the Required Equity Contribution.

(e)   Administrative Agent shall have received the initial fees called for by the Fee Letter, together with all other fees, costs and expenses required to be paid by Borrower at or before closing.

(f)   Administrative Agent and its counsel shall have completed all legal, tax and regulatory due diligence, including without limitation all documentation required by bank regulatory authorities under applicable Anti-Corruption Laws and Anti-Money Laundering Laws, the results of which shall be satisfactory to Administrative Agent in its sole discretion.

(g)   Each of the representations and warranties set forth herein and in the other Loan Documents shall be and remain true and correct as of said time, except to the extent the same expressly relate to an earlier date, in which case such representations and warranties shall be and remain true and correct as of such earlier date.

(h)   No Default or Event of Default shall have occurred and be continuing or would occur as a result of the making of the Loans.

(i)   No event or circumstance shall have occurred since December 31, 2020 that would reasonably be expected to have a Material Adverse Effect.

(j)   The Administrative Agent shall have received a borrowing notice with respect to the Loans.

-41-

(k)      777 Partners shall have made an equity contribution to the Borrower in the amount of $50,000,000 (the ***"Required Equity Contribution"***), of which $11,250,000 shall have been used to fund the Reserve Account.

## SECTION 5. REPRESENTATIONS AND WARRANTIES.

Borrower represents and warrants to Administrative Agent and the Lenders, as follows:

*Section 5.1     Organization and Qualification*.  Borrower is (a) duly organized, validly existing, and in good standing as a limited liability company under the laws of the State of Delaware, (b) has full and adequate power to own its Property and conduct its business as now conducted, and (c) is duly licensed or qualified and in good standing in each jurisdiction in which the nature of the business conducted by it or the nature of the Property owned or leased by it, in each case, requires such licensing or qualifying, except, with respect to this clause (c), where the failure to do so would not have a Material Adverse Effect.

*Section 5.2     Subsidiaries*. Each of Borrower's Subsidiaries (a) is duly organized, validly existing, and in good standing, or other applicable equivalent, under the laws of the jurisdiction in which it is organized, (b) has full and adequate power to own its Property and conduct its business as now conducted, and (c) is duly licensed or qualified and in good standing in each jurisdiction in which the nature of the business conducted by it or the nature of the Property owned or leased by it, in each case, requires such licensing or qualifying, except, with respect to this clause (c), where the failure to do so would not have a Material Adverse Effect.  Schedule 5.2 hereto identifies each Subsidiary, the jurisdiction of its organization, the percentage of issued and outstanding shares of each class of its capital stock or other equity interests owned by Borrower and the other Subsidiaries and, if such percentage is not 100% (excluding directors' qualifying shares as required by law), a description of each class of its authorized capital stock and other equity interests and the number of shares of each class issued and outstanding.  All of the outstanding shares of capital stock and other equity interests of each Subsidiary are validly issued and outstanding and fully paid and non-assessable and all such shares and other equity interests indicated on Schedule 5.2 as owned by Borrower or another Subsidiary are owned, beneficially and of record, by Borrower or such Subsidiary free and clear of all Liens other than Liens permitted pursuant to clauses (a), (b) or (f) of Section 7.2.   There are no outstanding commitments or other obligations of any Subsidiary to issue, and no options, warrants or other rights of any Person to acquire, any shares of any class of capital stock or other equity interests of any Subsidiary.

*Section 5.3     Authority and Validity of Obligations*.  Borrower has full right and authority to enter into this Agreement and the other Loan Documents executed by it, to make the borrowings herein provided for, to grant to Administrative Agent the Liens described in the Collateral Documents executed by Borrower, and to perform all of its obligations hereunder and under the other Loan Documents executed by it.  Each other Loan Party has full right and authority to enter into the Loan Documents executed by it, to guarantee the Obligations, to grant to Administrative Agent the Liens described in the Collateral Documents executed by such Person, and to perform all of its obligations under the Loan Documents executed by it.  The Loan Documents executed and delivered by Borrower have been duly authorized, executed, and delivered by the Borrower and constitute valid and binding obligations of Borrower and such Loan Parties enforceable against

-42-

them in accordance with their terms, except as enforceability may be limited by bankruptcy, insolvency, fraudulent conveyance or similar laws affecting creditors' rights generally and general principles of equity (regardless of whether the application of such principles is considered in a proceeding in equity or at law); and this Agreement and the other Loan Documents do not, nor does the performance or observance by Borrower or any other Loan Party of any of the matters and things herein or therein provided for, (a) contravene or constitute a default under any provision of law or any judgment, injunction, order or decree binding upon Borrower or Subsidiaries of Borrower or any provision of the organizational documents (e.g., charter, certificate or articles of incorporation and bylaws, certificate or articles of association and operating agreement, partnership agreement, or other similar organizational documents) of Borrower or Subsidiaries of Borrower, (b) conflict with, contravene or constitute a default under any material indenture or agreement of or affecting Borrower or Subsidiaries of Borrower or any of their Property, or (c) result in the creation or imposition of any Lien on any Property of Borrower or Subsidiaries of Borrower other than the Liens granted in favor of Administrative Agent pursuant to the Collateral Documents.

Section 5.4    *Use of Proceeds; Margin Stock.*  Borrower shall use the proceeds of the Term Loans to refinance existing indebtedness of 777 Partners, to provide growth capital for the Borrower, and for general corporate purposes as are legal and proper purposes as are consistent with all applicable Laws.  Neither Borrower nor any Subsidiary is engaged, principally or as one of its important activities, in the business of purchasing or carrying margin stock or in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U of the FRB), and no part of the proceeds of any Loan or any other extension of credit made hereunder will be used to purchase or carry any such margin stock or to extend credit to others for the purpose of purchasing or carrying any such margin stock.  Margin stock (as hereinabove defined) constitutes less than 25% of the assets of Borrower and its Subsidiaries on a consolidated basis.

Section 5.5    *Financial Reports*.   The consolidated balance sheet of BIH and its Subsidiaries as at December 31, 2020 and the related consolidated statements of income, retained earnings and cash flows of BIH and its Subsidiaries for the fiscal year then ended, and accompanying notes thereto, which financial statements are accompanied by the audit report of Grant Thornton, LLP, independent public accountants, and the unaudited interim consolidated balance sheet of BIH and its Subsidiaries as at March 31, 2022, and the related consolidated statements of income, retained earnings and cash flows of BIH and its Subsidiaries for the three months then ended, heretofore furnished to Administrative Agent and the Lenders, fairly present the consolidated financial condition of BIH and its Subsidiaries as at said dates and the consolidated results of their operations and cash flows for the periods then ended in conformity with GAAP applied on a consistent basis.  Neither Borrower nor any Subsidiary has contingent liabilities which are material to it other than as indicated on such financial statements or, with respect to future periods, on the financial statements furnished pursuant to Section 6.5.

Section 5.6    *No Material Adverse Change.*  Since December 31, 2020, there has occurred no event or circumstance which individually or in the aggregate could reasonably be expected to have a Material Adverse Effect.

Section 5.7    *Full Disclosure.*  The statements and information furnished to Administrative Agent and the Lenders in connection with the negotiation of this Agreement and the other Loan Documents and the commitments by the Lenders to provide all or part of the financing contemplated hereby do not contain any untrue statements of a material fact or omit a material fact necessary to make the material statements contained herein or therein, taken as a whole, not misleading, it being acknowledged that as to any projections furnished to Administrative Agent and the Lenders, Borrower only represents that the same were prepared on the basis of information and estimates Borrower believed to be reasonable at the time furnished. The information included in the Beneficial Ownership Certification, as updated in accordance with Section 6.9(b), is true and correct in all respects.

Section 5.8    *Intellectual Property, Franchises, and Licenses*.  Borrower and its Subsidiaries own, possess, or have the right to use all necessary patents, licenses, franchises, trademarks, trade names, trade styles, copyrights, trade secrets, know how, and confidential commercial and proprietary information to conduct their businesses as now conducted, without known conflict with any patent, license, franchise, trademark, trade name, trade style, copyright or other proprietary right of any other Person.

Section 5.9    *Governmental Authority and Licensing.*  Borrower and its Subsidiaries have received all licenses, permits, and approvals of all Governmental Authorities, if any, necessary to conduct their businesses, in each case, except where the failure to obtain or maintain the same could not reasonably be expected to have a Material Adverse Effect.  No investigation or proceeding is pending or, to the knowledge of Borrower, threatened, before or by any Governmental Authority that could reasonably be expected to have a Material Adverse Effect.

Section 5.10    *Good Title; Insurance.*  Borrower and its Subsidiaries have good and defensible title (or valid leasehold interests) to their assets as reflected on the most recent consolidated balance sheet of Borrower and its Subsidiaries furnished to Administrative Agent and the Lenders (except for sales of assets in the ordinary course of business), subject to no Liens other than such thereof as are permitted by Section 7.2.  Borrower's and its Subsidiaries' respective properties are insured with financially sound and reputable insurance companies in such amounts, with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses.

Section 5.11    *Litigation and Other Controversies.*  There is no litigation or governmental or arbitration proceeding or labor controversy pending, nor to the knowledge of Borrower threatened, against Borrower or any Subsidiary or any of their Property which if adversely determined, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

Section 5.12    *Taxes.*  All Tax returns required to be filed by Borrower or any Subsidiary in any jurisdiction have, in fact, been filed, and all Taxes, assessments, fees, and other governmental charges upon Borrower or any Subsidiary or upon any of its Property, income or franchises, which are shown to be due and payable in such returns, have been paid, except Taxes, if any, that are being contested in good faith and by appropriate proceedings which prevent enforcement of the matter under contest and as to which adequate reserves established in

-44-

accordance with GAAP have been provided.  Borrower does not know of any proposed additional Tax assessment against it or its Subsidiaries for which adequate provisions in accordance with GAAP have not been made on their accounts.  Adequate provisions in accordance with GAAP for Taxes on the books of Borrower and each Subsidiary have been made for all open years, and for its current fiscal period.

Section 5.13    *Approvals.*  No authorization, consent, license or exemption from, or filing or registration with, any Governmental Authority, nor any approval or consent of any other Person, is or will be necessary to the valid execution, delivery or performance by Borrower or other Subsidiary of any Loan Document, except for such approvals which have been obtained prior to the date of this Agreement and remain in full force and effect.

Section 5.14    *Affiliate Transactions.*  Neither Borrower nor any Subsidiary is a party to any contracts or agreements with any of its Affiliates (other than any such contracts or agreements with Wholly Owned Subsidiaries) on terms and conditions which are less favorable to Borrower or such Subsidiary than would be usual and customary in similar contracts or agreements between Persons not affiliated with each other, except as may be set forth in the Intercompany Services Agreement or the Investment Management Agreement.

Section 5.15    *Investment Company.* Neither Borrower nor any Subsidiary is an "investment company" or a company "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

Section 5.16    *ERISA; Plan Assets; Prohibited Transactions.*

(a)      Borrower and each other member of its Controlled Group has fulfilled its obligations under the minimum funding standards of and is in compliance in all material respects with ERISA and the Code to the extent applicable to it and has not incurred any liability to the PBGC or a Plan under Title IV of ERISA other than a liability to the PBGC for premiums under Section 4007 of ERISA. Neither Borrower nor any Subsidiary has any contingent liabilities with respect to any post-retirement benefits under a Welfare Plan, other than liability for continuation coverage described in article 6 of Title I of ERISA.

(b)      Neither Borrower nor any of its Subsidiaries is an entity deemed to hold "plan assets" within the meaning of 29 C.F.R. § 2510.3-101, as modified by Section 3(42) of ERISA, of an employee benefit plan (as defined in Section 3(3) of ERISA) which is subject to Title I of ERISA or any plan (within the meaning of Section 4975 of the Code) which is subject to Section 4975 of the Code, and neither the execution of this Agreement nor the making of credit extensions hereunder gives rise to a prohibited transaction within the meaning of Section 406 of ERISA or Section 4975 of the Code.  Neither Borrower nor any of its Subsidiaries is subject to any law, rule or regulation which is substantially similar to the prohibited transaction provisions of Section 406 of ERISA or Section 4975 of the Code.

Section 5.17    *Compliance with Laws.*
Borrower and its Subsidiaries are in compliance with the requirements of all federal, state and local laws, rules and regulations applicable to or pertaining to their Property or business

-45-

operations (including the Occupational Safety and Health Act of 1970, the Americans with Disabilities Act of 1990, and laws and regulations establishing quality criteria and standards for air, water, land and toxic or hazardous wastes and substances), where any such noncompliance, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect. Neither Borrower nor any Subsidiary has received notice to the effect that its operations are not in compliance with any of the requirements of applicable federal, state or local environmental, health, and safety statutes and regulations or is the subject of any governmental investigation evaluating whether any remedial action is needed to respond to a release of any toxic or hazardous waste or substance into the environment, where any such noncompliance or remedial action, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

Section 5.18    *Sanctions; Anti-Money Laundering Laws and Anti-Corruption Laws.*

(a)    None of the Loan Parties, any of their Subsidiaries, any director, officer or employee of any Loan Party or any of their Subsidiaries, nor, to the knowledge of Borrower, any agent or representative of any Loan Party or any of their Subsidiaries, is a Sanctioned Person or currently the subject or target of any Sanctions.

(b)    The Loan Parties, each of their Subsidiaries, each of the Loan Parties' and their Subsidiaries' respective directors, officers and employees, and, to the knowledge of Borrower, each of the Loan Parties' and their Subsidiaries' respective agents and representatives, is in compliance with all applicable Anti-Corruption Laws, Anti-Money Laundering Laws and Sanctions.

(c)    The Loan Parties and their Subsidiaries have instituted and maintain in effect policies and procedures reasonably designed to ensure compliance by the Loan Parties, their Subsidiaries, and the Loan Parties' and their Subsidiaries' respective directors, officers, employees and agents with all applicable Anti-Corruption Laws, Anti-Money Laundering Laws and Sanctions.

Section 5.19    *Other Agreements.*Neither Borrower nor any of its Subsidiaries is in default under the terms of any covenant, indenture or agreement of or affecting such Person or any of its Property, which default if uncured could reasonably be expected to have a Material Adverse Effect.

Section 5.20    *Solvency.*  Borrower and each of its Subsidiaries, taken in the aggregate, are solvent, able to pay their debts as they become due, and have sufficient capital to carry on their business and all businesses in which they are about to engage.

Section 5.21    *No Default.*  No Default or Event of Default has occurred and is continuing.

Section 5.22    *No Broker Fees.* No broker's or finder's fee or commission will be payable with respect hereto or any of the transactions contemplated hereby; and Borrower hereby agrees to indemnify Administrative Agent and the Lenders against, and agrees that it will hold Administrative Agent and the Lenders harmless from, any claim, demand, or liability for any such broker's or finder's fees alleged to have been incurred in connection herewith or therewith and any

-46-

expenses (including reasonable attorneys' fees) arising in connection with any such claim, demand, or liability.

*Section 5.23    EEA Financial Institution.*
No Loan Party, nor any of their respective Subsidiaries, is an EEA Financial Institution.

*Section 5.24    Insurance Licenses.*
Each Insurance Subsidiary has all Insurance Licenses necessary to conduct its business. To the best of Borrower's knowledge, (a) no Insurance License of any Insurance Subsidiary is the subject of a proceeding for suspension or revocation or any similar proceedings, (b) there is no sustainable basis for such a suspension or revocation, and (c) no such suspension or revocation is threatened in writing by any Applicable Insurance Regulatory Authority.

*Section 5.25    Status as Senior Indebtedness.*
All Obligations constitute Senior Indebtedness (as defined in the Intercreditor Agreement) entitled to the benefits of the subordination provisions contained in the Intercreditor Agreement. The Borrower acknowledges that the Administrative Agent and each Lender are entering into this Agreement and are extending the Commitments and making the Loans in reliance upon the subordination provisions of the Intercreditor Agreement and this <u>Section 5.25</u>.

