# EXHIBIT B

EXECUTION VERSION

**THIS INSTRUMENT AND THE RIGHTS AND OBLIGATIONS EVIDENCED HEREBY ARE SUBORDINATED IN THE MANNER AND TO THE EXTENT SET FORTH IN THAT CERTAIN SUBORDINATION AND INTERCREDITOR AGREEMENT DATED AS OF JUNE 30, 2022 AMONG BMO HARRIS BANK, N.A., LEADENHALL CAPITAL PARTNERS LLP, LEADENHALL LIFE SMA III ICAV, THE SUBORDINATED HOLDERS PARTY THERETO, BRICKELL INSURANCE HOLDINGS LLC, 777 PARTNERS LLC AND MTCP, LLC, AS AMENDED, RESTATED, SUPPLEMENTED OR OTHERWISE MODIFIED FROM TIME TO TIME.**

# SUBORDINATED NOTE PURCHASE AGREEMENT

dated as of June 30, 2022

by and among

**777 PARTNERS LLC**,

as the Company,

**THE PURCHASERS NAMED ON THE SIGNATURE PAGES HEREOF**,

**LEADENHALL CAPITAL PARTNERS LLP**,

as Note Administrative Agent,

and

**LEADENHALL LIFE SMA III ICAV**,

as Second Lien Collateral Agent

arranged by

**LEADENHALL CAPITAL PARTNERS LLP**

Ref: L-317379

Linklaters LLP

A48243114

**CONTENTS**

| SECTION | | PAGE |
|---------|---|------|
| 1. | Definitions and Interpretation | 1 |
| 2. | The Facility | 22 |
| 3. | Conditions Precedent | 23 |
| 4. | Repayment | 27 |
| 5. | Cancellation and Prepayment | 27 |
| 6. | Interest | 30 |
| 7. | Taxes | 31 |
| 8. | Increased Costs | 36 |
| 9. | Other indemnities | 38 |
| 10. | Mitigation by Second Lien Secured Parties | 40 |
| 11. | Costs and expenses | 41 |
| 12. | Representations and Warranties | 41 |
| 13. | Affirmative Covenants | 48 |
| 14. | Negative Covenants | 56 |
| 15. | Events of Default | 68 |
| 16. | Successors and Assigns Generally | 71 |
| 17. | Assignments by Purchasers and Participations | 71 |
| 18. | Changes to the Company | 75 |
| 19. | Role of the Agents and the Arranger | 75 |
| 20. | Conduct of business by the Second Lien Secured Parties | 86 |
| 21. | Sharing among the Purchasers | 86 |
| 22. | Payment Mechanics | 87 |
| 23. | Set-off | 90 |
| 24. | Notices | 90 |
| 25. | Calculations and Certificates | 92 |
| 26. | Severability | 93 |
| 27. | Remedies and Waivers | 93 |
| 28. | Amendments and Waivers | 93 |
| 29. | Confidential Information | 94 |
| 30. | Counterparts | 96 |
| 31. | Governing law; Jurisdiction; Etc. | 97 |
| 32. | WAIVER OF JURY TRIAL | 98 |
| 33. | Miscellaneous | 98 |

A48243114

**SCHEDULES**:

| | |
|---|---|
| Schedule 2.1: | Commitments |
| Schedule 12.2: | Subsidiaries |
| Schedule 14.3: | Investments |

**EXHIBITS**:

| | |
|---|---|
| Exhibit I: | Form of Assignment and Assumption |
| Exhibit II: | Form of Compliance Certificate |
| Exhibit III: | Form of Note |
| Exhibit IV: | [Reserved] |
| Exhibit V-A: | Form of US Tax Compliance Certificate (For Foreign Purchasers That Are Not Partnerships For US Federal Income Tax Purposes) |
| Exhibit V-B: | Form of US Tax Compliance Certificate (For Foreign Participants That Are Not Partnerships For US Federal Income Tax Purposes) |
| Exhibit V-C: | Form of US Tax Compliance Certificate (For Foreign Participants That Are Partnerships For US Federal Income Tax Purposes) |
| Exhibit V-D: | Form of US Tax Compliance Certificate (For Foreign Purchasers That Are Partnerships For US Federal Income Tax Purposes) |

A48243114

(ii)

This NOTE PURCHASE AGREEMENT, dated as of June 30, 2022 (as may be amended, restated, supplemented, or otherwise modified from time to time pursuant to the terms hereof, this "**Agreement**"), is made by and among 777 PARTNERS LLC, a Delaware limited liability company (the "**Company**"), the Purchasers named on the signature pages hereof, LEADENHALL CAPITAL PARTNERS LLP, as administrative agent for the Purchasers (in such capacity, the "**Note Administrative Agent**"), and LEADENHALL LIFE SMA III ICAV, as second lien collateral agent for the Second Lien Secured Parties (in such capacity, the "**Second Lien Collateral Agent**").

## PRELIMINARY STATEMENTS

**WHEREAS**, the Company has requested that the Purchasers extend credit to the Company by purchasing notes in an aggregate principal amount of $150,000,000 on the Closing Date; and

**WHEREAS**, the Purchasers are prepared to extend such credit to the Company upon the terms and subject to the conditions set forth herein.

**NOW, THEREFORE**, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties agree as follows:

1.    **DEFINITIONS AND INTERPRETATION**

1.1    **Definitions**

The following terms used in this Agreement shall have the following meanings:

"**777 Re**" means 777 Re LTD, a Bermuda company.

"**Adjusted Term SOFR**" means the per annum rate equal to the sum of (i) Term SOFR *plus* (ii) 0.15% (15 basis points); **provided** that, if Adjusted Term SOFR determined as provided above shall ever be less than the Floor, then Adjusted Term SOFR shall be deemed to be the Floor.

"**Affected Financial Institution**" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"**Affiliate**" means any Person directly or indirectly controlling or controlled by, or under direct or indirect common control with, another Person.  A Person shall be deemed to control another Person for purposes of this definition if such Person possesses, directly or indirectly, the power to direct, or cause the direction of, the management and policies of the other Person, whether through the ownership of voting securities, common directors, trustees or officers, by contract or otherwise; **provided** that, in any event for purposes of this definition, any Person that owns, directly or indirectly, 10% or more of the securities having the ordinary voting power for the election of directors or governing body of a corporation or 10% or more

A48243114

of the partnership or other ownership interest of any other Person (other than as a limited partner of such other Person) will be deemed to control such corporation or other Person.

"**Agents**" means, collectively, the Note Administrative Agent and the Second Lien Collateral Agent.

"**Aggregate Principal Amount**" means, as of any date of determination, the aggregate principal amount then outstanding under the Notes, being $150,000,000 as of the Closing Date.

"**Agreement**" has the meaning specified in the introductory paragraph of this Agreement.

"**Annual Statement**" means, with respect to any Insurance Subsidiary for any fiscal year, the annual financial statements of such Person as required to be filed with the Applicable Insurance Regulatory Authority of its jurisdiction of domicile and in accordance with the laws of such jurisdiction, together with all exhibits, schedules, certificates and actuarial opinions required to be filed or delivered therewith.

"**Anti-Corruption Laws**" means all Laws of any jurisdiction applicable to a Note Party, BIH or any of the Subsidiaries of BIH from time to time concerning or relating to bribery or corruption.

"**Anti-Money Laundering Laws**" means any and all Laws applicable to a Note Party, BIH or any of the Subsidiaries of BIH related to terrorism financing or money laundering, including any applicable provision of the PATRIOT Act.

"**Applicable Insurance Regulatory Authority**" means, with respect to any Insurance Subsidiary, the Governmental Authority charged with regulating insurance companies or insurance holding companies located in (a) the jurisdiction in which such Person is domiciled or (b) such other jurisdiction which due to the nature of such Insurance Subsidiary's business conducted in such other jurisdiction, has regulatory authority over such Insurance Subsidiary, including any federal Governmental Authority having regulatory authority over such Insurance Subsidiary.

"**Applicable Margin**" means 10.00% per annum.

"**Approved Fund**" means any Fund that is administered or managed by (a) a Purchaser, (b) an Affiliate of a Purchaser or (c) an entity or an Affiliate of an entity that administers or manages a Purchaser.

"**Arranger**" means Leadenhall Capital Partners LLP, as arranger of the Facility.

"**Assignment and Assumption**" means an assignment and assumption entered into by a Purchaser and an Eligible Assignee (with the consent of any Party whose consent is required by Section 17.1 (*Assignments by Purchasers*)), and accepted by the Note Administrative Agent, in substantially the form of Exhibit I (*Form of Assignment and Assumption*).

"**Authorized Representative**" means those persons shown on the list of officers provided by the Company pursuant to Section 3.2 (*Conditions Precedent*) or on any update of any such list provided by the Company to the Note Administrative Agent, or any further or different officers of the Company so named by any Authorized Representative of the Company in a written notice to the Note Administrative Agent.

"**Bail-In Action**" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"**Bail-In Legislation**" means (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"**Benchmark**" means, initially, the Term SOFR Reference Rate; **provided** that if a Benchmark Transition Event has occurred with respect to the Term SOFR Reference Rate or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section 6.4 (*Benchmark Replacement*).

"**Benchmark Replacement**" means, either of the following to the extent selected by Administrative Agent in its sole discretion,

(a)     Daily Simple SOFR *plus* 0.10%; or

(b)     the sum of: (i) the alternate benchmark rate that has been selected by the Note Administrative Agent and the Company giving due consideration to (A) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (B) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement to the then-current Benchmark for Dollar-denominated syndicated credit facilities and (ii) the related Benchmark Replacement Adjustment.

If the Benchmark Replacement as determined pursuant to clause (a) or (b) above would be less than the Floor, the Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents.

"**Benchmark Replacement Adjustment**" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement, the spread

A48243114

3

adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Note Administrative Agent and the Company giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (b) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for Dollar-denominated syndicated credit facilities.

"**Benchmark Replacement Date**" means the earliest to occur of the following events with respect to the then-current Benchmark:

(a)     in the case of clause (a) or (b) of the definition of "Benchmark Transition Event", the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide such Benchmark (or such component); or

(b)     in the case of clause (c) of the definition of "Benchmark Transition Event", the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by or on behalf of the administrator of such Benchmark (or such component thereof) or the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be no longer representative; **provided** that such non-representativeness or non-compliance will be determined by reference to the most recent statement or publication referenced in such clause (c).

"**Benchmark Transition Event**" means the occurrence of one or more of the following events with respect to the then-current Benchmark:

(a)     a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide such Benchmark (or such component thereof), permanently or indefinitely, **provided** that, at the time of such statement or publication, there is no successor administrator that will continue to provide such Benchmark (or such component thereof);

(b)     a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the FRB, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such

component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide such Benchmark (or such component thereof) permanently or indefinitely, **provided** that, at the time of such statement or publication, there is no successor administrator that will continue to provide such Benchmark (or such component thereof); or

(c)     a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) or the regulatory supervisor for the administrator of such Benchmark (or such component thereof) announcing that such Benchmark (or such component thereof) is no longer, or as of a specified future date will no longer be, representative.

"**Beneficial Ownership Certification**" means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation in form and substance satisfactory to the Note Administrative Agent.

"**Beneficial Ownership Regulation**" means 31 C.F.R. § 1010.230.

"**BIH**" means Brickell Insurance Holdings LLC, a Delaware limited liability company.

"**Business Day**" means any day (other than a Saturday or Sunday) on which banks are not authorized or required to close in Dublin, Ireland, London, United Kingdom or New York, New York.

"**Capital and Liquidity Maintenance Agreement**" means that certain Capital and Liquidity Maintenance Agreement dated as of December 30, 2020 between the Company and BIH.

"**Capital Lease**" means any lease of Property which in accordance with GAAP is required to be capitalized on the balance sheet of the lessee.

"**Capitalized Lease Obligation**" means, for any Person, the amount of the liability shown on the balance sheet of such Person in respect of a Capital Lease determined in accordance with GAAP.

"**Change in Law**" has the meaning specified in Section 8.1 (*Increased Costs*).

"**Change of Control**" means any "Change of Control" (as defined in the Senior Debt Documents) occurring under the Senior Debt Documents.

"**Closing**" has the meaning specified in Section 3.1 (*Closing*).

"**Closing Date**" has the meaning specified in Section 3.1 (*Closing*).

"**Code**" means the Internal Revenue Code of 1986, as amended, and any successor statute thereto.

A48243114

"**Collateral**" means all properties, rights, interests, and privileges from time to time subject to the Liens granted to the Second Lien Collateral Agent, or any security trustee therefor, under the Collateral Documents.

"**Collateral Document**" means the Second Lien Pledge Agreement, and all other mortgages, deeds of trust, security agreements, pledge agreements, assignments, financing statements and other documents as shall from time to time secure or relate to the Obligations or any part thereof.

"**Commitment**" means in relation to each Original Purchaser, the amount in Dollars set opposite its name under the heading "Commitments of Purchaser" in Schedule 2.1 (*Commitments*).

"**Company**" has the meaning specified in the introductory paragraph of this Agreement.

"**Compliance Certificate**" means a compliance certificate substantially in the form attached hereto as Exhibit II (*Form of Compliance Certificate*) or in any other form approved by the Note Administrative Agent and the Company.

"**Conforming Changes**" means with respect to either the use or administration of Term SOFR or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Business Day", the definition of "Interest Period", the definition of "US Government Securities Business Day", the timing and frequency of determining rates and making payments of interest, the timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of breakage provisions, and other technical, administrative or operational matters) that the Note Administrative Agent decides may be appropriate to reflect the adoption and implementation of any such rate or to permit the use and administration thereof by the Note Administrative Agent in a manner substantially consistent with market practice (or, if the Note Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Note Administrative Agent determines that no market practice for the administration of any such rate exists, in such other manner of administration as the Note Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement and the other Note Documents).

"**Connection Income Taxes**" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"**Consolidated Indebtedness**" means, as of any date of determination, the aggregate (without duplication) of (a) all Indebtedness for Borrowed Money (whether or not reflected on BIH's balance sheet) of BIH and its Subsidiaries as of such date, determined on a

A48243114

6

consolidated basis in accordance with GAAP and (b) the amount of the Obligations as of such date.

"**Consolidated Net Worth**" means, as of any date of determination, the consolidated shareholders' equity of BIH and its Subsidiaries determined on a consolidated basis in accordance with GAAP and as reflected on the consolidated financial statements of BIH and its Subsidiaries; **provided** that the Consolidated Net Worth shall be reduced by the amount of any Relevant Preferred Holding as of such date.

"**Consolidated Total Assets**" means, as of any date of determination, the consolidated total assets of BIH and its Subsidiaries determined on a consolidated basis in accordance with GAAP and as reflected on the consolidated financial statements of BIH and its Subsidiaries.

"**Consolidated Total Capital**" means, as of any date of determination, (a) Consolidated Net Worth as of such date _plus_ (b) Consolidated Indebtedness as of such date _minus_ (c) the amount of the Obligations as of such date.

"**Controlled Group**" means all members of a controlled group of corporations and all trades or businesses (whether or not incorporated) under common control which, together with BIH, are treated as a single employer under Section 414 of the Code.

"**Daily Simple SOFR**" means, for any day, SOFR, with the conventions for this rate (which will include a lookback) being established by the Note Administrative Agent in accordance with the conventions for this rate selected or recommended by the Relevant Governmental Body for determining "Daily Simple SOFR" for syndicated business loans; **provided** that if the Note Administrative Agent decides that any such convention is not administratively feasible for the Note Administrative Agent, then the Note Administrative Agent may establish another convention in its reasonable discretion.

"**Debt to Capital Ratio**" means the ratio of (a) Consolidated Indebtedness to (b) Consolidated Total Capital.

"**Debtor Relief Laws**" means the Bankruptcy Code of the United States of America, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect.

"**Default**" means any event or condition the occurrence of which would, with the passage of time or the giving of notice, or both, constitute an Event of Default.

"**Default Rate**" means the sum of 2.0% *plus* the Applicable Margin *plus* Adjusted Term SOFR from time to time in effect.

"**Designated Jurisdiction**" means, at any time, any country, region or territory which is itself the subject or target of any Sanctions.

"**Disposition**" means the sale, lease, conveyance or other disposition (in one transaction or in a series of transactions and whether effected pursuant to a Division or otherwise) of Property, other than sales or other dispositions expressly permitted under Sections 14.4(a), 14.4(b), or 14.4(d) (*Mergers, Consolidations and Sales*).

"**Disruption Event**" means either or both of:

(a)   a material disruption to those payment or communications systems or to those financial markets which are, in each case, required to operate in order for payments to be made in connection with the Notes (or otherwise in order for the transactions contemplated by the Note Documents to be carried out) which disruption is not caused by, and is beyond the control of, any of the Parties; or

(b)   the occurrence of any other event which results in a disruption (of a technical or systems-related nature) to the treasury or payments operations of a Party preventing that, or any other Party:

(i)   from performing its payment obligations under the Note Documents; or

(ii)   from communicating with other Parties in accordance with the terms of the Loan Documents,

and which (in either such case) is not caused by, and is beyond the control of, the Party whose operations are disrupted.

"**Dividing Person**" has the meaning specified in the definition of "Division".

"**Division**" means the division of the assets, liabilities and/or obligations of a Person (the "Dividing Person") among two or more Persons (whether pursuant to a "plan of division" or similar arrangement), which may or may not include the Dividing Person and pursuant to which the Dividing Person may or may not survive.

"**Division Successor**" means any Person that, upon the consummation of a Division of a Dividing Person, holds all or any portion of the assets, liabilities and/or obligations previously held by such Dividing Person immediately prior to the consummation of such Division.  A Dividing Person which retains any of its assets, liabilities and/or obligations after a Division shall be deemed a Division Successor upon the occurrence of such Division.

"**Dollars**" and the sign "**$**" mean the lawful money of the United States of America.

"**Domestic Subsidiary**" means a Subsidiary that is not a Foreign Subsidiary.

"**EBITDA**" means, with reference to any period, Net Income for such period *plus* all amounts deducted in arriving at such Net Income amount in respect of the following: (a) Interest Expense for such period, (b) federal, state, and local income taxes for such period, (c) depreciation of fixed assets and amortization of intangible assets for such period, (d) non-cash compensation expense, (e) costs, expenses, charges, accruals, or reserves attributable to the undertaking and/or the implementation of cost savings initiatives, operating expense reductions and other strategic initiatives, and (f) extraordinary, non-recurring or unusual losses, charges and expenses (other than such losses, charges and expenses related to insurance claims and insurance policies).

"**EEA Financial Institution**" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clause (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"**EEA Member Country**" means any of the member states of the European Union, Iceland, Liechtenstein and Norway.

"**EEA Resolution Authority**" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any credit institution or investment firm established in any EEA Member Country.

"**Eligible Assignee**" means (a) a Purchaser, (b) an Affiliate of a Purchaser, (c) an Approved Fund, and (d) any other Person (other than a natural person) approved by (i) the Note Administrative Agent and (ii) unless an Event of Default has occurred and is continuing, the Company (each such approval not to be unreasonably withheld or delayed); **provided** that notwithstanding the foregoing, "Eligible Assignee" shall not include the Company or any Subsidiary or any of the Company's or such Subsidiary's Affiliates or Subsidiaries.

"**Enhanced Capital Requirement**" means the higher of an insurer's approved internal capital model/Bermuda Solvency Capital Requirement and the Minimum Margin of Solvency, in each case, as defined in and calculated in accordance with the Bermuda Monetary Authority's Bermuda Capital and Solvency Return 2021 Instruction Handbook for Class E, Class D and Class C Insurers as in effect from time to time.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, or any successor statute thereto.

"**EU Bail-In Legislation Schedule**" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"**Event of Default**" means any event or condition identified as such in Section 15 (*Events of Default*).

"**Excluded Taxes**" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient: (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes; (b) in the case of a Purchaser, US federal withholding Taxes imposed on amounts payable to or for the account of such Purchaser with respect to an applicable interest in a Note pursuant to a law in effect on the date on which such Purchaser acquires such interest in the Note (other than pursuant to an assignment request by the Company under Section 5.3 (*Right of Replacement or Repayment in relation to a Single Purchaser*)); (c) Taxes attributable to such Recipient's failure to comply with Section 7.7 (*Status of Purchasers*); and (d) any withholding Taxes imposed under FATCA.

"**Existing Facility**" means that certain Credit Agreement dated as of December 31, 2018 by and among, *inter alios*, the Company, as borrower and Leadenhall Capital Partners LLP, as administrative agent.

"**Facility**" means the term note facility made available under this Agreement as described in Section 2 (*The Facility*).

"**FATCA**" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"**Fee Letter**" means that certain letter agreement, dated as of June 30, 2022, between the Note Administrative Agent and the Company.

"**Financial Strength Rating**" means, as to any Person, the rating that has been most recently announced by A.M. Best as the "financial strength rating" of such Person.

"**Fixed Charges**" means, with reference to any period, the sum of (a) all scheduled payments of principal during such period with respect to (i) Indebtedness for Borrowed Money of BIH and its Subsidiaries and (ii) the Company pursuant to the Subordinated Debt Documents and (b) cash Interest Expense of (i) BIH and its Subsidiaries with respect to Indebtedness for Borrowed Money of BIH and its Subsidiaries and (ii) the Company pursuant to the Note Documents.

"**Floor**" means the rate per annum of interest equal to 0%.

"**Foreign Purchaser**" means any Purchaser that is organized under the laws of a jurisdiction other than that in which the Company is resident for tax purposes. For purposes of this definition, the United States, each state thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"**Foreign Subsidiary**" means each Subsidiary which (a) is organized under the laws of a jurisdiction other than the United States of America or any state thereof or the District of Columbia, (b) conducts substantially all of its business outside of the United States of America, and (c) has substantially all of its assets outside of the United States of America.

"**FRB**" means the Board of Governors of the Federal Reserve System of the United States.

"**Fund**" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in, among other things, debt securities and other types of debt instrument in the ordinary course of its business.

"**GAAP**" means generally accepted accounting principles set forth from time to time in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the US accounting profession), which are applicable to the circumstances as of the date of determination.

"**Governmental Authority**" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"**Haircut Factor**" means (a) for the period commencing on the Closing Date and ending on December 31, 2022 (inclusive), 0%, (b) for the period commencing on January 1, 2023 and ending on March 31, 2023 (inclusive), 25%, (c) for the period commencing on April 1, 2023 and ending on June 30, 2023 (inclusive), 50% and (d) thereafter, 100%.

"**Holding Company Investments**" means any equity (including common and preferred stock) or debt issued by the Company or any other debt or capital instruments secured by such equity or debt issued by the Company, in each case, to the extent held as an investment by BIH or any of its Subsidiaries.

"**Indebtedness for Borrowed Money**" means for any Person (without duplication) (a) all indebtedness created, assumed or incurred in any manner by such Person representing money borrowed (including by the issuance of debt securities), (b) all indebtedness for the

deferred purchase price of property or services (other than trade accounts payable arising in the ordinary course of business which are not more than forty-five (45) days past due), (c) all indebtedness secured by any Lien upon Property of such Person, whether or not such Person has assumed or become liable for the payment of such indebtedness, (d) all Capitalized Lease Obligations of such Person, and (e) all obligations of such Person on or with respect to letters of credit, bankers' acceptances and other extensions of credit whether or not representing obligations for borrowed money.

"**Indemnified Taxes**" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Note Parties under any Note Document and (b) to the extent not otherwise described in (a), Other Taxes.

"**Insurance Contract**" means any insurance contract or policy issued by an Insurance Subsidiary that is not a Reinsurance Agreement.

"**Insurance License**" means any license, certificate of authority, permit or other authorization which is required to be obtained from any Governmental Authority in connection with the operation, ownership or transaction of insurance or reinsurance business.

"**Insurance Subsidiary**" means any Subsidiary of BIH which is licensed by any Governmental Authority to engage in the insurance and/or reinsurance business.

"**Intercompany Services Agreement**" means that certain Intercompany Services Agreement dated as of February 28, 2020 by and between the Company and BIH as in effect on the Closing Date.

"**Intercreditor Agreement**" means that certain Intercreditor Agreement between the Second Lien Collateral Agent and the Senior Administrative Agent, and acknowledged by the Note Parties dated as of the date hereof and in form and substance acceptable to the Note Administrative Agent.

"**Interest Expense**" means, with reference to any period, the sum of all interest charges (including imputed interest charges with respect to Capitalized Lease Obligations, all amortization of debt discount and expense and any accrued interest that is capitalized) of any Person for such period determined on a consolidated basis in accordance with GAAP.

"**Interest Payment Date**" means the last day of each Interest Period therefor and on the Maturity Date; **provided** that if any such date would be a day other than a Business Day, such date shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such date shall be the next preceding Business Day.

"**Interest Period**" means, in respect of any Note, the period commencing on the date of such Note and ending on the following date that is the earliest of (i) March 31, June 30, September

30 and December 31, and thereafter commencing on such following date and ending on the day that is three (3) months thereafter; **provided** that no Interest Period in respect of any Note shall extend beyond the Maturity Date.

"**Investment Management Agreement**" means that certain Amended and Restated Management Agreement dated March 1, 2021, by and between 777 Asset Management LLC and 777 Re, as in effect on the Closing Date.

"**IRS**" means the United States Internal Revenue Service.

"**Laws**" means, collectively, all international, foreign, Federal, state and local statutes, treaties, rules, regulations, ordinances, codes, obligatory government orders, decrees and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

"**Lien**" means any mortgage, lien, security interest, pledge, charge or encumbrance of any kind in respect of any Property, including the interests of a vendor or lessor under any conditional sale, Capital Lease or other title retention arrangement.

"**Material Adverse Effect**" means (a) a material adverse change in, or material adverse effect upon, the operations, business, Property, condition (financial or otherwise) of the Company, BIH and the Subsidiaries of BIH taken as a whole, (b) a material impairment of the ability of the Company or any Note Party to perform its material obligations under any Note Document to which it is a party or (c) a material adverse effect upon the legality, validity, binding effect or enforceability against the Company or any Note Party of any Note Document to which it is a party or the rights and remedies of the Note Administrative Agent and the Purchasers thereunder.

"**Maturity Date**" means June 30, 2027.

"**Merit Life**" means Merit Life Insurance Co., a Texas-domiciled stock life insurance company.

"**Moody's**" means Moody's Investors Service, Inc.

"**MTCP**" means MTCP LLC, a Florida limited liability company.

"**NAIC**" means the National Association of Insurance Commissioners and any successor thereto.

"**Net Cash Proceeds**" means, with respect to any offering of equity securities of a Person or the issuance of any Indebtedness for Borrowed Money by a Person, cash and cash

equivalent proceeds received by or for such Person's account, net of reasonable legal, underwriting, and other fees and expenses incurred as a direct result thereof.

"**Net Income**" means, with reference to any period, the net income (or net loss) of BIH and its Subsidiaries for such period computed on a consolidated basis in accordance with GAAP; **provided** that there shall be excluded from Net Income (a) the net income (or net loss) of any Person accrued prior to the date it becomes a Subsidiary of, or has merged into or consolidated with, BIH or another Subsidiary of BIH, and (b) the net income (or net loss) of any Person (other than a Subsidiary) in which BIH or any of its Subsidiaries has an equity interest in, except to the extent of the amount of dividends or other distributions actually paid to BIH or any of its Subsidiaries during such period.

"**Note**" means a Note in the form set forth in Exhibit III (*Form of Note*) initially issued and sold by the Issuer pursuant to Section 2.1(a) (*The Notes*).

"**Note Administrative Agent**" has the meaning specified in the introductory paragraph of this Agreement.

