# EXHIBIT D

*EXECUTION VERSION*

**THIRD AMENDMENT TO CREDIT AGREEMENT, CONSENT AND FORBEARANCE AGREEMENT**

THIS THIRD AMENDMENT TO CREDIT AGREEMENT, CONSENT AND FORBEARANCE AGREEMENT (this "*Agreement*"), dated as of September 27, 2023 amends the Credit Agreement, dated as of June 30, 2022 (as previously amended, restated, supplemented or otherwise modified from time to time, the "*Credit Agreement*"), by and among Brickell Insurance Holdings LLC, a Delaware limited liability company (the "*Borrower*"), BMO Bank N.A. (formerly known as BMO Harris Bank N.A.), a national banking association, as administrative agent (the "*Administrative Agent*"), and the Lenders from time to time party thereto.  Terms defined in the Credit Agreement are, unless otherwise defined herein or the context otherwise requires, used herein as defined therein.

WHEREAS, the Borrower has given notice to the Administrative Agent and the Lenders that certain Events of Default described on Schedule I hereto have occurred and are continuing (collectively the "*Specified Events of Default*" and each, individually, a "*Specified Event of Default*");

WHEREAS, certain provisions of the Credit Agreement and the other Loan Documents, including, without limitation, Section 6.11 of the Credit Agreement, require that the Borrower cause the Obligations to be secured by first priority Liens on the Collateral, and the Lenders have consented to receiving a second-priority Lien on the Borrower's investment account number 142212-000, which is currently pledged to SILAC Insurance Company as collateral for the guaranty of the Borrower under the SILAC Loan and Security Agreement, for so long as such Lien in favor of SILAC Insurance Company remains in effect (the "*Investment Account Lien Consent*");

WHEREAS, certain provisions of the Credit Agreement and the other Loan Documents, including, without limitation, Section 7.4 of the Credit Agreement, require that the Borrower and its Subsidiaries not sell or otherwise dispose of all or any of their Property, except as permitted by the Credit Agreement,

WHEREAS, the Lenders have consented to the Borrower's sale of substantially all the assets of Merit Life Insurance Co. notwithstanding any requirements to the contrary in the Credit Agreement, but subject to the terms and conditions specified herein (the "*Merit Sale Consent*");

WHEREAS, the Borrower has requested that the Administrative Agent and Lenders forbear from exercising their rights and remedies under the Credit Agreement, the other Loan Documents and applicable law in respect of the Specified Events of Default and to grant the Investment Account Lien Consent and Merit Sale Consent, in each case, pursuant to and upon the terms and conditions of this Agreement.  Consistent with the foregoing, nothing contained herein is intended or shall be deemed to constitute an acknowledgment, representation, warranty, covenant, or other agreement on the part of Administrative Agent or the Lenders that they have agreed or they will agree (i) to enter into any amendment to the Credit Agreement and the other Loan Documents on any terms and conditions other than as set forth herein or (ii) to any waiver relating to any Default or Event of Default; and

WHEREAS, the Borrower desires that the Credit Agreement be amended on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged), the parties hereto agree as follows:

756933467

1. <u>AMENDMENTS</u>. Subject to the terms and conditions of this Agreement, Administrative Agent and the Lenders hereby agree to the following amendments subject to the provisions of Section 4 hereof.

(a) Section 1.1 of the Credit Agreement is hereby amended by adding the following defined terms in the appropriate alphabetical order:

"*Merit Sale*" means the sale of substantially all of the assets of Merit Life Insurance Co.

"*SILAC*" means SILAC Insurance Company, a Utah corporation.

"*SILAC Loan and Security Agreement*" means that certain Second Amended and Restated Revolving Loan and Security Agreement, dated as of February 17, 2022, by and among SILAC, as the lender, 777 Partners, as the borrower, and the Borrower, as the guarantor, as in effect on the Third Amendment Date.

"*SILAC Pledged Collateral*" means Borrower's investment account number 142212-000, as set forth on Schedule 1 to the SILAC Loan and Security Agreement and all assets in such account.

"*Third Amendment*" means that certain Third Amendment to Credit Agreement, Consent and Forbearance Agreement, dated as of the Third Amendment Date, between the Borrower, Guarantor, Administrative Agent and Lenders party thereto.

"*Third Amendment Date*" means September 27, 2023.