*Section 5.26    Collateral Documents*
Each of the Collateral Documents is effective to create in favor of the Administrative Agent, for the benefit of the Lenders, a legal, valid and enforceable security interest in the Collateral described therein and proceeds thereof.  In the case of the pledged equity interests described in the Pledge Agreement, when the Administrative Agent obtains control of stock certificates representing such equity interests and in the case of the Collateral described in the Security Agreement, when financing statements and other filings in appropriate form are or have been filed in the appropriate offices, each of the Security Agreement and the Pledge Agreement shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in such Collateral and the proceeds thereof to the extent a security interest can be perfected by filing or other action required thereunder as security for the Obligations, in each case prior and superior in right to any other Person.

## SECTION 6.  AFFIRMATIVE COVENANTS.

Until such time as Payment in Full has occurred, the Borrower covenants and agrees that:

*Section 6.1    Maintenance of Business.*  Borrower shall, and shall cause each Subsidiary to, preserve and maintain its existence, except as otherwise provided in <u>Section 7.4(c)</u>.  Borrower shall, and shall cause each Subsidiary to, preserve and keep in force and effect all licenses, permits, franchises, approvals, patents, trademarks, trade names, trade styles, copyrights, and other proprietary rights necessary to the proper conduct of its business, except where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

-47-

Section 6.2    *Maintenance of Properties.*  Borrower shall, and shall cause each Subsidiary to, maintain, preserve, and keep its Property in good repair, working order and condition (ordinary wear and tear excepted), except to the extent that, in the reasonable business judgment of such Person, any such Property is no longer necessary for the proper conduct of the business of such Person.

Section 6.3    *Taxes and Assessments and other Obligations*.  Borrower shall duly pay and discharge, and shall cause each Subsidiary to duly pay and discharge, its obligations, including all taxes, rates, assessments, fees, and governmental charges upon or against it or its Property, in each case before the same become delinquent and before penalties accrue thereon, unless and to the extent that the same are being contested in good faith and by appropriate proceedings which prevent enforcement of the matter under contest and adequate reserves are provided therefor.

Section 6.4    *Insurance.*  Borrower shall insure and keep insured, and shall cause each Subsidiary to insure and keep insured, with good and responsible insurance companies, all insurable Property owned by it which is of a character usually insured by Persons similarly situated and operating like Properties against loss or damage from such hazards and risks, and in such amounts, as are insured by Persons similarly situated and operating like Properties; and Borrower shall insure, and shall cause each Subsidiary to insure, such other hazards and risks with good and responsible insurance companies as and to the extent usually insured by Persons similarly situated and conducting similar businesses.  Borrower shall in any event maintain, and cause each Subsidiary to maintain, insurance on the Collateral to the extent required by the Collateral Documents.  Borrower shall, upon the request of Administrative Agent, furnish to Administrative Agent and the Lenders a certificate setting forth in summary form the nature and extent of the insurance maintained pursuant to this Section.

Section 6.5    *Financial Reports.*  Borrower shall, and shall cause each Subsidiary to, maintain a standard system of accounting in accordance with GAAP or SAP, as applicable, and shall furnish to the Administrative Agent such information respecting the business and financial condition of Borrower and each Subsidiary as Administrative Agent or such Lender may reasonably request; and without any request, shall furnish to the Administrative Agent:

(a)    as soon as available, and in any event no later than 45 days after the last day of each calendar month, a copy of the consolidated and consolidating balance sheet of Borrower and its Subsidiaries as of the last day of such month and the consolidated and consolidating statements of income, retained earnings, and cash flows of Borrower and its Subsidiaries for the month and for the fiscal year to date period then ended, each in reasonable detail showing in comparative form the figures for the corresponding date and period in the previous fiscal year, prepared by Borrower in accordance with GAAP (subject to the absence of footnote disclosures and year end audit adjustments) and certified to by its chief financial officer or another officer of Borrower acceptable to Administrative Agent;

(b)    as soon as available, and in any event no later than 60 days after the last day of each fiscal quarter of each fiscal year of Borrower, a copy of the consolidated and consolidating balance sheet of Borrower and its Subsidiaries as of the last day of such fiscal quarter and the consolidated and consolidating statements of income, retained earnings, and cash flows of Borrower and its

-48-

Subsidiaries for the fiscal quarter and for the fiscal year to date period then ended, each in reasonable detail showing in comparative form the figures for the corresponding date and period in the previous fiscal year, prepared by Borrower in accordance with GAAP (subject to the absence of footnote disclosures and year end audit adjustments) and certified to by its chief financial officer or another officer of Borrower acceptable to Administrative Agent;

(c)    as soon as available, and in any event no later than 60 days after the last day of each fiscal quarter of each fiscal year, a copy of each Insurance Subsidiary's, quarterly statutory financial statements, prepared by each such Person in accordance with SAP, as filed with the Applicable Insurance Regulatory Authority;

(d)    as soon as available, and in any event no later than 120 days after the last day of each fiscal year of Borrower, a copy of the consolidated and consolidating balance sheet of Borrower and its Subsidiaries as of the last day of the fiscal year then ended and the consolidated and consolidating statements of income, retained earnings, and cash flows of Borrower and its Subsidiaries for the fiscal year then ended, and accompanying notes thereto, each in reasonable detail showing in comparative form the figures for the previous fiscal year, accompanied in the case of the consolidated financial statements by an unqualified opinion of Grant Thornton, LLP or another firm of independent public accountants of recognized national standing, selected by Borrower and reasonably satisfactory to Administrative Agent and the Required Lenders, which report and opinion shall be prepared in accordance with generally accepted auditing standards (and shall not be subject to any "going concern" or like qualification, exception or explanatory paragraph or any qualification, exception or explanatory paragraph as to the scope of such audit) to the effect that such consolidated financial statements present fairly in all material respects the financial condition, results of operations, shareholders' equity and cash flows of the Borrower and its Subsidiaries on a consolidated basis in accordance with GAAP consistently applied;

(e)    promptly after filing with the Applicable Insurance Regulatory Authority, and in any event no later than 120 days (or 150 days with respect to Merit Life Insurance Co.) after the last day of each fiscal year, a copy of each Insurance Subsidiary's Annual Statements, as filed with the Applicable Insurance Regulatory Authority, in each case, audited and accompanied by a report and opinion of independent public accountants of nationally recognized standing, which report and opinion shall be prepared in accordance with generally accepted auditing standards (and shall not be subject to any "going concern" or like qualification, exception or explanatory paragraph or any qualification, exception or explanatory paragraph as to the scope of such audit) to the effect that such financial statements present fairly in all material respects the financial condition, results of operations, capital and statutory surplus and cash flows of such Insurance Subsidiary in accordance with SAP consistently applied;

(f)    within the period provided in subsection (d) above, the written statement of the accountants who certified the audit report thereby required that in the course of their audit they have obtained no knowledge of any Default under Section 7.14 or Event of Default, or, if such accountants have obtained knowledge of any such Default or Event of Default, they shall disclose in such statement the nature and period of the existence thereof;

-49-

(g)      promptly after receipt thereof, any additional written reports, management letters or other detailed information contained in writing concerning significant aspects of Borrower's or any Subsidiary's operations and financial affairs given to it by its independent public accountants;

(h)      promptly after the sending or filing thereof, copies of each financial statement, report, notice or proxy statement sent by Borrower or any Subsidiary to its stockholders or other equity holders, and copies of each regular, periodic or special report, registration statement or prospectus (including all Form 10-K, Form 10-Q and Form 8-K reports) filed by Borrower or any Subsidiary with any securities exchange or the Securities and Exchange Commission or any successor agency;

(i)      promptly after receipt thereof, a copy of each audit made by any regulatory agency of the books and records of Borrower or any Subsidiary or of notice of any material noncompliance with any applicable Law, regulation or guideline relating to Borrower or any Subsidiary, or its business;

(j)      as soon as available, and in any event no later than the date that is sixty (60) days after the first day of each fiscal year of Borrower, a copy of the business plan for each of the Insurance Subsidiaries for such fiscal year, such business plan, capital management plan and liquidity plan to show projected revenues, expenses and a balance sheet on a month by month basis, summary of capital requirements (including sources and uses), and summary of liquidity requirements (including sources and uses), all in reasonable detail and in form satisfactory to Administrative Agent and the Required Lenders (and which shall include a summary of all assumptions made in preparing such business plan);

(k)      to the extent that any business plan of an Insurance Subsidiary described in clause (j) hereof is modified by such Insurance Subsidiary, a copy of such modified business plan as soon as such modification is made;

(l)      within three Business Days of receipt thereof, a copy of any written notice from any Applicable Insurance Regulatory Authority of any material noncompliance with any applicable insurance Law, regulation or guideline relating to Borrower or any Insurance Subsidiary, or its business;

(m)      promptly after making any changes thereto, a copy of any changes to Borrower's investment policy;

(n)      promptly upon notice thereof, any change in the Financial Strength Rating;

(o)      promptly after knowledge thereof shall have come to the attention of any Responsible Officer of Borrower, written notice of (i) any threatened or pending litigation or governmental or arbitration proceeding or labor controversy against Borrower or any Subsidiary or any of their Property which, if adversely determined, could reasonably be expected to have a Material Adverse Effect or (ii) the occurrence of any Default or Event of Default hereunder; and

-50-

(p)      with each of the financial statements delivered pursuant to subsections (b) and (d) above, a Compliance Certificate signed by the chief financial officer or treasurer of Borrower or another Responsible Officer of Borrower performing similar functions to the effect that to the best of such Responsible Officer's knowledge and belief no Default or Event of Default has occurred during the period covered by such statements or, if any such Default or Event of Default has occurred during such period, setting forth a description of such Default or Event of Default and specifying the action, if any, taken by Borrower or any Subsidiary to remedy the same.  Such certificate shall also set forth the calculations demonstrating that the financial covenants set forth in Section 7.14 are satisfied as of the date of such certificate.

(q)      The Borrower shall deliver to the Administrative Agent (i) on or before July 15, 2022, the audited consolidated financial statements of the Borrower and its Subsidiaries for the 2021 fiscal year, and (ii) on or before July 31, 2022, the audited financial statements of the Guarantor for the 2021 fiscal year.

*Section 6.6      Inspection.* Borrower shall, and shall cause each Subsidiary to, keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities.  Borrower shall, and shall cause each Subsidiary to, permit Administrative Agent, each Lender, and each of their duly authorized representatives and agents to visit and inspect any of its Property, corporate books, and financial records, to examine and make copies of its books of accounts and other financial records, and to discuss its affairs, finances, and accounts with, and to be advised as to the same by, its officers, employees and independent public accountants (and by this provision Borrower hereby authorizes such accountants to discuss with Administrative Agent and such Lenders the finances and affairs of Borrower and its Subsidiaries) at such reasonable times and intervals as Administrative Agent or any such Lender may designate; provided that (x) Borrower is given prior written notice of any such discussion with its independent public accountants and is an afforded an opportunity to participate and (y) so long as no Default or Event of Default exists the Administrative Agent shall provide reasonable prior written notice of any inspection or audit to Borrower.  All such inspections or audits by the Administrative Agent shall be at the Borrower's expense; provided that so long as no Default or Event of Default exists, the Borrower shall not be required to reimburse the Administrative Agent for inspections or audits more frequently than once in each fiscal year.

*Section 6.7      ERISA.*  Borrower shall, and shall cause each Subsidiary to, promptly pay and discharge all obligations and liabilities arising under ERISA of a character which if unpaid or unperformed could reasonably be expected to result in the imposition of a Lien against any of its Property.  Borrower shall, and shall cause each Subsidiary to, promptly notify Administrative Agent and each Lender of:  (a) the occurrence of any reportable event (as defined in ERISA) with respect to a Plan, (b) receipt of any notice from the PBGC of its intention to seek termination of any Plan or appointment of a trustee therefor, (c) its intention to terminate or withdraw from any Plan, and (d) the occurrence of any event with respect to any Plan which would result in the incurrence by Borrower or any Subsidiary of any material liability, fine or penalty, or any material increase in the contingent liability of Borrower or any Subsidiary with respect to any post retirement Welfare Plan benefit.

Section 6.8    *Compliance with Laws.*

Borrower shall, and shall cause each Subsidiary to, comply in all respects with the requirements of all federal, state, and local laws, rules, regulations, ordinances and orders applicable to or pertaining to its Property or business operations, where any such non- compliance, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect. The Borrower and its Subsidiaries shall maintain all applicable Insurance Licenses necessary for the conduct of its business.

Section 6.9    *Compliance with Anti-Corruption Laws, Anti-Money Laundering Laws and Sanctions.*

(a)    Borrower shall at all times comply with the requirements of all Anti-Corruption Laws, Anti-Money Laundering Laws and Sanctions applicable to Borrower and shall cause each other Loan Party and each of its and their respective Subsidiaries to comply with the requirements of all Anti-Corruption Laws, Anti-Money Laundering Laws and Sanctions applicable to such Persons.

(b)    Borrower shall provide Administrative Agent and the Lenders (i) any information regarding Borrower, each other Loan Party, and each of their respective owners, Affiliates, and Subsidiaries necessary for Administrative Agent and the Lenders to comply with all applicable Anti-Corruption Laws, Anti-Money Laundering Laws and Sanctions; subject however, in the case of Affiliates, to Borrower's ability to provide information applicable to them and (ii) without limiting the foregoing, notification of any change in the information provided in the Beneficial Ownership Certification that would result in a change to the list of beneficial owners identified therein.

(c)    Borrower will maintain in effect and enforce policies and procedures reasonably designed to ensure compliance by the Loan Parties, their Subsidiaries, and the Loan Parties' and their Subsidiaries' respective directors, officers, employees and agents with applicable Anti-Corruption Laws, Anti Money-Laundering Laws and Sanctions.

Section 6.10    *Use of Proceeds.*    Borrower shall use the credit extended under this Agreement solely for the purposes set forth in, or otherwise permitted by, Section 5.4.

Section 6.11    *Guaranties and Collateral.*

(a)    *Collateral.*  The Borrower agrees to cause the Obligations to be secured by valid, perfected, and enforceable Liens on all right, title, and interest of Borrower in all of its accounts, chattel paper, instruments, documents, general intangibles, letter of credit rights, supporting obligations, deposit accounts, investment property, inventory equipment, fixtures, commercial tort claims, real estate and certain other Property, whether now owned or hereafter acquired or arising, and all proceeds thereof, as further set forth in, and subject to the provisions of, the Security Agreement.  Borrower acknowledges and agrees that the Liens on the Collateral shall be granted to Administrative Agent for the benefit of the holders of the Obligations and shall be valid and perfected first priority Liens, in each case as set forth in, and subject to the provisions of, the Security Agreement.  Borrower shall cause each of 777 Partners and MTCP to pledge 100% of

-52-

their equity interests in the Borrower to the Administrative Agent for the benefit of the holders of the Obligations, which shall be valid and perfected first priority Liens pursuant to, and subject to the provisions of, the Pledge Agreement.

(b)    *Further Assurances*.  Borrower agrees that it shall, and shall cause each of its Subsidiaries to, from time to time at the request of Administrative Agent or the Required Lenders, execute and deliver such documents and do such acts and things as Administrative Agent or the Required Lenders may reasonably request in order to provide for or perfect or protect the Liens on the Collateral granted by the Borrower.

*Section 6.12    Status as Senior Debt.*The Borrower shall ensure that at all times all Obligations constitute Senior Indebtedness (as defined in the Intercreditor Agreement) entitled to the benefits of the subordination provisions contained in the Intercreditor Agreement.

*Section 6.13    Reserve Account*.  The Borrower shall at all times maintain a reserve account for the payment of Obligations in an amount equal to at least $11,250,000 (the "*Reserve Account*").  If at any time the amount in the Reserve Account is less than $11,250,000, the Borrower shall promptly, and in any event, within one Business Day deposit additional cash in the Reserve Account so that the amount in the Reserve Account is at least equal to $11,250,000.  The Borrower shall ensure that the Administrative Agent has a first priority, perfected security interest in the Reserve Account.