"**Note Document**" means this Agreement, each Note, the Fee Letter, the Intercreditor Agreement, any Collateral Document, any Compliance Certificate and any other document designated in writing as such by the Note Administrative Agent and the Company.

"**Note Party**" means the Company or any other Pledgor.

"**Obligations**" means all obligations of the Company to pay principal and interest in respect of the Notes, all fees and charges payable hereunder, and all other payment obligations of the Company arising under or in relation to any Note Document, in each case whether now existing or hereafter arising, due or to become due, direct or indirect, absolute or contingent, and howsoever evidenced, held or acquired.

"**OFAC**" means the United States Department of Treasury Office of Foreign Assets Control.

"**OFAC SDN List**" means the list of the Specially Designated Nationals and Blocked Persons maintained by OFAC.

"**Original Purchaser**" means a Purchaser as of the Closing Date being such Purchasers specified in Schedule 2.1 (*Commitments*).

"**Other Connection Taxes**" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Note Document, or sold or assigned an interest in any Note or Note Document).

"**Other Taxes**" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Note Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 5.3 (*Right of Replacement or Repayment in relation to a Single Purchaser*)).

"**Participant**" has the meaning specified in Section 17.3(a) (*Participations*).

"**Participant Register**" has the meaning specified in Section 17.3(b) (*Participations*).

"**Party**" means a party to this Agreement.

"**PATRIOT Act**" means the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)).

"**Payment in Full**" means as of any date of determination, (i) the indefeasible payment in full in cash of the full principal amount of all Notes, together with accrued and unpaid interest thereon and (ii) the indefeasible payment in full in cash of all fees, reimbursable expenses and other Obligations (other than contingent indemnification obligations in respect of which no claim for payment has yet been asserted by the Person entitled thereto).

"**Payoff Letter**" means that certain Payoff Letter dated as of the date hereof by and among, *inter alios*, the Company and Leadenhall Capital Partners LLP, as administrative agent under the Existing Facility.

"**PBGC**" means the Pension Benefit Guaranty Corporation or any Person succeeding to any or all of its functions under ERISA.

"**Person**" means an individual, partnership, corporation, limited liability company, association, trust, unincorporated organization or any other entity or organization, including a government or agency or political subdivision thereof.

"**PIK Amount**" has the meaning specified in Section 6.3(a) (*Payment of Interest; Payment In Kind*).

"**Plan**" means any employee pension benefit plan covered by Title IV of ERISA or subject to the minimum funding standards under Section 412 of the Code that either (a) is maintained by a member of the Controlled Group for employees of a member of the Controlled Group or (b) is maintained pursuant to a collective bargaining agreement or any other arrangement under which more than one employer makes contributions and to which a member of the Controlled Group is then making or accruing an obligation to make contributions or has within the preceding five plan years made contributions.

"**Pledgor**" means any "Pledgor" as defined in the Second Lien Pledge Agreement, or any pledgor, grantor or debtor, as applicable, under any Collateral Document.

"**Policies**" means all insurance and annuity policies and contracts, guaranteed interest contracts, guaranteed investment contracts, and funding agreements, and similar undertakings or arrangements (including riders to any such policies or contracts, certificates issued with respect to life insurance or annuity contracts and any contracts issued in connection with retirement plans or arrangements) and assumption certificates issued or to be issued (or filed pending current review by applicable Governmental Authorities) by any Insurance Subsidiary and any coinsurance agreements entered into or to be entered into by any Insurance Subsidiary.

"**Property**" means, as to any Person, all types of real, personal, tangible, intangible or mixed property owned by such Person whether or not included in the most recent balance sheet of such Person and its subsidiaries under GAAP.

"**PTE**" means a prohibited transaction class exemption issued by the US Department of Labor, as any such exemption may be amended from time to time.

"**Purchaser**" means (a) any Original Purchaser; and (b) any Person which has become a Purchaser in accordance with Section 17.1 (*Assignments by Purchasers*), in each case which has not ceased to be a Purchaser in accordance with the terms of this Agreement.

"**Recipient**" means the Note Administrative Agent or any Purchaser.

"**Recovered Amount**" has the meaning specified in Section 21.1 (*Payments to Purchasers*).

"**Recovering Purchaser**" has the meaning specified in Section 21.1 (*Payments to Purchasers*).

"**Redistributed Amount**" has the meaning specified in Section 21.4(a) (*Reversal of Redistribution*).

"**Register**" has the meaning specified in Section 17.2 (*Register*).

"**Reinsurance Agreement**" means any agreement, contract, treaty, certificate or other arrangement whereby any Insurance Subsidiary agrees to transfer, cede or retrocede to another insurer or reinsurer all or part of the liability assumed or assets held by such Insurance Subsidiary under a policy or policies of insurance issued by such Insurance Subsidiary.

"**Related Entity**" in relation to any entity, whether a fund or otherwise (the "**first entity**"), means an entity, whether a fund or otherwise, which is managed or advised (whether in part or in full and whether on a discretionary basis or otherwise) by the same party as the first entity or, if it is managed by a party, where such party is an Affiliate of the manager or adviser of the first entity.

"**Related Parties**" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

"**Relevant Governmental Body**" means the FRB and/or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the FRB and/or the Federal Reserve Bank of New York, or any successor thereto.

"**Relevant Preferred Holding**" means, as of any date of determination, (a) the aggregate amount of any Holding Company Investments held by BIH or any of its Subsidiaries as of such date *multiplied by* (b) the Haircut Factor that applies on such date.

"**Reportable Event**" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30-day notice period has been waived.

"**Required Purchasers**" means a Purchaser or Purchasers holding Notes with a principal amount in aggregate of more than 66 2/3% of the Aggregate Principal Amount.

"**Resolution Authority**" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"**Responsible Officer**" means with respect to any Person, the chief executive officer, chief operating officer, chief financial officer, chief actuary, treasurer or other financial officer performing similar functions, president or executive vice president of such Person.

"**Restricted Payments**" has the meaning specified in Section 14.6 (*Dividends and Certain Other Restricted Payments*).

"**S&P**" means Standard & Poor's Ratings Services Group, a division of The McGraw Hill Companies, Inc.

"**Sanctioned Person**" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by OFAC (including the OFAC SDN List), the United States Department of State, the United Nations Security Council, the European Union, any European Union member state, Her Majesty's Treasury of the United Kingdom, or any other relevant sanctions authority, (b) any Person located, organized or resident in a Designated Jurisdiction or (c) any Person owned or controlled by any such Person or Persons described in clauses (a) or (b) above.

"**Sanctions**" means all economic or financial sanctions, sectoral sanctions, secondary sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the United States government (including those administered by OFAC or the United States Department of State), or (b) the United Nations Security Council, the European Union, any European Union member state, Her Majesty's Treasury of the United Kingdom, or any other relevant sanctions authority with jurisdiction over any Note Party or any of their respective Affiliates, or any Subsidiary of BIH.

"**SAP**" means, as to any Insurance Subsidiary, the accounting practices prescribed or permitted by NAIC, if then applicable to such Insurance Subsidiary, or the Applicable Insurance Regulatory Authority of the jurisdiction of domicile of such Insurance Subsidiary for the preparation of Annual Statements, interim statements and other financial reports by insurance companies of the same type as such Insurance Subsidiary.

"**Second Lien Collateral Agent**" has the meaning specified in the introductory paragraph of this Agreement.

"**Second Lien Pledge Agreement**" means that certain Second Lien Pledge Agreement dated as of the date of this Agreement among the Company, MTCP and the Second Lien Collateral Agent, as the same may be amended, modified, supplemented or restated from time to time.

"**Second Lien Secured Party**" means the Note Administrative Agent, the Second Lien Collateral Agent, the Arranger or a Purchaser.

"**Senior Administrative Agent**" means BMO Harris Bank, N.A., as administrative agent under the Senior Credit Agreement.

"**Senior Credit Agreement**" means that certain Credit Agreement dated as of June 30, 2022 by and among, *inter alios*, BIH as borrower and the Senior Administrative Agent as administrative agent.

"**Senior Debt Documents**" means (a) the Senior Credit Agreement and (b) all other principal documents evidencing or securing the obligations thereunder, in each case under (a) and (b) above, as amended, supplemented, restated or otherwise modified in accordance with the Intercreditor Agreement.

"**Sharing Payment**" has the meaning specified in Section 21.1 (*Payments to Purchasers*).

"**Sharing Purchasers**" has the meaning specified in Section 21.2 (*Redistribution of Payments*).

"**Single Exposure**" means an exposure to a single counterparty; **provided** that for the purposes hereof, a "single counterparty" includes all related or connected counterparties that satisfy either of the following: (i) if a counterparty, directly or indirectly, has control of (as a result of its majority shareholding in or significant influence) the other counterparties (a controller relationship) or (ii) if one of the counterparties were to experience financial difficulties which directly or indirectly affect the ability of any or all of the remaining counterparties to perform their financial obligations (for example where a counterparty becomes unable to fund or repay certain financial contractual obligations, and as a result,

other counterparties, are likely to be unable to fund or repay certain obligations imposed on them) (economic inter-dependence).

"**SOFR**" means a rate equal to the secured overnight financing rate as administered by the Federal Reserve Bank of New York or a successor administrator of the secured overnight financing rate.

"**Subsidiary**" means, as to any particular parent corporation or organization, any other corporation or organization more than 50% of the outstanding Voting Stock of which is at the time directly or indirectly owned by such parent corporation or organization or by any one or more other entities which are themselves subsidiaries of such parent corporation or organization.  Unless otherwise expressly noted herein, the term "Subsidiary" means a Subsidiary of the Company or of any of its direct or indirect Subsidiaries.

"**Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Term SOFR**" means the Term SOFR Reference Rate for a tenor of three (3) months on the day (such day, the "**Term SOFR Determination Day**") that is two (2) US Government Securities Business Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR Administrator; **provided**, however, that if as of 5:00 p.m. (New York City time) on any Term SOFR Determination Day the Term SOFR Reference Rate for such tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding US Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding US Government Securities Business Day is not more than three (3) US Government Securities Business Days prior to such Term SOFR Determination Day.

"**Term SOFR Administrator**" means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Administrative Agent in its reasonable discretion).

"**Term SOFR Reference Rate**" means the forward-looking term rate based on SOFR.

"**UK Financial Institution**" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial

Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"**UK Resolution Authority**" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"**Unadjusted Benchmark Replacement**" means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"**Unfunded Vested Liabilities**" means, for any Plan at any time, the amount (if any) by which the present value of all vested nonforfeitable accrued benefits under such Plan exceeds the fair market value of all Plan assets allocable to such benefits, all determined as of the then most recent valuation date for such Plan, but only to the extent that such excess represents a potential liability of a member of the Controlled Group to the PBGC or the Plan under Title IV of ERISA.

"**Unpaid Sum**" means any sum due and payable but unpaid by the Company under the Note Documents.

"**US**" means the United States of America.

"**US Government Securities Business Day**" means any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"**US Person**" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"**US Tax Compliance Certificate**" has the meaning specified in Section 7.7(b)(ii)(C) (*Status of Purchasers*).

"**Voting Stock**" of any Person means capital stock or other equity interests of any class or classes (however designated) having ordinary power for the election of directors or other similar governing body of such Person, other than stock or other equity interests having such power only by reason of the happening of a contingency.

"**Welfare Plan**" means a "welfare plan" as defined in Section 3(1) of ERISA.

"**Wholly Owned Subsidiary**" means a Subsidiary of which all of the issued and outstanding shares of capital stock (other than directors' qualifying shares as required by law) or other equity interests are owned by the Company and/or one or more Wholly Owned Subsidiaries within the meaning of this definition.

"**Withholding Agent**" means the Company and the Note Administrative Agent.

"**Write-Down and Conversion Powers**" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time

to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

1.2 **Interpretation**

(a) Unless a contrary indication appears, any reference in this Agreement to:

    (i) the "**Arranger**", the "**Company**", the "**Note Administrative Agent**", any "**Party**", any "**Purchaser**" or the "**Second Lien Collateral Agent**" shall be construed so as to include its successors in title and permitted assigns to, or of, its rights and/or obligations under the Note Documents;

    (ii) "**assets**" includes present and future properties, revenues and rights of every description;

    (iii) a "**Note Document**" or any other agreement or instrument is a reference to that Note Document or other agreement or instrument as amended, novated, supplemented, extended, restated (however fundamentally and whether or not more onerously) or replaced and includes any change in the purpose of, any extension of or any increase in any facility or the addition of any new facility under that Note Document or other agreement or instrument;

    (iv) a "**regulation**" includes any regulation, rule, official directive, request or guideline (whether or not having the force of law, but if not having force of law which are binding or are customarily complied with) of any Governmental Authority;

    (v) a provision of law is a reference to that provision as amended or re-enacted; and

    (vi) a time of day is a reference to New York City time.

(b) Section, Clause and Schedule headings are for ease of reference only.

(c) Unless a contrary indication appears, a term used in any other Note Document or in any notice given under or in connection with any Note Document has the same meaning in that Note Document or notice as in this Agreement.

(d) A Default (including an Event of Default) is "**continuing**" if it has not been remedied or waived.

1.3 **Changes in GAAP**

If, after the date of this Agreement, there shall occur any change in GAAP, SAP or application thereof, as applicable, from those used in the preparation of the financial statements referred to in Section 12.5 (*Financial Reports*) and such change shall result in a change in the method of calculation of any financial covenant, standard or requirement found in this Agreement, either the Company or the Required Purchasers (acting through the Note Administrative Agent) may by notice to the Note Administrative Agent, Purchasers and the Company, respectively, request that the Purchasers and the Company negotiate in good faith to amend such covenants, standards, and requirements so as equitably to reflect such change in GAAP, SAP or application thereof, as applicable, with the desired result being that the criteria for evaluating the financial condition of the Company, BIH and the Subsidiaries of BIH shall be the same as if such change had not been made.  No delay by the Company or the Required Purchasers in requesting such negotiation shall limit their right to so request such a negotiation at any time after such a change in accounting principles.  Until any such covenant, standard, or term is amended in accordance with this Section 1.3 (*Changes in GAAP*), financial covenants shall be computed and determined in accordance with GAAP or SAP, as applicable, in effect prior to such change in accounting principles.  Without limiting the generality of the foregoing, the Company shall neither be deemed to be in compliance with any financial covenant hereunder nor out of compliance with any financial covenant hereunder if such state of compliance or noncompliance, as the case may be, would not exist but for the occurrence of a change in accounting principles after the date hereof.

1.4 **Divisions**

For all purposes under the Note Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its equity interests at such time.

2. **THE FACILITY**

2.1 **The Notes**

(a) Subject to and upon the terms and conditions set forth in this Agreement, on the Closing Date the Company will issue and sell to each Purchaser, and each Purchaser will acquire from the Company, Notes in the principal amount set forth opposite such Purchaser's name in Schedule 2.1 (*Commitments*) in exchange for the purchase price for such Notes from the Purchasers, which shall be the par value thereof.

(b) All Notes issued under this Section 2.1 (*The Notes*) shall (i) be issued and maintained in Dollars and (ii) not exceed for any Purchaser, in aggregate principal amount, that amount which equals the Commitment of such Purchaser at such time.

(c) All Notes issued and repaid or prepaid may not be reissued.

## 2.2 Purchasers' Rights and Obligations

(a) The obligations of each Purchaser under the Note Documents are several. Failure by a Purchaser to perform its obligations under the Note Documents does not affect the obligations of any other Party under the Note Documents. No Purchaser is responsible for the obligations of any other Purchaser under the Note Documents.

(b) The rights of each Purchaser under or in connection with the Note Documents are separate and independent rights and any debt arising under the Note Documents to a Purchaser from the Company is a separate and independent debt in respect of which a Purchaser shall be entitled to enforce its rights in accordance with clause (c) below. The rights of each Purchaser include any debt owing to such Purchaser under the Note Documents and, for the avoidance of doubt, any Note or any other amount owed by the Company which relates to a Purchaser's role under a Note Document (including any such amount payable to the Note Administrative Agent on its behalf) is a debt owing to such Purchaser by the Company.

(c) A Purchaser may, except as specifically provided in the Note Documents, separately enforce its rights under or in connection with the Note Documents.

## 3. CONDITIONS PRECEDENT

## 3.1 Closing

The purchase and issuance of the Notes to be purchased by each Purchaser shall occur at the offices of Linklaters LLP, 1290 Avenue of the Americas, New York, NY 10104, at a closing (the "**Closing**") on June 30, 2022 (the "**Closing Date**") or on such other Business Day as may be agreed upon by the Company and the Purchasers. At the Closing, the Company will deliver to each Purchaser the Notes to be purchased by such Purchaser in the form of a single Note dated the Closing Date and registered in such Purchaser's name, against delivery by such Purchaser to the Company of its order of immediately available funds in the amount of the purchase price therefor, by wire transfer to the Company's account notified to the Purchasers in writing at least two (2) Business Days prior to the Closing; **provided** that the purchase price for the Notes shall be paid, to the extent applicable to each Purchaser, in the manner set forth in the Payoff Letter. If at the Closing the Company fails to tender such Notes to any Purchaser as provided in this Section 3.1 (*Closing*), or any of the conditions specified in Section 3.2 (*Conditions Precedent*) shall not have been fulfilled to such Purchaser's satisfaction, such Purchaser shall, at its election, be relieved of all further obligations under this Agreement, without thereby waiving any rights such Purchaser may

have by reason of any of the conditions specified in Section 3.2 (*Conditions Precedent*) not having been fulfilled to such Purchaser's satisfaction or such failure by the Company to tender such Notes.

3.2 **Conditions Precedent**

Each Purchaser's obligation to purchase and pay for the Notes to be sold to such Purchaser at the Closing is subject to the fulfillment to such Purchaser's satisfaction (or waiver of the applicable party in accordance with Section 28 (*Amendments and Waivers*), prior to or at the Closing, of the conditions precedent set forth below:

(a)   The Note Administrative Agent shall have received each of the following, in each case, to the extent applicable (x) duly executed by all applicable parties, (y) dated a date satisfactory to the Note Administrative Agent, and (z) in form and substance satisfactory to the Note Administrative Agent:

(i)      this Agreement;

(ii)     the Collateral Documents, together with (A) original stock certificates or other similar instruments or securities representing all of the issued and outstanding equity interests in BIH owned by the Company and MTCP (to be received by the Senior Administrative Agent and thereafter held as gratuitous bailee for the Second Lien Security Parties, as applicable, subject to the Intercreditor Agreement), (B) stock powers for the Collateral described in clause (A) above executed in blank and undated, and (C) UCC financing statements to be filed against the Company and MTCP, in each case as debtor, in favor of the Second Lien Collateral Agent, as secured party;

(iii)    evidence of insurance required to be maintained under the Note Documents;

(iv)    copies of the Company's and each other Note Party's articles of incorporation and bylaws (or comparable organizational documents) and any amendments thereto, certified in each instance by its Secretary or Assistant Secretary;

(v)     copies of resolutions of Company's and each other Note Party's board of directors (or similar governing body) authorizing the execution, delivery and performance of this Agreement and the other Note Documents to which it is a party and the consummation of the transactions contemplated hereby and thereby, together with specimen signatures of the persons authorized to execute such documents, all certified in each instance by its Secretary or Assistant Secretary;

(vi)    copies of the certificates of good standing for the Company and each other Note Party (dated no earlier than 30 days prior to the date hereof) from the office of the secretary of the state of its incorporation or organization and of each state in which it is qualified to do business as a foreign corporation or organization, except where

such failure to be so qualified could not reasonably be expected to have a Material Adverse Effect;

(vii)     financing statement, tax, and judgment lien search results against the Property of BIH and each Subsidiary of BIH evidencing the absence of Liens on its Property except as permitted by Section 14.2 (*Liens*);

(viii)    satisfactory pay off and lien release letters from the secured creditors of BIH and each Subsidiary of BIH for Indebtedness for Borrowed Money not permitted hereunder, including for the Existing Facility, setting forth, among other things, the total amount of indebtedness outstanding and owing to them (or outstanding letters of credit issued for the account of BIH or any Subsidiary of BIH) and containing an undertaking to cause to be delivered to the Note Administrative Agent UCC termination statements and any other lien release instruments necessary to release their Liens on the assets of BIH or any Subsidiary of BIH;

(ix)      favorable written opinions of counsel to the Note Parties as to certain matters under New York and Delaware law;

(x)       a fully executed Internal Revenue Service Form W-9 for the Company;

(xi)      for each of (w) the Company and its Subsidiaries, (x) BIH and its Subsidiaries, (y) 777 Re and its Subsidiaries and (z) Merit Life and its Subsidiaries, (A) audited annual financial statements (including an income statement, a balance sheet, and a cash flow statement) for the fiscal years 2019 and 2020, (B) unaudited financial statements (including an income statement, a balance sheet, and a cash flow statement) for (I) the fiscal quarter ending March 31, 2022 and (II) the fiscal year ended December 31, 2021 and (C) a statement setting forth any material changes or events since any of the financial statements required under this clause (xi) were prepared;

(xii)     a fully executed Beneficial Ownership Certification;

(xiii)    the Intercreditor Agreement;

(xiv)     a copy of each of the Capital and Liquidity Maintenance Agreement, the Intercompany Services Agreement and the Investment Management Agreement, in each case in effect as of the Closing Date;

(xv)      a certificate signed by the Chief Financial Officer of the Company certifying that, after giving effect to the entering into of the Note Documents and the consummation of all of the transactions contemplated by this Agreement, the Company and its Subsidiaries, taken as a whole, are solvent, able to pay their debts as they become due, and have sufficient capital to carry on their business and all businesses in which they are about to engage;

A48243114

(xvi)   the Senior Debt Documents, and evidence that the conditions precedent to funding of the Senior Debt thereunder have been, or concurrent with the Closing will be, satisfied;

(xvii)  a closing certificate certifying as to the matters set forth in clauses (f), (g) and (h) of this Section 3.2 (*Conditions Precedent*);

(xviii) a closing compliance certificate containing calculations demonstrating that the financial covenants set forth in Section 14.14 (*Financial Covenants*) are satisfied as of the date of such certificate and incorporating all up-to-date valuations of BIH and its operating Subsidiaries;

(xix)   the conditions precedent set forth in Sections 4.1 and 4.2 of the Payoff Letter shall have been satisfied in accordance with the terms and conditions set forth therein;

(xx)    an issuance notice executed by the Company confirming, *inter alia*, the principal amount of Notes to be issued and wire instructions for the deposit account into which the amounts payable by the Purchasers under Section 3.1 (*Closing*) should be paid; and

(xxi)   such other agreements, instruments, documents, certificates, and opinions as the Note Administrative Agent may reasonably request.

(b)   The capital and organizational structure of the Company, BIH and the Subsidiaries of BIH shall be satisfactory to the Note Administrative Agent and the Purchasers.

(c)   The Note Administrative Agent shall have determined that the Senior Debt Documents contain interest rates, payment terms, maturities, amortization schedules, covenants, defaults, remedies and other material terms that are, in each case, in form and substance satisfactory to the Note Administrative Agent.

(d)   The Note Administrative Agent shall have received all fees, costs and expenses required to be paid by the Company at or before Closing.

(e)   The Note Administrative Agent and its counsel shall have completed all legal, tax and regulatory due diligence, including without limitation all documentation required by bank regulatory authorities under applicable Anti-Corruption Laws and Anti-Money Laundering Laws, the results of which shall be satisfactory to the Note Administrative Agent in its sole and absolute discretion.

(f)   Each of the representations and warranties set forth herein and in the other Note Documents shall be and remain true and correct as of said time, except to the extent the same expressly relate to an earlier date, in which case such representations and warranties shall be and remain true and correct as of such earlier date:

(g)     No Default or Event of Default shall have occurred and be continuing or would occur as a result of the issuance of the Notes.

(h)     No event or circumstance shall have occurred since December 31, 2020 that would reasonably be expected to have a Material Adverse Effect.

(i)     The Company shall have made an equity contribution to BIH in the amount of $50,000,000.

### 3.3    Conditions Subsequent

The Company agrees that:

(a)     the Note Administrative Agent shall have received within thirty (30) days from the Closing Date for each of (w) the Company, (x) BIH and its Subsidiaries, (y) 777 Re and its Subsidiaries and (z) Merit Life and its Subsidiaries, (A) audited annual financial statements (including an income statement, a balance sheet, and a cash flow statement) of BIH and its Subsidiaries for the fiscal year 2021, and (B) a statement setting forth any material changes or events since any of the financial statements required under this clause (a) were prepared; and

(b)     the Note Administrative Agent shall have received within forty-five (45) days from the Closing Date a favorable tax opinion of counsel to the Note Parties confirming the Notes would be treated as debt for tax purposes in form and substance satisfactory to the Note Administrative Agent;

**provided** that the Parties hereto agree that if any condition in this Section 3.3 is not met or waived by the applicable date, then all outstanding Notes shall immediately become due and payable together with all other amounts payable under the Note Documents without presentment, demand, protest or notice of any kind.

### 4.    REPAYMENT

The Company shall repay to the Note Administrative Agent for the ratable account of the Purchasers the aggregate principal amount of all Notes outstanding on the Maturity Date, together with accrued and unpaid interest on the principal amount to be paid.

### 5.    CANCELLATION AND PREPAYMENT

### 5.1    Illegality

If in any applicable jurisdiction, it becomes unlawful for any Purchaser to perform any of its obligations as contemplated by this Agreement or to purchase or maintain its Notes:

(a)     that Purchaser shall promptly notify the Note Administrative Agent upon becoming aware of that event; and

A48243114

(b)    to the extent that such Purchaser's Notes have not been transferred pursuant to clause **Error! Reference source not found.** of Section 5.3 (*Right of Replacement or Repayment in relation to a Single Purchaser*), the Company shall repay that Purchaser's Notes by no later than 60 days after the date on which the Note Administrative Agent has notified the Company or, if earlier, the date specified by the Purchaser in the notice delivered to the Note Administrative Agent (being no earlier than the last day of any applicable grace period permitted by law).

5.2    **Voluntary Prepayment of Notes**

Subject to the terms of the Intercreditor Agreement, the Company may, after the second anniversary of the Closing Date, if it gives the Note Administrative Agent not less than five Business Days' (or such shorter period as the Note Administrative Agent may agree) prior notice, prepay all or any part of the Notes (but, if in part, being an amount that reduces the outstanding Notes by a minimum amount of $500,000 or an integral multiple thereof), together with accrued and unpaid interest on the principal amount to be prepaid in cash.

5.3    **Right of Replacement or Repayment in relation to a Single Purchaser**

(a)    If any Purchaser claims indemnification from the Company under Section 7 (*Taxes*) or Section 8 (*Increased Costs*), the Company may, while the circumstance giving rise to the requirement for that increase or indemnification, or the demand for that increase or indemnification, continues, give the Note Administrative Agent notice of its intention to procure the repayment of that Purchaser's Notes or give the Note Administrative Agent notice of its intention to replace that Purchaser in accordance with clause (c) below.

(b)    By no later than thirty (30) days after the date on which the Company has given notice of repayment or replacement under clause **Error! Reference source not found.** above (or, if earlier, the date specified by the Company in that notice), the Company shall repay that Purchaser's Notes.

(c)    If:

(i)    any of the circumstances set out in clause **Error! Reference source not found.** above apply to a Purchaser; or

(ii)    the Company becomes obliged to pay any amount in accordance with Section 5.1 (*Illegality*) to any Purchaser,

the Company may, on five Business Days' prior notice to the Note Administrative Agent and that Purchaser, replace that Purchaser by requiring that Purchaser to (and, to the extent permitted by law, that Purchaser shall) assign pursuant to Section 17.1 (*Assignment by Purchasers*) all (and not part only) of its rights and obligations under this Agreement to a Purchaser or Person selected by the Company which confirms its willingness to assume and does assume all the obligations of the assigning Purchaser in accordance with Section 17.1 (*Assignment by Purchasers*) for a purchase price in cash payable at the time of the

A48243114

28

assignment in an amount equal to the outstanding principal amount of such Purchaser's Notes, all accrued interest and other amounts payable in relation thereto under the Note Documents.