(b) The definition of "*Maturity Date*" in Section 1.1 of the Credit Agreement is hereby amended and restated in its entirety as follows:

"*Maturity Date*" means June 30, 2025.

(c) The definition of "*Net Cash Proceeds*" in Section 1.1 of the Credit Agreement is hereby amended and restated in its entirety as follows:

> "*Net Cash Proceeds*" means, as applicable, (a) with respect to any Disposition by a Person, cash and cash equivalent proceeds received by or for such Person's account, net of (i) reasonable direct costs relating to such Disposition, including, without limitation, legal, accounting and actuarial costs, fees and expenses, and costs, fees and expenses of other advisors in connection with such Disposition and (ii) sale, use or other transactional taxes paid or payable by such Person as a direct result of such Disposition and (b) with respect to any offering of equity securities of a Person or the issuance of any Indebtedness for Borrowed Money by a Person, cash and cash equivalent proceeds received by or for such Person's account, net of reasonable legal, underwriting, and other fees and expenses incurred as a direct result thereof.

(d) Section 2.6 of the Credit Agreement is hereby amended and restated in its entirety as follows:

756933467                        2

*Section 2.6. Maturity of Loans; Scheduled Payments of Loans.*
Borrower shall make principal payments of the Loans on the second anniversary of the Closing Date in an amount equal to 5% of the sum of (A) the amount of the Loans outstanding on the Closing Date plus (B) the amount of any Incremental Term Loans. A final payment comprised of all principal and interest then outstanding on the Loans shall be due and payable on the Maturity Date. Each such principal payment shall be applied to the Lenders holding the Loans pro rata based upon their Term Loan Percentages.

(e)     Section 2.7(b) of the Credit Agreement is hereby amended by inserting the following new clause (iv):

(iv) If, after the Closing Date, the Borrower or any Subsidiary shall at any time or from time to time make or agree to make a Disposition, then the Borrower shall promptly notify Administrative Agent of such proposed Disposition (including the amount of the estimated Net Cash Proceeds to be received by the Borrower or such Subsidiary in respect thereof) and, promptly upon receipt by the Borrower or such Subsidiary of the Net Cash Proceeds of such Disposition, the Borrower shall prepay the Obligations in an aggregate amount equal to 100% of the amount of all such Net Cash Proceeds; provided that, notwithstanding the foregoing, the Net Cash Proceeds of the Merit Sale shall be distributed in accordance with the terms of the Third Amendment. The amount of each such prepayment shall be applied, subject to Section 2.7(b)(iii), to the outstanding Loans until paid in full. The Borrower acknowledges that its performance hereunder shall not limit the rights and remedies of the Lenders for any occurrence of a Change of Control or breach of Section 7.4, Section 7.5 or any other terms of the Loan Documents.

(f)     Sections 6.5(b) and (c) of the Credit Agreement are hereby amended and restated in their entirety as follows:

(b)     as soon as available, and in any event no later than 60 days after the last day of each fiscal quarter (other than the fourth fiscal quarter) of each fiscal year of Borrower, a copy of the consolidated and consolidating balance sheet of Borrower and its Subsidiaries as of the last day of such fiscal quarter and the consolidated and consolidating statements of income, retained earnings, and cash flows of Borrower and its Subsidiaries for the fiscal quarter and for the fiscal year to date period then ended, each in reasonable detail showing in comparative form the figures for the corresponding date and period in the previous fiscal year, prepared by Borrower in accordance with GAAP (subject to the absence of footnote disclosures and year end audit adjustments) and certified to by its chief financial officer or another officer of Borrower acceptable to Administrative Agent;

(c)     as soon as available, and in any event no later than 60 days after the last day of each fiscal quarter (other than the fourth fiscal quarter) of each fiscal year, a copy of each Insurance Subsidiary's, quarterly statutory financial statements, prepared by each such Person in accordance with SAP, as filed with the Applicable Insurance Regulatory Authority;

(g)     Section 6.5(q) of the Credit Agreement is hereby amended and restated in its entirety as follows:

(q) The Borrower shall deliver to the Administrative Agent (i) on or before July 31, 2022, the audited consolidated financial statements of the Borrower and its Subsidiaries for the 2021 fiscal year, and (ii) on or before December 31, 2023, the audited financial statements of the Guarantor for the 2022 fiscal year.