*Section 6.14    Additional Reporting Requirements*.  The Borrower shall provide the following information to the Administrative Agent:

(a)    promptly when obtained by the Borrower or any Subsidiary of the Borrower, ratings reports or internal credit write-ups on private investments added to the investment portfolios of any of the Borrower and the Insurance Subsidiaries;

(b)    promptly after being obtained by the board of the Borrower or any Insurance Subsidiary, all board reports and memoranda, including pricing presentations on new reinsurance transactions together with the associated capital management plan detailing sources of capital to support new reinsurance transactions; and

(c)    to the extent requested by the Required Lenders, (i) an asset review by Duff & Phelps or similar and (ii) a third party actuarial valuation review by an actuarial consultant nominated by the Required Lenders.

*Section 6.15    777 Re and Liquidity Maintenance*.  The Borrower shall ensure that the Capital and Liquidity Maintenance Agreement shall remain in full force and effect at all times. The Capital and Liquidity Maintenance Agreement must at all times require 777 Partners to (i) provide funding and liquidity to ensure 777 Re maintains at all times an Enhanced Capital Requirement, from time to time, as calculated under, and determined in accordance with, Bermuda law as in effect from time to time, in the amount of (A) 150% from the period commencing on the Closing Date and ending on December 31, 2022 (inclusive) and (B) 180% thereafter and (ii) provide liquidity to 777 Re at any time required by 777 Re in order to satisfy any excess payment

-53-

obligations of 777 Re that may become due.  The Borrower shall promptly provide to the Administrative Agent a copy of the terms of any amendment, waiver or other modification to the Capital and Liquidity Maintenance Agreement.

*Section 6.16    777 Re Reinsurance Agreements*.

(a)    The Borrower shall cause 777 Re, in the event that 777 Re intends to enter into a new agreement, contract, treaty, certificate or other arrangement whereby any Insurance Subsidiary agrees to transfer, cede or retrocede and/or accept, reinsure or retrocede from to another insurer or reinsurer all or part of the liability assumed or assets held by such Insurance Subsidiary under a policy or policies of insurance issued by such Insurance Subsidiary (a *"Relevant Insurance Agreement"*) or modify any existing Relevant Insurance Agreement to which it is party, to submit a capital management plan demonstrating the sources of capital to be used in support of the reinsurance business related to such Relevant Insurance Agreement to the board of directors of 777 Partners, and before any such agreement or modification is entered into or takes effect, the board of directors of 777 Partners must approve such plan.

(b)    The Borrower shall cause 777 Re, to the extent it is required to submit a capital management plan to the board of directors of 777 Partners under Section 6.16(a), to (i) promptly notify each of the Lenders thereof, (ii) deliver at the same time it is submitted to the board of directors of 777 Partners a copy of such capital management plan to each of the Borrowers and (iii) to the extent the board of directors of 777 Partners approves such plan, promptly notify the Lenders of such approval.

## SECTION 7.  NEGATIVE COVENANTS.

Until such time as Payment in Full has occurred, the Borrower covenants and agrees that:

*Section 7.1    Borrowings and Guaranties*.  Borrower shall not, nor shall it permit any Subsidiary to, issue, incur, assume, create or have outstanding any Indebtedness for Borrowed Money, or incur liabilities for interest rate, currency, or commodity cap, collar, swap, or similar hedging arrangements, or be or become liable as endorser, guarantor, surety or otherwise for any debt, obligation or undertaking of any other Person, or otherwise agree to provide funds for payment of the obligations of another, or supply funds thereto or invest therein or otherwise assure a creditor of another against loss, or apply for or become liable to the issuer of a letter of credit which supports an obligation of another; provided, that the foregoing shall not restrict nor operate to prevent:

(a)    the Obligations of Borrower and its Subsidiaries owing to Administrative Agent and the Lenders (and their Affiliates);

(b)    purchase money indebtedness and Capitalized Lease Obligations of Borrower and its Subsidiaries in an amount not to exceed $1,000,000 in the aggregate at any time outstanding;

(c)    obligations of Borrower or any Subsidiary arising out of interest rate, foreign currency, and commodity hedging agreements entered into with financial institutions in connection

-54-

with bona fide hedging activities in the ordinary course of business and not for speculative purposes;

(d)    endorsement of instruments and other items for deposit or collection of commercial paper received in the ordinary course of business;

(e)    intercompany advances from time to time owing by any Subsidiary to Borrower or another Subsidiary or by Borrower to a Subsidiary in the ordinary course of business; and

(f)    Subordinated Debt evidenced by the Subordinated Debt Documents (including, for the avoidance of doubt, any interest in kind thereupon);

(g)    indebtedness owed to any Person providing property, casualty, liability or other insurance to the Borrower or any of its Subsidiaries, so long as the amount of such indebtedness is not in excess of the amount of the unpaid cost of, and shall be incurred only to defer the cost of, such insurance for the year in which such indebtedness is incurred and such indebtedness is outstanding only during such year;

(h)    indebtedness incurred in respect of credit cards, credit card processing services, debit cards, stored value cards, purchase cards (including so-called "procurement cards" or "P-cards") or other similar cash management services and other indebtedness in respect of netting services, overdraft protections, automatic clearinghouse arrangements, employee credit card programs and other cash management and similar arrangements, in each case, incurred in the ordinary course of business, in an aggregate amount not to exceed $15,000,000 at any time outstanding;

(i)    investments permitted by Section 7.3; and

(j)    other indebtedness in an aggregate principal amount not exceeding $2,000,000 at any time outstanding.

*Section 7.2    Liens.*  Borrower shall not, nor shall it permit any Subsidiary to, create, incur or permit to exist any Lien of any kind on any Property owned by any such Person; provided, that the foregoing shall not apply to nor operate to prevent:

(a)    Liens arising by statute in connection with worker's compensation, unemployment insurance, old age benefits, social security obligations, taxes, assessments, statutory obligations or other similar charges (other than Liens arising under ERISA), and good faith cash deposits in connection with workers' compensation, unemployment insurance or other forms of governmental insurance or benefit, and tenders, contracts or leases to which Borrower or any Subsidiary is a party or other cash deposits required to be made in the ordinary course of business, provided in each case that the obligation is not for borrowed money and that the obligation secured is not overdue or, if overdue, is being contested in good faith by appropriate proceedings without enforcement of the matter under contest and adequate reserves have been established therefor;

-55-

(b)    mechanics', workmen's, materialmen's, landlords', carriers' or other similar Liens arising in the ordinary course of business with respect to obligations which are not overdue, or if overdue, are being contested in good faith by appropriate proceedings without enforcement of the matter under contest;

(c)    Liens on equipment of Borrower or any Subsidiary created solely for the purpose of securing indebtedness permitted by Section 7.1(b) incurred to finance the purchase price of such Property; provided that no such Lien shall extend to or cover other Property of Borrower or such Subsidiary other than the respective Property so acquired (and any attachments, accessories, parts, additions and substitutions therefor), and the principal amount of indebtedness secured by any such Lien shall at no time exceed the purchase price of such Property, as reduced by repayments of principal thereon;

(d)    any interest or title of a lessor under any operating lease (including Liens arising from precautionary financing statement filings under operating or similar leases);

(e)    easements, rights of way, restrictions, and other similar encumbrances against real property incurred in the ordinary course of business which, in the aggregate, are not substantial in amount and which do not materially detract from the value of the Property subject thereto or materially interfere with the ordinary conduct of the business of Borrower or any Subsidiary;

(f)    Liens granted in favor of Administrative Agent pursuant to the Collateral Documents;

(g)    Liens arising by virtue of trust arrangements, withheld balances, administrative accounts, or any other collateral or security arrangements incurred in connection with any Policies, Reinsurance Agreements or related agreements in the ordinary course of business or capital support agreements or any other agreements in support of the capital of any Insurance Subsidiary, or guarantees or any other agreements guaranteeing the obligations of any Insurance Subsidiary under any Policies or Reinsurance Agreements in each case entered into in the ordinary course of business;

(h)    non-exclusive licenses of patents, trademarks, copyrights, designs and other intellectual property rights in the ordinary course of business;

(i)    judgment Liens (other than for the payment of taxes, assessments or other governmental charges) securing judgments and other proceedings not constituting an Event of Default under Section 8.1(g);

(j)    rights of setoff or bankers' Liens upon deposits of cash in favor of banks or other depository institutions, solely to the extent incurred in connection with the maintenance of such deposit accounts in the ordinary course of business;

(k)    any other Liens against Borrower or any of its Subsidiaries solely to the extent that the aggregate outstanding principal amount of the obligations secured by all such Liens does not exceed $2,000,000 at any time.

-56-

It is understood that, with respect to any permitted Lien securing indebtedness that was permitted to secure such indebtedness at the time of the incurrence thereof, such permitted Lien shall also be permitted to secure any increase in the amount of such indebtedness in connection with any accrual of interest, the accretion of accreted value, and increase in the amount of indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies.

*Section 7.3    Investments, Acquisitions, Loans and Advances.*  Borrower shall not, nor shall it permit any Subsidiary to, directly or indirectly, make, retain or have outstanding any investments (whether through purchase of equity interests or obligations or otherwise) in, or loans or advances to (other than for travel advances and other similar cash advances made to employees in the ordinary course of business), any other Person, or acquire all or any substantial part of the assets or business of any other Person or division thereof; provided, that the foregoing shall not apply to nor operate to prevent:

(a)    investments in direct obligations of the United States of America or of any agency or instrumentality thereof whose obligations are backed by the full faith and credit of the United States of America, provided that any such obligations shall mature within one year of the date of issuance thereof;

(b)    investments in commercial paper rated at least P-1 by Moody's and at least A-1 by S&P maturing within one year of the date of issuance thereof;

(c)    investments in certificates of deposit issued by any Lender or by any United States commercial bank having capital and surplus of not less than $100,000,000 which have a maturity of one year or less;

(d)    investments in repurchase obligations with a term of not more than 90 days for underlying securities of the types described in subsection (a) above entered into with any bank meeting the qualifications specified in subsection (c) above, provided all such agreements require physical delivery of the securities securing such repurchase agreement, except those delivered through the Federal Reserve Book Entry System;

(e)    marketable direct obligations issued or fully guaranteed by any state of the United States maturing within one year from the date of acquisition thereof and, at the time of acquisition, having one of the two highest ratings obtainable from either S&P or Moody's;

(f)    investments in money market funds that invest primarily in investments of the type described in the immediately preceding subsections (a), (b), (c), and (d) above;

(g)    marketable tax exempt securities rated A or higher by Moody's or A+ or higher by S&P, in each case, maturing within 6 months from the date of acquisition thereof;

(h)    Borrower's investment existing on the date of this Agreement in its Subsidiaries or Borrower's investments from time to time in its Subsidiaries, and investments made from time to time by a Subsidiary in one or more of its Subsidiaries;

747351332

(i)      intercompany advances made from time to time by Borrower or a Subsidiary to another Subsidiary or by a Subsidiary to Borrower in the ordinary course of business;

(j)      investments by Insurance Subsidiaries in the ordinary course of business pursuant to Insurance Subsidiary's investment policy;

(k)      reinsurance agreements entered into by an Insurance Subsidiary in the ordinary course of business;

(l)      investments in negotiable instruments deposited or to be deposited for collection in the ordinary course of business;

(m)      advances made in connection with purchases of goods or services in the ordinary course of business;

(n)      investments received in settlement of amounts due to Borrower or any of its Subsidiaries effected in the ordinary course of business or owing to Borrower or any of its Subsidiaries as a result of (i) insolvency proceedings involving an account debtor or upon the foreclosure or enforcement of any Lien in favor of Borrower or its Subsidiaries or (ii) the compromise, resolution of litigation, arbitration or any other disputes, including, in each case, investments acquired by Borrower or any of its Subsidiaries as a result of a foreclosure by such Person with respect to any secured investment or transfer of title with respect to any secured investments in default;

(o)      to the extent constituting investments, deposits of cash made in the ordinary course of business to secure performance of operating leases;

(p)      investments acquired in connection with the settlement of delinquent accounts receivable in the ordinary course of business or in connection with the bankruptcy or reorganization of contractual counterparties;

(q)      hedging agreements entered into for non-speculative purposes in the ordinary course of business;

(r)      prepaid expenses or lease, utility and other similar deposits, in each case made in the ordinary course of business;

(s)      investments set forth on Schedule 7.3; and

(t)      other investments, loans, and advances in addition to those otherwise permitted by this Section 7.3 in an amount not to exceed $1,000,000 in the aggregate at any one time outstanding.

-58-

In determining the amount of investments, acquisitions, loans, and advances permitted under this Section, investments and acquisitions shall always be taken at the original cost thereof (regardless of any subsequent appreciation or depreciation therein), and loans and advances shall be taken at the principal amount thereof then remaining unpaid.

Without limiting the generality of the foregoing:

(A)    Each Insurance Subsidiary will invest its regulatory reserves, required capital, target capital or surplus assets in compliance at all times with the allocation parameters as agreed between Borrower and Administrative Agent;

(B)    The investments backing liabilities of the Insurance Subsidiaries will be made in compliance at all times with the allocation parameters as agreed between Borrower and Administrative Agent;

(C)    None of Borrower nor its Subsidiaries will invest in or lend to 777 Partners or any of 777 Partners' Affiliates or Subsidiaries (other than investments among Borrower and its Subsidiaries), or make investments in instruments which are linked to or secured by 777 Partners, or any of 777 Partners' Affiliates or Subsidiaries (other than investments among Borrower and its Subsidiaries) or make loans secured by equity of 777 Partners or any of 777 Partners' Affiliates or Subsidiaries except to the extent agreed between Borrower and Administrative Agent, and none of Borrower nor its Subsidiaries will make any unsecured loans to 777 Partners or any of 777 Partners' Affiliates or any Subsidiaries of 777 Partners (other than investments among Borrower and its Subsidiaries);

(D)    The special single issuer limits as agreed between Borrower and Administrative Agent (collectively such assets, the **"Special Single Issuers"**) will be complied with by Borrower and its Subsidiaries at all times and, in addition thereto, no Single Exposure of Borrower and its Subsidiaries will exceed at any time the lower of (I) 20% of Borrower's Consolidated Net Worth and (II) 2% of Borrower's Consolidated Total Assets; and

(E)    The five (5) largest individual Single Exposures of Borrower and its Subsidiaries rated NAIC 2 or worse (excluding the investments in the Special Single Issuers) will not cumulatively exceed at any time the lower of (I) 40% of Borrower's Consolidated Net Worth and (II) 4% of Borrower's Consolidated Total Assets.

*Section 7.4    Mergers, Consolidations and Sales*.  Borrower shall not, nor shall it permit any Subsidiary to, be a party to any merger or consolidation, consummate a Division, or sell, transfer, lease or otherwise dispose of all or any part of its Property, including any disposition of Property as part of a sale and leaseback transaction, or in any event sell or discount (with or without recourse) any of its notes or accounts receivable; provided, that this Section shall not apply to nor operate to prevent:

(a)    the sale or lease of inventory in the ordinary course of business;

(b)    the sale, transfer, lease or other disposition of Property of Borrower and its Subsidiaries to one another in the ordinary course of its business;

(c)    the merger of any Subsidiary with and into Borrower or any other Subsidiary; provided that, in the case of any merger involving Borrower, Borrower is the corporation surviving the merger;

(d)    the sale of delinquent notes or accounts receivable in the ordinary course of business for purposes of collection only (and not for the purpose of any bulk sale or securitization transaction);

(e)    ceding of insurance or reinsurance in the ordinary course of business and on arm's length terms; provided that such transaction (i) is between the Borrower and one of its Subsidiaries or between two Subsidiaries of the Borrower or (ii) does not result in a material change to the reinsurance purchasing policy of the Borrower or any of its Subsidiaries, as applicable;

(f)    the sale, transfer or other disposition of any tangible personal property that, in the reasonable business judgment of Borrower or its Subsidiary, has become damaged, obsolete or worn out, and which is disposed of in the ordinary course of business;

(g)    the license, on a non-exclusive basis, of patents, trademarks, copyrights, designs and other intellectual property rights in the ordinary course of business;

(h)    a disposition through the abandonment, cancellation or other failure to maintain any trademark or other intellectual property which is no longer used or useful in the business of Borrower or any of its Subsidiaries;

(i)    the lease or sublease of assets in the ordinary course of business;

(j)    the disposition of any of its or their property in connection with (1) any involuntary loss, damage or destruction of property and (2) any involuntary condemnation, seizure or taking, by exercise of the power of eminent domain or otherwise, or confiscation or requisition of use of property;

(k)    the settlement or write-off of accounts receivable or sale, discount or compromise of overdue accounts receivable for collection, in each case in the ordinary course of business and consistent with past practices;

(l)    Dispositions of assets by the Borrower and its Subsidiaries, including Insurance Subsidiaries, in connection with an Insurance Contract, Reinsurance Agreement or any related agreement, in each case in the ordinary course of business; and

(m)    other dispositions of property or assets for cash for fair market value and in an aggregate amount not to exceed $500,000 per fiscal year.