(d)    The replacement of a Purchaser pursuant to clause (c) of this Section 5.3 (*Right of Replacement or Repayment in relation to a Single Purchaser*), shall be subject to the following conditions:

(i)    the Company shall have no right to replace the Note Administrative Agent;

(ii)    neither the Note Administrative Agent nor any Purchaser shall have any obligation to find a replacement Purchaser;

(iii)    in no event shall the Purchaser replaced under clause (c) above be required to pay or surrender any of the fees received by such Purchaser pursuant to the Note Documents; and

(iv)    the Purchaser replaced under clause (c) above shall only be obliged to assign its rights and obligations pursuant to clause (c) above once it is satisfied that it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations in relation to that assignment.

(e)    A Purchaser shall perform the checks described in clause (d)(iv) above as soon as reasonably practicable following delivery of a notice referred to in clause **Error! Reference source not found.** above and shall notify the Note Administrative Agent and the Company when it is satisfied that it has complied with those checks.

### 5.4    Restrictions

(a)    Any notice of prepayment given by any Party under this Section 5 (*Prepayment*) shall be irrevocable and, unless a contrary indication appears in this Agreement, shall specify the date or dates upon which the relevant prepayment is to be made and the amount of that prepayment.

(b)    Any prepayment under this Agreement shall be made together with accrued interest on the amount prepaid in each case in cash and without premium or penalty (and, for the avoidance of doubt, without payment of any PIK Amount in respect of such accrued interest).

(c)    The Company shall not repay or prepay all or any part of the Notes except at the times and in the manner expressly provided for in this Agreement.

(d)    If the Note Administrative Agent receives a notice under this Section 5 (*Prepayment*), it shall promptly forward a copy of that notice to either the Company or the affected Purchaser, as appropriate.

(e)    Any prepayment of a Note (or part thereof) made in accordance with this Agreement (other than pursuant to Section 5.1 (*Illegality*) or any acceleration of a Note pursuant to Section

15.2 (*Non-Bankruptcy Defaults*) or 15.3 (*Bankruptcy Defaults*)) shall be made as at the date of such prepayment in respect of the relevant Note (or part thereof) prepaid.

5.5 **Application of Prepayments**

Any prepayment of Notes pursuant to Section 5.2 (*Voluntary Prepayment of Notes*) shall be applied pro rata to each Purchaser.

6.    **INTEREST**

6.1 **Interest Rate**

Subject to Section **Error! Reference source not found.** (*Default interest*), each Note shall bear interest at a rate per annum equal to Adjusted Term SOFR for the Interest Period therefor *plus* the Applicable Margin.

6.2 **Default Interest**

(a)    At any time when an Event of Default is continuing and from such date during that period as the Note Administrative Agent shall notify the Company in writing, interest shall accrue on the outstanding amount of the Notes for such period at a rate which is the sum of 2% per annum and the rate payable pursuant to Section 6.1 (*Interest Rate*).

(b)    Any interest accruing under this Section 6.2 (*Default interest*) shall be immediately payable by the Company on demand by the Note Administrative Agent.

(c)    Default interest (if unpaid) arising on an overdue amount will be compounded with the overdue amount on each Interest Payment Date but will remain immediately due and payable.

6.3 **Payment of Interest; Payment In Kind**

 Accrued interest on each Note shall be payable by the Company in arrears on each Interest Payment Date; **provided** that (i) such interest shall be payable 25.0% in cash and 75.0% by adding such amount of accrued interest to the principal amount of the Notes on the Interest Payment Date (such amount, a "**PIK Amount**"), which PIK Amount shall be automatically added to the principal amount of the Notes on such date and thereafter shall accrue interest in accordance with Sections 6.1 (Interest Rate) and 6.2 (Default Interest), as applicable (ii) interest accrued pursuant to Section 6.2 (Default Interest) shall be payable in cash on demand, and (iii) in the event of any repayment or prepayment of any Note, accrued interest on the principal amount repaid or prepaid shall be payable in cash on the date of such repayment or prepayment.

6.4 **Benchmark Replacement**

(a)    Notwithstanding anything to the contrary herein or in any other Note Document, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred prior to any setting of the then-current Benchmark, then (x) if a Benchmark Replacement is

determined in accordance with clause (a) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Note Document in respect of such Benchmark setting and subsequent Benchmark settings without any amendment to, or further action or consent of any other party to, this Agreement or any other Note Document and (y) if a Benchmark Replacement is determined in accordance with clause (b) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Note Document in respect of any Benchmark setting at or after 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the date notice of such Benchmark Replacement is provided to the Purchasers without any amendment to, or further action or consent of any other party to, this Agreement or any other Note Document so long as the Note Administrative Agent has not received, by such time, written notice of objection to such Benchmark Replacement from Purchasers comprising Required Purchasers.

(b)    In connection with the use, administration, adoption or implementation of a Benchmark Replacement, the Note Administrative Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Note Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Note Document.

(c)    The Note Administrative Agent will promptly notify the Company and the Purchasers of (i) the implementation of any Benchmark Replacement and (ii) the effectiveness of any Conforming Changes. Any determination, decision or election that may be made by the Note Administrative Agent or, if applicable, any Purchaser (or group of Purchasers) pursuant to this Section 6.4 (*Benchmark Replacement*), including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party hereto, except, in each case, as expressly required pursuant to this Section 6.4 (*Benchmark Replacement*).

7.    **TAXES**

7.1    **Defined Terms**

For purposes of this Section 7 (*Taxes*), the term "applicable law" includes FATCA.

7.2    **Payment Free of Taxes**

Any and all payments by or on account of any obligation of the Company under any Note Document shall be made without deduction or withholding for any Taxes, except as required

A48243114

by applicable law. If any applicable law (as reasonably determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the Company shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 7 (*Taxes*), the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

7.3 **Payment of Other Taxes**

The Company shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Note Administrative Agent timely reimburse it for the payment of, any Other Taxes.

7.4 **Indemnification for Taxes by Company**

The Company shall indemnify each Recipient, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 7 (*Taxes*) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient) and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Company by a Purchaser (with a copy to the Note Administrative Agent), or by the Note Administrative Agent on its own behalf or on behalf of a Purchaser, shall be conclusive absent manifest error.

7.5 **Indemnification for Taxes by the Purchasers**

Each Purchaser shall severally indemnify the Note Administrative Agent, within 10 days after demand therefor, for (a) any Indemnified Taxes attributable to such Purchaser (but only to the extent that the Company has not already indemnified the Note Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Company to do so), (b) any Taxes attributable to such Purchaser's failure to comply with the provisions of Section 17.3 (*Participations*) relating to the maintenance of a Participant Register and (c) any Excluded Taxes attributable to such Purchaser, in each case, that are payable or paid by the Note Administrative Agent in connection with any Note Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Purchaser by the Note Administrative Agent shall be conclusive absent manifest error. Each Purchaser hereby authorizes the Note

Administrative Agent to set off and apply any and all amounts at any time owing to such Purchaser under any Note Document or otherwise payable by the Note Administrative Agent to the Purchaser from any other source against any amount due to the Note Administrative Agent under this Section 7.5 (*Indemnification for Taxes by the Purchasers*).

7.6    **Evidence of Payments**

As soon as practicable after any payment of Taxes by the Company to a Governmental Authority pursuant to this Section 7 (*Taxes*), the Company shall deliver to the Note Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Note Administrative Agent.

7.7    **Status of Purchasers**

(a)    Any Purchaser that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Note Document shall deliver to the Company and the Note Administrative Agent, at the time or times reasonably requested by the Company or the Note Administrative Agent, such properly completed and executed documentation reasonably requested by the Company or the Note Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Purchaser, if reasonably requested by the Company or the Note Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Company or the Note Administrative Agent as will enable the Company or the Note Administrative Agent to determine whether or not such Purchaser is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in clauses **Error! Reference source not found.**, **Error! Reference source not found.** and **Error! Reference source not found.** of this Section 7.7 (*Status of Purchasers*) shall not be required if in the Purchaser's reasonable judgment such completion, execution or submission would subject such Purchaser to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Purchaser.

(b)    Without limiting the generality of the foregoing,

(i)    any Purchaser that is a US Person shall deliver to the Company and the Note Administrative Agent on or about the date on which such Purchaser becomes a Purchaser under this Agreement (and from time to time thereafter upon the reasonable request of the Company or the Note Administrative Agent), executed copies of IRS Form W-9 certifying that such Purchaser is exempt from US federal backup withholding tax;

(ii)    any Foreign Purchaser shall, to the extent it is legally entitled to do so, deliver to the Company and the Note Administrative Agent (in such number of copies as shall be requested by the Recipient) on or about the date on which such Foreign Purchaser becomes a Purchaser under this Agreement (and from time to time thereafter upon the reasonable request of the Company or the Note Administrative Agent), whichever of the following is applicable:

(A)    in the case of a Foreign Purchaser claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Note Document, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, US federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Note Document, IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, US federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(B)    executed copies of IRS Form W-8ECI;

(C)    in the case of a Foreign Purchaser claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit V-A (*Form of US Tax Compliance Certificate (For Foreign Purchasers That Are Not Partnerships For US Federal Income Tax Purposes)*) to the effect that such Foreign Purchaser is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Company within the meaning of Section 871(h)(3)(B) of the Code, or a "controlled foreign corporation" related to the Company as described in Section 881(c)(3)(C) of the Code (a "**US Tax Compliance Certificate**") and (y) executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E; or

(D)    to the extent a Foreign Purchaser is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, IRS Form W-8BEN-E, a US Tax Compliance Certificate substantially in the form of Exhibit V-B (*Form of US Tax Compliance Certificate (For Foreign Participants That Are Not Partnerships For US Federal Income Tax Purposes)*) or V-C (*Form of US Tax Compliance Certificate (For Foreign Participants That Are Partnerships For US Federal Income Tax Purposes)*), IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; **provided** that if the Foreign Purchaser is a partnership and one or more direct or indirect partners of such Foreign Purchaser are claiming the portfolio interest exemption, such

Foreign Purchaser may provide a US Tax Compliance Certificate substantially in the form of Exhibit V-D (*Form of US Tax Compliance Certificate (For Foreign Purchasers That Are Partnerships For US Federal Income Tax Purposes)*) on behalf of each such direct and indirect partner;

(iii)   any Foreign Purchaser shall, to the extent it is legally entitled to do so, deliver to the Company and the Note Administrative Agent (in such number of copies as shall be requested by the Recipient) on or about the date on which such Foreign Purchaser becomes a Purchaser under this Agreement (and from time to time thereafter upon the reasonable request of the Company or the Note Administrative Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in US federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Company or the Note Administrative Agent to determine the withholding or deduction required to be made; and

(iv)   if a payment made to a Purchaser under any Note Document would be subject to US federal withholding Tax imposed by FATCA if such Purchaser were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Purchaser shall deliver to the Company and the Note Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Company or the Note Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Company or the Note Administrative Agent as may be necessary for the Company and the Note Administrative Agent to comply with their obligations under FATCA and to determine that such Purchaser has complied with such Purchaser's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment.  Solely for purposes of this clause **Error! Reference source not found.**, "FATCA" shall include any amendments made to FATCA after the Closing Date.

Each Purchaser agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Company and the Note Administrative Agent in writing of its legal inability to do so.

7.8    **Treatment of Certain Tax Refunds**

If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 7 (*Taxes*) (including by the payment of additional amounts pursuant to this Section 7 (*Taxes*), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of

indemnity payments made under this Section 7 (*Taxes*) with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this Section 7.8 (*Treatment of Certain Refunds*) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this Section 7.8 (*Treatment of Certain Refunds*), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this Section 7.8 (*Treatment of Certain Refunds*) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This clause shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

7.9    **Survival of Tax Provisions**

Each Party's obligations under this Section 7 (*Taxes*) shall survive the resignation or replacement of the Note Administrative Agent or any assignment of rights by, or the replacement of, a Purchaser and the repayment, satisfaction or discharge of all obligations under any Note Document.

8.    **INCREASED COSTS**

8.1    **Increased Costs**

(a)    Subject to Section 8.3 (*Exceptions*), the Company shall, within ten (10) Business Days of a demand by the Note Administrative Agent, pay for the account of any Second Lien Secured Party the amount of any Increased Costs incurred by such Second Lien Secured Party as a result of any of the following (a "**Change in Law**"): (i) the introduction of or any change in (or in the interpretation, administration or application of) any law or regulation, (ii) compliance with any law or regulation made after the Closing Date, (iii) the implementation or application of or compliance with Basel III CRD IV, MIFID II or AIFMD or any law or regulation that implements or applies Basel III, CRD IV, MIFID II or AIFMD or (iv) the implementation or application of or compliance with the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "**Dodd-Frank Act**") and any requests, rules, guidelines or directives made under, or issued in connection with, the Dodd-Frank Act.

(b)    In this Agreement:

A48243114

"**AIFMD**" means Directive 2011/61/EU of the European Parliament and of the Council of 8 June 2011 on Alternative Investment Fund Managers and amending Directives 2003/41/EC and 2009/65/EC and Regulations (EC) No 1060/2009 and (EU) No 1095/2010.

"**Basel III**" means:

(i)     the agreements on capital requirements, a leverage ratio and liquidity standards contained in "Basel III: A global regulatory framework for more resilient banks and banking systems", "Basel III: International framework for liquidity risk measurement, standards and monitoring" and "Guidance for national authorities operating the countercyclical capital buffer" published by the Basel Committee on Banking Supervision in December 2010, each as amended, supplemented or restated;

(ii)    the rules for global systemically important banks contained in "Global systemically important banks: assessment methodology and the additional loss absorbency requirement – Rules text" published by the Basel Committee on Banking Supervision in November 2011, as amended, supplemented or restated; and

(iii)   any further guidance or standards published by the Basel Committee on Banking Supervision relating to "Basel III".

"**CRD IV**" means:

(i)     Regulation (EU) No 575/2013 of the European Parliament and of the Council of 26 June 2013 on prudential requirements for credit institutions and investment firms; and

(ii)    Directive 2013/36/EU of the European Parliament and of the Council of 26 June 2013 on access to the activity of credit institutions and the prudential supervision of credit institutions and investment firms.

"**Increased Costs**" means:

(i)     a reduction in the rate of return from the Notes or on a Second Lien Secured Party's overall capital;

(ii)    an additional or increased cost; or

(iii)   a reduction of any amount due and payable under any Note Document,

which is incurred or suffered by a Second Lien Secured Party or any of its Affiliates to the extent that it is attributable to such Second Lien Secured Party having purchased Notes hereunder or funding or performing its obligations under any Note Document.

"**MIFID II**" means Directive 2014/65/EU of the European Parliament and of the Council of 15 May 2014 on markets in financial instruments and amending Directive 2002/92/EC and Directive 2011/61/EU.

### 8.2 Increased Cost Claims

(a)    A Second Lien Secured Party intending to make a claim pursuant to Section 8.1 (*Increased Costs*) shall notify the Note Administrative Agent of the event giving rise to the claim, following which the Note Administrative Agent shall promptly notify the Company.

(b)    Each Second Lien Secured Party shall, as soon as practicable after a demand by the Note Administrative Agent, provide a certificate confirming the amount of its Increased Costs.

### 8.3 Exceptions

Section 8.1 (*Increased Costs*) does not apply to the extent any Increased Cost is:

(i)    attributable to (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of "Excluded Taxes" and (C) Connection Income Taxes;

(ii)    attributable to the breach by the relevant Second Lien Secured Party or its Affiliates of any law or regulation; or

(iii)    accruing more than 180 days prior to the date the relevant Second Lien Secured Party made the applicable claim hereunder (ignoring for this purpose any period of retroactive effect of any applicable increased cost).

## 9. OTHER INDEMNITIES

### 9.1 Currency Indemnity

(a)    If any sum due from the Company under the Note Documents (a "**Sum**"), or any order, judgment or award given or made in relation to a Sum, has to be converted from the currency (the "**First Currency**") in which that Sum is payable into another currency (the "**Second Currency**") for the purpose of:

(i)    making or filing a claim or proof against the Company;

(ii)    obtaining or enforcing an order, judgment or award in relation to any litigation or arbitration proceedings,

the Company shall as an independent obligation, within ten (10) Business Days of written demand, indemnify each Second Lien Secured Party to whom that Sum is due against any cost, loss or liability arising out of or as a result of the conversion including any discrepancy between (A) the rate of exchange used to convert that Sum from the First Currency into the Second Currency and (B) the rate or rates of exchange available to that person at the time of its receipt of that Sum.

(b)    The Company waives any right it may have in any jurisdiction to pay any amount under the Note Documents in a currency or currency unit other than that in which it is expressed to be payable.

9.2    **Other Indemnities**

The Company shall, within three (3) Business Days of written demand (which written demand shall be accompanied by such details or calculations of the amount demanded as the Note Administrative Agent may consider reasonable), indemnify each Second Lien Secured Party against any cost (which must be reasonable), loss or liability incurred by that Second Lien Secured Party as a result of:

(a)    the occurrence of any Event of Default; or

(b)    a failure by the Company to pay any amount due under a Note Document beyond all applicable grace and cure periods, including without limitation, any cost (which is reasonable), loss or liability arising as a result of Section 21 (*Sharing among the Purchasers*),

**provided** that the Company shall have no obligation under this Section 9.2 (*Other Indemnities*) to the extent such loss or liability is caused by the gross negligence or willful misconduct of such Second Lien Secured Party.

9.3    **Indemnity to the Note Administrative Agent**

The Company shall promptly indemnify the Note Administrative Agent against:

(a)    any reasonable cost, loss or liability incurred by the Note Administrative Agent (acting reasonably) as a result of:

(i)    investigating any event which it reasonably believes is a Default;

(ii)    acting or relying on any notice, request or instruction which it reasonably believes to be genuine, correct and appropriately authorized; or

(iii)    instructing lawyers, accountants, tax advisers or other professional advisers or experts as permitted under this Agreement; and

(b)    any cost (which is reasonable, taking into account the fees the Note Administrative Agent receives for the performance of its function as Note Administrative Agent), loss or liability (including, without limitation, for negligence or any other category of liability whatsoever) incurred by the Note Administrative Agent (otherwise than by reason of the Note Administrative Agent's gross negligence or willful misconduct) (or, in the case of any cost, loss or liability pursuant to Section 22.7 (*Disruption to Payment Systems etc.*), notwithstanding the Note Administrative Agent's negligence or any other category of liability whatsoever but not including any claim based on the fraud or gross negligence of the Note Administrative Agent) in acting as Note Administrative Agent under the Note Documents.

A48243114

9.4 **Transaction Indemnity**

The Company shall, within ten (10) Business Days of demand, indemnify each Second Lien Secured Party and each officer or employee thereof, against any cost, loss or liability incurred by such Second Lien Secured Party (or officer or employee thereof) in connection with or arising out of this Agreement, the other Note Documents or the transactions contemplated hereby or thereby, unless such loss or liability is caused by the gross negligence or willful misconduct of such Second Lien Secured Party (or employee or officer thereof); **provided** that if such Second Lien Secured Party (or officer or employee thereof) requires external legal counsel, such counsel will be appointed by mutual agreement between the Company and such Second Lien Secured Party (or employee or officer thereof). Any officer or employee of a Second Lien Secured Party may rely on this Section 9.4 (*Transaction Indemnity*).  Notwithstanding anything in any Note Document to the contrary, under no circumstances shall the Company or any member of the Group or any Affiliate thereof have any liability to any Second Lien Secured Party, any Affiliate thereof or any officer of any of the foregoing in connection with this Agreement, the other Note Documents or the transactions contemplated hereby or thereby on any theory of liability for any special, indirect, consequential or punitive damages (as opposed to actual or direct damages).

9.5 **Taxes**

This Section 9 (*Other Indemnities*) shall not apply with respect to Taxes other than any Taxes that represent losses, claims or damages arising from any non-Tax claim.

10. **MITIGATION BY SECOND LIEN SECURED PARTIES**

10.1 **Mitigation**

(a) Each Second Lien Secured Party shall, in consultation with the Company, take all reasonable steps to mitigate any circumstances which arise and which would result in any amount becoming payable under or pursuant to, or cancelled pursuant to, any of Section 5.1 (*Illegality*), Section 7 (*Taxes*) or Section 8 (*Increased Costs*) including (but not limited to) transferring its rights and obligations under the Note Documents to another Affiliate.

(b) Clause **Error! Reference source not found.** above does not in any way limit the obligations of the Company under the Note Documents.

10.2 **Limitation of liability**

(a) The Company shall promptly indemnify each Second Lien Secured Party for all reasonable costs and expenses reasonably incurred by such Second Lien Secured Party as a result of steps taken by it under Section 10.1 (*Mitigation*) after consultation with the Company.

(b) A Second Lien Secured Party is not obliged to take any steps under Section 10.1 (*Mitigation*) if, in the opinion of such Second Lien Secured Party (acting reasonably), to do so might be prejudicial to it.

A48243114

11. **COSTS AND EXPENSES**

11.1 **Transaction expenses**

The Company shall promptly on demand pay the Note Administrative Agent and the Arranger the amount of all documented costs and expenses (including legal fees) reasonably incurred by any of them in connection with the negotiation, preparation, printing, execution and administration of:

(a)     this Agreement and any other documents referred to in this Agreement; and

(b)     any other Note Documents executed after the Closing Date.

11.2 **Amendment costs**

If the Company requests an amendment, waiver or consent, the Company shall, promptly on demand, reimburse the Note Administrative Agent for the amount of all documented costs and expenses (including legal fees) reasonably incurred by the Note Administrative Agent, in each case subject to any agreed cap, in responding to, evaluating, negotiating or complying with that request or requirement.

11.3 **Enforcement and preservation costs**

The Company shall, within ten (10) Business Days of demand, pay to each Second Lien Secured Party the amount of all documented costs and expenses (including legal fees) incurred by such Second Lien Secured Party in connection with the enforcement of, or the preservation of any rights under, any Note Document or the Liens on the Collateral and with any proceedings instituted by or against that Second Lien Secured Party as a consequence of it entering into a Note Document or taking or holding the Liens on the Collateral, or enforcing those rights.

12. **REPRESENTATIONS AND WARRANTIES**

The Company represents and warrants to the Note Administrative Agent and the Purchasers as follows:

12.1 **Organization and Qualification**

The Company is (a) duly organized, validly existing, and in good standing as a limited liability company under the laws of the State of Delaware, (b) has full and adequate power to own its Property and conduct its business as now conducted, and (c) is duly licensed or qualified and in good standing in each jurisdiction in which the nature of the business conducted by it or the nature of the Property owned or leased by it, in each case, requires such licensing or qualifying, except, with respect to this clause (c), where the failure to do so would not have a Material Adverse Effect.

A48243114

12.2 **Subsidiaries**

Each of BIH and its Subsidiaries (a) is duly organized, validly existing, and in good standing, or other applicable equivalent, under the laws of the jurisdiction in which it is organized, (b) has full and adequate power to own its Property and conduct its business as now conducted, and (c) is duly licensed or qualified and in good standing in each jurisdiction in which the nature of the business conducted by it or the nature of the Property owned or leased by it, in each case, requires such licensing or qualifying, except, with respect to this clause (c), where the failure to do so would not have a Material Adverse Effect.  Schedule 12.2 (*Subsidiaries*) hereto identifies each of BIH and its Subsidiaries, and, in each case the jurisdiction of its organization, the percentage of issued and outstanding shares of each class of its capital stock or other equity interests owned by the Company, BIH and the Subsidiaries of BIH and, if such percentage is not 100% (excluding directors' qualifying shares as required by law), a description of each class of its authorized capital stock and other equity interests and the number of shares of each class issued and outstanding.  All of the outstanding shares of capital stock and other equity interests of each of BIH and its Subsidiaries are validly issued and outstanding and fully paid and non-assessable and all such shares and other equity interests indicated on Schedule 12.2 (*Subsidiaries*) as owned by the Company, BIH or any Subsidiary of BIH are owned, beneficially and of record, by the Company, BIH or such Subsidiary of BIH free and clear of all Liens other than Liens permitted pursuant to clauses (a), (b) or (f) of Section 14.2 (*Liens*).  There are no outstanding commitments or other obligations of BIH or any Subsidiary of BIH to issue, and no options, warrants or other rights of any Person to acquire, any shares of any class of capital stock or other equity interests of BIH or any Subsidiary of BIH.

12.3 **Authority and Validity of Obligations**

The Company has full right and authority to enter into this Agreement and the other Note Documents executed by it, to issue the notes herein provided for, to grant to the Note Administrative Agent the Liens described in the Collateral Documents executed by the Company, and to perform all of its obligations hereunder and under the other Note Documents executed by it.  Each other Note Party has full right and authority to enter into the Note Documents executed by it, to guarantee the Obligations, to grant to the Note Administrative Agent the Liens described in the Collateral Documents executed by such Person, and to perform all of its obligations under the Note Documents executed by it.  The Note Documents executed and delivered by the Company and each other Note Party have been duly authorized, executed, and delivered by the Company and each such other Note Party and constitute valid and binding obligations of the Company and such Note Parties enforceable against them in accordance with their terms, except as enforceability may be limited by bankruptcy, insolvency, fraudulent conveyance or similar laws affecting creditors' rights generally and general principles of equity (regardless of whether the application of such principles is considered in a proceeding in equity or at law); and this Agreement and

A48243114

the other Note Documents do not, nor does the performance or observance by the Company or any other Note Party of any of the matters and things herein or therein provided for, (a) contravene or constitute a default under any provision of law or any judgment, injunction, order or decree binding upon the Company, BIH or the Subsidiaries of BIH or any provision of the organizational documents (e.g., charter, certificate or articles of incorporation and bylaws, certificate or articles of association and operating agreement, partnership agreement, or other similar organizational documents) of the Company, BIH or the Subsidiaries of BIH, (b) conflict with, contravene or constitute a default under any material indenture or agreement of or affecting the Company, BIH or the Subsidiaries of BIH or any of their Property, or (c) result in the creation or imposition of any Lien on any Property of the Company, BIH or the Subsidiaries of BIH other than the Liens granted in favor of the Note Administrative Agent pursuant to the Collateral Documents.

12.4  **Use of Proceeds; Margin Stock**

The Company shall use the proceeds of the Notes to pay all and any outstanding amounts due under the Existing Facility, and the remaining proceeds of the Notes shall be contributed to BIH, which may be documented as the purchase of common stock in BIH at par value. Neither the Company, BIH nor any Subsidiary of BIH is engaged, principally or as one of its important activities, in the business of purchasing or carrying margin stock or in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U of the FRB), and no part of the proceeds of any Note or any other extension of credit made hereunder will be used to purchase or carry any such margin stock or to extend credit to others for the purpose of purchasing or carrying any such margin stock. Margin stock (as hereinabove defined) constitutes less than 25% of the assets of the Company, BIH and the Subsidiaries of BIH on a consolidated basis.