(h) Section 6.13 of the Credit Agreement is hereby amended and restated in its entirety as follows:

*Section 6.13  Reserve Account.*  The Borrower shall at all times maintain a reserve account for the payment of Obligations (the "*Reserve Account*") in an amount equal to at least $11,250,000 until application of the proceeds of the Merit Sale pursuant to Section 2.4(e) of the Third Amendment and thereafter in a minimum amount equal to the greater of (i) $8,000,000 and (ii) 17.5% of the outstanding principal amount of the Loans immediately following application of the proceeds of the Merit Sale pursuant to Section 2.4(e) of the Third Amendment (the "*Minimum Reserve Amount*").  If at any time the amount in the Reserve Account is less than the Minimum Reserve Amount, the Borrower shall promptly, and in any event, within one Business Day (other than during the Forbearance Period (as defined in the Third Amendment)) deposit additional cash in the Reserve Account so that the amount in the Reserve Account is at least equal to the Minimum Reserve Amount; provided that, following application of the proceeds of the Merit Sale in accordance with Section 2.4(e) of the Third Amendment if the Borrower uses the cash from the Reserve Account to pay interest payable pursuant to Section 2.2 (other than interest accrued at the Default Rate), the Borrower shall have 30 days from the date of such payment to deposit cash in the Reserve Account so that the amount in the Reserve Account is at least equal to the Minimum Reserve Amount.  The Borrower shall ensure that the Administrative Agent has a first priority, perfected security interest in the Reserve Account.

(i) Section 7.1 of the Credit Agreement is hereby amended by deleting "and" at the end of clause (i), renumbering clause (j) as clause (k), and inserting the following new clause (j):

(j) the guaranty by the Borrower of the obligations of 777 Partners under the SILAC Loan and Security Agreement in an aggregate amount not to exceed the amount outstanding on the Third Amendment Date, being $14,000,000; and

(j) Section 7.2 of the Credit Agreement is hereby amended by renumbering clause (k) as clause (l), and inserting the following new clause (k):

(k) a Lien in favor of SILAC on the SILAC Pledged Collateral; and

2. FORBEARANCE.

2.1 Period.  Subject to the terms and conditions of this Agreement, the Administrative Agent and the Lenders shall forbear from exercising their respective rights and remedies under the Loan Documents and/or under applicable law, in each case, as a result of the Specified Events of Default (and any other Events of Default directly resulting from the Specified Events of Default (including any requirements to give notice of such Specified Events of Default)) (the

"Forbearance") commencing on the Forbearance Effective Date and ending on the Termination Date (the "Forbearance Period"), but only upon satisfaction of the conditions set forth in Section 4 of this Agreement.  As used herein, "Termination Date" means the date and time which is the earliest of (a) March 27, 2024 at 5:00 p.m. New York City time (the "Stated Termination Date"), (b) the date on which the Administrative Agent on behalf of the Lenders receives irrevocable payment in full in cash of all of the Obligations under the Credit Agreement, (c) the date the Administrative Agent (on behalf of the Lenders) elects to terminate the Forbearance following cure of all of the Specified Events of Default, (d) the date the Administrative Agent elects to terminate the Forbearance Period following the occurrence and during the continuance of a Forbearance Default, (e) October 4, 2023 if the Subordinated Holders (as defined in the Intercreditor Agreement) have not (i) entered into an amendment, consent and forbearance with respect to their rights and remedies in respect of any defaults under the Subordinated Debt Documents in a manner similar to this Agreement and in form and substance satisfactory to the Administrative Agent and (ii) consented to the Merit Sale by such date or (f) the Merit Sale Purchase Agreement is terminated or ceases to be in full force and effect or the Administrative Agent becomes aware that the Merit Sale will not be consummated.

2.2    Optional Termination.  The Administrative Agent, at the direction of Required Lenders, may elect to terminate the Forbearance Period by delivering written notice thereof to the Loan Parties upon the occurrence and during the continuance of any of the following events after the date hereof (each, a "Forbearance Default"):

(a)    the breach by any Loan Party (a) of any of its representations or warranties or (b) of any of its covenants or conditions, in each case, set forth in this Agreement; or

(b)    the occurrence of an event or condition (other than any of the Specified Events of Default) that constitutes an Event of Default under any of the Loan Documents.