-60-

Section 7.5     *Maintenance of Subsidiaries.*  Borrower shall not assign, sell or transfer, nor shall it permit any Subsidiary to issue, assign, sell or transfer, any shares of capital stock or other equity interests of a Subsidiary; provided, that the foregoing shall not operate to prevent (a) Liens on the capital stock or other equity interests of Subsidiaries granted to Administrative Agent pursuant to the Collateral Documents, (b) the issuance, sale, and transfer to any person of any shares of capital stock of a Subsidiary solely for the purpose of qualifying, and to the extent legally necessary to qualify, such person as a director of such Subsidiary, (c) any transaction permitted by Section 7.4(c) above and (d) the formation of special purpose Subsidiaries for tax or regulatory purposes, which Subsidiaries shall have no material operations or own any assets other than as necessary to achieve such special purpose for which they were formed.

Section 7.6     *Dividends and Certain Other Restricted Payments*.   Borrower shall not, nor shall it permit any Subsidiary to, (a) declare or pay any dividends on or make any other distributions in respect of any class or series of its capital stock or other equity interests (other than dividends or distributions payable solely in its capital stock or other equity interests), (b) directly or indirectly purchase, redeem, or otherwise acquire or retire any of its capital stock or other equity interests or any warrants, options, or similar instruments to acquire the same, or (c) directly or indirectly pay investment or management fees (collectively referred to herein as **"Restricted Payments"**); provided, that the foregoing shall not operate to prevent any of the following:

(a)     the making of dividends or distributions by any Subsidiary to Borrower (or such Subsidiary's direct parent entity);

(b)     the payment of fees to 777 Asset Management LLC pursuant to the Investment Management Agreement and fees payable pursuant to the Intercompany Services Agreement; provided that (i) no Default or Event of Default pursuant to Sections 8.01(a), (b), (f), (j) or (k) shall have occurred and be continuing or would result therefrom and (ii) if a default shall occur and be continuing under any Indebtedness for Borrowed Money issued, assumed or guaranteed by Guarantor aggregating in excess of $15,000,000, except as set forth on Schedule 7.6(b), or under any indenture, agreement or other instrument under which the same may be issued, and such default shall continue for a period of time sufficient to permit the acceleration of the maturity of any such Indebtedness for Borrowed Money (whether or not such maturity is in fact accelerated), or any such Indebtedness for Borrowed Money shall not be paid when due (whether by demand, lapse of time, acceleration or otherwise), then the portion of such fees under the Investment Management Agreement and Intercompany Services Agreement in excess of $10,000,000 in each fiscal year shall not be permitted to be paid;

(c)     so long as no Default or Event of Default has occurred and is continuing or would result therefrom, investment or management fees in an amount not to exceed the amounts paid as of the Closing Date; and

(d)     for the avoidance of doubt, board of directors fees and other compensation paid to members of the board of directors of Borrower or any of its Subsidiaries.

Section 7.7     *Burdensome Contracts With Affiliates*.  Borrower shall not, nor shall it permit any Subsidiary to, enter into any contract, agreement or business arrangement with any of

-61-

its Affiliates (other than with Wholly Owned Subsidiaries) on terms and conditions which are less favorable to Borrower or such Subsidiary on the whole than would be usual and customary in similar contracts, agreements or business arrangements between Persons not affiliated with each other; provided, that this provision shall not apply to any of the transactions set forth in the Intercompany Services Agreement.

Section 7.8    *No Changes in Fiscal Year.*  The fiscal year of Borrower and its Subsidiaries ends on December 31st of each year; and Borrower shall not, nor shall it permit any Subsidiary to, change its fiscal year from its present basis.

Section 7.9    *Accounting Changes.*  Borrower will not, and will not permit or cause any of its Subsidiaries to, make or permit any material change in its accounting policies or reporting practices, except as may be required or permitted by GAAP or SAP, as the case may be.

Section 7.10    *Change in the Nature of Business & Organizational Documents.*  Borrower shall not, nor shall it permit any Subsidiary to, (a) engage in any business or activity if as a result the general nature of the business of Borrower or any Subsidiary would be changed in any material respect from the general nature of the business engaged in by it as of the Closing Date or (b) engage in any non-life insurance or non-life reinsurance business.  Borrower shall not make any amendments to Borrower's certificate of formation or limited liability company agreement in a manner adverse to the Lenders in any material respect.

Section 7.11    *No Restrictive Agreements.*  Except as provided herein, Borrower shall not, nor shall it permit any Subsidiary to, directly or indirectly create or otherwise cause or suffer to exist or become effective any consensual encumbrance or restriction of any kind on the ability of Borrower or any Subsidiary to:  (a) pay dividends or make any other distribution on any Subsidiary's capital stock or other equity interests owned by Borrower or any other Subsidiary, (b) pay any indebtedness owed to Borrower or any other Subsidiary, (c) make loans or advances to Borrower or any other Subsidiary, (d) transfer any of its Property to Borrower or any other Subsidiary, or (e) guarantee the Obligations and/or grant Liens on its assets to Administrative Agent as required by the Loan Documents, except any such provision contained in the Subordinated Debt Documents or the Intercreditor Agreement.

Section 7.12    *Subordinated Debt.*  Borrower shall not, nor shall it permit any Subsidiary or other Loan Party to (a) amend or modify any of the terms or conditions relating to Subordinated Debt, including the Subordinated Debt Documents, (b) make any voluntary prepayment of Subordinated Debt or effect any voluntary redemption thereof, or (c) make any payment on account of Subordinated Debt which is prohibited under the terms of any instrument or agreement subordinating the same to the Obligations, in each case, except as permitted by the Intercreditor Agreement.  Notwithstanding the foregoing, Borrower may agree to a decrease in the interest rate applicable thereto or conversion of cash interest to interest in-kind, or to a deferral of repayment of any of the principal of or interest on any Subordinated Debt beyond the current due dates therefor; provided, that the foregoing restrictions under this Section 7.12 applicable to the Guarantor shall apply only with respect to the Subordinated Debt under the Subordinated Debt Documents.

-62-

Section 7.13    *Use of Proceeds*.

(a)    Neither Borrower nor any Subsidiary will engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock or in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U of the FRB), and no part of the proceeds of any Loan or any other extension of credit made hereunder will be used to purchase or carry any such margin stock or to extend credit to others for the purpose of purchasing or carrying any such margin stock.

(b)    Borrower will not request any Loan, and Borrower shall not use, and shall ensure that its Subsidiaries and Affiliates, and its or their respective directors, officers, employees and agents not use, the proceeds of any Loan, directly or indirectly, (i) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, (ii) to fund, finance or facilitate any activities, business or transaction of or with any Sanctioned Person or in any Designated Jurisdiction, or (iii) in any other manner that would result in the violation of any Sanctions applicable to any party hereto.

Section 7.14    *Financial Covenants*.

(a)    *Debt to Capital Ratio*.  Borrower shall at all times maintain an Debt to Capital Ratio of less than or equal to 35%.

(b)    *Net Worth*.  Borrower and its Subsidiaries shall at all times maintain a Consolidated Net Worth in an amount of not less than $225,000,000.

(c)    *Fixed Charge Coverage Ratio*.  As of the last day of each fiscal quarter of Borrower beginning with the fiscal quarter ending December 31, 2022, Borrower shall maintain a ratio of (i) EBITDA for the four fiscal quarters of Borrower then ended, less the sum of federal, state, and local income taxes paid in cash by Borrower and its Subsidiaries during such period, to (ii) Fixed Charges for the same four fiscal quarters then ended of not less than 1.20 to 1.00.

In the event that the Borrower fails to comply with the requirements of Section 7.14(c) as of the end of any fiscal quarter, until the date that the financial statements with respect to such fiscal quarter are required to be delivered pursuant to Section 6.5, 777 Partners and/or MTRS shall have the right to make a common equity investment in the Borrower in cash or otherwise make cash common equity contributions to the Borrower (the **"Cure Right"**), and upon receipt by the Borrower of such cash contributions (the **"Cure Amount"**), the Borrower's compliance with Section 7.14(c) shall be recalculated giving effect to the following pro forma adjustments:  (i) EBITDA shall be increased, solely for the purposes of determining compliance with Section 7.14(c), including determining compliance with Section 7.14(c) as of the end of such fiscal quarter and applicable subsequent periods that include the fiscal quarter for which the Cure Right is exercised, by an amount equal to the Cure Amount; and (ii) if, after giving effect to the foregoing calculations (but not, for the avoidance of doubt, giving pro forma effect to any repayment of Indebtedness for Borrowed Money in connection therewith), the requirements of Section 7.14(c) shall be satisfied, then the requirements of Section 7.14(c) shall be deemed satisfied as of the end of the relevant fiscal quarter with the same effect as though there had been no failure to comply

-63-

therewith at such date, and the applicable breach or default of Section 7.14(c) that had occurred shall be deemed cured for the purposes of this Agreement.  Notwithstanding anything herein to the contrary, (A) the Cure Right shall not be exercised more than two times, (B) the Cure Right shall not be exercised in two consecutive fiscal quarters, (C) the Cure Amount shall be no greater than the amount required for purposes of complying with Section 7.14(c), (D) the Cure Amount shall be disregarded for purposes of determining compliance with any other provision of this Agreement (including any provision that requires compliance with Section 7.14 on a pro forma basis) and (E) to the extent that the proceeds of the Cure Amount are used to repay Indebtedness for Borrowed Money, such Indebtedness for Borrowed Money shall not be deemed to have been repaid for purposes of calculating the financial covenants set forth in Section 7.14 for the relevant fiscal quarter.

(d)     *Maintenance of Financial Strength Rating.*  The Borrower shall cause its Insurance Subsidiaries to at all times, maintain a Financial Strength Rating of at least B++.

(e)     *Minimum ECR.*  Borrower shall cause 777 Re to maintain at all times an Enhanced Capital Requirement, from time to time, as calculated under, and determined in accordance with, Bermuda law as in effect from time to time, in the amount of  (i) 150% from the period commencing on the Closing Date and ending on December 31, 2022 (inclusive) and (ii) 180% thereafter.

Section 7.15    *Longevity Risk.*

(a)     None of the Borrower or any Subsidiary will enter into any contract or transaction which could give rise to Longevity Risk that is not 100% reinsured.

(b)     For the purposes of Section 7.15(a) (*Longevity Risk*), **"Longevity Risk"** means assets or liabilities in respect of which the primary risk of loss is contingent on a specific pool of people or general population living longer than expected or modelled.

Section 7.16    *Pensions.*

(a)     None of the Borrower or its Subsidiaries shall introduce any form of pension or service arrangement for its respective directors, officers or employees without the prior written consent of all the Lenders.

(b)     Clause (a) above does not apply to employment benefits in the ordinary course of business, which (i) is a defined contribution savings-type plan and (ii) has no capital or income guarantees given by the Borrower or any of its Subsidiaries.

## SECTION 8.  EVENTS OF DEFAULT AND REMEDIES.

Section 8.1    *Events of Default.*  Any one or more of the following shall constitute an *"Event of Default"* hereunder:

-64-

747351332

(a)    (i) the Borrower shall fail to pay any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise and (ii) the Borrower shall fail to pay any interest on any Loan, or any fee or any other amount (other than an amount referred to in clause (i) of this Section 8.1(a)) payable under this Agreement or under any other Loan Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of three or more Business Days;

(b)    default in the observance or performance of any covenant, condition or agreement set forth in Sections 6.1, 6.5, 6.6, 6.9, 6.13, or 7;

(c)    default in the observance or performance of any other provision hereof or of any other Loan Document which is not remedied within 30 days after the earlier of (i) the date on which such failure shall first become known to any Responsible Officer of Borrower or (ii) written notice thereof is given to Borrower by Administrative Agent;

(d)    any representation or warranty made herein or in any other Loan Document or in any certificate furnished to Administrative Agent or the Lenders pursuant hereto or thereto or in connection with any transaction contemplated hereby or thereby proves untrue in any material respect (or in any respect if such representation, warranty, certification or statement is by its terms already qualified as to materiality) as of the date of the issuance or making or deemed making thereof;

(e)    (i) any event occurs or condition exists (other than those described in subsections (a) through (d) above) which is specified as an event of default under any of the other Loan Documents, or (ii) any of the Loan Documents shall for any reason not be or shall cease to be in full force and effect or is declared to be null and void, or (iii) any of the Collateral Documents shall for any reason fail to create a valid and perfected first priority Lien in favor of Administrative Agent in Collateral with an aggregate value of $100,000 or more purported to be covered thereby except as expressly permitted by the terms thereof, (iv) any Loan Party takes any action for the purpose of terminating, repudiating or rescinding any Loan Document executed by it or any of its obligations thereunder, or (v) any party to the Intercreditor Agreement contests in any manner the validity or enforceability of the Intercreditor Agreement or denies that it has any liability or obligation thereunder or purports to revoke, terminate or rescind the Intercreditor Agreement;

(f)    (i) default shall occur and be continuing under any Indebtedness for Borrowed Money issued, assumed or guaranteed by Borrower or any of its Subsidiaries aggregating in excess of $5,000,000, or under any indenture, agreement or other instrument under which the same may be issued, or (ii) an Event of Default (as defined in the Subordinated Debt Documents) shall have occurred and be continuing, and in each case, such default shall continue for a period of time sufficient to permit the acceleration of the maturity of any such Indebtedness for Borrowed Money (whether or not such maturity is in fact accelerated), or any such Indebtedness for Borrowed Money shall not be paid when due (whether by demand, lapse of time, acceleration or otherwise);

-65-

(g)    any judgment or judgments, writ or writs or warrant or warrants of attachment, or any similar process or processes, shall be entered or filed against Borrower or any of its Subsidiaries or against any of their Property, in an aggregate amount in excess of $5,000,000 (except to the extent fully covered by insurance pursuant to which the insurer has accepted liability therefor in writing), and which remains undischarged, unvacated, unbonded or unstayed for a period of 30 days;

(h)    Borrower or any Subsidiary, or any member of its Controlled Group, shall fail to pay when due an amount or amounts aggregating in excess of $5,000,000 which it shall have become liable to pay to the PBGC or to a Plan under Title IV of ERISA; or notice of intent to terminate a Plan or Plans having aggregate Unfunded Vested Liabilities in excess of $5,000,000 (collectively, a *"Material Plan"*) shall be filed under Title IV of ERISA by Borrower or any Subsidiary, or any other member of its Controlled Group, any plan administrator or any combination of the foregoing; or the PBGC shall institute proceedings under Title IV of ERISA to terminate or to cause a trustee to be appointed to administer any Material Plan or a proceeding shall be instituted by a fiduciary of any Material Plan against Borrower or any Subsidiary, or any member of its Controlled Group, to enforce Section 515 or 4219(c)(5) of ERISA and such proceeding shall not have been dismissed within 30 days thereafter; or a condition shall exist by reason of which the PBGC would be entitled to obtain a decree adjudicating that any Material Plan must be terminated;

(i)    any Change of Control shall occur;