12.5  **Financial Reports**

The consolidated balance sheet of each of (w) the Company and its Subsidiaries, (x) BIH and its Subsidiaries, (y) 777 Re and its Subsidiaries and (z) Merit Life and its Subsidiaries as at December 31, 2019 and December 31, 2020 and the related consolidated statements of income, retained earnings and cash flows of each of the Persons identified at sub-clauses (w) to (z) herein for each fiscal year then ended, and accompanying notes thereto, which financial statements are accompanied by the audit report of Grant Thornton, LLP, independent public accountants, and the unaudited interim consolidated balance sheet of each of the Persons identified at sub-clauses (w) to (z) herein as at March 31, 2022, and the related consolidated statements of income, retained earnings and cash flows of each of the Persons identified at sub-clauses (w) to (z) herein for the three months then ended, heretofore furnished to the Note Administrative Agent and the Purchasers, fairly present the consolidated financial condition of each of the Persons identified at sub-clauses (w) to (z) herein as at said dates and the consolidated results of their operations and cash flows for the periods then ended in conformity with GAAP applied on a consistent basis.  Neither the

A48243114

Company, BIH nor any Subsidiary of BIH has contingent liabilities which are material to it other than as indicated on such financial statements or, with respect to future periods, on the financial statements furnished pursuant to Section 13.5 (*Financial Reports*).

12.6 **No Material Adverse Change**

Since December 31, 2020, there has occurred no event or circumstance which individually or in the aggregate could reasonably be expected to have a Material Adverse Effect.

12.7 **Full Disclosure**

The statements and information furnished to the Note Administrative Agent and the Purchasers in connection with the negotiation of this Agreement and the other Note Documents and the commitments by the Purchasers to provide all or part of the financing contemplated hereby do not contain any untrue statements of a material fact or omit a material fact necessary to make the material statements contained herein or therein, taken as a whole, not misleading, it being acknowledged that as to any projections furnished to the Note Administrative Agent and the Purchasers, the Company only represents that the same were prepared on the basis of information and estimates the Company believed to be reasonable at the time furnished. The information included in the Beneficial Ownership Certification, as updated in accordance with Section 13.9(b) (*Compliance with Anti-Corruption Laws, Anti-Money Laundering Laws and Sanctions*), is true and correct in all respects.

12.8 **Intellectual Property, Franchises, and Licenses**

The Company, BIH and the Subsidiaries of BIH own, possess, or have the right to use all necessary patents, licenses, franchises, trademarks, trade names, trade styles, copyrights, trade secrets, know how, and confidential commercial and proprietary information to conduct their businesses as now conducted, without known conflict with any patent, license, franchise, trademark, trade name, trade style, copyright or other proprietary right of any other Person.

12.9 **Governmental Authority and Licensing**

The Company, BIH and the Subsidiaries of BIH have received all licenses, permits, and approvals of all Governmental Authorities, if any, necessary to conduct their businesses, in each case, except where the failure to obtain or maintain the same could not reasonably be expected to have a Material Adverse Effect. No investigation or proceeding is pending or, to the knowledge of any of the Company, BIH or the Subsidiaries of BIH, threatened, before or by any Governmental Authority that could reasonably be expected to have a Material Adverse Effect.

12.10 **Good Title; Insurance**

The Company, BIH and the Subsidiaries of BIH have good and defensible title (or valid leasehold interests) to their assets as reflected on the most recent consolidated balance

sheet of the Company and BIH and the Subsidiaries of BIH respectively furnished to the Note Administrative Agent and the Purchasers (except for sales of assets in the ordinary course of business), subject to no Liens other than such thereof as are permitted by Section 14.2 (*Liens*).  The Company's, BIH's and the Subsidiaries of BIH's respective properties are insured with financially sound and reputable insurance companies in such amounts, with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses.

12.11 **Litigation and Other Controversies**

There is no litigation or governmental or arbitration proceeding or labor controversy pending, nor to the knowledge of any of the Company, BIH or the Subsidiaries of BIH threatened, against the Company, BIH or any of the Subsidiaries of BIH or any of their Property which if adversely determined, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

12.12 **Taxes**

All Tax returns required to be filed by the Company, BIH or any of the Subsidiaries of BIH in any jurisdiction have, in fact, been filed, and all Taxes, assessments, fees, and other governmental charges upon the Company, BIH or any of the Subsidiaries of BIH or upon any of their Property, income or franchises, which are shown to be due and payable in such returns, have been paid, except Taxes, if any, that are being contested in good faith and by appropriate proceedings which prevent enforcement of the matter under contest and as to which adequate reserves established in accordance with GAAP have been provided.  None of the Company, BIH or any of the Subsidiaries of BIH know of any proposed additional Tax assessment against any of them for which adequate provisions in accordance with GAAP have not been made on their accounts.  Adequate provisions in accordance with GAAP for Taxes on the books of the Company, BIH and each Subsidiary of BIH have been made for all open years, and for its current fiscal period.

12.13 **Approvals**

No authorization, consent, license or exemption from, or filing or registration with, any Governmental Authority, nor any approval or consent of any other Person, is or will be necessary to the valid execution, delivery or performance by the Company, BIH or any of the Subsidiaries of BIH of any Note Document, except for such approvals which have been obtained prior to the date of this Agreement and remain in full force and effect.

12.14 **Affiliate Transactions**

None of the Company, BIH or any Subsidiary of BIH is a party to any contracts or agreements with any of its Affiliates (other than any such contracts or agreements with Wholly-Owned Subsidiaries) on terms and conditions which are less favorable to the Company, BIH or such Subsidiary of BIH than would be usual and customary in similar contracts or agreements

between Persons not affiliated with each other, except as may be set forth in the Intercompany Services Agreement or the Investment Management Agreement.

### 12.15 Investment Company

None of the Company, BIH or any Subsidiary of BIH is an "investment company" or a company "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

### 12.16 ERISA; Plan Assets; Prohibited Transactions

(a)    BIH and each other member of its Controlled Group has fulfilled its obligations under the minimum funding standards of and is in compliance in all material respects with ERISA and the Code to the extent applicable to it and has not incurred any liability to the PBGC or a Plan under Title IV of ERISA other than a liability to the PBGC for premiums under Section 4007 of ERISA. Neither BIH nor any of its Subsidiaries has any contingent liabilities with respect to any post-retirement benefits under a Welfare Plan, other than liability for continuation coverage described in article 6 of Title I of ERISA.

(b)    Neither BIH nor any of its Subsidiaries is an entity deemed to hold "plan assets" within the meaning of 29 C.F.R. § 2510.3-101, as modified by Section 3(42) of ERISA, of an employee benefit plan (as defined in Section 3(3) of ERISA) which is subject to Title I of ERISA or any plan (within the meaning of Section 4975 of the Code) which is subject to Section 4975 of the Code, and neither the execution of this Agreement nor the making of credit extensions hereunder gives rise to a prohibited transaction within the meaning of Section 406 of ERISA or Section 4975 of the Code.  Neither BIH nor any of its Subsidiaries is subject to any law, rule or regulation which is substantially similar to the prohibited transaction provisions of Section 406 of ERISA or Section 4975 of the Code.

### 12.17 Compliance with Laws

The Company, BIH and the Subsidiaries of BIH are in each case in compliance with the requirements of all federal, state and local laws, rules and regulations applicable to or pertaining to their Property or business operations (including the Occupational Safety and Health Act of 1970, the Americans with Disabilities Act of 1990, and laws and regulations establishing quality criteria and standards for air, water, land and toxic or hazardous wastes and substances), where any such noncompliance, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.  None of the Company, BIH or any Subsidiary of BIH has received notice to the effect that its operations are not in compliance with any of the requirements of applicable federal, state or local environmental, health, and safety statutes and regulations or is the subject of any governmental investigation evaluating whether any remedial action is needed to respond to a release of any toxic or hazardous waste or substance into the environment, where any such noncompliance or remedial action, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

**12.18  Sanctions; Anti-Money Laundering Laws and Anti-Corruption Laws**

(a)    None of the Note Parties, any of the Subsidiaries of BIH, any director, officer or employee of any Note Party or any of the Subsidiaries of BIH, nor, to the knowledge of the Company, BIH and each Subsidiary of BIH, any agent or representative of any Note Party or any of the Subsidiaries of BIH, is a Sanctioned Person or currently the subject or target of any Sanctions.

(b)    The Note Parties, each of BIH's Subsidiaries, each of the Note Parties' and BIH's Subsidiaries' respective directors, officers and employees, and, to the knowledge of the Company, BIH and each Subsidiary of BIH, each of the Note Parties' and BIH's Subsidiaries' respective agents and representatives, is in compliance with all applicable Anti-Corruption Laws, Anti-Money Laundering Laws and Sanctions.

(c)    The Note Parties and BIH's Subsidiaries have instituted and maintain in effect policies and procedures reasonably designed to ensure compliance by the Note Parties, BIH's Subsidiaries, and the Loan Parties' and BIH's Subsidiaries' respective directors, officers, employees and agents with all applicable Anti-Corruption Laws, Anti-Money Laundering Laws and Sanctions.

**12.19  Other Agreements**

None of the Company, BIH or any of the Subsidiaries of BIH is in default under the terms of any covenant, indenture or agreement of or affecting such Person or any of its Property, which default if uncured could reasonably be expected to have a Material Adverse Effect.

**12.20  Solvency**

The Company and its Subsidiaries, taken in the aggregate, are solvent, able to pay their debts as they become due, and have sufficient capital to carry on their business and all businesses in which they are about to engage.

**12.21  No Default**

No Default or Event of Default has occurred and is continuing.

**12.22  No Broker Fees**

No broker's or finder's fee or commission will be payable with respect hereto or any of the transactions contemplated hereby; and the Company hereby agrees to indemnify the Note Administrative Agent and the Purchasers against, and agrees that it will hold the Note Administrative Agent and the Purchasers harmless from, any claim, demand, or liability for any such broker's or finder's fees alleged to have been incurred in connection herewith or therewith and any expenses (including reasonable attorneys' fees) arising in connection with any such claim, demand, or liability.

**12.23  EEA Financial Institution**

No Note Party, nor any of the Subsidiaries of BIH, is an EEA Financial Institution.

12.24 **Insurance Licenses**

Each Insurance Subsidiary has all Insurance Licenses necessary to conduct its business. To the best knowledge of each of the Company, BIH and the Subsidiaries of BIH, (a) no Insurance License of any Insurance Subsidiary is the subject of a proceeding for suspension or revocation or any similar proceedings, (b) there is no sustainable basis for such a suspension or revocation, and (c) no such suspension or revocation is threatened in writing by any Applicable Insurance Regulatory Authority.

12.25 **Collateral Documents**

Each of the Collateral Documents is effective to create in favor of the Second Lien Collateral Agent, for the benefit of the Second Lien Secured Parties, a legal, valid and enforceable security interest in the Collateral described therein and proceeds thereof.  In the case of the pledged equity interests described in the Second Lien Pledge Agreement, when the Senior Administrative Agent obtains control of stock certificates representing such equity interests (to be received by the Senior Administrative Agent and thereafter held as gratuitous bailee for the Second Lien Security Parties, as applicable, subject to the Intercreditor Agreement), the Second Lien Pledge Agreement shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Note Parties in such Collateral and the proceeds thereof to the extent a security interest can be perfected by filing or other action required thereunder as security for the Obligations, in each case prior and superior in right to any other Person other than the lenders under the Senior Credit Agreement (subject to the Intercreditor Agreement).

13.    **AFFIRMATIVE COVENANTS**

Until such time as Payment in Full has occurred, the Company covenants and agrees that:

13.1 **Maintenance of Business**

The Company shall, and shall cause each of BIH and the Subsidiaries of BIH to, preserve and maintain its existence, except as otherwise provided in Section 14.4(c) (*Mergers, Consolidations and Sales*).  The Company shall, and shall cause each of BIH and the Subsidiaries of BIH to, preserve and keep in force and effect all licenses, permits, franchises, approvals, patents, trademarks, trade names, trade styles, copyrights, and other proprietary rights necessary to the proper conduct of its business, except where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

13.2 **Maintenance of Properties**

The Company shall, and shall cause each of BIH and the Subsidiaries of BIH to, maintain, preserve, and keep its Property in good repair, working order and condition (ordinary wear and tear excepted), except to the extent that, in the reasonable business judgment of such

Person, any such Property is no longer necessary for the proper conduct of the business of such Person.

13.3 **Taxes and Assessments and other Obligations**

The Company shall duly pay and discharge, and shall cause each of BIH and the Subsidiaries of BIH to duly pay and discharge, its obligations, including all taxes, rates, assessments, fees, and governmental charges upon or against it or its Property, in each case before the same become delinquent and before penalties accrue thereon, unless and to the extent that the same are being contested in good faith and by appropriate proceedings which prevent enforcement of the matter under contest and adequate reserves are provided therefor in accordance with GAAP.

13.4 **Insurance**

The Company shall insure and keep insured, and shall cause each of BIH and the Subsidiaries of BIH to insure and keep insured, with good and responsible insurance companies, all insurable Property owned by it which is of a character usually insured by Persons similarly situated and operating like Properties against loss or damage from such hazards and risks, and in such amounts, as are insured by Persons similarly situated and operating like Properties; and the Company shall insure, and shall cause each of BIH and the Subsidiaries of BIH to insure, such other hazards and risks with good and responsible insurance companies as and to the extent usually insured by Persons similarly situated and conducting similar businesses.  The Company shall in any event maintain, and cause each of BIH and the Subsidiaries of BIH to maintain, insurance on the Collateral to the extent required by the Collateral Documents.  The Company shall, upon the request of the Note Administrative Agent, furnish to the Note Administrative Agent and the Purchasers a certificate setting forth in summary form the nature and extent of the insurance maintained pursuant to this Section 13.4 (*Insurance*).

13.5 **Financial Reports**

(a) The Company shall, and shall cause each of BIH and the Subsidiaries of BIH to, maintain a standard system of accounting in accordance with GAAP or SAP, as applicable, and shall furnish to the Note Administrative Agent such information respecting the business and financial condition of each of the Company, BIH and the Subsidiaries of BIH as the Note Administrative Agent or such Purchaser may reasonably request; and without any request, shall furnish to the Note Administrative Agent:

(i) as soon as available, and in any event no later than 45 days after the last day of each calendar month, a copy of the consolidated and consolidating balance sheet of each of (w) the Company and its Subsidiaries, (x) BIH and its Subsidiaries, (y) 777 Re and its Subsidiaries and (z) Merit Life and its Subsidiaries as of the last day of such month and the consolidated and consolidating statements of income, retained earnings, and cash flows of each of the Persons identified at sub-clauses

(w) to (z) herein for the month and for the fiscal year to date period then ended, each in reasonable detail showing in comparative form the figures for the corresponding date and period in the previous fiscal year, prepared by the Company, BIH, 777 Re and Merit Life in accordance with GAAP (subject to the absence of footnote disclosures and year end audit adjustments) and certified to by its chief financial officer or another officer of each such Person acceptable to the Note Administrative Agent;

(ii)   as soon as available, and in any event no later than 60 days after the last day of each fiscal quarter of each fiscal year of each of the Company, BIH, 777 Re and Merit Life, a copy of the consolidated and consolidating balance sheet of each of (w) the Company and its Subsidiaries, (x) BIH and its Subsidiaries, (y) 777 Re and its Subsidiaries and (z) Merit Life and its Subsidiaries as of the last day of such fiscal quarter and the consolidated and consolidating statements of income, retained earnings, and cash flows of each of the Persons identified at sub-clauses (w) to (z) herein for the fiscal quarter and for the fiscal year to date period then ended, each in reasonable detail showing in comparative form the figures for the corresponding date and period in the previous fiscal year, prepared by the Company, BIH, 777 Re and Merit Life in accordance with GAAP (subject to the absence of footnote disclosures and year end audit adjustments) and certified to by its chief financial officer or another officer of each such Person acceptable to the Note Administrative Agent;

(iii)  as soon as available, and in any event no later than 60 days after the last day of each fiscal quarter of each fiscal year, a copy of each Insurance Subsidiary's, quarterly statutory financial statements, prepared by each such Person in accordance with SAP, as filed with the Applicable Insurance Regulatory Authority;

(iv)   as soon as available, and in any event no later than 120 days after the last day of each fiscal year of the Company, BIH, 777 Re and Merit Life, a copy of the consolidated and consolidating balance sheet of each of (w) the Company and its Subsidiaries, (x) BIH and its Subsidiaries, (y) 777 Re and its Subsidiaries and (z) Merit Life and its Subsidiaries as of the last day of the fiscal year then ended and the consolidated and consolidating statements of income, retained earnings, and cash flows of each of the Persons identified at sub-clauses (w) to (z) herein for the fiscal year then ended, and accompanying notes thereto, each in reasonable detail showing in comparative form the figures for the previous fiscal year, accompanied in the case of the consolidated financial statements by an unqualified opinion of Grant Thornton, LLP or another firm of independent public accountants of recognized national standing, selected by the Company, BIH, 777 Re or Merit Life, as applicable, and reasonably satisfactory to the Note Administrative Agent and the

Required Holders, which report and opinion shall be prepared in accordance with generally accepted auditing standards (and shall not be subject to any "going concern" or like qualification, exception or explanatory paragraph or any qualification, exception or explanatory paragraph as to the scope of such audit) to the effect that such consolidated financial statements present fairly in all material respects the financial condition, results of operations, shareholders' equity and cash flows of each of the Persons identified at sub-clauses (w) to (z) herein on a consolidated basis in accordance with GAAP consistently applied;

(v)     promptly after filing with the Applicable Insurance Regulatory Authority, and in any event no later than 120 days (or 150 days with respect to Merit Life) after the last day of each fiscal year, a copy of each Insurance Subsidiary's Annual Statements, as filed with the Applicable Insurance Regulatory Authority, in each case, audited and accompanied by a report and opinion of independent public accountants of nationally recognized standing, which report and opinion shall be prepared in accordance with generally accepted auditing standards (and shall not be subject to any "going concern" or like qualification, exception or explanatory paragraph or any qualification, exception or explanatory paragraph as to the scope of such audit) to the effect that such financial statements present fairly in all material respects the financial condition, results of operations, capital and statutory surplus and cash flows of such Insurance Subsidiary in accordance with SAP consistently applied;

(vi)    within the period provided in clause (iv) in this Section 13.5 (*Financial Reports*), the written statement of the accountants who certified the audit report thereby required that in the course of their audit they have obtained no knowledge of any Default under Section 14.14 (*Financial Covenants*) or Event of Default, or, if such accountants have obtained knowledge of any such Default or Event of Default, they shall disclose in such statement the nature and period of the existence thereof;

(vii)   promptly after receipt thereof, any additional written reports, management letters or other detailed information contained in writing concerning significant aspects of the operations and financial affairs of each of the Company, BIH and the Subsidiaries of BIH given to it by its independent public accountants;

(viii)  promptly after the sending or filing thereof, copies of each financial statement, report, notice or proxy statement sent by the Company, BIH or any Subsidiary of BIH to its stockholders or other equity holders, and copies of each regular, periodic or special report, registration statement or prospectus (including all Form 10-K, Form 10-Q and Form 8-K reports) filed by the Company, BIH or any Subsidiary of BIH with any securities exchange or the Securities and Exchange Commission or any successor agency;

A48243114

(ix)    promptly after receipt thereof, a copy of each audit made by any regulatory agency of the books and records of the Company, BIH or any Subsidiary or of notice of any material noncompliance with any applicable Law, regulation or guideline relating to the Company, BIH or any Subsidiary of BIH, or any of their business;

(x)    as soon as available, and in any event no later than the date that is sixty (60) days after the first day of its fiscal year, a copy of the business plan for each of the Insurance Subsidiaries for such fiscal year, such business plan, capital management plan and liquidity plan to show projected revenues, expenses and a balance sheet on a month by month basis, summary of capital requirements (including sources and uses), and summary of liquidity requirements (including sources and uses) all in reasonable detail and in form satisfactory to the Note Administrative Agent and the Required Purchasers (and which shall include a summary of all assumptions made in preparing such business plan);

(xi)    to the extent that any business plan of an Insurance Subsidiary described in clause (x) hereof is modified by such Insurance Subsidiary, a copy of such modified business plan as soon as such modification is made;

(xii)    within three Business Days of receipt thereof, a copy of any written notice from any Applicable Insurance Regulatory Authority of any material noncompliance with any applicable insurance Law, regulation or guideline relating to the Company, BIH or any Insurance Subsidiary, or its business;

(xiii)    promptly after making any changes thereto, a copy of any changes to BIH's investment policy;

(xiv)    promptly upon notice thereof, any change in the Financial Strength Rating of BIH;

(xv)    promptly after knowledge thereof shall have come to the attention of any Responsible Officer of the Company, BIH or any Subsidiary of BIH, written notice of (A) any threatened or pending litigation or governmental or arbitration proceeding or labor controversy against the Company, BIH or any Subsidiary of BIH or any of their Property which, if adversely determined, could reasonably be expected to have a Material Adverse Effect or (B) the occurrence of any Default or Event of Default hereunder; and

(xvi)    with each of the financial statements delivered pursuant to clauses (ii) and (iv) above, a Compliance Certificate signed by the chief financial officer or treasurer of the Company or another Responsible Officer of the Company performing similar functions to the effect that to the best of such Responsible Officer's knowledge and belief no Default or Event of Default has occurred during the period covered by such statements or, if any such Default or Event of Default has occurred during such period, setting forth a description of such Default or Event of Default and specifying

A48243114

the action, if any, taken by the Company, BIH or any Subsidiary of BIH to remedy the same.  Such certificate shall also set forth calculations demonstrating that the financial covenants set forth in Section 14.14 (*Financial Covenants*) are satisfied as of the date of such certificate.

(b)    The Company shall deliver to the Note Administrative Agent on or before June 30, 2022, the Annual Statement of 777 Re for the 2021 fiscal year.

13.6   **Inspection**

The Company shall, and shall cause each of BIH and BIH's Subsidiaries to, keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities.  The Company shall, and shall cause each of BIH and BIH's Subsidiaries to, permit the Note Administrative Agent, each Purchaser, and each of their duly authorized representatives and agents to visit and inspect any of its Property, corporate books, and financial records, to examine and make copies of its books of accounts and other financial records, and to discuss its affairs, finances, and accounts with, and to be advised as to the same by, its officers, employees and independent public accountants (and by this provision the Company hereby authorizes such accountants to discuss with the Note Administrative Agent and such Purchasers the finances and affairs of the Company, BIH and BIH's Subsidiaries) at such reasonable times and intervals as the Note Administrative Agent or any such Purchaser may designate; **provided** that so long as no Default or Event of Default exists, the Note Administrative Agent shall provide reasonable prior written notice thereof to the Company.  All such inspections or audits by the Note Administrative Agent shall be at the Company's expense; **provided** that so long as no Default or Event of Default exists, the Company shall not be required to reimburse the Note Administrative Agent for inspections or audits more frequently than once in each fiscal year.

13.7   **ERISA**

The Company shall, and shall cause each of BIH and BIH's Subsidiaries to, promptly pay and discharge all obligations and liabilities arising under ERISA of a character which if unpaid or unperformed could reasonably be expected to result in the imposition of a Lien against any of its Property.  The Company shall, and shall cause each of BIH and BIH's Subsidiaries to, promptly notify the Note Administrative Agent and each Purchaser of: (a) the occurrence of any reportable event (as defined in ERISA) with respect to a Plan, (b) receipt of any notice from the PBGC of its intention to seek termination of any Plan or appointment of a trustee therefor, (c) its intention to terminate or withdraw from any Plan, and (d) the occurrence of any event with respect to any Plan which would result in the incurrence by the Company, BIH or any Subsidiary of BIH of any material liability, fine or penalty, or any material increase in the contingent liability of the Company, BIH or any Subsidiary of BIH with respect to any post retirement Welfare Plan benefit.

13.8 **Compliance with Laws**

The Company shall, and shall cause each of BIH and BIH's Subsidiaries to, comply in all respects with the requirements of all federal, state, and local laws, rules, regulations, ordinances and orders applicable to or pertaining to its Property or business operations, where any such non- compliance, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.  The Company, BIH and the Subsidiaries of BIH shall maintain all applicable Insurance Licenses necessary for the conduct of its business.

13.9 **Compliance with Anti-Corruption Laws, Anti-Money Laundering Laws and Sanctions**

(a)    The Company shall at all times comply with the requirements of all Anti-Corruption Laws, Anti-Money Laundering Laws and Sanctions applicable to the Company and shall cause each other Note Party and each of the Subsidiaries of BIH to comply with the requirements of all Anti-Corruption Laws, Anti-Money Laundering Laws and Sanctions applicable to such Persons.

(b)    The Company shall provide the Note Administrative Agent and the Purchasers (i) any information regarding the Company, each other Note Party, and each other Note Party's respective owners, Affiliates, and Subsidiaries necessary for the Note Administrative Agent and the Purchasers to comply with all applicable Anti-Corruption Laws, Anti-Money Laundering Laws and Sanctions, subject however, in the case of Affiliates, to the Company's ability to provide information applicable to them, and (ii) without limiting the foregoing, notification of any change in the information provided in the Beneficial Ownership Certification that would result in a change to the list of beneficial owners identified therein.

(c)    The Company will maintain in effect and enforce policies and procedures reasonably designed to ensure compliance by the Note Parties, the Subsidiaries of BIH, and the Note Parties' and BIH's Subsidiaries' respective directors, officers, employees and agents with applicable Anti-Corruption Laws, Anti Money-Laundering Laws and Sanctions.

13.10 **Use of Proceeds**

The Company shall use the credit extended under this Agreement solely for the purposes set forth in, or otherwise permitted by, Section 12.4 (*Use of Proceeds; Margin Stock*).

13.11 **Guaranties and Collateral**

(a)    The Company shall, and shall cause MTCP to, pledge 100% of their equity interests in BIH to the Second Lien Collateral Agent for the benefit of the holders of the Obligations, which shall be valid and perfected second priority Liens pursuant to, and subject to the provisions of, the Second Lien Pledge Agreement.

(b)    The Company agrees that it shall, and shall cause each of BIH and BIH's Subsidiaries to, from time to time at the request of the Note Administrative Agent or the Required Purchasers, execute and deliver such documents and do such acts and things as the Note Administrative

A48243114

Agent or the Required Purchasers may reasonably request in order to provide for or perfect or protect the Liens on the Collateral granted by it and MTCP.

13.12 **Additional Reporting Requirements**

The Company shall provide the following information to the Note Administrative Agent:

(a)     as soon as available, and in any event no later than 60 days after the last day of each fiscal quarter of each fiscal year: (i) an asset list and commentary from CIO highlighting any changes to portfolio, (ii) an update on performance drivers and compliance with the Business Plan, and (iii) a compliance report reporting all financial metrics and affirmation of compliance with all financial and non-financial covenants applicable to the investment with any exceptions highlighted for the attention of the Purchasers;

(b)     promptly when obtained by the Company, BIH or any Subsidiary of BIH, ratings reports or internal credit write-ups on private investments added to the investment portfolios of any of BIH and the Insurance Subsidiaries;

(c)     promptly after being obtained by the board of BIH or any Insurance Subsidiary, all board reports and memoranda, including pricing presentations on new reinsurance transactions together with the associated capital management plan detailing sources of capital to support new reinsurance transactions; and

(d)     to the extent requested by the Required Purchasers, (i) an asset review by Duff & Phelps or similar and (ii) a third party actuarial valuation review by an actuarial consultant nominated by the Required Purchasers.

13.13 **777 Re Capital and Liquidity Maintenance**

The Company shall ensure that the Capital and Liquidity Maintenance Agreement shall remain in full force and effect at all times.  The Capital and Liquidity Maintenance Agreement must at all times require the Company to (i) provide funding and liquidity to ensure 777 Re maintains at all times an Enhanced Capital Requirement, from time to time, as calculated under, and determined in accordance with, Bermuda law as in effect from time to time, in the amount of (A) 150% from the period commencing on the Closing Date and ending on December 31, 2022 (inclusive) and (B) 180% thereafter and (ii) provide liquidity to 777 Re at any time required by 777 Re in order to satisfy any excess payment obligations of 777 Re that may become due.  The Company shall promptly provide to the Note Administrative Agent a copy of the terms of any amendment, waiver or other modification to the Capital and Liquidity Maintenance Agreement.