2.3    Effect of Forbearance Termination.  Immediately upon the Termination Date, Administrative Agent and the Lenders may exercise their respective rights and remedies under the Loan Documents and this Agreement, without the requirement of any further notice or other action (other than written notice to the Loan Parties of the termination of such forbearance as required by Section 2.2) by the Administrative Agent or the Lenders.  The Loan Parties agree not to contest any such lawful exercise by the Administrative Agent or the Lenders of such rights and remedies. All of the Administrative Agent's and the Lenders' respective rights and remedies hereunder or under the other Loan Documents and this Agreement are cumulative. Notwithstanding the termination of the Forbearance for any reason whatsoever, Administrative Agent and the Lenders shall be entitled to retain all of their respective rights and benefits under this Agreement, including with respect to any representation, acknowledgement, confirmation, release of liabilities, promises, covenants, or agreements by the Loan Parties which in all respects shall, unless expressly stated otherwise, survive any such termination.

2.4    Forbearance Covenants. In order to induce the Administrative Agent and the Lenders to extend the Forbearance, and as express conditions thereof, but without limiting the generality of the provisions of the Credit Agreement, the Loan Parties agree that:

(a)    The Loan Parties shall consummate the Merit Sale on or prior to March 27, 2024 (provided that, such date may be extended for an additional 30 days, with notice from the Borrower to the Administrative Agent, certifying that such extension is necessary to comply with regulatory requirements or obtain necessary regulatory approvals) (such

date, the "Required Merit Sale Date") on terms substantially the same as those set forth in the Merit Sale Purchase Agreement provided to the Administrative Agent pursuant to clause (b) below.

(b)   Promptly following the execution thereof, the Administrative Agent shall have received a copy of the purchase agreement with respect to the Merit Sale (the "Merit Sale Purchase Agreement").

(c)   The Loan Parties shall promptly deliver to the Administrative Agent and the Lenders notice of the occurrence of any of the following events related to the Merit Sale and copies of all correspondence and filings related thereto: (i) the Form A filing, (ii) any regulatory timelines, (iii) the date of any public hearings, and (iv) any feedback or correspondence from any regulator.

(d)   The Loan Parties shall cause their senior management to hold meetings via telephone on the 15th day of each month or such other date on which the parties mutually reasonably agree, commencing November 15, 2023, at a mutually agreeable time, with the Administrative Agent and Lenders to discuss the progress of the Merit Sale and any other matters reasonably requested by the Administrative Agent and Lenders.

(e)   Promptly upon receipt of the Net Cash Proceeds of the Merit Sale, the Borrower shall apply the Net Cash Proceeds to the payment of the following obligations:

(i)   first, to pay all legal costs and expenses required to be paid (A) by Borrower pursuant to Section 11.13 of the Credit Agreement and (B) by Guarantor pursuant to Section 9.4 of the Subordinated Note Purchase Agreement (as defined in the Intercreditor Agreement);

(ii)   second, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans (but excluding interest accrued at the Default Rate), ratably among the Lenders in proportion to the respective amounts payable to them;

(iii)   third, if necessary, to deposit cash into the Reserve Account so that the amount in the Reserve Account is at least equal to $11,250,000;

(iv)   fourth, to payment of outstanding cash interest (but excluding interest accrued at the Default Rate) (as defined in the Subordinated Debt Documents)) owed under the Subordinated Debt Documents for the periods ending June 30, 2023, September 30, 2023, and December 31, 2023;

(v)   fifth, to payment of that portion of the Obligations constituting unpaid principal of the Loans, ratably among the Lenders in proportion to the respective amounts payable to them under the Credit Agreement; and

(vi)   sixth, if the Minimum Reserve Amount has been reduced to an amount less than $11,250,000 pursuant to Section 6.13 of the Credit Agreement, the excess amount in the Reserve Account will be used to pay that portion of the Obligations constituting unpaid principal of the Loans,

ratably among the Lenders in proportion to the respective amounts payable to them under the Credit Agreement.

(f) The Borrower shall on or prior to October 31, 2023 file a uniform commercial code amendment or termination of the Balanced Management UCC-1 Filings (as defined in Schedule I hereto) or cause such filings to be filed in form and substance effective to terminate such Balanced Management UCC-1 Filings.