(j)    Borrower, any Subsidiary or any Loan Party shall (i) have entered involuntarily against it an order for relief under the United States Bankruptcy Code, as amended, (ii) not pay, or admit in writing its inability to pay, its debts generally as they become due, (iii) make an assignment for the benefit of creditors, (iv) apply for, seek, consent to or acquiesce in, the appointment of a receiver, custodian, trustee, examiner, liquidator or similar official for it or any substantial part of its Property, (v) institute any proceeding seeking to have entered against it an order for relief under the United States Bankruptcy Code, as amended, to adjudicate it insolvent, or seeking dissolution, winding up, liquidation, reorganization, arrangement, adjustment or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors or fail to file an answer or other pleading denying the material allegations of any such proceeding filed against it, (vi) take any corporate, limited liability, or other applicable organizational action in furtherance of any matter described in parts (i) through (v) above, or (vii) fail to contest in good faith any appointment or proceeding described in Section 8.1(k);

(k)    a custodian, receiver, trustee, examiner, liquidator or similar official shall be appointed for Borrower, any Subsidiary or any Loan Party, or any substantial part of any of its Property, or a proceeding described in Section 8.1(j)(v) shall be instituted against Borrower, any Subsidiary or any Loan Party, and such appointment continues undischarged or such proceeding continues undismissed or unstayed for a period of 60 days;

(l)    (a) any Insurance License of any Insurance Subsidiary (i) shall be revoked by the Applicable Insurance Regulatory Authority, (ii) shall be suspended by the Applicable Insurance Regulatory Authority for a period in excess of thirty days or (iii) shall not be reissued or renewed

-66-

by the Applicable Insurance Regulatory Authority upon the expiration thereof following application for such reissuance or renewal of such Person, or (b) any Applicable Insurance Regulatory Authority shall issue any order of conservation or seizure, however denominated, relating to Borrower or any Insurance Subsidiary or shall take any other action to exercise control (i) over Borrower or any Insurance Subsidiary or (ii) over any assets of Borrower or any Insurance Subsidiary; or

(m)    (a) The Subordination Provisions shall fail to be enforceable by the Lenders (which have not effectively waived the benefits thereof) in accordance with the terms thereof; or (b) the principal or interest on any Loan or other Obligations shall fail to constitute "designated senior debt" (or any other similar term) under any document, instrument or agreement evidencing such Subordinated Debt; or (c) any Loan Party or any of its Subsidiaries shall, directly or indirectly, disavow or contest in any manner (i) the effectiveness, validity or enforceability of any of the Subordination Provisions, or (ii) that any of such Subordination Provisions exist for the benefit of any Secured Party; or (d) any Loan Party or any Subsidiary thereof or any other Person fails to observe or perform any of the Subordination Provisions.

Section 8.2    *Non Bankruptcy Defaults.*  When any Event of Default (other than those described in Section 8.1(j) or (k) with respect to Borrower) has occurred and is continuing, Administrative Agent may (and if so directed by the Required Lenders shall) by written notice to Borrower: (a) terminate the remaining Commitments and all other obligations of the Lenders hereunder on the date stated in such notice (which may be the date thereof); and (b) declare the principal of and the accrued interest on all outstanding Loans to be forthwith due and payable and thereupon all outstanding Loans, including both principal and interest thereon, shall be and become immediately due and payable together with all other amounts payable under the Loan Documents without further demand, presentment, protest or notice of any kind.  Administrative Agent, after giving notice to Borrower pursuant to Section 8.1(c) or this Section 8.2, shall also promptly send a copy of such notice to the other Lenders, but the failure to do so shall not impair or annul the effect of such notice.

Section 8.3    *Bankruptcy Defaults*.  When any Event of Default described in Section 8.1(j) or (k) with respect to Borrower has occurred and is continuing, then all outstanding Loans shall immediately become due and payable together with all other amounts payable under the Loan Documents without presentment, demand, protest or notice of any kind, the obligation of the Lenders to extend further credit pursuant to any of the terms hereof shall immediately terminate.

Section 8.4    *Reserve Account.*  Upon the occurrence of an Event of Default under Section 8.1(a), the Administrative Agent may apply the amount held in the Reserve Account to the Obligations.

## SECTION 9.  ADMINISTRATIVE AGENT.

Section 9.1    *Appointment and Authorization of Administrative Agent.*  Each Lender hereby appoints BMO Harris Bank N.A. as Administrative Agent under the Loan Documents and hereby authorizes Administrative Agent to take such action as Administrative Agent on its behalf and to exercise such powers under the Loan Documents as are delegated to Administrative Agent

by the terms thereof, together with such powers as are reasonably incidental thereto.  It is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law. Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.  Therefore, the Lenders expressly agree that Administrative Agent is not acting as a fiduciary of the Lenders in respect of the Loan Documents, Borrower or otherwise, and nothing herein or in any of the other Loan Documents shall result in any duties or obligations on Administrative Agent or any of the Lenders except as expressly set forth herein.  Except as provided in Section 9.7, the provisions of this Article are solely for the benefit of the Administrative Agent, the Lenders, and the Borrower and the Loan Parties shall not have rights as a third-party beneficiary of any of such provisions.

The Administrative Agent shall also act as the "collateral agent" under the Loan Documents, and each of the Lenders hereby irrevocably appoints and authorizes the Administrative Agent to act as the agent of such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto (including, without limitation, to enter into additional Loan Documents or supplements to existing Loan Documents on behalf of the Secured Parties).  In this connection, the Administrative Agent, as "collateral agent" and any co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent pursuant to this Section 9 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Security Documents, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent, shall be entitled to the benefits of all provisions of Sections 9 and 11 (including Section 11.13, as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents) as if set forth in full herein with respect thereto.

Section 9.2    Rights as a Lender.  The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent, and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent hereunder in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for, and generally engage in any kind of business with, the Borrower or any Subsidiary or other Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.

Section 9.3    Action by Administrative Agent.  The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents, and its duties hereunder shall be administrative in nature.  Without limiting the generality of the foregoing, the Administrative Agent (a) shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or an Event of Default has occurred and is continuing, (b) shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the

-68-

747351332

Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); provided that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable Law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law and (c) shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity. Administrative Agent shall in all cases be fully justified in failing or refusing to act hereunder or under any other Loan Document unless it first receives such advice or concurrence of the Required Lenders (or, if so specified by this Agreement, all or other Lenders) as it deems appropriate and any further assurances of its indemnification from the Lenders that it may require, including prepayment of any related expenses and any other protection it requires against any and all costs, expense, and liability which may be incurred by it by reason of taking or continuing to take any such action.  The Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Loan Documents in accordance with a request of the Required Lenders (or, if so specified by this Agreement, all or other Lenders), and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Loans.

Section 9.4    *Consultation with Experts.* Administrative Agent may consult with legal counsel (who may be counsel to the Borrower), independent public accountants, and other experts selected by it and shall not be liable for any action taken or omitted to be taken by it in accordance with the advice of such counsel, accountants or experts.

Section 9.5    *Liability of Administrative Agent; Credit Decision.* Neither Administrative Agent nor any of its directors, officers, agents or employees shall be liable for any action taken or not taken by it in connection with the Loan Documents:  (i) with the consent or at the request of the Required Lenders or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and non-appealable judgment.  The Administrative Agent shall be deemed not to have knowledge of any Default or Event of Default unless and until notice describing such Default or Event of Default is given to the Administrative Agent in writing by the Borrower or a Lender.  Neither Administrative Agent nor any of its directors, officers, agents or employees shall be responsible for or have any duty to ascertain, inquire into or verify:  (i) any statement, warranty or representation made in connection with this Agreement, any other Loan Document; (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith; (iii) the performance or observance of any of the covenants or agreements of Borrower or any Subsidiary contained herein or in any other Loan Document; (iv) the satisfaction of any condition specified in Section 4, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent; or (v) the validity, effectiveness, genuineness, enforceability, perfection, value, worth or collectability hereof or of any other Loan Document or of any other documents or writing furnished in connection with any Loan Document or of any Collateral; and Administrative Agent makes no representation of any kind or character with respect to any such matter mentioned in this sentence.

-69-

(b)     The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of a Loan, that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan.  In particular and without limiting any of the foregoing, Administrative Agent shall have no responsibility for confirming the accuracy of any Compliance Certificate or other document or instrument received by it under the Loan Documents.  Administrative Agent may treat the payee of any Obligation as the holder thereof until written notice of transfer shall have been filed with Administrative Agent signed by such payee in form satisfactory to Administrative Agent.  Each Lender acknowledges that it has independently and without reliance on Administrative Agent or any other Lender (or any of their Related Parties), and based upon such information, investigations and inquiries as it deems appropriate, made its own credit analysis and decision to extend credit to Borrower in the manner set forth in the Loan Documents.  It shall be the responsibility of each Lender to keep itself informed as to the creditworthiness of Borrower and its Subsidiaries or any Loan Party, and Administrative Agent shall have no liability to any Lender with respect thereto.

Section 9.6     Indemnity.    To the extent that the Borrower for any reason fails to indefeasibly pay any amount required under Section 11.13 to be paid by it to the Administrative Agent (or any sub-agent thereof) or any Related Party of any of the foregoing, each Lender severally agrees to pay to the Administrative Agent (or any such sub-agent) or such Related Party, as the case may be, such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought based on each Lender's Term Loan Percentage at such time) of such unpaid amount (including any such unpaid amount in respect of a claim asserted by such Lender); provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such sub-agent in its capacity as such), or against any Related Party of any of the foregoing acting for the Administrative Agent (or any such sub-agent) in connection with such capacity.  The obligations of the Lenders under this Section shall survive termination of this Agreement.  Administrative Agent shall be entitled to offset amounts received for the account of a Lender under this Agreement against unpaid amounts due from such Lender to Administrative Agent hereunder (whether as fundings of participations, indemnities or otherwise, and with any amounts offset for the benefit of Administrative Agent to be held by it for its own account), but shall not be entitled to offset against amounts owed to Administrative Agent by any Lender arising outside of this Agreement and the other Loan Documents.

Section 9.7     Resignation of Administrative Agent and Successor Administrative Agent. Administrative Agent may resign at any time by giving written notice thereof to the Lenders and Borrower.  Upon any such resignation of Administrative Agent, the Required Lenders shall have the right, in consultation with the Borrower, to appoint a successor Administrative Agent.  If no

-70-

747351332

successor Administrative Agent shall have been so appointed by the Required Lenders, and shall have accepted such appointment within 30 days after the retiring Administrative Agent's giving of notice of resignation (or such earlier day as shall be agreed by the Required Lenders) (the ***"Resignation Effective Date"***) then the retiring Administrative Agent may (but shall not be obligated to), on behalf of the Lenders, appoint a successor Administrative Agent, which may be any Lender hereunder or any commercial bank, or an Affiliate of a commercial bank, having an office in the United States of America and having a combined capital and surplus of at least $200,000,000.  With effect from the Resignation Effective Date (a) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders under any of the Loan Documents, the retiring or removed Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed) and (b) except for any indemnity payments owed to the retiring Administrative Agent, all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided for above. Upon the acceptance of its appointment as Administrative Agent hereunder, such successor Administrative Agent shall thereupon succeed to and become vested with all the rights and duties of the retiring Administrative Agent under the Loan Documents.  The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After any retiring Administrative Agent's resignation hereunder as Administrative Agent, the provisions of this Section 9 and all protective provisions of the other Loan Documents shall continue in effect for the benefit of such retiring or removed Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring or removed Administrative Agent was acting as Administrative Agent.

**Section 9.8**    *Designation of Additional Agents.*    Administrative Agent shall have the continuing right, for purposes hereof, at any time and from time to time to designate one or more of the Lenders (and/or its or their Affiliates) as "syndication agents," "documentation agents," "book runners," "lead arrangers," "arrangers," or other designations for purposes hereto, but such designation shall have no substantive effect, and such Lenders and their Affiliates shall have no additional powers, duties or responsibilities as a result thereof.

**Section 9.9**    *Authorization to Release or Subordinate or Limit Liens.* Administrative Agent is hereby irrevocably authorized by each of the Lenders to (a) release any Lien covering any Collateral that is sold, transferred, or otherwise disposed of in accordance with the terms and conditions of this Agreement and the relevant Collateral Documents (including a sale, transfer, or disposition permitted by the terms of <u>Section 7.4</u> or which has otherwise been consented to in accordance with <u>Section 11.11</u>), (b) release or subordinate any Lien on Collateral consisting of goods financed with purchase money indebtedness or under a Capital Lease to the extent such purchase money indebtedness or Capitalized Lease Obligation, and the Lien securing the same, are permitted by <u>Sections 7.1(b)</u> and <u>7.2(d)</u>, (c) reduce or limit the amount of the indebtedness secured by any particular item of Collateral to an amount not less than the estimated value thereof to the extent necessary to reduce mortgage registry, filing and similar tax, and (d) release Liens on the Collateral following termination or expiration of the Commitments and Payment in Full.

*Section 9.10    Authorization to Enter into, and Enforcement of, the Collateral Documents.* Administrative Agent is hereby irrevocably authorized by each of the Lenders to execute and deliver the Collateral Documents and the Intercreditor Agreement on behalf of each of the Lenders and their Affiliates and, subject to Section 11.11, to take such action and exercise such powers under the Collateral Documents as Administrative Agent considers appropriate. Each Lender acknowledges and agrees that it will be bound by the terms and conditions of the Collateral Documents and the Intercreditor Agreement upon the execution and delivery thereof by Administrative Agent.

(b)    Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent in accordance with Section 8.2 and 8.3 for the benefit of all the Lenders; provided that the foregoing shall not prohibit (i) the Administrative Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Administrative Agent) hereunder and under the other Loan Documents, (ii) any Lender from exercising setoff rights in accordance with Section 11.14 (subject to the terms of Section 11.5), or (iii) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party under any Debtor Relief Law; and provided, further, that if at any time there is no Person acting as Administrative Agent hereunder and under the other Loan Documents, then (a) the Required Lenders shall have the rights otherwise ascribed to the Administrative Agent pursuant to Sections 8.2 and 8.3 and (b) in addition to the matters set forth in clauses (ii) and (iii) of the preceding proviso and subject to Section 11.5, any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

*Section 9.11    Delegation of Duties.*  The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent.  The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.  The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the Loans as well as activities as Administrative Agent.  The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

*Section 9.12    Administrative Agent may File Proofs of Claim.*  In case of the pendency of any proceeding under any Debtor Relief Law the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on

-72-

the Borrower) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

   (a) to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under Sections 2.10 and 11.13) allowed in such judicial proceeding; and

   (b) to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under Sections 2.10 and 11.13.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

   *Section 9.13 Certain ERISA Matters*. (a) Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent, the Sole Lead Arranger and their respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that at least one of the following is and will be true:

  (i) such Lender is not using "plan assets" (within the meaning of 29 CFR § 2510.3-101, as modified by Section 3(42) of ERISA) of one or more Plans in connection with the Loans, the Commitments or this Agreement;

  (ii) the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement;

-73-

(iii)    (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement; or

(iv)    such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b)    In addition, unless sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or such Lender has not provided another representation, warranty and covenant as provided in sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent, the Sole Lead Arranger and their respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that the Administrative Agent is not a fiduciary with respect to the assets of such Lender involved in such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related hereto or thereto)

*Section 9.14    Recovery of Erroneous Payments.*    Notwithstanding anything to the contrary in this Agreement, if at any time Administrative Agent determines (in its sole and absolute discretion) that it has made a payment hereunder in error to any Lender or other Secured Party, whether or not in respect of an Obligation due and owing by Borrower at such time, where such payment is a Rescindable Amount, then in any such event, each such Person receiving a Rescindable Amount severally agrees to repay to Administrative Agent forthwith on demand the Rescindable Amount received by such Person in immediately available funds in the currency so received, with interest thereon, for each day from and including the date such Rescindable Amount is received by it to but excluding the date of payment to Administrative Agent, at the greater of the Federal Funds Rate and a rate determined by Administrative Agent in accordance with banking industry rules on interbank compensation. Each Lender and each other Secured Party irrevocably waives any and all defenses, including any "discharge for value" (under which a creditor might otherwise claim a right to retain funds mistakenly paid by a third party in respect of a debt owed by another), "good consideration", "change of position" or similar defenses (whether at law or in equity) to its obligation to return any Rescindable Amount. Administrative Agent shall inform each Lender or other Secured Party that received a Rescindable Amount promptly upon determining that any payment made to such Person comprised, in whole or in part, a Rescindable Amount. Each Person's obligations, agreements and waivers under this Section 9.14 shall survive

-74-

the resignation or replacement of the Administrative Agent, any transfer of rights or obligations by, or the replacement of, a Lender, the termination of the Commitments and/or the repayment, satisfaction or discharge of all Obligations (or any portion thereof) under any Loan Document.