13.14 **777 Re Reinsurance Agreements**

(a)     The Company shall cause 777 Re, in the event that 777 Re intends to enter into a new agreement, contract, treaty, certificate or other arrangement whereby any Insurance Subsidiary agrees to transfer, cede or retrocede and/or accept, reinsure or retrocede from

to another insurer or reinsurer all or part of the liability assumed or assets held by such Insurance Subsidiary under a policy or policies of insurance issued by such Insurance Subsidiary (a "**Relevant Insurance Agreement**")or modify any existing Relevant Insurance Agreement to which it is party, to submit a capital management plan demonstrating the sources of capital to be used in support of the reinsurance business related to such Relevant Insurance Agreement to the board of directors of the Company, and before any such agreement or modification is entered into or takes effect, the board of directors of the Company must approve such plan.

(b)    The Company shall cause 777 Re, to the extent it is required to submit a capital management plan to the board of directors of the Company under Section 13.15(a), to (i) promptly notify each of the Purchasers thereof, (ii) deliver at the same time it is submitted to the board of directors of the Company a copy of such capital management plan to each of the Purchasers and (iii) to the extent the board of directors of the Company approves such plan, promptly notify the Purchasers of such approval.

14.    **NEGATIVE COVENANTS**

Until such time as Payment in Full has occurred, the Company covenants and agrees that:

14.1   **Borrowings and Guaranties**

BIH shall not, nor shall it permit any of its Subsidiaries to, issue, incur, assume, create or have outstanding any Indebtedness for Borrowed Money, or incur liabilities for interest rate, currency, or commodity cap, collar, swap, or similar hedging arrangements, or be or become liable as endorser, guarantor, surety or otherwise for any debt, obligation or undertaking of any other Person, or otherwise agree to provide funds for payment of the obligations of another, or supply funds thereto or invest therein or otherwise assure a creditor of another against loss, or apply for or become liable to the issuer of a letter of credit which supports an obligation of another; **provided**, that the foregoing shall not restrict nor operate to prevent:

(a)    [Reserved];

(b)    purchase money indebtedness and Capitalized Lease Obligations of BIH and its Subsidiaries in an amount not to exceed $1,000,000 in the aggregate at any time outstanding;

(c)    obligations of BIH or any of its Subsidiaries arising out of interest rate, foreign currency, and commodity hedging agreements entered into with financial institutions in connection with bona fide hedging activities in the ordinary course of business and not for speculative purposes;

A48243114

(d)      endorsement of instruments and other items for deposit or collection of commercial paper received in the ordinary course of business;

(e)      intercompany advances from time to time owing by any Subsidiary to BIH or another Subsidiary of BIH or by BIH to a Subsidiary of BIH in the ordinary course of business;

(f)      Senior Debt evidenced by the Senior Debt Documents;

(g)      indebtedness owed to any Person providing property, casualty, liability or other insurance to BIH or any of its Subsidiaries, so long as the amount of such indebtedness is not in excess of the amount of the unpaid cost of, and shall be incurred only to defer the cost of, such insurance for the year in which such indebtedness is incurred and such indebtedness is outstanding only during such year;

(h)      indebtedness incurred in respect of credit cards, credit card processing services, debit cards, stored value cards, purchase cards (including so-called "procurement cards" or "P-cards") or other similar cash management services and other indebtedness in respect of netting services, overdraft protections, automatic clearinghouse arrangements, employee credit card programs and other cash management and similar arrangements, in each case, incurred in the ordinary course of business, in an aggregate amount not to exceed $15,000,000 at any time outstanding;

(i)      investments permitted by Section 14.3 (*Investments, Acquisitions, Loans and Advances*); and

(j)      other indebtedness in an aggregate principal amount not exceeding $2,000,000 at any time outstanding.

14.2   **Liens**

BIH shall not, nor shall it permit any of its Subsidiaries to, create, incur or permit to exist any Lien of any kind on any Property owned by any such Person; **provided** that the foregoing shall not apply to nor operate to prevent:

(a)      Liens arising by statute in connection with worker's compensation, unemployment insurance, old age benefits, social security obligations, taxes, assessments, statutory obligations or other similar charges (other than Liens arising under ERISA), and good faith cash deposits in connection with workers' compensation, unemployment insurance or other forms of governmental insurance or benefit, and tenders, contracts or leases to which BIH or any of its Subsidiaries is a party or other cash deposits required to be made in the ordinary course of business, **provided** in each case that the obligation is not for borrowed money and that the obligation secured is not overdue or, if overdue, is being contested in good faith by appropriate

proceedings without enforcement of the matter under contest and adequate reserves have been established therefor consistent with GAAP;

(b)    mechanics', workmen's, materialmen's, landlords', carriers' or other similar Liens arising in the ordinary course of business with respect to obligations which are not overdue, or if overdue, are being contested in good faith by appropriate proceedings without enforcement of the matter under contest;

(c)    Liens on equipment of BIH or any of its Subsidiaries created solely for the purpose of securing indebtedness permitted by Section 14.1(b) (*Borrowings and Guaranties*) incurred to finance the purchase price of such Property; **provided** that no such Lien shall extend to or cover other Property of BIH or any Subsidiary of BIH other than the respective Property so acquired (and any attachments, accessories, parts, additions and substitutions therefor), and the principal amount of indebtedness secured by any such Lien shall at no time exceed the purchase price of such Property, as reduced by repayments of principal thereon;

(d)    any interest or title of a lessor under any operating lease (including Liens arising from precautionary financing statement filings under operating or similar leases);

(e)    easements, rights of way, restrictions, and other similar encumbrances against real property incurred in the ordinary course of business which, in the aggregate, are not substantial in amount and which do not materially detract from the value of the Property subject thereto or materially interfere with the ordinary conduct of the business of BIH or any of its Subsidiaries;

(f)    [Reserved];

(g)    Liens granted in favor of the Senior Administrative Agent pursuant to the relevant Senior Debt Documents, to the extent permitted under the terms of the Intercreditor Agreement;

(h)    Liens arising by virtue of trust arrangements, withheld balances, administrative accounts, or any other collateral or security arrangements incurred in connection with any Policies, Reinsurance Agreements or related agreements in the ordinary course of business or capital support agreements or any other agreements in support of the capital of any Insurance Subsidiary, or guarantees or any other agreements guaranteeing the obligations of any Insurance Subsidiary under any Policies or Reinsurance Agreements in each case entered into in the ordinary course of business;

(i)    non-exclusive licenses of patents, trademarks, copyrights, designs and other intellectual property rights in the ordinary course of business;

(j)     judgment Liens (other than for the payment of taxes, assessments or other governmental charges) securing judgments and other proceedings not constituting an Event of Default under Section 15.1(g) (*Events of Default*);

(k)     rights of setoff or bankers' Liens upon deposits of cash in favor of banks or other depository institutions, solely to the extent incurred in connection with the maintenance of such deposit accounts in the ordinary course of business; and

(l)     any other Liens against BIH or any of its Subsidiaries solely to the extent that the aggregate outstanding principal amount of the obligations secured by all such Liens does not exceed $2,000,000 at any time.

It is understood that, with respect to any permitted Lien securing indebtedness that was permitted to secure such indebtedness at the time of the incurrence thereof, such permitted Lien shall also be permitted to secure any increase in the amount of such indebtedness in connection with any accrual of interest, the accretion of accreted value, and increase in the amount of indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies.

### 14.3    Investments, Acquisitions, Loans and Advances

BIH shall not, nor shall it permit any of its Subsidiaries to, directly or indirectly, make, retain or have outstanding any investments (whether through purchase of equity interests or obligations or otherwise) in, or loans or advances to (other than for travel advances and other similar cash advances made to employees in the ordinary course of business), any other Person, or acquire all or any substantial part of the assets or business of any other Person or division thereof; **provided** that the foregoing shall not apply to nor operate to prevent:

(a)     investments in direct obligations of the United States of America or of any agency or instrumentality thereof whose obligations are backed by the full faith and credit of the United States of America; **provided** that any such obligations shall mature within one year of the date of issuance thereof;

(b)     investments in commercial paper rated at least P-1 by Moody's and at least A-1 by S&P maturing within one year of the date of issuance thereof;

(c)     investments in certificates of deposit issued by any United States commercial bank having capital and surplus of not less than $100,000,000 which have a maturity of one year or less;

(d)     investments in repurchase obligations with a term of not more than 90 days for underlying securities of the types described in clause (a) above entered into with any bank meeting the qualifications specified in clause (c) above, provided all such

A48243114

agreements require physical delivery of the securities securing such repurchase agreement, except those delivered through the Federal Reserve Book Entry System;

(e)    marketable direct obligations issued or fully guaranteed by any state of the United States maturing within one year from the date of acquisition thereof and, at the time of acquisition, having one of the two highest ratings obtainable from either S&P or Moody's;

(f)    investments in money market funds that invest primarily in investments of the type described in the immediately preceding clauses (a), (b), (c), and (d) above;

(g)    marketable tax exempt securities rated A or higher by Moody's or A+ or higher by S&P, in each case, maturing within 6 months from the date of acquisition thereof;

(h)    any investment: (i) of BIH existing on the date of this Agreement in one or more of its Subsidiaries, (ii) of BIH from time to time in one or more of its Subsidiaries, (iii) of a Subsidiary of BIH existing on the date of this Agreement in one or more of its Subsidiaries, and (iv) of a Subsidiary of BIH from time to time in its Subsidiaries made from time to time by a Subsidiary in one or more of its Subsidiaries;

(i)    intercompany advances made from time to time by BIH or a Subsidiary of BIH to another Subsidiary or by a Subsidiary of BIH to BIH in the ordinary course of business;

(j)    investments by Insurance Subsidiaries in the ordinary course of business pursuant to Insurance Subsidiary's investment policy;

(k)    reinsurance agreements entered into by an Insurance Subsidiary in the ordinary course of business;

(l)    investments in negotiable instruments deposited or to be deposited for collection in the ordinary course of business;

(m)    advances made in connection with purchases of goods or services in the ordinary course of business;

(n)    investments received in settlement of amounts due to BIH or any of its Subsidiaries effected in the ordinary course of business or owing to BIH or any of its Subsidiaries as a result of (i) insolvency proceedings involving an account debtor or upon the foreclosure or enforcement of any Lien in favor of BIH or any of its Subsidiaries or (ii) the compromise, resolution of litigation, arbitration or any other disputes, including, in each case, investments acquired by BIH or any of its Subsidiaries as a result of a foreclosure by such Person with respect to any secured investment or transfer of title with respect to any secured investments in default;

(o)    to the extent constituting investments, deposits of cash made in the ordinary course of business to secure performance of operating leases;

(p)    investments acquired in connection with the settlement of delinquent accounts receivable in the ordinary course of business or in connection with the bankruptcy or reorganization of contractual counterparties;

(q)    hedging agreements entered into for non-speculative purposes in the ordinary course of business;

(r)    prepaid expenses or lease, utility and other similar deposits, in each case made in the ordinary course of business;

(s)    investments set forth on Schedule 14.3(1) (*Specified Investments*); and

(t)    other investments, loans, and advances in addition to those otherwise permitted by this Section 14.3 (*Investments, Acquisitions, Loans and Advances*) in an amount not to exceed $1,000,000 in the aggregate at any one time outstanding;

**provided** that notwithstanding anything in clauses (a) to (t) set forth above, BIH shall not, and shall not permit its Subsidiaries to, make any investment that would result in BIH or any of its Subsidiaries incurring any non-life (re)insurance exposure.

In determining the amount of investments, acquisitions, loans, and advances permitted under this Section 14.3 (*Investments, Acquisitions, Loans and Advances*), investments and acquisitions shall always be taken at the original cost thereof (regardless of any subsequent appreciation or depreciation therein), and loans and advances shall be taken at the principal amount thereof then remaining unpaid.

Without limiting the generality of the foregoing:

(A)    Each Insurance Subsidiary will invest its regulatory reserves, required capital, target capital or surplus assets in compliance at all times with the allocation parameters specified in Schedule 14.3(2) (*Allocation Parameters for Investment of Regulatory Reserves*);

(B)    The investments backing liabilities of the Insurance Subsidiaries will be made in compliance at all times with the allocation parameters specified in Schedule 14.3(3) (*Allocation Parameters for Investments backing Liabilities of Insurance Subsidiaries*);

(C)    None of BIH nor its Subsidiaries will invest in the Company or any of the Company's Affiliates or Subsidiaries (other than investments among BIH and its Subsidiaries), or make investments in instruments which are linked to the Company, or any of the Company's Affiliates or Subsidiaries (other than investments among BIH and its Subsidiaries) or make loans secured by the

equity of the Company or any of the Company's Affiliates or Subsidiaries except to the extent permitted as set forth in Schedule 14.3(1) (*Specified Investments*), and none of BIH nor its Subsidiaries will make any unsecured investments or loans to the Company or any of the Company's Affiliates or Subsidiaries (other than investments or loans amongst BIH and its Subsidiaries) except to the extent permitted as set forth in Schedule 14.3(1) (*Specified Investments*);

(D)     The special single issuer limits set forth in Schedule 14.3(5) (*Special Single Issuer Limits*) (the assets described in Schedule 14.3(4), the "**Special Single Issuers**") will be complied with by BIH and its Subsidiaries at all times and, in addition thereto, no Single Exposure of BIH and its Subsidiaries will exceed at any time the lower of (I) 20% of BIH's Consolidated Net Worth and (II) 2% of BIH's Consolidated Total Assets; and

(E)     The five (5) largest individual Single Exposures of BIH and its Subsidiaries rated NAIC 2 or worse (excluding the investments in the Special Single Issuers) will not cumulatively exceed at any time the lower of (I) 40% of BIH's Consolidated Net Worth and (II) 4% of BIH's Consolidated Total Assets.

## 14.4  Mergers, Consolidations and Sales

BIH shall not, nor shall it permit any of its Subsidiaries to, be a party to any merger or consolidation, consummate a Division, or sell, transfer, lease or otherwise dispose of all or any part of its Property, including any disposition of Property as part of a sale and leaseback transaction, or in any event sell or discount (with or without recourse) any of its notes or accounts receivable; **provided** that this Section 14.4 (*Mergers, Consolidations and Sales*) shall not apply to nor operate to prevent:

(a)     the sale or lease of inventory in the ordinary course of business;

(b)     the sale, transfer, lease or other disposition of Property of BIH and its Subsidiaries to one another in the ordinary course of its business;

(c)     the merger of any Subsidiary with and into BIH or any other Subsidiary of BIH; **provided** that, in the case of any merger involving BIH, BIH is the corporation surviving the merger;

(d)     the sale of delinquent notes or accounts receivable in the ordinary course of business for purposes of collection only (and not for the purpose of any bulk sale or securitization transaction);

(e)     ceding of insurance or reinsurance in the ordinary course of business and on arm's length terms; **provided** that such transaction (i) is between BIH and one of its

Subsidiaries or between two Subsidiaries of BIH or (ii) does not result in a material change to the reinsurance purchasing policy of BIH or any of its Subsidiaries;

(f)     the sale, transfer or other disposition of any tangible personal property that, in the reasonable business judgment of BIH or any of its Subsidiaries, has become damaged, obsolete or worn out, and which is disposed of in the ordinary course of business;

(g)     the license, on a non-exclusive basis, of patents, trademarks, copyrights, designs and other intellectual property rights in the ordinary course of business;

(h)     a disposition through the abandonment, cancellation or other failure to maintain any trademark or other intellectual property which is no longer used or useful in the business of BIH or any Subsidiary of BIH;

(i)     the lease or sublease of assets in the ordinary course of business;

(j)     the disposition of any of its or their property in connection with (i) any involuntary loss, damage or destruction of property and (ii) any involuntary condemnation, seizure or taking, by exercise of the power of eminent domain or otherwise, or confiscation or requisition of use of property;

(k)     the settlement or write-off of accounts receivable or sale, discount or compromise of overdue accounts receivable for collection, in each case in the ordinary course of business and consistent with past practices;

(l)     Dispositions of assets by BIH and its Subsidiaries, including Insurance Subsidiaries, in connection with an Insurance Contract, Reinsurance Agreement or any related agreement, in each case in the ordinary course of business; and

(m)     other dispositions of property or assets for cash for fair market value and in an aggregate amount not to exceed $500,000 per fiscal year.

14.5  **Maintenance of Subsidiaries**

BIH shall not assign, sell or transfer, nor shall it permit any of its Subsidiaries to issue, assign, sell or transfer, any shares of capital stock or other equity interests of any of its Subsidiaries; **provided** that the foregoing shall not operate to prevent (a) Liens on the capital stock or other equity interests of Subsidiaries of BIH granted to the to the Senior Administrative Agent pursuant to the Senior Debt Documents to the extent permitted under the terms of the Intercreditor Agreement, (b) the issuance, sale, and transfer to any person of any shares of capital stock of a Subsidiary solely for the purpose of qualifying, and to the extent legally necessary to qualify, such person as a director of such Subsidiary, (c) any transaction permitted by Section 14.4(c) (*Mergers, Consolidations and Sales*) and (d) the formation of special purpose Subsidiaries for tax or regulatory purposes, which Subsidiaries shall have

no material operations or own any assets other than as necessary to achieve such special purpose for which they were formed.

14.6 **Dividends and Certain Other Restricted Payments**

BIH shall not, nor shall it permit any of its Subsidiaries to, (a) declare or pay any dividends on or make any other distributions in respect of any class or series of its capital stock or other equity interests (other than dividends or distributions payable solely in its capital stock or other equity interests), (b) directly or indirectly purchase, redeem, or otherwise acquire or retire any of its capital stock or other equity interests or any warrants, options, or similar instruments to acquire the same, or (c) directly or indirectly pay investment or management fees (collectively referred to herein as "**Restricted Payments**"); **provided** that the foregoing shall not operate to prevent any of the following:

(a)    the making of dividends or distributions by any Subsidiary to BIH (or such Subsidiary's direct parent entity);

(b)    the payment of fees to 777 Asset Management LLC pursuant to the Investment Management Agreement and fees payable pursuant to the Intercompany Services Agreement; **provided** that (i) no Default or Event of Default pursuant to Sections 15.1(a), (b), (f), (j) or (k) shall have occurred and be continuing or would result therefrom and (ii) if a default shall occur and be continuing under any Indebtedness for Borrowed Money issued, assumed or guaranteed by the Company aggregating in excess of $15,000,000, or under any indenture, agreement or other instrument under which the same may be issued, and such default shall continue for a period of time sufficient to permit the acceleration of the maturity of any such Indebtedness for Borrowed Money (whether or not such maturity is in fact accelerated), or any such Indebtedness for Borrowed Money shall not be paid when due (whether by demand, lapse of time, acceleration or otherwise), then the portion of such fees under the Investment Management Agreement and Intercompany Services Agreement in excess of $10,00,000 in each fiscal year shall not be permitted to be paid;

(c)    so long as no Default or Event of Default has occurred and is continuing or would result therefrom, investment or management fees in an amount not to exceed the amounts paid as of the Closing Date; and

(d)    for the avoidance of doubt, board of directors fees and other compensation paid to members of the board of directors of BIH or any of its Subsidiaries.

14.7 **Burdensome Contracts with Affiliates**

BIH shall not, nor shall it permit any of its Subsidiaries to, enter into any contract, agreement or business arrangement with any of its Affiliates (other than with Wholly Owned Subsidiaries) on terms and conditions which are less favorable to BIH or such Subsidiary on

the whole than would be usual and customary in similar contracts, agreements or business arrangements between Persons not affiliated with each other; **provided** that this provision shall not apply to any of the transactions set forth in the Intercompany Services Agreement.

14.8  **No Changes in Fiscal Year**

The fiscal year of each of the Company, BIH and the Subsidiaries of BIH ends on December 31st of each year and the Company shall not, nor shall it permit any of BIH or any Subsidiary of BIH to, change its fiscal year from its present basis.

14.9  **Accounting Changes**

The Company will not, and will not permit or cause BIH or any Subsidiary of BIH to, make or permit any material change in its accounting policies or reporting practices, except as may be required or permitted by GAAP or SAP, as the case may be.

14.10  **Change in the Nature of Business and Organizational Documents**

BIH shall not, nor shall it permit any of its Subsidiaries to: (a) engage in any business or activity if as a result the general nature of the business of BIH of any of BIH's Subsidiaries would be changed in any material respect from the general nature of the business engaged in by it as of the Closing Date or (b) engage in any non-life insurance or non-life reinsurance business.  The Company shall not make any amendments to its certificate of formation or limited liability company agreement in a manner adverse to the Purchasers in any material respect.

14.11  **No Restrictive Agreements**

Except as provided herein, the Company shall not, nor shall it permit BIH of any of BIH's Subsidiaries to, directly or indirectly create or otherwise cause or suffer to exist or become effective any consensual encumbrance or restriction of any kind on the ability of BIH or any such Subsidiary of BIH to: (a) pay dividends or make any other distribution on any of BIH's Subsidiaries' capital stock or other equity interests owned by the Company or any Subsidiary, (b) pay any indebtedness owed to the Company, BIH or any Subsidiary of BIH, (c) make loans or advances to the Company, BIH or any Subsidiary of BIH, (d) transfer any of its Property to the Company, BIH or any Subsidiary of BIH, or (e) guarantee the Obligations and/or grant Liens on its assets to the Second Lien Collateral Agent as required by the Note Documents, except, in each case, any such provision contained in the Senior Debt Documents or the Intercreditor Agreement.

14.12  **Senior Debt**

The Company shall not, nor shall it permit BIH or any Subsidiary of BIH or other Note Party to (a) amend or modify any of the terms or conditions relating to the Senior Debt, including the Senior Debt Documents, or (b) make any voluntary prepayment of Senior Debt or effect any voluntary redemption thereof or make any payment on account of Senior Debt which is prohibited under the terms of any instrument or agreement subordinating the same to the

Obligations, in each case except as permitted by the Intercreditor Agreement. Notwithstanding the foregoing, the Company may agree to a decrease in the interest rate applicable thereto or conversion of cash interest to interest-in-kind, or to a deferral of repayment of any of the principal of or interest on any Senior Debt beyond the current due dates therefor; **provided** that the foregoing restrictions under this Section 14.12 (*Senior Debt*) shall apply only with respect to the Senior Debt under the Senior Debt Documents.

14.13 **Use of Proceeds**

(a)    None of the Company, BIH or any Subsidiary of BIH will engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock or in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U of the FRB), and no part of the proceeds of any Note or any other extension of credit made hereunder will be used to purchase or carry any such margin stock or to extend credit to others for the purpose of purchasing or carrying any such margin stock.

(b)    The Company will not request any Note be issued, and the Company shall not use, and shall ensure that each of BIH and the Subsidiaries and Affiliates of BIH, and their respective directors, officers, employees and agents not use, the proceeds of issuance any Note, directly or indirectly, (i) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, (ii) to fund, finance or facilitate any activities, business or transaction of or with any Sanctioned Person or in any Designated Jurisdiction, or (iii) in any other manner that would result in the violation of any Sanctions applicable to any party hereto.

14.14 **Financial Covenants**

(a)    **Debt to Capital Ratio.**  BIH shall at all times maintain a Debt to Capital Ratio of less than or equal to 75%.

(b)    **Net Worth.**  BIH and its Subsidiaries shall at all times maintain a Consolidated Net Worth in an amount of not less than $225,000,000.

(c)    **Fixed Charge Coverage Ratio**.  As of the last day of each fiscal quarter of BIH beginning with the fiscal quarter ending December 31, 2022, BIH shall maintain a ratio of (i) EBITDA for the four fiscal quarters of BIH then ended, less the sum of federal, state, and local income taxes paid in cash by BIH and its Subsidiaries during such period, to (ii) Fixed Charges for the same four fiscal quarters then ended of not less than 1.20 to 1.00.

In the event that BIH fails to comply with the requirements of Section 14.14(c) (*Financial Covenants*) as of the end of any fiscal quarter, until the date that the financial statements with respect to such fiscal quarter are required to be delivered pursuant to Section 13.5 (*Financial Reports*), the Company and/or MTRS shall have the right to make a common equity investment in BIH in cash or otherwise make cash common equity contributions to

BIH (the "**Cure Right**"), and upon receipt by BIH of such cash contributions (the "**Cure Amount**"), BIH's compliance with Section 14.14(c) (*Financial Covenants*) shall be recalculated giving effect to the following pro forma adjustments: (i) EBITDA shall be increased, solely for the purposes of determining compliance with Section 14.14(c) (*Financial Covenants*), including determining compliance with Section 14.14(c) (*Financial Covenants*) as of the end of such fiscal quarter and applicable subsequent periods that include the fiscal quarter for which the Cure Right is exercised, by an amount equal to the Cure Amount; and (ii) if, after giving effect to the foregoing calculations (but not, for the avoidance of doubt, giving pro forma effect to any repayment of Indebtedness for Borrowed Money in connection therewith), the requirements of Section 14.14(c) (*Financial Covenants*) shall be satisfied, then the requirements of Section 14.14(c) (*Financial Covenants*) shall be deemed satisfied as of the end of the relevant fiscal quarter with the same effect as though there had been no failure to comply therewith at such date, and the applicable breach or default of Section 14.14(c) (*Financial Covenants*) that had occurred shall be deemed cured for the purposes of this Agreement.  Notwithstanding anything herein to the contrary, (A) the Cure Right shall not be exercised more than two times, (B) the Cure Right shall not be exercised in two consecutive fiscal quarters, (C) the Cure Amount shall be no greater than the amount required for purposes of complying with Section 14.14(c) (*Financial Covenants*), (D) the Cure Amount shall be disregarded for purposes of determining compliance with any other provision of this Agreement (including any provision that requires compliance with Section 14.14 (*Financial Covenants*) on a pro forma basis) and (E) to the extent that the proceeds of the Cure Amount are used to repay Indebtedness for Borrowed Money, such Indebtedness for Borrowed Money shall not be deemed to have been repaid for purposes of calculating the financial covenants set forth in Section 14.14 (*Financial Covenants*) for the relevant fiscal quarter.

(d)    **Maintenance of Financial Strength Rating.**  BIH shall cause its Insurance Subsidiaries to at all times, maintain a Financial Strength Rating of at least B++.

(e)    **Minimum ECR.**  The Company shall cause 777 Re to maintain at all times an Enhanced Capital Requirement, from time to time, as calculated under, and determined in accordance with, Bermuda law as in effect from time to time, in the amount of: (i) 150% from the period commencing on the Closing Date and ending on December 31, 2022 (inclusive) and (ii) 180% thereafter.

14.15  **Longevity Risk**

(a)    The Company shall ensure that neither it, BIH nor any Subsidiary of BIH will enter into any contract or transaction which could give rise to Longevity Risk that is not 100% reinsured.

(b)    For the purposes of Section 14.15(a) (*Longevity Risk*), "**Longevity Risk**" means assets or liabilities in respect of which the primary risk of loss is contingent on a specific pool of people or general population living longer than expected or modelled.

14.16 **Pensions**

(a)  The Company shall not (and shall ensure that none of BIH and the Subsidiaries of BIH shall) introduce any form of pension or service arrangement for its respective directors, officers or employees without the prior written consent of all the Purchasers.

(b)  Clause (a) above does not apply to employment benefits in the ordinary course of business, which (i) is a defined contribution savings-type plan and (ii) has no capital or income guarantees given by the Company, BIH or any of the Subsidiaries of BIH.