(g) On or before December 31, 2023, the Administrative Agent shall have received the reviewed financial statements for BIH for the fiscal year ending December 31, 2022, in the form and substance required by Section 6.5(d) of the Credit Agreement.

3. CONSENT. Subject to the terms and conditions of this Agreement (including the satisfaction of the conditions set forth in Section 4 hereof), the Administrative Agent and the Lenders hereby (a) agree to the Investment Account Lien Consent, (b) consent to the Borrower's obligations under the SILAC Loan and Security Agreement (including the pledge of the SILAC Pledged Collateral thereunder) notwithstanding the requirements of Section 7.7 and/or Section 7.11 of the Credit Agreement and (c) agree to the Merit Sale Consent; provided that the Merit Sale Consent is subject to (i) compliance with the requirements set forth in Sections 2.4(a), (b), (c) and (e) and (ii) consent to the Merit Sale under any Subordinated Debt Documents having been received and effective.

4. CONDITIONS PRECEDENT. This Agreement shall become effective on the date that each of the conditions precedent set forth in this Section 4 shall have been satisfied, and notice thereof shall have been given by the Administrative Agent to the Borrower and the Required Lenders. None of the terms, conditions or provisions contained in this Agreement is intended to be enforceable or interpreted, or shall be construed, against any of the parties hereto in the event that the conditions precedent set forth in this Section 4 are not satisfied (or waived by the Administrative Agent and the Required Lenders) on or before September 27, 2023, time being of the essence; in such event, this Agreement shall be null and void (except for the provisions of this Section 4 and Section 5.4), and each of the parties in all respects shall be returned to the respective positions each occupied prior to the execution of this Agreement, all as if this Agreement had never been executed and delivered.

4.1 Receipt of Documents. The Administrative Agent shall have received this Agreement duly executed by the Borrower, the Administrative Agent, and the Required Lenders.

4.2 [Reserved].

4.3 Compliance with Warranties, No Default, etc. After giving effect to this Agreement, the following statements by the Borrower shall be true and correct (and the Borrower, by its execution of this Agreement, hereby represents and warrants to the Administrative Agent and each Lender that such statements are true and correct as at such times):

(a) the representations and warranties set forth in Section 5 of the Credit Agreement and in the other Loan Documents are true and correct in all material respects as of the date hereof (other than as they specifically relate to the Specified Events of Default), except to the extent the same expressly relate to an earlier date, in which case such representations and warranties shall be and remain true and correct as of such earlier date, and except to the extent any representation and warranty is qualified by "material", "Material Adverse Effect" or similar language, in which case, such representation and warranty shall be true and correct in all respects; and

(b) no Default or Event of Default (other than the Specified Events of Default) has occurred and is continuing.

4.4 [Reserved].

4.5 Payment of Interest. All Obligations constituting accrued and unpaid interest on the Loans (but excluding interest accrued at the Default Rate), payable to the Lenders for the periods ending June 30, 2023, September 30, 2023 and December 31, 2023 (paid in advance) shall have been paid; provided that such amounts may be paid from the Reserve Account, and such amounts shall not be required to be replenished in the Reserve Account until the earlier of the Merit Sale (as set forth in Section 2.4(e) of this Agreement) and the Termination Date. The Borrower hereby authorizes the Administrative Agent to apply the amounts in the Reserve Account as set forth in this Section 4.5.

5. MISCELLANEOUS.

5.1 Continuing Effectiveness, etc. This Agreement shall be strictly limited to its terms. In this Agreement, the Lenders waive no Default or Event of Default (including the Specified Events of Default), whether presently or subsequently existing. Except as otherwise expressly provided for herein (including the Forbearance), the Administrative Agent and the Lenders hereby fully preserve all of their rights, powers and remedies against the Loan Parties and any other Person or such Person's property, including the right to act immediately upon the occurrence of any Default or Event of Default other than the Specified Events of Default. In addition, and except solely as provided herein (including the Forbearance), nothing contained herein shall be deemed to be a waiver or abandonment of any Default or Event of Default (including the Specified Events of Default) or of any right, power or remedy available to the Administrative Agent or any Lender under any Loan Document, applicable law or otherwise, whether against any Loan Party or any other Person, and each such right, power and remedy is hereby specifically and expressly reserved, whether any such right, power or remedy relates to any obligation incurred or property transferred before the date of this Agreement, during the Forbearance Period, or subsequent to the occurrence of any Forbearance Default, including the right to seek judgment against any Loan Party, to foreclose its interest in any Collateral held by the Administrative Agent or in which the Administrative Agent has a security interest or other lien or to take any other action permitted under the Loan Documents and applicable law. This Agreement shall be deemed to be (i) an amendment to the Credit Agreement, and the Credit Agreement as amended hereby, shall remain in full force and effect and is hereby ratified, approved and confirmed in each and every respect and (ii) a Loan Document, and each other Loan Document is hereby ratified, approved and confirmed in each and every respect. After the effectiveness of this Agreement in accordance with its terms, all references to the Credit Agreement in the Loan Documents or in any other document, instrument, agreement or writing shall be deemed to refer to the Credit Agreement as amended hereby. Except as expressly modified in this Agreement, all of the terms, provisions and conditions of the Credit Agreement, as heretofore amended, shall remain unchanged and in full force and effect.