**SECTION 10.        [RESERVED].**

**SECTION 11.        MISCELLANEOUS.**

*Section 11.1    No Waiver, Cumulative Remedies.*  No delay or failure on the part of Administrative Agent or any Lender, or on the part of the holder or holders of any of the Obligations, in the exercise of any power or right under any Loan Document shall operate as a waiver thereof or as an acquiescence in any default, nor shall any single or partial exercise of any power or right preclude any other or further exercise thereof or the exercise of any other power or right.  The rights and remedies hereunder of Administrative Agent, the Lenders, and of the holder or holders of any of the Obligations are cumulative to, and not exclusive of, any rights or remedies which any of them would otherwise have.

*Section 11.2    Non-Business Days.*  If any payment hereunder becomes due and payable on a day which is not a Business Day, the due date of such payment shall be extended to the next succeeding Business Day on which date such payment shall be due and payable.  In the case of any payment of principal falling due on a day which is not a Business Day, interest on such principal amount shall continue to accrue during such extension at the rate per annum then in effect, which accrued amount shall be due and payable on the next scheduled date for the payment of interest.

*Section 11.3    Survival of Representations.*  All representations and warranties made herein or in any other Loan Document or in certificates given pursuant hereto or thereto shall survive the execution and delivery of this Agreement and the other Loan Documents, and shall continue in full force and effect with respect to the date as of which they were made as long as any credit is in use or available hereunder.

*Section 11.4    Survival of Indemnity and Certain Other Provisions*.  All indemnity provisions and other provisions relative to reimbursement to the Lenders of amounts sufficient to protect the yield of the Lenders with respect to the Loans, including, but not limited to, Sections 3.4, 3.6, and 11.13, shall survive Payment in Full, and shall remain in force beyond the expiration of any applicable statute of limitations and payment or satisfaction in full of any single claim thereunder.  All such indemnity and other provisions shall be binding upon the successors and assigns of Borrower and its Subsidiaries and shall inure to the benefit of each applicable Indemnitee and its successors and assigns.

*Section 11.5    Sharing of Set Off.*  Each Lender agrees with each other Lender a party hereto that if such Lender shall receive and retain any payment, whether by set off or application of deposit balances or otherwise, on any of the Loans in excess of its ratable share of payments on all such Obligations then outstanding to the Lenders, then such Lender shall purchase for cash at face value, but without recourse, ratably from each of the other Lenders such amount of the Loans, or participations therein, held by each such other Lenders (or interest therein) as shall be necessary

-75-

to cause such Lender to share such excess payment ratably with all the other Lenders; provided, that if any such purchase is made by any Lender, and if such excess payment or part thereof is thereafter recovered from such purchasing Lender, the related purchases from the other Lenders shall be rescinded ratably and the purchase price restored as to the portion of such excess payment so recovered, but without interest.

*Section 11.6    Notices.* (a)  Except as otherwise specified herein, all notices hereunder and under the other Loan Documents shall be in writing (including notice by telecopy) and shall be given to the relevant party at its address or telecopier number set forth below, or such other address or telecopier number as such party may hereafter specify by notice to Administrative Agent and Borrower given by courier, by United States certified or registered mail, by telecopy or by other telecommunication device capable of creating a written record of such notice and its receipt. Notices under the Loan Documents to any Lender shall be addressed to its address or telecopier number set forth on its Administrative Questionnaire; and notices under the Loan Documents to Borrower or any other Loan Party or the Administrative Agent shall be addressed to their respective address or telecopier number set forth below:

to Borrower or any other Loan Party:

600 Brickell Avenue, 19th Floor
Miami, FL 33131
Attention: Gayle Levy, General Counsel
Email: glevy@brickell-insurance.com
Telephone:    305-921-2801

with a copy to (which shall not constitute notice):

777 Partners LLC
600 Brickell Avenue, 19th Floor
Miami, FL 33131
Attn: Legal Department
Email: legalnotices@777part.com

to Administrative Agent:

BMO Harris Bank N.A.
111 West Monroe Street
Chicago, Illinois  60603
Attention:      Brij Grewal
Email: Brij.Grewal@bmo.com
Telephone:    929-837-9090

with a copy to (which shall not constitute notice)

Mayer Brown LLP
71 South Wacker Drive
Chicago, IL 60606
Attn: Jennifer A. Kratochvil
Email:  JKratochvil@mayerbrown.com
Phone: 312-701-8291
Telecopy : 312-701-7711

Each such notice, request or other communication shall be effective (i) if given by telecopier, when such telecopy is transmitted to the telecopier number specified in this Section or in the relevant Administrative Questionnaire and a confirmation of such telecopy has been received by the sender, (ii) if given by mail, 5 days after such communication is deposited in the mail, certified or registered with return receipt requested, addressed as aforesaid or (iii) if given by any other means, when delivered at the addresses specified in this Section or in the relevant Administrative Questionnaire; provided that any notice given pursuant to Section 2 shall be effective only upon receipt.

(b)    Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail, FpML, and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, <u>provided</u> that the foregoing shall not apply to notices to any Lender pursuant to <u>Section 2</u> if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Section by electronic communication. The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; <u>provided</u> that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient, at its e-mail address as described in the foregoing clause (i), of notification that such notice or communication is available and identifying the website address therefor; provided that, for both clauses (i) and (ii) above, if such notice, email or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient.

(a)    Any party hereto may change its address or facsimile number for notices and other communications hereunder by notice to the other parties hereto.

(b)    The Borrower agrees that the Administrative Agent may, but shall not be obligated to, make the Communications (as defined below) available to the Lenders by posting the Communications on the Platform.

(c)    The Platform is provided "as is" and "as available." The Agent Parties (as defined below) do not warrant the adequacy of the Platform and expressly disclaim liability for errors or omissions in the Communications. No warranty of any kind, express, implied or statutory, including any warranty of merchantability, fitness for a particular purpose, non-infringement of third-party rights or freedom from viruses or other code defects, is made by any Agent Party in connection with the Communications or the Platform. In no event shall the Administrative Agent or any of its Related Parties (collectively, the *"Agent Parties"*) have any liability to the Borrower, any Lender or any other Person or entity for damages of any kind, including direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of the Borrower's or the Administrative Agent's transmission of communications through the Platform. *"Communications"* means, collectively, any notice, demand, communication, information, document or other material provided by or on behalf of the Borrower pursuant to any Loan Document or the transactions contemplated therein that is distributed to the Administrative Agent or any Lender by means of electronic communications pursuant to this Section, including through the Platform.

*Section 11.7    Counterparts.*    This Agreement may be executed in any number of counterparts, and by the different parties hereto on separate counterpart signature pages, each of which shall constitute an original, and all such counterparts taken together shall be deemed to

-77-

constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Agreement by telecopy, emailed .pdf or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement and such counterpart shall be deemed to be an original hereof.

Section 11.8    *Successors and Assigns.* This Agreement shall be binding upon the Borrower and its Subsidiaries and their successors and assigns, and shall inure to the benefit of Administrative Agent and each of the Lenders, and their respective successors and assigns, including any subsequent holder of any of the Obligations. The Borrower and its Subsidiaries may not assign any of their rights or obligations under any Loan Document without the written consent of all of the Lenders.

Section 11.9    *Participants.* Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Person (other than a natural Person, or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural Person, or the Borrower or any of the Borrower's Affiliates or Subsidiaries) (each, a *"Participant"*) in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible for the performance of such obligations, and (iii) the Borrower, the Administrative Agent and Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. For the avoidance of doubt, each Lender shall be responsible for the indemnity under Section 9.6 with respect to any payments made by such Lender to its Participant(s). Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the proviso of Section 11.11 that affects such Participant. The Borrower agrees that each Participant shall be entitled to the benefits of Sections 3.1 through 3.4 and 3.6 (subject to the requirements and limitations therein) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant Section 11.10; provided that such Participant (A) agrees to be subject to the provisions of Section 2.14 as if it were an assignee under paragraph (b) of this Section; and (B) shall not be entitled to receive any greater payment under Sections 3.1, 3.2 or 3.6, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation. Each Lender that sells a participation agrees, at the Borrower's request and expense, to use reasonable efforts to cooperate with the Borrower to effectuate the provisions of Section 2.14 with respect to any Participant. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 11.14 as though it were a Lender; provided that such Participant agrees to be subject to Section 11.5 as though it were a Lender. Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the *"Participant Register"*); provided that no Lender shall

-78-

have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

Section 11.10  Assignments. (a) Any Lender may at any time assign to one or more Eligible Assignees all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it); provided that any such assignment shall be subject to the following conditions:

(i)    Minimum Amounts.  (A) In the case of an assignment of the entire remaining amount of the Loans at the time owing to it or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and (B) in any case not described in subsection (a)(i)(A) of this Section, the aggregate amount of the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to Administrative Agent or, if "Effective Date" is specified in the Assignment and Acceptance, as of the Effective Date) shall not be less than $5,000,000, unless each of Administrative Agent and, so long as no Event of Default has occurred and is continuing, Borrower otherwise consents (each such consent not to be unreasonably withheld or delayed);

(ii)    Proportionate Amounts.  Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loan assigned.

(iii)    Required Consents.   No consent shall be required for any assignment except to the extent required by Section 11.10(a)(i)(B) and, in addition:

(b)    the consent of Borrower (such consent not to be unreasonably withheld or delayed) shall be required unless (x) an Event of Default has occurred and is continuing at the time of such assignment or (y) such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund; provided that Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to Administrative Agent within five (5) Business Days after having received notice thereof; and

(c)    the consent of Administrative Agent (such consent not to be unreasonably withheld or delayed) shall be required for assignments to a Person who is not a Lender, an Affiliate of a Lender or an Approved Fund.

-79-

(i) *Assignment and Acceptance.* The parties to each assignment shall execute and deliver to Administrative Agent an Assignment and Acceptance, together with a processing and recordation fee of $3,500 (provided that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment) and the assignee, if it is not a Lender, shall deliver to Administrative Agent an Administrative Questionnaire.

(ii) *No Assignment to Certain Persons.* No such assignment shall be made to the Borrower or any of the Borrower's Affiliates or Subsidiaries.

(iii) *No Assignment to Natural Persons.* No such assignment shall be made to a natural person (or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural Person).

Subject to acceptance and recording thereof by Administrative Agent pursuant to Section 11.10(f), from and after the effective date specified in each Assignment and Acceptance, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 11.4 and 11.13 with respect to facts and circumstances occurring prior to the effective date of such assignment. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 11.9. Notwithstanding anything to the contrary contained herein, assignments to Limited Voting Lenders shall be subject to Section 11.27.

(d) *Register.* Administrative Agent, acting solely for this purpose as an agent of Borrower, shall maintain at one of its offices in Chicago, Illinois, a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the **"Register"**). The entries in the Register shall be conclusive, and Borrower, Administrative Agent, and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(e) Any Lender may at any time pledge or grant a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any such pledge or grant to a FRB, and this Section shall not apply to any such pledge or grant of a security interest; provided that no such pledge or grant of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or secured party for such Lender as a party hereto; provided further, however, the right of any such pledgee or grantee (other than any FRB)

-80-

to further transfer all or any portion of the rights pledged or granted to it, whether by means of foreclosure or otherwise, shall be at all times subject to the terms of this Agreement.

*Section 11.11  Amendments*. Subject to Section 3.9, any provision of this Agreement or the other Loan Documents may be amended or waived if, but only if, such amendment or waiver is in writing and is signed by (a) Borrower, (b) the Required Lenders, and (c) the Administrative Agent (or by the Borrower and the Administrative Agent with the consent of the Required Lenders), and each such amendment or waiver shall be effective only in the specific instance and for the specific purpose for which given; provided that no such amendment or waiver shall:

(i)    extend or increase any Commitment of any Lender without the written consent of such Lender (it being understood that a waiver of any condition precedent set forth in Article IV or the waiver of any Default or Event of Default shall not constitute an extension or increase of any Commitment of any Lender);

(ii)    reduce the principal of, or rate of interest specified herein on, any Loan or any fees or other amounts payable hereunder or under any other Loan Document, without the written consent of each Lender directly and adversely affected thereby (provided that only the consent of the Required Lenders shall be necessary (x) to amend the definition of "Default Rate" or to waive the obligation of the Borrower to pay interest at the Default Rate or (y) to amend any financial covenant (or any defined term directly or indirectly used therein), even if the effect of such amendment would be to reduce the rate of interest on any Loan or other Obligation or to reduce any fee payable hereunder);

(iii)    postpone any date scheduled for any payment of principal of, or interest on, any Loan, or any fees or other amounts payable hereunder or under any other Loan Document, or reduce the amount of, waive or excuse any such payment, without the written consent of each Lender directly and adversely affected thereby;

(iv)    change Section 2.11(c) or Section 11.5 in a manner that would alter the pro rata sharing of payments required thereby without the written consent of each Lender directly and adversely affected thereby;

(v)    waive any condition set forth in Section 4.1 without the written consent of each Lender;

(vi)    [reserved];

(vii)    change any provision of this Section or the percentage in the definition of "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or make any determination or grant any consent hereunder, without the written consent of each Lender;

(viii)    release all or substantially all of the Collateral; or

-81-

(ix)    release all or substantially all of the value of the Guaranty;

provided, further, that (i) no such amendment or waiver shall amend, modify or otherwise affect the rights or duties hereunder or under any other Loan Document of (A) the Administrative Agent, unless in writing executed by the Administrative Agent and (ii) the Fee Letter may be amended, or rights or privileges thereunder waived, in a writing executed only by the parties thereto.

In addition, notwithstanding anything in this Section to the contrary, if the Administrative Agent and the Borrower shall have jointly identified an obvious error or any error or omission of a technical nature, in each case, in any provision of the Loan Documents, then the Administrative Agent and the Borrower shall be permitted to amend such provision, and, in each case, such amendment shall become effective without any further action or consent of any other party to any Loan Document if the same is not objected to in writing by the Required Lenders to the Administrative Agent within ten Business Days following receipt of notice thereof.

Notwithstanding anything to the contrary contained in this Section 11.11 or any other Loan Document, the determination of Required Lenders for purposes of amending or waiving Section 11.27 shall exclude any Lender that is a holder of Subordinated Debt at the time of such determination; provided that no such amendment or waiver may adversely affect a Limited Voting Lender without the consent of such Limited Voting Lender.

*Section 11.12  Headings.* Section headings used in this Agreement are for reference only and shall not affect the construction of this Agreement.