15.  **EVENTS OF DEFAULT**

15.1 **Events of Default**

Any one or more of the following shall constitute an "Event of Default" hereunder:

(a)  (i) the Company shall fail to pay any principal amount of any Note when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise and (ii) the Company shall fail to pay any interest on any Note, or any fee or any other amount (other than an amount referred to in clause (i) of this Section 15.1(a) (*Events of Default*)) payable under this Agreement or under any other Note Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of three or more Business Days;

(b)  default in the observance or performance of any covenant, condition or agreement set forth in Sections 13.1 (*Maintenance of Business*), 13.5 (*Financial Reports*), 13.6 (*Inspection*), 13.9 (*Compliance with Anti-Corruption Laws, Anti-Money Laundering Laws and Sanctions*), or 14 (*Negative Covenants*);

(c)  default in the observance or performance of any other provision hereof or of any other Note Document which is not remedied within 30 days after the earlier of (i) the date on which such failure shall first become known to any Responsible Officer of the Company or (ii) written notice thereof is given to the Company by the Note Administrative Agent;

(d)  any representation or warranty made herein or in any other Note Document or in any certificate furnished to the Note Administrative Agent or the Purchasers pursuant hereto or thereto or in connection with any transaction contemplated hereby or thereby proves untrue in any material respect (or in any respect if such representation, warranty, certification or statement is by its terms already qualified as to materiality) as of the date of the issuance or making or deemed making thereof;

(e)  (i) any event occurs or condition exists (other than those described in clauses (a) through (d) above of this Section 15.1 (*Events of Default*)) which is specified as an event of default under any of the other Note Documents, or (ii) any of the Note Documents shall for any reason not be or shall cease to be in full force and effect or is declared to be null and void,

or (iii) any of the Collateral Documents shall for any reason fail to create a valid and perfected second priority Lien in favor of the Second Lien Collateral Agent in Collateral with an aggregate value of $500,000 or more purported to be covered thereby except as expressly permitted by the terms thereof, (iv) any Note Party takes any action for the purpose of terminating, repudiating or rescinding any Note Document executed by it or any of its obligations thereunder, or (v) any party to the Intercreditor Agreement contests in any manner the validity or enforceability of the Intercreditor Agreement or denies that it has any liability or obligation thereunder or purports to revoke, terminate or rescind the Intercreditor Agreement;

(f)     (i) default shall occur and be continuing under any Indebtedness for Borrowed Money issued, assumed or guaranteed by the Company, BIH or any Subsidiary of BIH aggregating in excess of $30,000,000, or under any indenture, agreement or other instrument under which the same may be issued, or (ii) an Event of Default (as defined in the Senior Debt Documents) shall have occurred and be continuing, and in each case, such default shall continue for a period of time sufficient to permit the acceleration of the maturity of any such Indebtedness for Borrowed Money (whether or not such maturity is in fact accelerated), or any such Indebtedness for Borrowed Money shall not be paid when due (whether by demand, lapse of time, acceleration or otherwise);

(g)     any judgment or judgments, writ or writs or warrant or warrants of attachment, or any similar process or processes, shall be entered or filed against the Company, BIH or any Subsidiary of BIH or against any of their Property, in an aggregate amount in excess of $30,000,000 (except to the extent fully covered by insurance pursuant to which the insurer has accepted liability therefor in writing), and which remains undischarged, unvacated, unbonded or unstayed for a period of 30 days;

(h)     (i) the Company, BIH or any Subsidiary of BIH, or any member of the Controlled Group, shall fail to pay when due an amount or amounts aggregating in excess of $10,000,000 which it shall have become liable to pay to the PBGC or to a Plan under Title IV of ERISA; (ii) notice of intent to terminate a Plan or Plans having aggregate Unfunded Vested Liabilities in excess of $10,000,000 (collectively, a "**Material Plan**") shall be filed under Title IV of ERISA by the Company, BIH or any Subsidiary of BIH, or any other member of the Controlled Group, any plan administrator or any combination of the foregoing; (iii) the PBGC shall institute proceedings under Title IV of ERISA to terminate or to cause a trustee to be appointed to administer any Material Plan or a proceeding shall be instituted by a fiduciary of any Material Plan against the Company, BIH or any Subsidiary of BIH, or any member of the Controlled Group, to enforce Section 515 or 4219(c)(5) of ERISA and such proceeding shall not have been dismissed within 30 days thereafter; or (iv) a condition shall exist by reason of which the PBGC would be entitled to obtain a decree adjudicating that any Material Plan must be terminated;

(i)     any Change of Control shall occur;

(j)     the Company, BIH, any Subsidiary of BIH or any Note Party shall (i) have entered involuntarily against it an order for relief under the United States Bankruptcy Code, as amended, (ii) not pay, or admit in writing its inability to pay, its debts generally as they become due, (iii) make an assignment for the benefit of creditors, (iv) apply for, seek, consent to or acquiesce in, the appointment of a receiver, custodian, trustee, examiner, liquidator or similar official for it or any substantial part of its Property, (v) institute any proceeding seeking to have entered against it an order for relief under the United States Bankruptcy Code, as amended, to adjudicate it insolvent, or seeking dissolution, winding up, liquidation, reorganization, arrangement, adjustment or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors or fail to file an answer or other pleading denying the material allegations of any such proceeding filed against it, (vi) take any corporate, limited liability, or other applicable organizational action in furtherance of any matter described in parts (i) through (v) above, or (vii) fail to contest in good faith any appointment or proceeding described in Section 15.1(k) (*Events of Default*);

(k)     a custodian, receiver, trustee, examiner, liquidator or similar official shall be appointed for the Company, BIH, any Subsidiary of BIH or any Note Party, or any substantial part of any of its Property, or a proceeding described in Section 15.1(j)(v) (*Events of Default*) shall be instituted against the Company, BIH, any Subsidiary of BIH or any Note Party, and such appointment continues undischarged or such proceeding continues undismissed or unstayed for a period of 60 days; or

(l)     (i) any Insurance License of any Insurance Subsidiary (A) shall be revoked by the Applicable Insurance Regulatory Authority, (B) shall be suspended by the Applicable Insurance Regulatory Authority for a period in excess of thirty days or (C) shall not be reissued or renewed by the Applicable Insurance Regulatory Authority upon the expiration thereof following application for such reissuance or renewal of such Person, or (ii) any Applicable Insurance Regulatory Authority shall issue any order of conservation or seizure, however denominated, relating to the Company, BIH or any Insurance Subsidiary or shall take any other action to exercise control (A) over the Company, BIH or any Insurance Subsidiary or (B) over any assets of the Company, BIH or any Insurance Subsidiary.

15.2   **Non-Bankruptcy Defaults**

When any Event of Default (other than those described in Sections 15.1(j) or (k) (*Events of Default*) with respect to the Company) has occurred and is continuing, the Note Administrative Agent may (and if so directed by the Required Purchasers shall) by written notice to the Company: (a) terminate any obligations of the Purchasers hereunder on the date stated in such notice (which may be the date thereof); and (b) declare the principal of and the accrued interest on all outstanding Notes to be forthwith due and payable and thereupon all outstanding Notes, including both principal and interest thereon, shall be and

A48243114

become immediately due and payable together with all other amounts payable under the Note Documents without further demand, presentment, protest or notice of any kind. The Note Administrative Agent, after giving notice to the Company pursuant to Section 15.1(c) (*Events of Default*) or this Section 15.2 (*Non-Bankruptcy Defaults*), shall also promptly send a copy of such notice to the other Purchasers, but the failure to do so shall not impair or annul the effect of such notice.

15.3 **Bankruptcy Defaults**

When any Event of Default described in Sections 15.1(j) or (k) (*Events of Default*) with respect to the Company has occurred and is continuing, then all outstanding Notes shall immediately become due and payable together with all other amounts payable under the Note Documents without presentment, demand, protest or notice of any kind.

16. **SUCCESSORS AND ASSIGNS GENERALLY**

The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in Section 17.3 (*Participations*) and, to the extent expressly contemplated hereby, the Related Parties of each of the Note Administrative Agent and the Purchasers) any legal or equitable right, remedy or claim under or by reason of this Agreement.

17. **ASSIGNMENTS BY PURCHASERS AND PARTICIPATIONS**

17.1 **Assignments by Purchasers**

Any Purchaser may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Notes); **provided** that any such assignment shall be subject to the following conditions:

(a)     Minimum Amounts.

(i)     In the case of an assignment of the entire remaining amount of the assigning Purchaser's Notes or contemporaneous assignments to Related Entities (determined after giving effect to such assignments) that equal at least the amount specified in Section 17.1(a)(ii) (*Assignments by Purchasers*) in the aggregate or in the case of an assignment to a Purchaser, an Affiliate of a Purchaser or a Related Entity, no minimum amount need be assigned; and

(ii)    in any case not described in Section 17.1(a)(i) (*Assignments by Purchasers*), the principal outstanding balance of the Notes of the assigning Purchaser subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Note Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date) shall not be less than $5,000,000, unless each of the Note Administrative Agent and, so long as no Event of Default has occurred and is continuing, the Company otherwise consents (each such consent not to be unreasonably withheld or delayed).

(b)    <u>Proportionate Amounts</u>.  Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Purchaser's rights and obligations under this Agreement with respect to the Notes assigned.

(c)    <u>Required Consents</u>.  No consent shall be required for any assignment except to the extent required by Section 17.1(a)(ii) (*Assignments by Purchasers*) and, in addition:

(i)    the consent of the Company (such consent not to be unreasonably withheld or delayed) shall be required unless (x) an Event of Default has occurred and is continuing at the time of such assignment, or (y) such assignment is to a Purchaser, an Affiliate of a Purchaser or a Related Entity; **provided** that the Company shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Note Administrative Agent within five (5) Business Days after having received notice thereof; and

(ii)    the consent of the Note Administrative Agent (such consent not to be unreasonably withheld or delayed) shall be required for assignments to a Person that is not a Purchaser, an Affiliate of such Purchaser or a Related Entity with respect to such Purchaser.

(d)    <u>Assignment and Assumption</u>.  The parties to each assignment shall execute and deliver to the Note Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500; **provided** that the Note Administrative Agent may, in its sole and absolute discretion, elect to waive such processing and recordation fee in the case of any assignment.

(e)    <u>No Assignment to Certain Persons</u>.  No such assignment shall be made to the Company or any of the Company's Affiliates or Subsidiaries.

(f)    <u>No Assignment to Natural Persons</u>.  No such assignment shall be made to a natural Person (or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural Person).

A48243114

Subject to acceptance and recording thereof by the Note Administrative Agent pursuant to Section 17.2 (*Register*), from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Purchaser under this Agreement, and the assigning Purchaser thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Purchaser's rights and obligations under this Agreement, such Purchaser shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 7 (*Taxes*), 8 (*Increased Costs*) and 9 (*Other Indemnities*) with respect to facts and circumstances occurring prior to the effective date of such assignment. Any assignment or transfer by a Purchaser of rights or obligations under this Agreement that does not comply with this Section 17.1 (*Assignments by Purchasers*) shall be treated for purposes of this Agreement as a sale by such Purchaser of a participation in such rights and obligations in accordance with Section 17.3 (*Participations*).

17.2 **Register**

The Note Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Company, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Purchasers, and principal amounts (and stated interest) of its Notes, each Purchaser pursuant to the terms hereof from time to time (the "**Register**").  The entries in the Register shall be conclusive absent manifest error, and the Company, the Note Administrative Agent and the Purchasers shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Purchaser hereunder for all purposes of this Agreement. The Register shall be available for inspection by the Company and any Purchaser, at any reasonable time and from time to time upon reasonable prior notice.

17.3 **Participations**

(a)  Any Purchaser may at any time, without the consent of, or notice to, the Company or the Note Administrative Agent, sell participations to any Person (other than a natural Person, or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural Person, or the Company or any of the Company's Affiliates or Subsidiaries) (each, a "**Participant**") in all or a portion of such Purchaser's rights and/or obligations under this Agreement (including all or a portion of its Notes); **provided** that (i) such Purchaser's obligations under this Agreement shall remain unchanged, (ii) such Purchaser shall remain solely responsible to the other parties hereto for the performance of such obligations, and (iii) the Company, the Note Administrative Agent and Purchasers shall continue to deal solely and directly with such Purchaser in connection with such Purchaser's rights and obligations under this Agreement.

(b)    Any agreement or instrument pursuant to which a Purchaser sells such a participation shall provide that such Purchaser shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; **provided** that such agreement or instrument may provide that such Purchaser will not, without the consent of the Participant, agree to any amendment, modification or waiver described in Section 28.2 (*All Purchaser Matters*) that affects such Participant.    The Company agrees that each Participant shall be entitled to the benefits of Sections 7 (*Taxes*), 8 (*Increased Costs*) and 9 (*Other Indemnities*) (subject to the requirements and limitations therein, including the requirements under Section 7.7 (*Status of Purchasers*) (it being understood that the documentation required under Section 7.7 (*Status of Purchasers*) shall be delivered to the participating Purchaser)) to the same extent as if it were a Purchaser and had acquired its interest by assignment pursuant to 17.1 (*Assignments by Purchasers*); **provided** that such Participant (A) agrees to be subject to the provisions of Section 10 (*Mitigation by Second Lien Secured Parties*) as if it were an assignee under Section 17.1 (*Assignments by Purchasers*); and (B) shall not be entitled to receive any greater payment under Sections 7 (*Taxes*) or 8  (*Increased Costs*), with respect to any participation, than its participating Purchaser would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.   Each Purchaser that sells a participation agrees, at the Company's request and expense, to use reasonable efforts to cooperate with the Company to effectuate the provisions of 5.3 (*Right of Replacement or Repayment in relation to a Single Purchaser*) with respect to any Participant.   To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 23 (*Set-off*) as though it were a Purchaser; **provided** that such Participant agrees to be subject to Section 21 (*Sharing among the Purchasers*) as though it were a Purchaser.   Each Purchaser that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Company, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Notes or other obligations under the Note Documents (the "**Participant Register**"); **provided** that no Purchaser shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any Notes, or its other obligations under any Note Document) to any Person except to the extent that such disclosure is necessary to establish that such Note or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Purchaser shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Note Administrative Agent (in its capacity as Note Administrative Agent) shall have no responsibility for maintaining a Participant Register.

17.4 **Certain Pledges**

Any Purchaser may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Purchaser, including any pledge or assignment to secure obligations to a Federal Reserve Bank; **provided** that no such pledge or assignment shall release such Purchaser from any of its obligations hereunder or substitute any such pledgee or assignee for such Purchaser as a party hereto.

18. **CHANGES TO THE COMPANY**

The Company may not assign any of its rights or transfer any of its rights or obligations under the Note Documents and any such attempted assignment or transfer by the Company shall be null and void.

19. **ROLE OF THE AGENTS AND THE ARRANGER**

19.1 **Appointment of Agents**

(a) Each Purchaser appoints the Note Administrative Agent to act as its agent and the Second Lien Collateral Agent to act as collateral agent, in each case under and in connection with the Note Documents.

(b) Each Purchaser authorizes the Note Administrative Agent to perform the duties, obligations and responsibilities and to exercise the rights, powers, authorities and discretions specifically given to the Note Administrative Agent under or in connection with the Note Documents together with any other incidental rights, powers, authorities and discretions.

19.2 **Instructions**

(a) The Note Administrative Agent shall:

(i) unless a contrary indication appears in a Note Document, exercise or refrain from exercising any right, power, authority or discretion vested in it as Note Administrative Agent in accordance with any instructions given to it by:

(A) all Purchasers if the relevant Note Document stipulates the matter is an all Purchaser decision; and

(B) in all other cases, the Required Purchasers; and

(ii) not be liable for any act (or omission) if it acts (or refrains from acting) in accordance with sub-clause (i) above (or, if this Agreement stipulates the matter is a decision for any other Second Lien Secured Party or group of Second Lien Secured Parties, from that Second Lien Secured Party or group of Second Lien Secured Parties).

(b)     The Note Administrative Agent shall be entitled to request instructions, or clarification of any instruction, from the Required Purchasers (or, if the relevant Note Document stipulates the matter is a decision for any other Second Lien Secured Party or group of Second Lien Secured Parties, from that Second Lien Secured Party or group of Second Lien Secured Parties) as to whether, and in what manner, it should exercise or refrain from exercising any right, power, authority or discretion and the Note Administrative Agent may refrain from acting unless and until it receives any such instructions or that clarification.

(c)     Save in the case of decisions stipulated to be a matter for any other Second Lien Secured Party or group of Second Lien Secured Parties under the relevant Note Document and unless a contrary indication appears in a Note Document, any instructions given to the Note Administrative Agent by the Required Purchasers shall override any conflicting instructions given by any other Parties and will be binding on all Second Lien Secured Parties.

(d)     Clause (a) in this Section 19.2 (*Instructions*) shall not apply:

   (i)      where a contrary indication appears in a Note Document;

   (ii)     where a Note Document requires the Note Administrative Agent to act in a specified manner or to take a specified action;

   (iii)    in respect of any provision which protects the Note Administrative Agent's own position in its personal capacity as opposed to its role of Note Administrative Agent for the relevant Second Lien Secured Parties including, without limitation, Section 19.5 (*No Fiduciary Duties*) to Section 19.10 (*Exclusion of Liability*) and Section 19.13 (*Confidentiality*).

(e)     If giving effect to instructions given by the Required Purchasers would (in the Note Administrative Agent's opinion) have an effect equivalent to an amendment or waiver referred to in Section 28 (*Amendments and Waivers*), the Note Administrative Agent shall not act in accordance with those instructions unless consent to it so acting is obtained from each Party (other than the Note Administrative Agent) whose consent would have been required in respect of that amendment or waiver.

(f)     In exercising any discretion to exercise a right, power or authority under the Note Documents where it has not received any instructions as to the exercise of that discretion, the Note Administrative Agent shall do so having regard to the interests of all the Second Lien Secured Parties.

(g)     The Note Administrative Agent may refrain from acting in accordance with any instructions of any Second Lien Secured Party or group of Second Lien Secured Parties until it has received any indemnification and/or security that it may in its discretion require (which may be greater in extent than that contained in the Note Documents and which may include

payment in advance) for any cost, loss or liability which it may incur in complying with those instructions.

(h)    Without prejudice to the remainder of this Section 19.2 (*Instructions*), in the absence of instructions, the Note Administrative Agent may act (or refrain from acting) as it considers to be in the best interest of the Second Lien Secured Parties.

(i)    The Note Administrative Agent is not authorized to act on behalf of a Second Lien Secured Party (without first obtaining that Second Lien Secured Party's consent) in any legal or arbitration proceedings relating to any Note Document.

19.3    **Duties of the Note Administrative Agent**

(a)    The duties of the Note Administrative Agent under the Note Documents are solely administrative in nature.

(b)    Subject to clause (c) of this Section 19.3, the Note Administrative Agent shall promptly forward to a Party the original or a copy of any document which is delivered to the Note Administrative Agent for that Party by any other Party.

(c)    Without prejudice to Section 17.2 (*Register*), clause (b) of this Section 19.3 (*Duties of the Note Administrative Agent*) shall not apply to any Assignment and Assumption.

(d)    Except where a Note Document specifically provides otherwise, the Note Administrative Agent is not obliged to review or check the adequacy, accuracy or completeness of any document it forwards to another Party.

(e)    If the Note Administrative Agent receives notice from a Party referring to any Note Document, describing a Default and stating that the circumstance described is a Default, it shall promptly notify the other Second Lien Secured Parties.

(f)    If the Note Administrative Agent is aware of the non-payment of any principal, interest, commitment fee or other fee payable to a Second Lien Secured Party (other than the Note Administrative Agent or the Arranger) under this Agreement, it shall promptly notify the other Second Lien Secured Parties.

(g)    The Note Administrative Agent shall have only those duties, obligations and responsibilities expressly specified in the Note Documents to which it is expressed to be a party (and no others shall be implied).

19.4    **Role of the Arranger**

Except as specifically provided in the Note Documents, the Arranger has no obligations of any kind to any other Party under or in connection with any Note Document.

19.5    **No Fiduciary Duties**

(a)    Nothing in any Note Document constitutes the Note Administrative Agent or the Arranger as a trustee or fiduciary of any other person.

(b)    Neither the Note Administrative Agent, nor the Arranger shall be bound to account to any other Second Lien Secured Party for any sum or the profit element of any sum received by it for its own account.

19.6    **Business with the Company**

The Note Administrative Agent and the Arranger may accept deposits from, lend money to and generally engage in any kind of banking or other business with the Company, BIH, any Subsidiary of BIH or any Affiliate of any of the foregoing.

19.7    **Rights and Discretions**

(a)    The Note Administrative Agent may:

(i)    rely on any representation, communication, notice or document believed by it to be genuine, correct and appropriately authorized;

(ii)    assume that:

(A)    any instructions received by it from the Required Purchasers, any Second Lien Secured Parties or any group of Second Lien Secured Parties are duly given in accordance with the terms of the Note Documents; and

(B)    unless it has received notice of revocation, that those instructions have not been revoked; and

(iii)    rely on a certificate from any person:

(A)    as to any matter of fact or circumstance which could reasonably be expected to be within the knowledge of that person; or

(B)    to the effect that such person approves of any particular dealing, transaction, step, action or thing,

as sufficient evidence that that is the case and, in the case of clause (A)  of this Section 19.7 (*Rights and Discretions*), may assume the truth and accuracy of that certificate.

(b)    The Note Administrative Agent may assume (unless it has received notice to the contrary) in its capacity as administrative agent for the Second Lien Secured Parties that:

(i)    no Default has occurred (unless it has actual knowledge of a Default arising under Section 15.1(a) (*Events of Default*)); and

(ii)    any right, power, authority or discretion vested in any Party or any group of Second Lien Secured Parties has not been exercised.

(c)    The Note Administrative Agent may engage and pay for the advice or services of any lawyers, accountants, tax advisers or other professional advisers or experts.

A48243114

(d)     Without prejudice to the generality of clauses (c) or (e) of this Section 19.7 (*Rights and Discretions*), the Note Administrative Agent may at any time engage and pay for the services of any lawyers to act as independent counsel to the Note Administrative Agent (and so separate from any lawyers instructed by the Purchasers) if the Note Administrative Agent in its reasonable opinion deems this to be desirable.

(e)     The Note Administrative Agent may rely on the advice or services of any lawyers, accountants, tax advisers or other professional advisers or experts (whether obtained by the Note Administrative Agent or by any other Party) and shall not be liable for any damages, costs or losses to any person, any diminution in value or any liability whatsoever arising as a result of its so relying.

(f)     The Note Administrative Agent may act in relation to the Note Documents through its officers, employees and agents and shall not:

        (i)     be liable for any error of judgment made by any such person; or

        (ii)    be bound to supervise, or be in any way responsible for any loss incurred by reason of misconduct, omission or default on the part of, any such person,

unless such error or such loss was directly caused by the Note Administrative Agent's gross negligence or willful misconduct.

(g)     Unless a Note Document expressly provides otherwise, the Note Administrative Agent may disclose to any other Party any information it reasonably believes it has received as administrative agent under the Note Documents.

(h)     Notwithstanding any other provision of any Note Document to the contrary, neither the Note Administrative Agent nor the Arranger is obliged to do or omit to do anything if it would, or might in its reasonable opinion, constitute a breach of any law or regulation or a breach of a fiduciary duty or duty of confidentiality.

(i)     Notwithstanding any provision of any Note Document to the contrary, the Note Administrative Agent is not obliged to expend or risk its own funds or otherwise incur any financial liability in the performance of its duties, obligations or responsibilities or the exercise of any right, power, authority or discretion if it has grounds for believing the repayment of such funds or adequate indemnity against, or security for, such risk or liability is not reasonably assured to it.

19.8    **Responsibility for Documentation**

Neither the Note Administrative Agent nor the Arranger is responsible or liable for:

        (a)     the adequacy, accuracy or completeness of any information (whether oral or written) supplied by the Note Administrative Agent (in the case of the Arranger), the Second Lien Collateral Agent, the Arranger (in the case of the Note Administrative Agent), the Company or any other person in or in connection with any Note Document or the

transactions contemplated in the Note Documents or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Note Document; or

(b)     the legality, validity, effectiveness, adequacy or enforceability of any Note Document or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Note Document; or

(c)     any determination as to whether any information provided or to be provided to any Second Lien Secured Party is non-public information the use of which may be regulated or prohibited by applicable law or regulation relating to insider dealing or otherwise.

### 19.9  No Duty to Monitor

The Note Administrative Agent shall not be bound to enquire:

(a)     whether or not any Default has occurred;

(b)     as to the performance, default or any breach by any Party of its obligations under any Note Document; or

(c)     whether any other event specified in any Note Document has occurred.

### 19.10  Exclusion of Liability

(a)     Without limiting clause (b) of this Section 19.10 (*Exclusion of Liability*) (and without prejudice to any other provision of any Note Document excluding or limiting the liability of the Note Administrative Agent), the Note Administrative Agent will not be liable (including, without limitation, for negligence or any other category of liability whatsoever) for:

(i)     any damages, costs or losses to any person, any diminution in value, or any liability whatsoever arising as a result of taking or not taking any action under or in connection with any Note Document, unless directly caused by its gross negligence or willful misconduct;

(ii)     exercising, or not exercising, any right, power, authority or discretion given to it by, or in connection with, any Note Document or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with, any Note Document; or

(iii)     without prejudice to the generality of clauses (i) and (ii) above, any damages, costs or losses to any person, any diminution in value or any liability whatsoever arising as a result of:

(A)     any act, event or circumstance not reasonably within its control; or

(B)     the general risks of investment in, or the holding of assets in, any jurisdiction,

including (in each case and without limitation) such damages, costs, losses, diminution in value or liability arising as a result of: nationalization, expropriation or other governmental actions; any regulation, currency restriction, devaluation or fluctuation; market conditions affecting the execution or settlement of transactions or the value of assets (including any Disruption Event); breakdown, failure or malfunction of any third-party transport, telecommunications, computer services or systems; natural disasters or acts of God; war, terrorism, insurrection or revolution; or strikes or industrial action.

(b)     No Party (other than the Note Administrative Agent) may take any proceedings against any officer, employee or agent of the Note Administrative Agent in respect of any claim it might have against the Note Administrative Agent, or in respect of any act or omission of any kind by that officer, employee or agent in relation to any Note Document and any officer, employee or agent of the Note Administrative Agent, may rely on this Section 19.10 (*Exclusion of Liability*).

(c)     The Note Administrative Agent will not be liable for any delay (or any related consequences) in crediting an account with an amount required under the Note Documents to be paid by the Note Administrative Agent if the Note Administrative Agent has taken all necessary steps as soon as reasonably practicable to comply with the regulations or operating procedures of any recognized clearing or settlement system used by the Note Administrative Agent for that purpose.

(d)     Nothing in this Agreement shall oblige the Note Administrative Agent or the Arranger to carry out:

(i)      any "know your customer" or other checks in relation to any Person; or

(ii)     any check on the extent to which any transaction contemplated by this Agreement might be unlawful for any Second Lien Secured Party,

on behalf of any Second Lien Secured Party and each Second Lien Secured Party confirms to the Note Administrative Agent and the Arranger that it is solely responsible for any such checks it is required to carry out and that it may not rely on any statement in relation to such checks made by the Note Administrative Agent or the Arranger.