5.2 Headings. Section headings used in this Agreement are for reference only and shall not affect the construction of this Agreement.

5.3 Execution in Counterparts. This Agreement may be executed in any number of counterparts, and by the different parties hereto on separate counterpart signature pages, each of which shall constitute an original, and all such counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Agreement by telecopy, emailed .pdf or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement and such counterpart shall be deemed to be an original hereof.

5.4     Incorporation of Credit Agreement Provisions.  The provisions of Sections 1.2, 11.13, 11.16, 11.17, 11.21 and 11.22 of the Credit Agreement are incorporated herein by reference as if fully set forth herein, *mutatis mutandis*.

6.     RELEASE; INDEMNIFICATION.

6.1     Release. In further consideration of the Administrative Agent's and the Lenders' execution of this Agreement, each Loan Party, individually and on behalf of its successors (including any trustees acting on behalf of such Loan Party, and any debtor-in-possession with respect to such Loan Party), assigns, subsidiaries and affiliates, hereby forever releases the Administrative Agent, each Lender and each of their respective successors, assigns, parents, subsidiaries, and affiliates, officers, employees, directors, agents and attorneys (collectively, the "***Releasees***") from any and all debts, claims, demands, liabilities, responsibilities, disputes, causes, damages, actions and causes of actions (whether at law or in equity), and obligations of every nature whatsoever, whether liquidated or unliquidated, whether matured or unmatured, whether fixed or contingent that each Loan Party has or may have against the Releasees, or any of them, which arise from or relate to any actions which the Releasees, or any of them, have or may have taken or omitted to take in connection with the Credit Agreement or the other Loan Documents prior to the date hereof (including with respect to the Obligations, any Collateral and any third parties liable in whole or in part for the Obligations). This provision shall survive and continue in full force and effect whether or not the Loan Parties shall satisfy all other provisions of the Credit Agreement (as amended by this Agreement) or the other Loan Documents.

6.2     Related Indemnity. Each Loan Party hereby agrees that its release of the Releasees set forth in Section 6.1 shall include an obligation to indemnify and hold the Releasees, or any of them, harmless with respect to any and all liabilities, obligations, losses, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever incurred by the Releasees, or any of them, whether direct, indirect or consequential, as a result of or arising from or relating to any proceeding by, or on behalf of any Person, including officers, directors, agents, trustees, creditors, partners or shareholders of such Loan Party or any parent, subsidiary or affiliate of such Loan Party, whether threatened or initiated, asserting any claim for legal or equitable remedy under any statutes, regulation, common law principle or otherwise arising from or in connection with the negotiation, preparation, execution, delivery, performance, administration and enforcement of this Agreement or any other document executed in connection herewith; provided, that no Loan Party shall be liable for any indemnification to a Releasee to the extent that any such liability, obligation, loss, penalty, action, judgment, suit, cost, expense or disbursement results from the applicable Releasee's gross negligence or willful misconduct, as finally determined by a court of competent jurisdiction. The foregoing indemnity shall survive the payment in full of the Obligations and the termination of the Credit Agreement and the other Loan Documents (in each case as amended by this Agreement).

7.     Representation and Covenant Regarding SILAC Pledged Collateral.  The Borrower hereby (i) represents and warrants to the Administrative Agent that the investment account holding the SILAC Pledged Collateral holds 6,279,959 shares of RQIH LN as of the date hereof and (ii) agrees not to cause or permit any additional shares of RQIH LN to become SILAC Pledged Collateral, except for such additional shares representing dividends or other distributions received upon the SILAC Pledged Collateral.