*Section 11.13  Costs and Expenses; Indemnification.*

(a)    The Borrower agrees to pay all costs and expenses of Administrative Agent in connection with the preparation, negotiation, syndication, and administration of the Loan Documents, including the reasonable fees and disbursements of counsel to Administrative Agent, in connection with the preparation and execution of the Loan Documents and in connection with the transactions contemplated hereby or thereby, and any amendment, waiver or consent related thereto, whether or not the transactions contemplated herein are consummated, together with any fees and charges suffered or incurred by Administrative Agent in connection with periodic environmental audits, fixed asset appraisals, title insurance policies, collateral filing fees and lien searches.  The Borrower agrees to pay to Administrative Agent and each Lender, and any other holder of any Obligations outstanding hereunder, all costs and expenses reasonably incurred or paid by Administrative Agent, such Lender, or any such holder, including reasonable attorneys' fees and disbursements and court costs, in connection with any Default or Event of Default hereunder or in connection with the enforcement of any of the Loan Documents (including all such costs and expenses incurred in connection with any proceeding under the United States Bankruptcy Code involving Borrower, any other Loan Party or any Guarantor as a debtor thereunder).  The Borrower further agrees to indemnify Administrative Agent, each Lender, and any security trustee therefor, and their respective directors, officers, employees, agents, financial advisors, and consultants (each such Person being called an ***"Indemnitee"***) against all losses, claims, damages, penalties, judgments, liabilities and expenses (including all reasonable fees and disbursements of counsel for any such Indemnitee and all reasonable expenses of litigation or preparation therefor, whether or not the Indemnitee is a party thereto, or any settlement arrangement arising from or

-82-

relating to any such litigation) which any of them may pay or incur arising out of or relating to any Loan Document or any of the transactions contemplated thereby or the direct or indirect application or proposed application of the proceeds of any Loan, other than those which arise from the gross negligence or willful misconduct of the party claiming indemnification (as determined by a court of competent jurisdiction by final and non-appealable judgment).  The Borrower, upon demand by Administrative Agent or a Lender at any time, shall reimburse Administrative Agent or such Lender for any legal or other expenses (including all reasonable fees and disbursements of counsel for any such Indemnitee) incurred in connection with investigating or defending against any of the foregoing (including any settlement costs relating to the foregoing) except if the same is directly due to the gross negligence or willful misconduct of the party to be indemnified (as determined by a court of competent jurisdiction by final and non-appealable judgment).  To the extent permitted by applicable Law, the Borrower and its Subsidiaries shall not assert, and each such Person hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or the other Loan Documents or any agreement or instrument contemplated hereby or thereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof.  No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby.  This Section shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(b)    The Borrower agrees to indemnify, defend and hold harmless, and covenants not to sue for any claim for contribution against, each Indemnitee for any damages, costs, loss or expense, including response, remedial or removal costs and all fees and disbursements of counsel for any such Indemnitee, arising out of any of the following:  (i) any presence, release, threatened release or disposal of any hazardous or toxic substance or petroleum by Borrower or any Subsidiary or otherwise occurring on or with respect to its Property (whether owned or leased), (ii) the operation or violation of any environmental law, whether federal, state, or local, and any regulations promulgated thereunder, by Borrower or any Subsidiary or otherwise occurring on or with respect to its Property (whether owned or leased), (iii) any claim for personal injury or property damage in connection with the Borrower or any Subsidiary or otherwise occurring on or with respect to its Property (whether owned or leased), and (iv) the inaccuracy or breach of any environmental representation, warranty or covenant by the Borrower or any Subsidiary made herein or in any other Loan Document evidencing or securing any Obligations or setting forth terms and conditions applicable thereto or otherwise relating thereto, except for damages arising from the willful misconduct or gross negligence of the relevant Indemnitee (as determined by a court of competent jurisdiction by final and non-appealable judgment).

*Section 11.14  Set off.*   In addition to any rights now or hereafter granted under the Loan Documents or applicable Law and not by way of limitation of any such rights, upon the occurrence of any Event of Default, with the prior written consent of Administrative Agent, each Lender, each subsequent holder of any Obligation, and each of their respective affiliates, is hereby authorized by Borrower at any time or from time to time, without notice to Borrower or to any other Person, any such notice being hereby expressly waived, to set off and to appropriate and to apply any and

-83-

all deposits (general or special, including, but not limited to, indebtedness evidenced by certificates of deposit, whether matured or unmatured, and in whatever currency denominated, but not including trust accounts) and any other indebtedness at any time held or owing by that Lender, subsequent holder, or affiliate, to or for the credit or the account of Borrower or any Subsidiary, whether or not matured, against and on account of the Obligations of Borrower or any Subsidiary to that Lender or subsequent holder under the Loan Documents, including, but not limited to, all claims of any nature or description arising out of or connected with the Loan Documents, irrespective of whether or not (a) that Lender or subsequent holder shall have made any demand hereunder or (b) the principal of or the interest on the Loans and other amounts due hereunder shall have become due and payable pursuant to Section 8 and although said obligations and liabilities, or any of them, may be contingent or unmatured.

Section 11.15  *Entire Agreement.* The Loan Documents constitute the entire understanding of the parties thereto with respect to the subject matter thereof and any prior agreements, whether written or oral, with respect thereto are superseded hereby.

Section 11.16  *Governing Law.*  This Agreement and the other Loan Documents (except as otherwise specified therein), and any claim, controversy, dispute or cause of action (whether in contract, tort or otherwise) based upon, arising out of or relating to this Agreement or any Loan Document, and the rights and duties of the parties hereto, shall be governed by and construed and determined in accordance with the internal laws of the State of New York.

Section 11.17  *Severability of Provisions.*  Any provision of any Loan Document which is unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such unenforceability without invalidating the remaining provisions hereof or affecting the enforceability of such provision in any other jurisdiction.  All rights, remedies and powers provided in this Agreement and the other Loan Documents may be exercised only to the extent that the exercise thereof does not violate any applicable mandatory provisions of law, and all the provisions of this Agreement and Loan Documents are intended to be subject to all applicable mandatory provisions of law which may be controlling and to be limited to the extent necessary so that they will not render this Agreement or the other Loan Documents invalid or unenforceable.

Section 11.18  *Excess Interest.*  Notwithstanding any provision to the contrary contained herein or in any other Loan Document, no such provision shall require the payment or permit the collection of any amount of interest in excess of the maximum amount of interest permitted by applicable Law to be charged for the use or detention, or the forbearance in the collection, of all or any portion of the Loans or other obligations outstanding under this Agreement or any other Loan Document (*"Excess Interest"*).  If any Excess Interest is provided for, or is adjudicated to be provided for, herein or in any other Loan Document, then in such event (a) the provisions of this Section shall govern and control, (b) neither Borrower, nor any other Loan Party nor any Guarantor or endorser shall be obligated to pay any Excess Interest, (c) any Excess Interest that Administrative Agent or any Lender may have received hereunder shall, at the option of Administrative Agent, be (i) applied as a credit against the then outstanding principal amount of Obligations hereunder and accrued and unpaid interest thereon (not to exceed the maximum amount permitted by applicable Law), (ii) refunded to Borrower, or (iii) any combination of the foregoing, (d) the interest rate payable hereunder or under any other Loan Document shall be

-84-

automatically subject to reduction to the maximum lawful contract rate allowed under applicable usury laws (the *"Maximum Rate"*), and this Agreement and the other Loan Documents shall be deemed to have been, and shall be, reformed and modified to reflect such reduction in the relevant interest rate, and (e) neither Borrower, nor any Loan Party, nor any Guarantor or endorser shall have any action against Administrative Agent or any Lender for any damages whatsoever arising out of the payment or collection of any Excess Interest. Notwithstanding the foregoing, if for any period of time interest on any of the Obligations is calculated at the Maximum Rate rather than the applicable rate under this Agreement, and thereafter such applicable rate becomes less than the Maximum Rate, the rate of interest payable on such Obligations shall remain at the Maximum Rate until the Lenders have received the amount of interest which such Lenders would have received during such period on such Obligations had the rate of interest not been limited to the Maximum Rate during such period.

 *Section 11.19  Construction.* The parties acknowledge and agree that the Loan Documents shall not be construed more favorably in favor of any party hereto based upon which party drafted the same, it being acknowledged that all parties hereto contributed substantially to the negotiation of the Loan Documents. The provisions of this Agreement relating to Subsidiaries shall only apply during such times as Borrower has one or more Subsidiaries. Nothing contained herein shall be deemed or construed to permit any act or omission which is prohibited by the terms of any Collateral Document, the covenants and agreements contained herein being in addition to and not in substitution for the covenants and agreements contained in the Collateral Documents.

 *Section 11.20  Lender's Obligations Several.* The obligations of the Lenders hereunder are several and not joint. Nothing contained in this Agreement and no action taken by the Lenders pursuant hereto shall be deemed to constitute the Lenders a partnership, association, joint venture or other entity.

 *Section 11.21  Submission to Jurisdiction; Waiver of Venue; Service of Process.*  (a) BORROWER IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK SITTING IN THE BOROUGH OF MANHATTAN IN NEW YORK AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT ADMINISTRATIVE AGENT AND LENDERS MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN

DOCUMENT AGAINST ANY LOAN PARTY OR THEIR PROPERTY IN THE COURTS OF ANY OTHER JURISDICTION.

(b)    BORROWER IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (a) OF THIS SECTION.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(a)    EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN <u>SECTION 11.6(a)</u>.  NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

*Section 11.22  Waiver of Jury Trial.*    EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

*Section 11.23  USA Patriot Act.*  Each Lender that is subject to the requirements of the USA Patriot Act (Title III of Pub. L. 107 56 (signed into law October 26, 2001)) (the *"Act"*) hereby notifies each Loan Party that pursuant to the requirements of the Act, it is required to obtain, verify, and record information that identifies each such Loan Party, which information includes the name and address of such Loan Party and other information that will allow such Lender to identify such Loan Party in accordance with the Act.

*Section 11.24  Time is of the Essence.* Time is of the essence of this Agreement and each of the other Loan Documents.

*Section 11.25  Confidentiality.* Each of Administrative Agent and the Lenders severally agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' and its Related Parties, including

-86-

accountants, legal counsel and other advisors to the extent any such Person has a need to know such Information (it being understood that the Persons to whom such disclosure is made will first be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent required or requested by any regulatory authority (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable Laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (A) any assignee of or participant in, or any prospective assignee of or participant in, any of its rights or obligations under this Agreement or (B) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to Borrower, any other Loan Party or any Subsidiary and its obligations, (g) on a confidential basis to any rating agency in connection with rating the Borrower or its Subsidiaries or the Loans; (h) with the prior written consent of the applicable Loan Party, (i) to the extent such Information (A) becomes publicly available other than as a result of a breach of this Section or (B) becomes available to Administrative Agent or any Lender on a non-confidential basis from a source other than Borrower, a Loan Party or any Subsidiary or any of their directors, officers, employees or agents, including accountants, legal counsel and other advisors, or (j) to entities which compile and publish information about the syndicated loan market, provided that only basic information about the pricing and structure of the transaction evidenced hereby may be disclosed pursuant to this subsection (j).  For purposes of this Section, "Information" means all information received from Borrower, any Loan Party or any of the Subsidiaries or from any other Person on behalf of Borrower, any Loan Party or any Subsidiary relating to Borrower, any Loan Party or any Subsidiary or any of their respective businesses, other than any such information that is available to Administrative Agent or any Lender on a non-confidential basis prior to disclosure by Borrower, any Loan Party or any of their Subsidiaries or from any other Person on behalf of Borrower, any Loan Party or any of their Subsidiaries**; *provided* that, in the case of information received from the Borrower, any Loan Party or any Subsidiary, or on behalf of Borrower, any Loan Party or any Subsidiary, after the date hereof, such information is clearly identified at the time of delivery as confidential.  Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information**.

Section 11.26  *Customary Advertising Material*.  Notwithstanding anything to the contrary in Section 11.25, the Borrower consents to the publication by the Administrative Agent or any Lender of customary advertising material (including customary "tombstone" disclosure) relating to the transactions contemplated hereby using the name, product photographs, logo or trademark of the Borrower and its Subsidiaries.

Section 11.27  *Limited Voting Lender*  Notwithstanding anything herein or in any other Loan Document to the contrary:

-87-

(a)    in the event that a Limited Voting Lender owns any Loans or unfunded Commitments, for purposes of any amendment, waiver or modification of any Loan Document (other than amendments described in clauses (i) through (vii) of the proviso to Section 11.11), each Limited Voting Lender will be deemed to have voted in the same proportion as the Lenders that are not Limited Voting Lenders voting on such matter, except to the extent that such amendment, waiver or modification proposes to treat the Obligations held by such Limited Voting Lender in a manner that is less favorable in any respect to such Limited Voting Lender than the proposed treatment of similar Obligations held by Lenders that are not Limited Voting Lenders or would deprive such Limited Voting Lender of its pro rata share of any payments to which all Lenders are entitled; and

(b)    in the event that a Limited Voting Lender owns any Loans or unfunded Commitments, in the event that any proceeding under the Bankruptcy Code shall be instituted by or against the Borrower or any other Guarantor, such Limited Voting Lender shall be deemed to vote in such proceedings (in its capacity as a Lender) in the same proportion as the allocation of voting with respect to such matter by those Lenders who are not Limited Voting Lenders, except to the extent that any plan of reorganization proposes to treat the Obligations held by such Limited Voting Lender in a manner that is less favorable in any respect to such Limited Voting Lender than the proposed treatment of similar Obligations held by Lenders that are not Limited Voting Lenders or would deprive such Limited Voting Lender of its pro rata share of any payments to which all Lenders are entitled.

As used herein, the term "*Limited Voting Lender*" means, at any relevant time of determination, any Lender, together with its controlled investment Affiliates, that is also a holder of any Subordinated Debt, including any unfunded commitments in respect thereof.

Section 11.28  *Acknowledgement and Consent to Bail-In of Affected Financial Institutions*. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

-88-

(iii)    the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of the applicable Resolution Authority.

*Section 11.29  Acknowledgement Regarding any Supported QFCs*.  To the extent that the Loan Documents provide support, through a guarantee or otherwise, for any agreement or instrument that is a QFC (such support, *"QFC Credit Support"* and each such QFC a *"Supported QFC"*), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the *"U.S. Special Resolution Regimes"*) in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

(a) In the event a Covered Entity that is party to a Supported QFC (each, a *"Covered Party"*) becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States.  In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States.

(b) As used in this <u>Section 11.29</u>, the following terms have the following meanings:

*"BHC Act Affiliate"* of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

*"Covered Entity"* means any of the following: (i) a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b); (ii) a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or (iii) a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

*"Default Right"* has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

-89-

***"QFC"*** has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

[Signature Pages to Follow]

-90-

This Credit Agreement is entered into between us for the uses and purposes hereinabove set forth as of the date first above written.

*"Borrower"*

**BRICKELL INSURANCE HOLDINGS LLC**

By _____
Name: Steven W. Pasko
Title: Chief Executive Officer

*"Administrative Agent"*

**BMO HARRIS BANK N.A.**, as Administrative Agent

By
Name Brij Grewal
Title Managing Director

[Signature page to Credit Agreement]

*"Lenders"*

**BMO HARRIS BANK N.A.**, as a Lender


By
Name Brij Grewal
Title Managing Director

**TABLE OF CONTENTS**

Page

Schedule 1 Lenders' Commitments ................................................................................................. 2

Schedule 5.2 Subsidiaries ............................................................................................................... 3

Schedule 7.3 Permitted Investments ............................................................................................... 4

Schedule 7.6(b) Defaults under Indebtedness for Borrowed Money ............................................. 5

**Schedule 1**

**Lenders' Commitments**

| __Lenders__ | __Term Loan Commitments__ |
|---|---|
| BMO Harris Bank N.A. | $65,000,000.00 |
| __Total__ | __$65,000,000.00__ |

**Schedule 5.2**

**Subsidiaries**

| **Subsidiary** | **Owner** | **Jurisdiction of Organization** | **Ownership (%)** |
|---|---|---|---|
| Merit Life Insurance Co. | Borrower | TX | 100% |
| Merit Life Insurance Holdings LLC | Borrower | DE | 100% |
| 777 Re. LTD | Borrower | Bermuda | 98% |
| 777 Re. LTD | Will Rinehimer | Bermuda | 2% |

**Schedule 7.3**

**Permitted Investments**

| Entity Name | Share Type | Share Quantity | Owner |
|---|---|---|---|
| Randall & Quilter PS Holdings Inc. | Series A Preferred Stock | 6,009,763 | Brickell Insurance Holdings LLC |
| Randall & Quilter PS Holdings Inc. | Series A Preferred Stock | 349,785 | Merit Life Insurance Co. |

**Schedule 7.6(b)**

**Defaults under Indebtedness for Borrowed Money**

1. Defaults have occurred and are continuing under that certain Third Amended and Restated Margin Loan Agreement, dated as of February 22, 2022, among 777 Partners LLC, Vida Longevity Fund, LP, Vida Insurance Credit Opportunity Fund II, LP and Vida Insurance Credit Opportunity Fund III, LP.