(e)     Without prejudice to any provision of any Note Document excluding or limiting the liability of the Note Administrative Agent, any liability of the Note Administrative Agent arising under or in connection with any Note Document shall be limited to the amount of actual loss which has been finally judicially determined to have been suffered (as determined by reference to the date of default of the Note Administrative Agent or, if later, the date on which the loss arises as a result of such default) but without reference to any special conditions or circumstances known to the Note Administrative Agent at any time which increase the amount of that loss. In no event shall the Note Administrative Agent be liable for any loss of profits, goodwill, reputation, business opportunity or anticipated saving, or for special,

punitive, indirect or consequential damages, whether or not the Note Administrative Agent has been advised of the possibility of such loss or damages.

(f)    The Note Administrative Agent does not warrant or accept responsibility for, and shall not have any liability with respect to (a) the continuation of, administration of, submission of, calculation of or any other matter related to the Term SOFR Reference Rate, Adjusted Term SOFR or Term SOFR, or any component definition thereof or rates referred to in the definition thereof, or any alternative, successor or replacement rate thereto (including any Benchmark Replacement), including whether the composition or characteristics of any such alternative, successor or replacement rate (including any Benchmark Replacement) will be similar to, or produce the same value or economic equivalence of, or have the same volume or liquidity as, the Term SOFR Reference Rate, Adjusted Term SOFR, Term SOFR or any other Benchmark prior to its discontinuance or unavailability, or (b) the effect, implementation or composition of any Conforming Changes.  The Note Administrative Agent and its affiliates or other related entities may engage in transactions that affect the calculation of the Term SOFR Reference Rate, Term SOFR, Adjusted Term SOFR, any alternative, successor or replacement rate (including any Benchmark Replacement) or any relevant adjustments thereto, in each case, in a manner adverse to the Borrower.  The Note Administrative Agent may select information sources or services in its reasonable discretion to ascertain the Term SOFR Reference Rate, Term SOFR, Adjusted Term SOFR or any other Benchmark, in each case pursuant to the terms of this Agreement, and shall have no liability to the Borrower, any Purchaser, the Company, BIH or any of BIH's Subsidiaries or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

19.11  **Purchasers' Indemnity to the Note Administrative Agent**

Each Purchaser shall (in proportion to its share of the Aggregate Principal Amount then outstanding) indemnify the Note Administrative Agent, within three (3) Business Days of demand, against any cost, loss or liability including without limitation for negligence or any other category of liability whatsoever incurred by any of them (otherwise than by reason of the Note Administrative Agent's gross negligence or willful misconduct) (or in the case of any cost, loss or liability pursuant to Section 22.7 (*Disruption to Payment Systems, Etc.*) notwithstanding the Note Administrative Agent's negligence or any other category of liability whatsoever but not including any claim based on the fraud or gross negligence of the Note Administrative Agent) in acting as Note Administrative Agent under the Note Documents (unless the Note Administrative Agent has been reimbursed by the Company pursuant to a Note Document).  For the avoidance of doubt, the Company shall not be required to indemnify the Note Administrative Agent pursuant to this Section 19.11 (*Purchasers' Indemnity to the Note Administrative Agent*).

19.12  **Resignation of the Agents**

(a)     Any Agent may resign and appoint one of its Affiliates as successor by giving notice to the other Second Lien Secured Parties and the Company.

(b)     Alternatively, such Note Administrative Agent may resign by giving thirty (30) days' notice to the other Second Lien Secured Parties and the Company, in which case the Required Purchasers (after consultation with the other Second Lien Secured Parties and the Company) may appoint a successor Agent.

(c)     If the Required Purchasers have not appointed a successor Agent in accordance with clause (b) above within twenty (20) days after notice of resignation was given, the retiring Agent (after consultation with the other Second Lien Secured Parties and the Company) may appoint a successor Agent.

(d)     If any Agent wishes to resign because (acting reasonably) it has concluded that it is no longer appropriate for it to remain as administrative agent or collateral agent, as applicable, and such Agent is entitled to appoint a successor Agent under clause of this Section 19.12 (*Resignation of the Agents*), such Agent may (if it concludes (acting reasonably) that it is necessary to do so in order to persuade the proposed successor Agent to become a party to this Agreement as the applicable Agent) agree with the proposed successor Agent amendments to this Section 19 (*Role of the Agents and the Arranger*) and any other term of this Agreement dealing with the rights or obligations of such Agent consistent with then current market practice for the appointment and protection of corporate trustees together with any reasonable amendments to the agency fee payable under this Agreement which are consistent with the successor Agent's normal fee rates and those amendments will bind the Parties.

(e)     The retiring Agent shall, at its own cost, make available to the successor Agent such documents and records and provide such assistance as the successor Agent may reasonably request for the purposes of performing its functions as the applicable Agent under the Note Documents.

(f)     The resignation notice of the applicable Agent shall only take effect upon the appointment of a successor.

(g)     Upon the appointment of a successor, the retiring Agent shall be discharged from any further obligation in respect of the Note Documents (other than its obligations under clause (e) of this Section 19.12 (*Resignation of the Agents*)) but shall remain entitled to the benefit of Section 9.3 (*Indemnity to the Administrative Agent*), and this Section 19 (*Role of the Agents and the Arranger*) (and any fees for the account of the retiring Agent shall cease to accrue from (and shall be payable on) that date). Its successor and each of the other Parties shall have the same rights and obligations amongst themselves as they would have had if such successor had been an original Party.

(h)     After consultation with the Company, the Required Purchasers may, by giving thirty (30) days' notice to the Note Administrative Agent or Second Lien Collateral Agent (as applicable), require it to resign in accordance with clause (b) above. In this event, the Note Administrative Agent or Second Lien Collateral Agent (as applicable) shall resign in accordance with clause (b) above but the cost referred to in clause (e) above shall be for the account of the Company.

19.13   **Confidentiality**

(a)     In acting as administrative agent for the Second Lien Secured Parties, the Note Administrative Agent shall be regarded as acting through its agency division which shall be treated as a separate entity from any other of its divisions or departments.

(b)     If information is received by another division or department of the Note Administrative Agent, it may be treated as confidential to that division or department and the Note Administrative Agent shall not be deemed to have notice of it.

19.14   **Relationship with the other Second Lien Secured Parties**

(a)     The Note Administrative Agent may treat the Person shown in its records as Purchaser at the opening of business (in the place of the Note Administrative Agent's principal office as notified to the Second Lien Secured Parties from time to time) as the Purchaser entitled to receive and act upon any notice, request, document or communication or make any decision or determination under any Note Document made or delivered on that day unless it has received not less than five (5) Business Days' prior notice from that Purchaser to the contrary in accordance with the terms of this Agreement.

(b)     Any Purchaser may by notice to the Note Administrative Agent appoint a Person to receive on its behalf all notices, communications, information and documents to be made or dispatched to that Purchaser under the Note Documents. Such notice shall contain the address and (where communication by electronic mail or other electronic means is permitted under Section 24.5 (*Electronic Communication*)) electronic mail address and/or any other information required to enable the transmission of information by that means (and, in each case, the department or officer, if any, for whose attention communication is to be made) and be treated as a notification of a substitute address, electronic mail address (or such other information), department and officer by that Purchaser for the purposes of Section 24.2 (*Addresses*) and clause (a)(ii) of Section 24.5 (*Electronic Communication*) and the Note Administrative Agent shall be entitled to treat such Person as the Person entitled to receive all such notices, communications, information and documents as though that Person were that Purchaser.

19.15   **Credit Appraisal by the Purchasers**

Without affecting the responsibility of the Company for information supplied by it or on its behalf in connection with any Note Document, each Purchaser confirms to the Note

A48243114

Administrative Agent and the Arranger that it has been, and will continue to be, solely responsible for making its own independent appraisal and investigation of all risks arising under or in connection with any Note Document including but not limited to:

(a) the financial condition, status and nature of the Company, BIH and each Subsidiary of BIH;

(b) the legality, validity, effectiveness, adequacy or enforceability of any Note Document and any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Note Document;

(c) whether that Purchaser has recourse, and the nature and extent of that recourse, against any Party or any of its respective assets under or in connection with any Note Document, the transactions contemplated by the Note Documents or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Note Document; and

(d) the adequacy, accuracy or completeness of any other information provided by the Note Administrative Agent, any Party or by any other person under or in connection with any Note Document, the transactions contemplated by any Note Document or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Note Document.

### 19.16 Deduction from Amounts Payable by the Note Administrative Agent

If any Party owes an amount to the Note Administrative Agent under the Note Documents, the Note Administrative Agent may, after giving notice to that Party, deduct an amount not exceeding that amount from any payment to that Party which the Note Administrative Agent would otherwise be obliged to make under the Note Documents and apply the amount deducted in or towards satisfaction of the amount owed. For the purposes of the Note Documents that Party shall be regarded as having received any amount so deducted.

### 19.17 Non-Reliance and Engagement Letters

Each Second Lien Secured Party confirms that each of the Arranger and the Note Administrative Agent has authority to accept on its behalf (and ratifies the acceptance on its behalf of any letters or reports already accepted by the Arranger or the Note Administrative Agent) the terms of any non-reliance letter or engagement letters relating to any reports or letters provided by accountants, auditors or providers of due diligence reports in connection with the Note Documents or the transactions contemplated in the Note Documents and to bind it in respect of those reports or letters and to sign such letters on its behalf and further confirms that it accepts the terms and qualifications set out in such letters.

20.    **CONDUCT OF BUSINESS BY THE SECOND LIEN SECURED PARTIES**

No provision of this Agreement will:

(a)    interfere with the right of any Second Lien Secured Party to arrange its affairs (tax or otherwise) in whatever manner it thinks fit;

(b)    oblige any Second Lien Secured Party to investigate or claim any credit, relief, remission or prepayment available to it or the extent, order and manner of any claim; or

(c)    oblige any Second Lien Secured Party to disclose any information relating to its affairs (tax or otherwise) or any computations in respect of Tax.

21.    **SHARING AMONG THE PURCHASERS**

21.1    **Payments to Purchasers**

If a Purchaser (a "**Recovering Purchaser**") receives or recovers any amount from the Company other than in accordance with Section 22 (*Payment Mechanics*) (a "**Recovered Amount**") and applies that amount to a payment due under the Note Documents then:

(a)    the Recovering Purchaser shall, within three (3) Business Days, notify details of the receipt or recovery to the Note Administrative Agent;

(b)    the Note Administrative Agent shall determine whether the receipt or recovery is in excess of the amount the Recovering Purchaser would have been paid had the receipt or recovery been received or made by the Note Administrative Agent and distributed in accordance with Section 22 (*Payment Mechanics*), without taking account of any Tax which would be imposed on the Note Administrative Agent in relation to the receipt, recovery or distribution; and

(c)    the Recovering Purchaser shall, within three (3) Business Days of demand by the Note Administrative Agent, pay to the Note Administrative Agent an amount (the "**Sharing Payment**") equal to such receipt or recovery less any amount which the Note Administrative Agent determines may be retained by the Recovering Purchaser as its share of any payment to be made, in accordance with Section 22.4 (*Partial Payments*).

21.2    **Redistribution of Payments**

The Note Administrative Agent shall treat the Sharing Payment as if it had been paid by the Company and distribute it between the Purchasers (other than the Recovering Purchaser) (the "**Sharing Purchasers**") in accordance with Section 22.4 (*Partial Payments*) towards the obligations of the Company to the Sharing Purchasers.

21.3 **Recovering Purchaser's Rights**

On a distribution by the Note Administrative Agent under Section 21.2 (*Redistribution of Payments*) of a payment received by a Recovering Purchaser from the Company, as between the Company and the Recovering Purchaser, an amount of the Recovered Amount equal to the Sharing Payment will be treated as not having been paid by the Company.

21.4 **Reversal of Redistribution**

If any part of the Sharing Payment received or recovered by a Recovering Purchaser becomes repayable and is repaid by that Recovering Purchaser, then:

(a)     each Sharing Purchaser shall, upon request of the Note Administrative Agent, pay to the Note Administrative Agent for the account of that Recovering Purchaser an amount equal to the appropriate part of its share of the Sharing Payment (together with an amount as is necessary to reimburse that Recovering Purchaser for its proportion of any interest on the Sharing Payment which that Recovering Purchaser is required to pay) (the "**Redistributed Amount**"); and

(b)     as between the Company and each relevant Sharing Purchaser, an amount equal to the relevant Redistributed Amount will be treated as not having been paid by the Company.

21.5 **Exceptions**

(a)     This Section 21 (*Sharing among the Purchasers*) shall not apply to the extent that the Recovering Purchaser would not, after making any payment pursuant to this Section, have a valid and enforceable claim against the Company.

(b)     A Recovering Purchaser is not obliged to share with any other Purchaser any amount which the Recovering Purchaser has received or recovered as a result of taking legal or arbitration proceedings, if:

(i)     it notified that other Purchaser of the legal or arbitration proceedings; and

(ii)     that other Purchaser had an opportunity to participate in those legal or arbitration proceedings but did not do so as soon as reasonably practicable having received notice and did not take separate legal or arbitration proceedings.

22.     **PAYMENT MECHANICS**

22.1 **Payments by the Company**

All payments to be made by the Company hereunder and the other Note Documents shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff. On each date on which the Company is required to make a payment to the Note Administrative Agent or any Purchaser under a Note Document, the Company shall make

such payment the same available directly to the Note Administrative Agent or such Purchaser, as applicable, in immediately available funds not later than 12:00 noon (New York City time) on such date. All amounts received by the Note Administrative Agent or any Purchaser after such time on any date shall be deemed to have been received on the next succeeding Business Day and any applicable interest or fees shall continue to accrue.

22.2 **Payments to the Note Administrative Agent**

The Note Administrative Agent will only receive payments for its own account and will not receive or hold any money for the account of the Company, the Purchasers or any other Person.  The Note Administrative Agent will instruct the Company and the Purchasers to direct payments to the applicable recipients.

22.3 **Partial Payments**

(a)    If the Note Administrative Agent receives notice from the Company of a payment and the amount of such payment will not be sufficient to discharge all the amounts then due and payable by the Company under the Note Documents, the Note Administrative Agent shall instruct the Company to make such payment towards the obligations of the Company under the Note Documents in the following order:

(i)    **first**, in or towards payment pro rata of any unpaid amount owing to the Note Administrative Agent, the Second Lien Collateral Agent or the Arranger under the Note Documents;

(ii)    **second**, in or towards payment pro rata of any accrued interest or fee due but unpaid under this Agreement;

(iii)    **third**, in or towards payment pro rata of any principal due but unpaid under this Agreement; and

(iv)    **fourth**, in or towards payment pro rata of any other sum due but unpaid under the Note Documents.

(b)    Clause (a) above will override any appropriation made by the Company.

22.4 **No set-off by the Company**

All payments to be made by the Company under the Note Documents shall be calculated and be made without (and free and clear of any deduction for) set-off or counterclaim.

22.5 **Business Days**

(a)    Any payment under the Note Documents which is due to be made on a day that is not a Business Day shall be made on the next Business Day in the same calendar month (if there is one) or the preceding Business Day (if there is not).

(b)    During any extension of the due date for payment of any principal or Unpaid Sum under this Agreement, interest is payable on the principal or Unpaid Sum at the rate payable on the original due date.

## 22.6    Currency of account

(a)    Subject to clauses (b) to (e) below, Dollars is the currency of account and payment for any sum due from the Company under any Note Document.

(b)    A repayment of a Note or Unpaid Sum or a part of a Note or Unpaid Sum shall be made in Dollars, pursuant to this Agreement, on its due date.

(c)    Each payment of interest shall be made in Dollars, pursuant to this Agreement, when that interest accrued.

(d)    Each payment in respect of costs, expenses or Taxes shall be made in Dollars.

(e)    Any amount expressed to be payable in a currency other than Dollars shall be paid in Dollars.

## 22.7    Disruption to Payment Systems, Etc.

If either the Note Administrative Agent determines (in its reasonable discretion) that a Disruption Event has occurred or the Note Administrative Agent is notified by the Company that a Disruption Event has occurred:

(a)    the Note Administrative Agent may (and if requested to do so by the Company, shall) consult with the Company with a view to agreeing with the Company such changes in respect of the operation or administration in connection with the Notes as the Note Administrative Agent may deem necessary in the circumstances; **provided** that no modifications to the Note Documents may be made without the Company's express written consent.

(b)    the Note Administrative Agent may consult with the Second Lien Secured Parties in relation to any changes mentioned in clause (a) above but shall not be obliged to do so if, in its opinion, it is not practicable to do so in the circumstances;

(c)    any such changes agreed upon by the Note Administrative Agent and the Company shall (whether or not it is finally determined that a Disruption Event has occurred) be binding upon the Parties as an amendment to (or, as the case may be, waiver of) the terms of the Note Documents notwithstanding the provisions of Section 28 (*Amendments and Waivers*);

(d)    the Note Administrative Agent shall not be liable for any damages, costs or losses to any person, any diminution in value or any liability whatsoever (including, without limitation for negligence or any other category of liability whatsoever but not including any claim based on the fraud or gross negligence of the Note Administrative Agent) arising as a result of its taking, or failing to take, any actions

A48243114

pursuant to or in connection with this Section 22.7 (*Disruption to Payment systems etc.*); and

(e)     the Note Administrative Agent shall notify the Second Lien Secured Parties of all changes agreed pursuant to clause (c) above.

23.    **SET-OFF**

A Second Lien Secured Party may set off any matured obligation due from the Company under the Note Documents (to the extent beneficially owned by such Second Lien Secured Party) against any matured obligation owed by such Second Lien Secured Party to the Company regardless of the place of payment, booking branch or currency of either obligation. If the obligations are in different currencies, the Second Lien Secured Party may convert either obligation at a market rate of exchange in its usual course of business for the purpose of the set-off.

24.    **NOTICES**

24.1   **Communications in Writing**

Any communication to be made under or in connection with the Note Documents shall be made in writing and, unless otherwise stated, may be made by letter.

24.2   **Addresses**

The contact details (and the department or officer, if any, for whose attention the communication is to be made) of each Party for any communication or document to be made or delivered under or in connection with the Note Documents is:

(a)     in the case of the Company;

        Address:        600 Brickell Avenue, 19th Floor, Miami, FL 33131

        Email:          legalnotices@777part.com

        Attention:      Legal Department

(b)     in the case of the Note Administrative Agent;

        Address:        Leadenhall Capital Partners LLP, Level 15, 70 Mark Lane, London EC3R 7NQ

        Email:          LifeTeam@leadenhallcp.com / LCP.Operations@leadenhallcp.com

        Attention:      Life Portfolio Management / Operations

(c)     in the case of the Second Lien Collateral Agent;

| | |
|---|---|
| Address: | c/o Leadenhall Capital Partners LLP |
| | Level 15, 70 Mark Lane, |
| | London EC3R 7NQ |
| Email: | LifeTeam@leadenhallcp.com / LCP.Operations@leadenhallcp.com |
| Attention: | Life Portfolio Management / Operations |

(d)    in the case of each Original Purchaser:

| | |
|---|---|
| Address: | c/o Leadenhall Capital Partners LLP |
| | Level 15, 70 Mark Lane, |
| | London EC3R 7NQ |
| Email: | LifeTeam@leadenhallcp.com / LCP.Operations@leadenhallcp.com |
| Attention: | Life Portfolio Management / Operations |

(e)    in the case of each Purchaser (other than the Original Purchasers) that notified in writing to the Note Administrative Agent on or prior to the date on which it becomes a Party, to the contact details set forth in an administrative questionnaire or otherwise notified to the Note Administrative Agent in writing,

or any substitute address or department or officer as the Party may notify to the Note Administrative Agent (or the Note Administrative Agent may notify to the other Parties, if a change is made by the Note Administrative Agent) by not less than five Business Days' notice.

**24.3    Delivery**

(a)    Any communication or document made or delivered by one person to another under or in connection with the Note Documents will only be effective when it has been left at the relevant address or five (5) Business Days after being deposited in the post postage prepaid in an envelope addressed to it at that address and, if a particular department or officer is specified as part of its address details provided under Section 24.2 (*Addresses*), if addressed to that department or officer.

(b)    Any communication or document to be made or delivered to the Note Administrative Agent will be effective only when actually received by the Note Administrative Agent and then only if it is expressly marked for the attention of the department or officer identified with the Note Administrative Agent's signature below (or any substitute department or officer as the Note Administrative Agent shall specify for this purpose).

(c)    All notices from or to the Company shall be sent through the Note Administrative Agent.

(d)    Any communication or document which becomes effective, in accordance with clauses (a) to (c) above, after 5:00 p.m. in the place of receipt shall be deemed only to become effective on the following day.

24.4 **Notification of Address**

Promptly upon changing its address, the Note Administrative Agent shall notify the other Parties.

24.5 **Electronic Communication**

(a) Any communication to be made between any two Parties under or in connection with the Note Documents may be made by electronic mail or other electronic means (including, without limitation, by way of posting to a secure website) if those two Parties:

   (i) notify each other in writing of their electronic mail address and/or any other information required to enable the transmission of information by that means; and

   (ii) notify each other of any change to their address or any other such information supplied by them by not less than five (5) Business Days' notice.

(b) Any such electronic communication as specified in clause (a) above to be made between the Company and a Second Lien Secured Party may only be made in that way to the extent that those two Parties agree that, unless and until notified to the contrary, this is to be an accepted form of communication.

(c) Any such electronic communication as specified in clause (a) above made between any two Parties will be effective only when actually received (or made available) in readable form and in the case of any electronic communication made by a Party to the Note Administrative Agent only if it is addressed in such a manner as the Note Administrative Agent shall specify for this purpose.

(d) Any electronic communication which becomes effective, in accordance with clause (c) above, after 5:00 p.m. in the place in which the Party to whom the relevant communication is sent or made available has its address for the purpose of this Agreement shall be deemed only to become effective on the following day.

(e) Any reference in a Note Document to a communication being sent or received shall be construed to include that communication being made available in accordance with this Section 24.5 (*Electronic Communication*).


25. **CALCULATIONS AND CERTIFICATES**

25.1 **Accounts**

In any litigation or arbitration proceedings arising out of or in connection with a Note Document, the entries made in the accounts maintained by a Second Lien Secured Party are prima facie evidence of the matters to which they relate.

25.2 **Certificates and Determinations**

Any certification or determination by a Second Lien Secured Party of a rate or amount under any Note Document is conclusive absent manifest error.

25.3 **Day Count Convention**

All interest hereunder shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed.

26. **SEVERABILITY**

If any provision of this Agreement or the other Note Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Note Documents shall not be affected or impaired thereby and (b) the Parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

27. **REMEDIES AND WAIVERS**

No failure to exercise, nor any delay in exercising, on the part of any Second Lien Secured Party, any right or remedy under a Note Document shall operate as a waiver of any such right or remedy or constitute an election to affirm any of the Note Documents. No waiver or election to affirm any Note Document on the part of any Second Lien Secured Party shall be effective unless in writing. No single or partial exercise of any right or remedy shall prevent any further or other exercise or the exercise of any other right or remedy. The rights and remedies provided in each Note Document are cumulative and not exclusive of any rights or remedies provided by law.

28. **AMENDMENTS AND WAIVERS**

28.1 **Required Consents**

(a)    Subject to Section 28.2 (*All Purchaser Matters*) and Section 28.3 (*Other Exceptions*), any term of the Note Documents may be amended or waived only with the consent of the Required Purchasers and the Company and any such amendment or waiver will be binding on all Parties.

(b)    The Note Administrative Agent may effect, on behalf of any Second Lien Secured Party, any amendment or waiver permitted by this Section 28 (*Amendments and Waivers*).

A48243114

28.2  **All Purchaser Matters**

An amendment or waiver of any term of any Note Document that has the effect of changing or which relates to:

(a)     the definition of "Required Purchasers" in Section 1.1 (*Definitions*);

(b)     an extension to the date of payment of any amount under the Note Documents;

(c)     a reduction in, or change in the calculation of, the interest rate applicable to the Notes or a reduction in the amount of any payment of principal, interest or fees payable;

(d)     any increase in the Commitments;

(e)     an assignment of Notes by the Company;

(f)     any provision which expressly requires the consent of all the Purchasers;

(g)     Section 2.2 (*Purchasers' Rights and Obligations*), Section 5.5 (*Application of Prepayments*), Section 17 (*Assignments by Purchasers and Participations*), Section 21 (*Sharing among the Purchasers*), this Section 28 (*Amendments and Waivers*) or Section 31 (*Governing Law; Jurisdiction; Etc.*);

(h)     the release of any Lien created pursuant to any Collateral Document or of any Collateral (except as provided in any Collateral Document); or

(i)     Section 3.2 (*Conditions Precedent*),

        in each case including all definitions defined in Section 1.1 (*Definitions*) that are used or referred to in such Section,

shall not be made without the prior consent of all the Purchasers.

28.3  **Other exceptions**

An amendment or waiver which relates to the rights or obligations of the Note Administrative Agent or the Second Lien Collateral Agent (each in their capacity as such) may not be effected without the consent of the Note Administrative Agent or the Second Lien Collateral Agent, as the case may be.

29.   **CONFIDENTIAL INFORMATION**

29.1  **Confidentiality**

Each Second Lien Secured Party agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its Related Parties (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential); (b) to the extent required or requested by any regulatory authority

purporting to have jurisdiction over such Person or its Related Parties (including any self-regulatory authority, such as the National Association of Insurance Commissioners); (c) to the extent required by applicable laws or by any subpoena or similar legal process; **provided** that prior to any such disclosure, the applicable Second Lien Secured Party will inform the Company thereof so the Company may seek a protective order; (d) to any other party hereto; (e) in connection with the exercise of any remedies hereunder or under any other Note Document or any action or proceeding relating to this Agreement or any other Note Document or the enforcement of rights hereunder or thereunder; (f) subject to an agreement containing provisions substantially the same as those of this Section 29.1 (*Confidentiality*), to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights and obligations under this Agreement, or (ii) any actual or prospective party (or its Related Parties) to any swap, derivative or other transaction under which payments are to be made by reference to the Company and its obligations, this Agreement or payments hereunder; (g) on a confidential basis to (i) any rating agency in connection with rating the Company, BIH or the Subsidiaries of BIH or the Notes or (ii) the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of CUSIP numbers with respect to the Notes; (h) with the prior written consent of the Company; or (i) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section, or (y) becomes available to any Second Lien Secured Party or any of its respective Affiliates on a nonconfidential basis from a source other than the Company to the extent it did not acquire such information as a result of a breach of this Section and is permitted to disclose such Information.

For purposes of this Section 29.1 (*Confidentiality*), "**Information**" means all information received from the Company or any member of the Group relating to the Company or any other member of the Group or any of their respective businesses, other than any such information that is available to any Second Lien Secured Party on a nonconfidential basis prior to disclosure by the Company or any other member of the Group; **provided** that in the case of information received from the Company, BIH or any Subsidiary of BIH after the date hereof, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section 29.1 (*Confidentiality*) shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

29.2    **Entire agreement**

This Section 29 (*Confidential Information*) constitutes the entire agreement between the Parties in relation to the obligations of the Second Lien Secured Parties under the Note Documents regarding confidentiality of the Information and supersedes any previous agreement, whether express or implied, regarding confidentiality of the Information.

A48243114

29.3 **Inside information**

Each of the Second Lien Secured Parties acknowledges that some or all of the Information is or may be price-sensitive information and that the use of such information may be regulated or prohibited by applicable legislation including securities law relating to insider dealing and market abuse and each of the Second Lien Secured Parties undertakes not to use any Information for any unlawful purpose.

29.4 **Notification of disclosure**

Each of the Second Lien Secured Parties agrees (to the extent permitted by law and regulation) to inform the Company:

(a)     of the circumstances of any disclosure of the Information made pursuant to Section 29.1 (*Confidentiality*) except where such disclosure is made to any of the Persons referred to in Section 29.1 (*Confidentiality*) during the ordinary course of its supervisory or regulatory function; and

(b)     upon becoming aware that the Information has been disclosed in breach of this Section 29 (*Confidential Information*).