*[Signature Pages Follow]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

*"Borrower"*

**BRICKELL INSURANCE HOLDINGS LLC**, as Borrower

By _____
Name   Steven W. Pasko
Title   Manager

*"Guarantor"*

**777 PARTNERS LLC**, as Guarantor

By _____
Name   Steven W. Pasko
Title   Co-Managing Partner

*Third Amendment to Credit Agreement, Consent and Forbearance Agreement*

*"Administrative Agent"*

**BMO BANK N.A.**, as Administrative Agent

By _____
  Name Brij Grewal
  Title Managing Director

*"Lenders"*

**BMO BANK N.A.**, as Lender

By _____
    Name <u>Brij Grewal</u>_____
    Title <u>Managing Director</u>_____

SCHEDULE I

**SPECIFIED EVENTS OF DEFAULT**

1. Certain Events of Default have occurred and are continuing under Section 8.1(b) of the Credit Agreement as a result of the Borrower's failure to deliver the Borrower's audited financial statements and a Compliance Certificate for the fiscal year ended December 31, 2022 as a result of the violation of Sections 6.5(b), 6.5(d), 6.5(f) and 6.5(p) of the Credit Agreement and (b) the Borrower's failure to deliver of a copy of the business plan for each of the Insurance Subsidiaries for the fiscal year ending December 31, 2023 in violation of Section 6.5(j) of the Credit Agreement.

2. Certain Events of Default have occurred and are continuing under Section 8.1(a)(ii) of the Credit Agreement as a result of the Borrower's failure to timely pay to the Administrative Agent, for the benefit of the Lenders, the interest payments on the Loans which became due and payable on each Interest Payment Date of August 29, 2022, September 29, 2022, October 31, 2022 and June 29, 2023, in violation of Section 2.2 of the Credit Agreement, and the continuance of such failures for three or more Business Days after the applicable due dates therefor.

3. Certain Events of Default have occurred and are continuing under Section 8.1(b) of the Credit Agreement as a result of the Borrower making unpermitted interest payments in respect of the Subordinated Debt (which are not permitted during the existence of any Event of Default).

4. Certain Events of Default have occurred and are continuing under Section 8.1(b) of the Credit Agreement as a result of the Borrower entering into and providing a secured guaranty pursuant to that certain Second Amended and Restated Revolving Loan and Security Agreement dated as of February 17, 2022, by and among SILAC Insurance Company, 777 Partners LLC, as the borrower, and the Borrower, as the guarantor, in violation of Sections 7.1, 7.2, 7.7 and 7.11 of the Credit Agreement.

5. Certain Events of Default have occurred and are continuing under Section 8.1(c) of the Credit Agreement as a result of the Borrower granting a first priority Lien on certain Collateral pursuant to the SILAC Loan and Security Agreement in violation of the Security Agreement, and the continuance of such failures for thirty (30) or more days.

6. Certain Events of Default have occurred and are continuing under Section 8.1(d) of the Credit Agreement as a result of the Borrower's breaches of the representations and warranties set forth in Section 5.14, Section 5.21 and Section 5.26 of the Credit Agreement, solely to the extent breached due to the other Events of Default described in this Schedule I and the underlying facts and circumstances.

7. An Event of Default has occurred and is continuing under Section 8.1(e) of the Credit Agreement as a result of the Borrower pledging investment account number 142212-000 to SILAC Insurance Company as collateral for the guaranty of the Borrower under the SILAC Loan and Security Agreement, in violation of Section 6.11 of the Credit Agreement.

8. Certain Events of Default have occurred and are continuing under Section 8.1(f) of the Credit Agreement as a result of each of the other Events of Default described herein and the underlying facts and circumstances, in each case to the extent constituting an "Event of Default" under the Subordinated Debt Documents.

9. Certain Events of Default have occurred and are continuing under Section 8.1(c) of the Credit Agreement with respect to 777 Partners LLC having pledged its equity interest in the Borrower to Balanced Management, LLC and authorized Balanced Management, LLC to file UCC-1 financing statements relating to the 777 Partners LLC's equity interest in the Borrower (collectively, the "***Balanced Management UCC-1 Filings***").