**EXECUTION VERSION**

## Exhibit A

## Notice of Borrowing

Date: _____, ____

To:    BMO Harris Bank N.A., as Administrative Agent for the Lenders party to the Credit Agreement dated as of June 30, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the *"Credit Agreement"*), among Brickell Insurance Holdings LLC, certain Lenders party thereto from time to time, and BMO Harris Bank N.A., as Administrative Agent

Ladies and Gentlemen:

The undersigned, Brickell Insurance Holdings LLC (the *"Borrower"*), refers to the Credit Agreement, the terms defined therein being used herein as therein defined, and hereby gives you notice irrevocably, pursuant to <u>Section 2.4</u> of the Credit Agreement, of the Borrowing specified below:

1.    The Business Day of the proposed Borrowing is _____, ____.

2.    The aggregate amount of the proposed Borrowing is $_____.

3.    The Borrowing is to be comprised of $_____ of **[Base Rate] [SOFR]** Loans.

**[4.    The duration of the Interest Period for the SOFR Loans included in the Borrowing shall be _____[1] months.]**

The undersigned hereby certifies that the following statements are true on the date hereof, and will be true on the date of the proposed Borrowing, before and after giving effect thereto and to the application of the proceeds therefrom:

(a)    the representations and warranties of Borrower contained in <u>Section 5</u> of the Credit Agreement are true and correct as though made on and as of such date (except to the extent such representations and warranties relate to an earlier date, in which case they are true and correct as of such date); and

---

[1] To be one, three or six months.

     (b)    no Default or Event of Default has occurred and is continuing or would result from such proposed Borrowing.

BRICKELL INSURANCE HOLDINGS LLC


By _____
    Name _____
    Title _____

**Exhibit B**

**Notice of Continuation/Conversion**

Date: _____, _____

To:  BMO Harris Bank N.A., as Administrative Agent for the Lenders party to the Credit Agreement dated as of June 30, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the *"Credit Agreement"*) among Brickell Insurance Holdings LLC, certain Lenders party thereto from time to time, and BMO Harris Bank N.A., as Administrative Agent

Ladies and Gentlemen:

The undersigned, Brickell Insurance Holdings LLC (the *"Borrower"*), refers to the Credit Agreement, the terms defined therein being used herein as therein defined, and hereby gives you notice irrevocably, pursuant to Section 2.4 of the Credit Agreement, of the **[conversion] [continuation]** of the Loans specified herein, that:

1.    The conversion/continuation Date is _____, _____.

2.    The aggregate amount of the Loans to be **[converted] [continued]** is $_____.

3.    The Loans are to be **[converted into] [continued as] [SOFR] [Base Rate]** Loans.

4.    **[If applicable:** The duration of the Interest Period for the Term Loans included in the **[conversion] [continuation]** shall be _____[2] months.**]**

The undersigned hereby certifies that the following statements are true on the date hereof, and will be true on the proposed conversion/continuation date, before and after giving effect thereto and to the application of the proceeds therefrom:

(a)    the representations and warranties of Borrower contained in Section 5 of the Credit Agreement are true and correct as though made on and as of such date (except to the extent such representations and warranties relate to an earlier date, in which case they are true and correct as of such date); *provided,* that this condition shall not apply to the conversion of an outstanding SOFR Loan to a Base Rate Loan; and

---

[2] To be one, three or six months.

(b)    no Default or Event of Default has occurred and is continuing, or would result from such proposed **[conversion] [continuation]**.

BRICKELL INSURANCE HOLDINGS LLC

By _____

Name _____

Title _____

**Exhibit C**

**Note**

U.S. $_____                                    _____, _____

       For Value Received, the undersigned, Brickell Insurance Holdings LLC, a Delaware limited liability company (the *"Borrower"*), hereby promises to pay to _____ (the *"Lender"*) or its registered assigns at the principal office of Administrative Agent in Chicago, Illinois (or such other location as Administrative Agent may designate to Borrower), in immediately available funds, the principal sum of _____ Dollars ($_____) or, if less, the aggregate unpaid principal amount of all Loans made or maintained by the Lender to Borrower pursuant to the Credit Agreement, to be payable in the manner and on the dates specified in the Credit Agreement, together with interest on the principal amount of such Loan from time to time outstanding hereunder at the rates, and payable in the manner and on the dates, specified in the Credit Agreement.

       This Note (*"Note"*) is one of the Notes referred to in the Credit Agreement dated as of June 30, 2022, among Borrower, the Lenders party thereto from time to time, and BMO Harris Bank N.A., as Administrative Agent (as amended, restated, supplemented or otherwise modified from time to time, the *"Credit Agreement"*), and this Note and the holder hereof are entitled to all the benefits and security provided for thereby or referred to therein, to which Credit Agreement reference is hereby made for a statement thereof.  All defined terms used in this Note, except terms otherwise defined herein, shall have the same meaning as in the Credit Agreement.  This Note shall be governed by and construed in accordance with the internal laws of the State of New York.

       Voluntary prepayments may be made hereon, certain prepayments are required to be made hereon,  and this Note may be declared due prior to the expressed maturity hereof, all in the events, on the terms and in the manner as provided for in the Credit Agreement.

       Borrower hereby waives demand, presentment, protest or notice of any kind hereunder.

                     BRICKELL INSURANCE HOLDINGS LLC

                     By _____

                        Name _____

                        Title _____

**Exhibit D**

**BRICKELL INSURANCE HOLDINGS LLC**

**Compliance Certificate**

To: BMO Harris Bank N.A., as Administrative Agent under, and the Lenders from time to time party to, the Credit Agreement described below

      This Compliance Certificate is furnished to Administrative Agent and the Lenders pursuant to that certain Credit Agreement dated as of June 30, 2022, among Brickell Insurance Holdings LLC (the "*Borrower*"), the lenders party thereto, and BMO Harris Bank N.A., as administrative agent (as amended, restated, supplemented or otherwise modified from time to time, the *"Credit Agreement"*). Unless otherwise defined herein, the terms used in this Compliance Certificate have the meanings ascribed thereto in the Credit Agreement.

      The Undersigned hereby certifies that:

      1.    I am the duly elected _____ of Brickell Insurance Holdings LLC;

      2.    I have reviewed the terms of the Credit Agreement and I have made, or have caused to be made under my supervision, a detailed review of the transactions and conditions of Borrower and its Subsidiaries during the accounting period covered by the attached financial statements;

      3.    The examinations described in paragraph 2 did not disclose, and I have no knowledge of, the existence of any condition or the occurrence of any event which constitutes a Default or Event of Default during or at the end of the accounting period covered by the attached financial statements or as of the date of this Compliance Certificate, except as set forth below;

      4.    The financial statements required by Section 6.5 of the Credit Agreement and being furnished to you concurrently with this Compliance Certificate are true, correct and complete as of the date and for the periods covered thereby;

      5.    The Schedule I hereto sets forth financial data and computations evidencing Borrower's compliance with certain covenants of the Credit Agreement, all of which data and computations are, to the best of my knowledge, true, complete and correct and have been made in accordance with the relevant Sections of the Credit Agreement;

      6.    The Insurance Subsidiaries have a Financial Strength Rating of at least B++; and

      7.    777 Re has an Enhanced Capital Requirement, as calculated under, and determined in accordance with, Bermuda law, in the amount of 150%.

Described below are the exceptions, if any, to paragraph 3 by listing, in detail, the nature of the condition or event, the period during which it has existed and the action which Borrower has taken, is taking, or proposes to take with respect to each such condition or event:

_____

_____

_____

_____

The foregoing certifications, together with the computations set forth in Schedule I hereto and the financial statements delivered with this Certificate in support hereof, are made and delivered this _____ day of _____ 20___.

BRICKELL INSURANCE HOLDINGS LLC

By _____

Name _____

Title _____

**Schedule I**
**to Compliance Certificate**

**BRICKELL INSURANCE HOLDINGS LLC**

**Compliance Calculations**
**for Credit Agreement dated as of June 30, 2022**

Calculations as of _____, _____

---

A.   <u>Debt to Capital Ratio (Section 7.14(a))</u>

    1.    Consolidated Indebtedness: All Indebtedness for Borrowed      $_____
Money (whether or not reflected on Borrower's balance
sheet) of Borrower and its Subsidiaries as of such date,
determined on a consolidated basis in accordance with
GAAP

    2.    Consolidated Net Worth: The consolidated shareholders'      $_____
equity of Borrower and its Subsidiaries determined on a
consolidated basis in accordance with GAAP and as
reflected on the consolidated financial statements of
Borrower and its Subsidiaries

    3.    Consolidated Total Capital:  Line A1 plus Line A2      $_____

    4.    Ratio of Line A1 to A3 (expressed as a percentage)      ____%

    5.    Line A4 ratio must not exceed      35%

    6.    Borrower is in compliance (circle yes or no)      yes/no

B.   <u>Net Worth (Section 7.14(b))</u>

    1.    Consolidated Net Worth (Line A2 above)      $_____

    2.    Line B1 shall not be less than      $225,000,000

    3.    Borrower is in compliance (circle yes or no)      yes/no

C.   <u>Fixed Charge Coverage Ratio (Section 7.14(c))</u>

    1.    Net Income for preceding four fiscal quarters      $_____

    2.    Interest Expense for preceding four fiscal quarters      $_____

    3.    Federal, state, and local income taxes for preceding four      $_____
fiscal quarters

    4.    Depreciation of fixed assets and amortization of intangible      $_____
assets for preceding four fiscal quarters

| | | |
|---|---|---|
| 5. | Non-cash compensation expense for preceding four fiscal quarters | $_____ |
| 6. | Costs, expenses, charges, accruals, or reserves attributable to the undertaking and/or the implementation of cost savings initiatives, operating expense reductions and other strategic initiatives for preceding four fiscal quarters | $_____ |
| 7. | Extraordinary, non-recurring or unusual losses, charges and expenses (other than such losses, charges and expenses related to insurance claims and insurance policies) for preceding four fiscal quarters | $_____ |
| 8. | EBITDA:  Sum of lines C1, C2, C3, C4, C5, C6 and C7[3] | $_____ |
| 9. | Sum of federal, state, and local income taxes paid in cash by Borrower and its Subsidiaries for preceding four fiscal quarters | $_____ |
| 10. | Line C8 less Line C9 | $_____ |
| 11. | Sum of all scheduled payments of principal for preceding four fiscal quarters with respect to (i) Indebtedness for Borrowed Money of Borrower and its Subsidiaries and (ii) 777 Partners pursuant to the Subordinated Debt Documents | $_____ |
| 12. | Sum of cash Interest Expense for preceding four quarters of (i) the Borrower and its Subsidiaries with respect to Indebtedness for Borrowed Money of Borrower and its Subsidiaries and (ii) 777 Partners pursuant to the Subordinated Debt Documents | $_____ |
| 13. | Fixed Charges:  Sum of Lines C11 and C12 | $_____ |
| 14. | Ratio of Line C10 to Line C13 | ____:1.0 |
| 15. | Line C14 ratio must not be less than | 1.20:1.00 |
| 16. | Borrower is in compliance (circle yes or no) | yes/no |

---

[3] Lines C2 through C7 shall only include amounts that were deduced in determining Net Income.

**Exhibit E**

**Assignment and Acceptance**

Dated _____, _____

Reference is made to the Credit Agreement dated as of June 30, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the *"Credit Agreement"*) among Brickell Insurance Holdings LLC, the Lenders party thereto from time to time, and BMO Harris Bank N.A., as Administrative Agent (the *"Administrative Agent"*).  Terms defined in the Credit Agreement are used herein with the same meaning.

_____ (the *"Assignor"*) and _____ (the *"Assignee"*) agree as follows:

      1.    The Assignor hereby sells and assigns to the Assignee, and the Assignee hereby purchases and assumes from the Assignor, the amount and specified percentage interest shown on Annex I hereto of the Assignor's rights and obligations under the Credit Agreement as of the Effective Date (as defined below), including the Assignor's Commitments as in effect on the Effective Date and the Loans, if any, owing to the Assignor on the Effective Date.

      2.    The Assignor (i) represents and warrants that it is the legal and beneficial owner of the interest being assigned by it hereunder and that such interest is free and clear of any adverse claim, lien, or encumbrance of any kind; (ii) makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with the Credit Agreement or the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Credit Agreement or any other instrument or document furnished pursuant thereto; and (iii) makes no representation or warranty and assumes no responsibility with respect to the financial condition of Borrower or any Subsidiary or the performance or observance by Borrower or any Subsidiary of any of their respective obligations under the Credit Agreement or any other instrument or document furnished pursuant thereto.

      3.    The Assignee (i) confirms that it has received a copy of the Credit Agreement, together with copies of the most recent financial statements delivered to the Lenders pursuant to Section 6.5(a), (b), (c), (d) and (e) thereof and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Acceptance; (ii) agrees that it will, independently and without reliance upon Administrative Agent, the Assignor or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Credit Agreement; (iii) appoints and authorizes Administrative Agent to take such action as Administrative Agent on its behalf and to exercise such powers under the Credit Agreement and the other Loan Documents as are delegated to Administrative Agent by the terms thereof, together with such powers as are reasonably incidental thereto; (iv) agrees that it will perform in accordance with their terms all of the obligations which by the terms of the Credit

Agreement are required to be performed by it as a Lender; and (v) specifies as its lending office (and address for notices) the offices set forth on its Administrative Questionnaire.

4.    As consideration for the assignment and sale contemplated in Annex I hereof, the Assignee shall pay to the Assignor on the Effective Date in Federal funds the amount agreed upon between them.  Each of the Assignor and the Assignee hereby agrees that if it receives any amount under the Credit Agreement which is for the account of the other party hereto, it shall receive the same for the account of such other party to the extent of such other party's interest therein and shall promptly pay the same to such other party.

5.    The effective date for this Assignment and Acceptance shall be _____ (the *"Effective Date"*).  Following the execution of this Assignment and Acceptance, it will be delivered to Administrative Agent for acceptance and recording by Administrative Agent and, if required, Borrower.

6.    Upon such acceptance and recording, as of the Effective Date, (i) the Assignee shall be a party to the Credit Agreement and, to the extent provided in this Assignment and Acceptance, have the rights and obligations of a Lender thereunder and (ii) the Assignor shall, to the extent provided in this Assignment and Acceptance, relinquish its rights and be released from its obligations under the Credit Agreement.

7.    Upon such acceptance and recording, from and after the Effective Date, Administrative Agent shall make all payments under the Credit Agreement in respect of the interest assigned hereby (including all payments of principal and interest with respect thereto) to the Assignee.  The Assignor and Assignee shall make all appropriate adjustments in payments under the Credit Agreement for periods prior to the Effective Date directly between themselves.

8.    This Assignment and Acceptance shall be governed by, and construed in accordance with, the laws of the State of New York.

[Assignor Lender]


By _____
    Name _____
    Title _____

[Assignee Lender]


By _____
    Name _____
    Title _____

[Accepted and consented this
    _____ day of _____


BRICKELL INSURANCE HOLDINGS LLC


By _____
    Name _____
    Title_____ ]

[Accepted and consented to by the Administrative
  Agent this ____ day of _____


BMO Harris Bank N.A.,
as Administrative Agent


By _____
    Name_____
    Title_____ ]

-3-

**Annex I**
**to Assignment and Acceptance**

The assignee hereby purchases and assumes from the assignor the following interest in and to all of the Assignor's rights and obligations under the Credit Agreement as of the effective date.

| Facility Assigned | Aggregate Commitment/Loans For All Lenders | Amount of Commitment/Loans Assigned | Percentage Assigned of Commitment/Loans |
|---|---|---|---|
| Term Loans | $_____ | $_____ | _____% |

747931754 22707135