29.5 **Continuing obligations**

The obligations in this Section 29.1 (*Confidential Information*) are continuing and, in particular, shall survive and remain binding on each Second Lien Secured Party for a period of twelve months from the earlier of:

(a)     the date on which all amounts payable by the Company under or in connection with this Agreement and the Notes have been paid in full; and

(b)     the date on which such Second Lien Secured Party otherwise ceases to be a Second Lien Secured Party.


30.    **COUNTERPARTS**

(a)    This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and the other Note Documents, and any separate letter agreements with respect to fees payable to the Note Administrative Agent, constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  This Agreement shall become effective when it shall have been executed by the Note Administrative Agent and when the Note Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto.  Delivery of an executed counterpart of a signature page of this

Agreement by facsimile or in electronic (e.g., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Agreement.

(b)     The words "execution," "signed," "signature," and words of like import in this Agreement and each other Note Document shall be deemed to include images of manually executed signatures transmitted by facsimile or other electronic format (including, without limitation, ".pdf", ".tif" or ".jpg") and other electronic signatures (including, without limitation, DocuSign and AdobeSign), each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

31.    **GOVERNING LAW; JURISDICTION; ETC.**

31.1   **Governing Law**

This Agreement and the other Note Documents and any claims, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement or any other Note Document (except, as to any other Note Document, as expressly set forth therein) and the transactions contemplated hereby and thereby shall be governed by, and construed in accordance with, the law of the State of New York.

31.2   **Jurisdiction**

The Company irrevocably and unconditionally agrees that it will not commence any action, litigation or proceeding of any kind or description, whether in law or equity, whether in contract or in tort or otherwise, against any Second Lien Secured Party or any Related Party thereof in any way relating to this Agreement or any other Note Document or the transactions relating hereto or thereto, in any forum other than the courts of the State of New York sitting in New York County, and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, and each of the parties hereto irrevocably and unconditionally submits to the jurisdiction of such courts and agrees that all claims in respect of any such action, litigation or proceeding may be heard and determined in such New York State court or, to the fullest extent permitted by applicable law, in such federal court.  Each of the parties hereto agrees that a final judgment in any such action, litigation or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement or in any other Note Document shall affect any right that any Second Lien Secured Party may otherwise have to bring any action or proceeding relating to this Agreement or any other Note Document against the Company or its properties in the courts of any jurisdiction.

A48243114

31.3   **Waiver of Venue**

Each party hereto irrevocably and unconditionally waives, to the fullest extent permitted by applicable law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement or any other Note Document in any court referred to in Section 31.2 (*Jurisdiction*).   Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

32.   **WAIVER OF JURY TRIAL**

**EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER NOTE DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).   EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER NOTE DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS CLAUSE**.

33.   **MISCELLANEOUS**

33.1   **Survival**

All covenants, agreements, representations and warranties made by the Company or any other Note Party herein or in any Note Document to which it is a party or other documents delivered in connection herewith or therewith or pursuant hereto or thereto shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery hereof and thereof and the purchase of the Notes hereunder, regardless of any investigation made by any such other party or on its behalf and notwithstanding that any Second Lien Secured Party may have had notice or knowledge of any Default at the time of issuance of any Note, and shall continue in full force and effect as long as any Note or any other Obligation hereunder shall remain unpaid or unsatisfied.   The provisions of Sections 7 (*Taxes*), 8 (*Increased Costs*), 9 (*Other Indemnities*), 19.1 (*Appointment of Agents*) through 19.11 (*Purchasers' Indemnity to the Note Administrative Agent*), and 33.4 (*Payments Set Aside*) shall survive and remain in full force and effect

regardless of the consummation of the transactions contemplated hereby, the payment in full of the Obligations or the termination of this Agreement or any provision hereof.

33.2 **Headings**

Section and Clause headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

33.3 **PATRIOT Act Notice**

Each Second Lien Secured Party subject to the PATRIOT Act hereby notifies the Company that, pursuant to the requirements of the PATRIOT Act, it may be required to obtain, verify and record information that identifies the Company, which information includes the name and address of the Company and other information that will allow such Second Lien Secured Party to identify the Company in accordance with the PATRIOT Act.

33.4 **Payments Set Aside**

To the extent that any payment by or on behalf of the Company is made to any Second Lien Secured Party, or any Second Lien Secured Party exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Second Lien Secured Party in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Purchaser severally agrees to pay to the Note Administrative Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by the Note Administrative Agent, plus interest thereon from the date of such demand to the date such payment is made.

33.5 **Acknowledgment and Consent to Bail-In of Affected Financial Institutions**

Notwithstanding anything to the contrary in any Note Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Note Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a) the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b) the effects of any Bail-in Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Note Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of the applicable Resolution Authority.

### 33.6    Tax Treatment

Each party to this Agreement intends to treat the Notes for accounting purposes and for all United States federal, state and local income and franchise tax purposes, as indebtedness.

### 33.7    Representations of the Purchasers

Each Purchaser severally represents that it is purchasing the Notes for its own account or for one or more separate accounts maintained by such Purchaser or for the account of one or more pension or trust funds and not with a view to the distribution thereof; **provided** that the disposition of such Purchaser's or their property shall at all times be within such Purchaser's or their control.  Each Purchaser understands that the Notes have not been registered under the Securities Act of 1933 and the rules and regulations promulgated thereunder from time to time in effect (collectively, the "**Securities Act**") and may be resold only if registered pursuant to the provisions of the Securities Act or if an exemption from registration is available, except under circumstances where neither such registration nor such an exemption is required by law, and that the Company is not required to register the Notes.

[**SIGNATURE PAGES FOLLOW**.]

A48243114

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first written above.

**777 PARTNERS LLC**,
as Company

By _____

Name: Steve W. Pasko
Title:  Co-Managing Partner

**LEADENHALL CAPITAL PARTNERS
LLP**, as Note Administrative Agent

By _____
    Name: Craig Gillespie
    Title: Head of Life & Alternative Credit Portfolio
        Management

A48243114

**LEADENHALL LIFE SMA III ICAV**,
through its agent, Leadenhall Capital Partners LLP,
as Second Lien Collateral Agent

By _____

    Name: Craig Gillespie
    Title: Head of Life & Alternative Credit Portfolio
          Management

[*Signature Page to Note Purchase Agreement*]

**LEADENHALL LIFE II DAC**,
through its agent, Leadenhall Capital Partners LLP,
as Purchaser

By _____
     Name: Craig Gillespie
     Title: Head of Life & Alternative Credit Portfolio
          Management

**LEADENHALL LIFE SMA III ICAV**,
through its agent, Leadenhall Capital Partners LLP,
as Purchaser

By _____
     Name: Craig Gillespie
     Title: Head of Life & Alternative Credit Portfolio
          Management

**LEADENHALL LIFE IV DAC**,
through its agent, Leadenhall Capital Partners LLP,
as Purchaser

By _____
     Name: Craig Gillespie
     Title: Head of Life & Alternative Credit Portfolio
          Management

**SITKA ICAV**,
through its agent, Leadenhall Capital Partners LLP,
as Purchaser

By _____
     Name: Craig Gillespie
     Title: Head of Life & Alternative Credit Portfolio
          Management

A48243114

*[Signature Page to Note Purchase Agreement]*

**Schedule 2.1**
**Commitments**

| Purchaser | Commitments of Purchaser |
|---|---|
| Leadenhall Life II DAC | $46,661,856.50 |
| Leadenhall Life SMA III ICAV | $50,824,514.69 |
| Leadenhall Life IV DAC | $27,513,628.82 |
| Sitka ICAV | $25,000,000.00 |
| **Total** | **$150,000,000** |

**Schedule 12.2**
**Subsidiaries**

| Subsidiary | Owner | Jurisdiction of Organization | Ownership (%) |
|---|---|---|---|
| Merit Life Insurance Co. | BIH | TX | 100% |
| Merit Life Insurance Holdings LLC | BIH | DE | 100% |
| 777 Re. LTD | BIH | Bermuda | 98% |
| 777 Re. LTD | Will Rinehimer | Bermuda | 2% |

**Schedule 14.3**

**Investments**

(1)    **Specified Investments**

| Entity Name | Share Type | Share Quantity | Owner |
|---|---|---|---|
| Randall & Quilter PS Holdings Inc. | Series A Preferred Stock | 6,009,763 | Brickell Insurance Holdings LLC |
| Randall & Quilter PS Holdings Inc. | Series A Preferred Stock | 349,785 | Merit Life Insurance Co. |

(2)    **Allocation Parameters for Investment of Regulatory Reserves**

| Asset | Permitted Allocation |
|---|---|
| Investment Grade Corporate Debt[1] | 100% |
| Private Credit Total | 20% |
| Non-Real Estate ABS | 25% |
| Total CLO Exposure | 25% |
| First Lien Real Estate Loans | 15% |
| IG RMBS/CMBS | 25% |
| Structured Credit | 30% |
| Non-IG CLO: HY, Equity (including repack), Risk Retention, unrated CLO[2] | 2.5% |
| Total Unrated and non-IG (any asset) | 15% |
| Non-IG Credit (Corporates including Privates and funds thereof) | 10% |
| Private Credit Non-IG | 5% |
| Real Estate Loans (2nd/Equity/CM3 or lower) | 5% |
| Hybrids (non-IG) | 5% |

---

[1]  To include NAIC 1 and NAIC 2 structured settlement bonds issued by bankruptcy remote SPVs rated by S&P/Moody's/Fitch/Kroll/DBRS/Egan Jones, provided, however, that in the case of Egan Jones rated structured settlement bonds, such bonds shall only be included if approved in advance by the Company. Total structured settlement bond assets not to exceed 20% of Consolidated Total Assets.

[2]  Non-IG CLO includes all CLO exposures other than those tranches which are rated investment grade by at least one of Moody's, S&P or Fitch.

| Asset | Permitted Allocation |
|---|---|
| Common and Preferred Equity/LP Interests | 5% |

**(3)    Allocation Parameters for Investments backing Liabilities of Insurance Subsidiaries**

| Asset | Permitted Allocation |
|---|---|
| Investment Grade Corporate Debt[3] | 100% |
| Private Credit Total | 30% |
| Non-Real Estate ABS | 25% |
| Total CLO Exposure | 25% |
| First Lien Real Estate Loans | 25% |
| IG RMBS/CMBS | 25% |
| Structured Credit | 40% |
| Non-IG CLO: HY, Equity (including repacks), Risk Retention, unrated CLO[4] | 5.0% |
| Total Unrated and non-IG (any asset) | 20% |
| Non-IG Credit (Corporate including Privates and funds of such) | 15% |
| Private Credit Non-IG | 5% |
| Real Estate Loans (2nd/Equity/CM3 or lower) | 10% |
| Hybrids (non-IG) | 10% |
| Common and Preferred Equity/LP Interests | 5% |

---

[3]  To include NAIC 1 and NAIC 2 structured settlement bonds issued by bankruptcy remote SPVs rated by S&P/Moody's/Fitch/Kroll/DBRS/Egan Jones, provided, however, that in the case of Egan Jones rated structured settlement bonds, such bonds shall only be included if approved in advance by the Company. Total structured settlement bond assets not to exceed 20% of Consolidated Total Assets.

[4]  Non-IG CLO includes all CLO exposures other than those tranches which are rated investment grade by at least one of Moody's, S&P or Fitch.

(4)    **Special Single Issuer Limits**

| Asset | Rating minimum | Limit Per Issuer (% of Total Consolidated Assets) |
|---|---|---|
| Structured Settlement SPV 144A Securities | Baa1/BBB-/NAIC 2 | 10% |
| 777 Litigation Receivable SPV Facility | Baa1/BBB-/NAIC 2 | 10% |

**Exhibit I**
**Form of Assignment and Assumption**

This Assignment and Assumption (this "**Assignment and Assumption**") is dated as of the Effective Date set forth below and is entered into by and between [the][each] Assignor identified in item 1 below ([the][each, an] "**Assignor**") and [the][each] Assignee identified in item 2 below ([the][each, an] "**Assignee**").  [It is understood and agreed that the rights and obligations of [the Assignors][the Assignees] hereunder are several and not joint.] Capitalized terms used but not defined herein shall have the meanings given to them in the Subordinated Note Purchase Agreement identified below (as amended, the "**Agreement**"), receipt of a copy of which is hereby acknowledged by [the][each] Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

For an agreed consideration, [the][each] Assignor hereby irrevocably sells and assigns to [the Assignee][the respective Assignees], and [the][each] Assignee hereby irrevocably purchases and assumes from [the Assignor][the respective Assignors], subject to and in accordance with the Standard Terms and Conditions and the Agreement, as of the Effective Date inserted by the Note Administrative Agent as contemplated below (i) all of [the Assignor's][the respective Assignors'] rights and obligations in [its capacity as a Purchaser][their respective capacities as Purchasers] under the Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of [the Assignor][the respective Assignors] under the note facility identified below (including any guarantees included in such note facility), and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of [the Assignor (in its capacity as a Purchaser)][the respective Assignors (in their respective capacities as Purchasers)] against any Person, whether known or unknown, arising under or in connection with the Agreement, any other documents or instruments delivered pursuant thereto or the transactions governed thereby or in any way based on or related to any of the foregoing, including contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned by [the][any] Assignor to [the][any] Assignee pursuant to clauses (i) and (ii) above being referred to herein collectively as [the][an] "**Assigned Interest**"). Each such sale and assignment is without recourse to [the][any] Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by [the][any] Assignor.

1. Assignor[s]:        _____

2. Assignee[s]:        _____

[Assignee is [an Affiliate][a Related Entity] of [*identify Purchaser*]

Exhibit I - 1

3.        Company:      777 Partners LLC

4.        Note Administrative Agent:      Leadenhall Capital Partners LLP

5.        Agreement:  Subordinated Note Purchase Agreement dated as of [June 30], 2022, among the Company, the Purchasers parties thereto, the Note Administrative Agent and Leadenhall Life SMA III ICAV as Second Lien Collateral Agent

6.        Assigned Interest[s]:

| Assignor[s][1] | Assignee[s][2] | Aggregate Amount of Commitment/Notes for all Purchasers[3] | Amount of Commitment/Notes Assigned[8] | Percentage Assigned of Commitment/ Notes[4] |
|---|---|---|---|---|
| | | $ | $ | % |
| | | $ | $ | % |
| | | $ | $ | % |

[7.       Trade Date:              _____]

[Page break]

---

[1] List each Assignor, as appropriate.

[2] List each Assignee, as appropriate.

[3] Amount to be adjusted by the counterparties to take into account any payments or prepayments made between the Trade Date and the Effective Date.

[4] Set forth, to at least 9 decimals, as a percentage of the Commitment/Notes of all Purchasers thereunder.

Exhibit I - 2

Effective Date:  _____ ___, 20___ [TO BE INSERTED BY NOTE ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

The terms set forth in this Assignment and Assumption are hereby agreed to:

ASSIGNOR[S]

[NAME OF ASSIGNOR]

By:_____

Title:

[NAME OF ASSIGNOR]

By:_____

Title:

ASSIGNEE[S]

[NAME OF ASSIGNEE]

By:_____

Title:

[NAME OF ASSIGNEE]

By:_____

Title:

[Consented to and] Accepted:

[NAME OF NOTE ADMINISTRATIVE AGENT], as

Note Administrative Agent

By: _____

Title:

Exhibit I - 3

[Consented to:][1]

[NAME OF RELEVANT PARTY]

By:  _____

Title:

---

[1] To be added only if the consent of the Company and/or other parties is required by the terms of the Agreement.

Exhibit I - 4

ANNEX 1

STANDARD TERMS AND CONDITIONS FOR
ASSIGNMENT AND ASSUMPTION

1.    **Representations and Warranties**.

1.1    **Assignor[s]**.  [The][Each] Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of [the][the relevant] Assigned Interest, (ii) [the][such] Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Agreement or any other Note Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Note Documents [or any collateral thereunder], (iii) the financial condition of the Company, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Note Document, or (iv) the performance or observance by the Company, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Note Document.

1.2    **Assignee[s]**.  [The][Each] Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Purchaser under the Agreement, (ii) it meets all the requirements to be an assignee under Section 17.1 (*Assignments by Purchasers*) of the Agreement (subject to such consents, if any, as may be required thereunder), (iii) from and after the Effective Date, it shall be bound by the provisions of the Agreement as a Purchaser thereunder and, to the extent of [the][the relevant] Assigned Interest, shall have the obligations of a Purchaser thereunder, (iv) it is sophisticated with respect to decisions to acquire assets of the type represented by the Assigned Interest and either it, or the Person exercising discretion in making its decision to acquire the Assigned Interest, is experienced in acquiring assets of such type, (v) it has received a copy of the Agreement, and has received or has been accorded the opportunity to receive copies of the most recent financial statements delivered pursuant to Section 13.5 (*Financial Reports*) thereof, as applicable, and such other documents and information as it deems appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase [the][such] Assigned Interest, (vi) it has, independently and without reliance upon the Note Administrative Agent or any other Purchaser and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Assignment and Assumption and to purchase [the][such] Assigned Interest, and (vii) if it is a Foreign Purchaser attached to the Assignment and Assumption is any documentation required to be delivered by it pursuant to the terms of the Agreement, duly completed and executed by [the][such] Assignee; and (b) agrees that (i) it will, independently and without reliance on the Note Administrative Agent, [the][any] Assignor or any other Purchaser, and based on such documents and information as it shall deem appropriate

Exhibit I - 5

at the time, continue to make its own credit decisions in taking or not taking action under the Note Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Note Documents are required to be performed by it as a Purchaser.

2.      **Payments**.  From and after the Effective Date, the Note Administrative Agent shall make all payments in respect of [the][each] Assigned Interest (including payments of principal, interest, fees and other amounts) to [the][the relevant] Assignor for amounts that have accrued to but excluding the Effective Date and to [the][the relevant] Assignee for amounts that have accrued from and after the Effective Date. Notwithstanding the foregoing, the Note Administrative Agent shall make all payments of interest, fees or other amounts paid or payable in kind from and after the Effective Date to [the][the relevant] Assignee.

3.      **General Provisions**.  This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.  This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument.  Delivery of an executed counterpart of a signature page of this Assignment and Assumption by facsimile shall be effective as delivery of a manually executed counterpart of this Assignment and Assumption. This Assignment and Assumption shall be governed by, and construed in accordance with, the law of the State of New York.

Exhibit I - 6

**Exhibit II**
**Form of Compliance Certificate**

[*To be provided*]

Exhibit II - 1

**Exhibit III**
**Form of Note**

THIS NOTE WAS ISSUED IN A PRIVATE PLACEMENT, WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**ACT**"), AND MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE TRANSFERRED (A) IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT COVERING THE TRANSFER OR PURSUANT TO AN EXEMPTION FROM REGISTRATION AND (B) EXCEPT IN COMPLIANCE WITH SECTION 17.1 OF THE AGREEMENT REFERRED TO BELOW.

THIS INSTRUMENT AND THE RIGHTS AND OBLIGATIONS EVIDENCED HEREBY ARE SUBORDINATED IN THE MANNER AND TO THE EXTENT SET FORTH IN THAT CERTAIN SUBORDINATION AND INTERCREDITOR AGREEMENT DATED AS OF JUNE 30, 2022 AMONG BMO HARRIS BANK, N.A., LEADENHALL CAPITAL PARTNERS LLP, LEADENHALL LIFE SMA III ICAV, THE SUBORDINATED HOLDERS PARTY THERETO, BRICKELL INSURANCE HOLDINGS LLC, 777 PARTNERS LLC AND MTCP, LLC, AS AMENDED, RESTATED, SUPPLEMENTED OR OTHERWISE MODIFIED FROM TIME TO TIME.

$[*Amount of Purchaser's Note*]                                                                    New York, NY
                                                                                                                      [*Date*]

FOR VALUE RECEIVED, 777 PARTNERS LLC, a Delaware limited liability company (the "**Company**"), promises to pay [*PURCHASER*] (the "**Payee**") or its registered assigns the principal amount of [*Amount of Purchaser's Note*] ($[*Amount*]). The principal amount of this note (this "**Note**") shall be payable on the dates and in the amounts specified in the Subordinated Note Purchase Agreement dated as of [June 30], 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "**Agreement**") by and among the Company, the Purchasers party thereto from time to time, LEADENHALL CAPITAL PARTNERS LLP, as administrative agent for the Purchasers (in such capacity, the "**Note Administrative Agent**"), and LEADENHALL LIFE SMA III ICAV, as second lien collateral agent for the Second Lien Secured Parties. Capitalized terms used and not otherwise defined herein having the meanings given to them in the Agreement.

The Company also promises to pay interest on the unpaid principal amount hereof, until paid in full, at the rates and at the times which shall be determined in accordance with the provisions of the Agreement. Unless and until an Assignment and Assumption effecting the assignment or transfer of this Note shall have been accepted by the Note Administrative Agent and recorded in the Register as provided in the Agreement, the Company and the Note Administrative Agent shall be entitled to deem and treat the Payee as the owner and holder of this Note.

All extensions of credit evidenced by this note and all prepayments and repayments of the principal hereof and interest hereon and the respective dates thereof, each pursuant to the terms of the Agreement, shall be endorsed by the holder hereof on the schedule attached hereto and made a part hereof or on a continuation thereof that shall be attached hereto and made a part hereof, or

Exhibit III - 1

otherwise recorded by such holder in its internal records; **provided**, **however**, that the failure of the holder hereof to make such notation or any error in such notation shall not affect the obligations of the Company under this Note.

This Note is one of the notes referred to in the Agreement, which, among other things, contains provisions for the acceleration of the maturity hereof upon the occurrence of certain events, for voluntary and mandatory prepayment of the principal hereof prior to the maturity hereof and for the amendment or waiver of certain provisions of the Agreement, all upon the terms and conditions specified in the Agreement. This Note is entitled to the benefits of the Agreement and the other Note Documents.

**THIS NOTE AND ANY CLAIMS, CONTROVERSY, DISPUTE OR CAUSE OF ACTION (WHETHER IN CONTRACT OR TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS NOTE AND THE TRANSACTIONS CONTEMPLATED HEREBY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.**

[Signature page follows]

Exhibit III - 2

**IN WITNESS WHEREOF**, the Company has duly executed this Note as of the date first written above.

Delivery of an executed counterpart of this Note by facsimile or other electronic transmission (e.g., a ".pdf" or ".tif") shall be effective as delivery of a manually executed counterpart of this Note.

**777 PARNTERS LLC**

By: _____

Title: _____

Exhibit III - 3

**Schedule**

**Transactions on Note**

| Date | Amount of Advance to Company Made This Date | Amount of Principal Paid This Date | Outstanding Principal Balance This Date | Notation Made By |
|------|---------------------------------------------|------------------------------------|-----------------------------------------|------------------|
|      |                                             |                                    |                                         |                  |

Exhibit III - 4

**Exhibit IV**

[*Reserved*]

Exhibit IV - 1

**Exhibit V-A**

**Form of U.S. Tax Compliance Certificate**

(For Foreign Purchasers That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is made to the Subordinated Note Purchase Agreement dated as of [June 30], 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "**Agreement**") by and among 777 PARTNERS LLC, a Delaware limited liability company (the "**Company**"), the Purchasers party thereto from time to time, LEADENHALL CAPITAL PARTNERS LLP, as administrative agent for the Purchasers (in such capacity, the "**Note Administrative Agent**"), and LEADENHALL LIFE SMA III ICAV, as second lien collateral agent for the Second Lien Secured Parties. Capitalized terms not defined herein shall have the meanings specified in the Agreement.

Pursuant to the provisions of Section 7.7 (*Status of Purchasers*) of the Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Note(s) in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of the Company within the meaning of Section 871(h)(3)(B) of the Code and (iv) it is not a controlled foreign corporation related to the Company as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Note Administrative Agent and the Company with a certificate of its non-U.S. Person status on IRS Form W-8BEN or IRS Form W-8BEN-E. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Company and the Note Administrative Agent, and (2) the undersigned shall have at all times furnished the Company and the Note Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF PURCHASER]


By:_____

     Name:

     Title:


Date: _____ __, 20[  ]

Exhibit V-A

**Exhibit V-B**

**Form of U.S. Tax Compliance Certificate**

(For Foreign Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is made to the Subordinated Note Purchase Agreement dated as of [June 30], 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "**Agreement**") by and among 777 PARTNERS LLC, a Delaware limited liability company (the "**Company**"), the Purchasers party thereto from time to time, LEADENHALL CAPITAL PARTNERS LLP, as administrative agent for the Purchasers (in such capacity, the "**Note Administrative Agent**"), and LEADENHALL LIFE SMA III ICAV, as second lien collateral agent for the Second Lien Secured Parties. Capitalized terms not defined herein shall have the meanings specified in the Agreement.

Pursuant to the provisions of Section 7.7 (*Status of Purchasers*) of the Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of the Company within the meaning of Section 871(h)(3)(B) of the Code, and (iv) it is not a controlled foreign corporation related to the Company as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Purchaser with a certificate of its non-U.S. Person status on IRS Form W-8BEN or IRS Form W-8BEN-E. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Purchaser in writing, and (2) the undersigned shall have at all times furnished such Purchaser with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF PARTICIPANT]

By:_____
       Name:
       Title:

Date: _____ __, 20[  ]

Exhibit V-B

**Exhibit V-C**

**Form of U.S. Tax Compliance Certificate**

(For Foreign Participants That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is made to the Subordinated Note Purchase Agreement dated as of [June 30], 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "**Agreement**") by and among 777 PARTNERS LLC, a Delaware limited liability company (the "**Company**"), the Purchasers party thereto from time to time, LEADENHALL CAPITAL PARTNERS LLP, as administrative agent for the Purchasers (in such capacity, the "**Note Administrative Agent**"), and LEADENHALL LIFE SMA III ICAV, as second lien collateral agent for the Second Lien Secured Parties. Capitalized terms not defined herein shall have the meanings specified in the Agreement.

Pursuant to the provisions of Section 7.7 (*Status of Purchasers*) of the Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such participation, (iii) with respect to such participation, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of the Company within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Company as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Purchaser with a duly completed and executed IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or IRS Form W-8BEN-E from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Purchaser and (2) the undersigned shall have at all times furnished such Purchaser with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF PARTICIPANT]


By:_____

Name:

Title:

Date: _____ __, 20[  ]

Exhibit V-C

**Exhibit V-D**

**Form of U.S. Tax Compliance Certificate**

(For Foreign Purchasers That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is made to the Subordinated Note Purchase Agreement dated as of [June 30], 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "**Agreement**") by and among 777 PARTNERS LLC, a Delaware limited liability company (the "**Company**"), the Purchasers party thereto from time to time, LEADENHALL CAPITAL PARTNERS LLP, as administrative agent for the Purchasers (in such capacity, the "**Note Administrative Agent**"), and LEADENHALL LIFE SMA III ICAV, as second lien collateral agent for the Second Lien Secured Parties. Capitalized terms not defined herein shall have the meanings specified in the Agreement.

Pursuant to the provisions of Section 7.7 (*Status of Purchasers*) of the Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Note(s) in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such Note(s), (iii) with respect to the extension of credit pursuant to the Agreement or any other Note Document, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of the Company within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Company as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Note Administrative Agent and the Company with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or IRS Form W-8BEN-E or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or IRS Form W-8BEN-E from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption.  By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Company and the Note Administrative Agent, and (2) the undersigned shall have at all times furnished the Company and the Note Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF PURCHASER]


By:_____
        Name:
        Title:

Date: _____ __, 20[  ]


Exhibit V-D