# EXHIBIT F

*EXECUTION VERSION*

**FIRST AMENDMENT TO SUBORDINATED NOTE PURCHASE AGREEMENT,
CONSENT AND FORBEARANCE AGREEMENT**

THIS FIRST AMENDMENT TO SUBORDINATED NOTE PURCHASE AGREEMENT, CONSENT AND FORBEARANCE AGREEMENT (this "***Agreement***"), dated as of October 6, 2023 amends the Subordinated Note Purchase Agreement, dated as of June 30, 2022 (as previously amended, restated, supplemented or otherwise modified from time to time, the "***Note Purchase Agreement***"), by and among 777 Partners LLC, a Delaware limited liability company (the "***Company***"), Leadenhall Capital Partners LLP, as administrative agent (the "***Note Administrative Agent***"), Leadenhall Life SMA III ICAV, as second lien collateral agent, and the Purchasers from time to time party thereto. Terms defined in the Note Purchase Agreement are, unless otherwise defined herein or the context otherwise requires, used herein as defined therein.

WHEREAS, the Company has given notice to the Note Administrative Agent and the Purchasers that certain Events of Default described on Schedule I hereto have occurred and are continuing (collectively the "***Specified Events of Default***" and each, individually, a "***Specified Event of Default***");

WHEREAS, certain provisions of the Note Purchase Agreement and the other Note Documents, including, without limitation, Section 14.4 of the Note Purchase Agreement, require that Brickell Insurance Holdings LLC, a Delaware limited liability company ("**BIH**"), and its Subsidiaries not sell or otherwise dispose of all or any of their Property, except as permitted by the Note Purchase Agreement;

WHEREAS, the Purchasers have consented to BIH's sale of substantially all the assets of Merit Life Insurance Co. notwithstanding any requirements to the contrary in the Note Purchase Agreement, but subject to the terms and conditions specified herein (the "***Merit Sale Consent***");

WHEREAS, the Company has requested that the Note Administrative Agent and Purchasers forbear from exercising their rights and remedies under the Note Purchase Agreement, the other Note Documents and applicable law in respect of the Specified Events of Default and to grant the Merit Sale Consent, in each case, pursuant to and upon the terms and conditions of this Agreement. Consistent with the foregoing, nothing contained herein is intended or shall be deemed to constitute an acknowledgment, representation, warranty, covenant, or other agreement on the part of the Note Administrative Agent or the Purchasers that they have agreed or they will agree (i) to enter into any amendment to the Note Purchase Agreement and the other Note Documents on any terms and conditions other than as set forth herein or (ii) to any waiver relating to any Default or Event of Default;

WHEREAS, BIH and the Company have entered into that certain Third Amendment to Credit Agreement, Consent and Forbearance Agreement, dated as of September 27, 2023 (as amended by the Amendment to Forbearance Agreement, dated as of October 6, 2023, and as further amended, restated, supplemented or otherwise modified, the "***Senior Amendment and Forbearance Agreement***"), by and among BIH, as borrower, the Company, as guarantor, BMO Bank N.A. (formerly known as BMO Harris Bank N.A.), as administrative agent (the "***Senior Administrative Agent***"), and the lenders party to the Senior Credit Agreement (the "***Senior Lenders***"), pursuant to which the Senior Administrative Agent and Senior Lenders agreed to (i) forbear from exercising certain of their rights and remedies under the Senior Credit Agreement and (ii) make certain amendments to the Senior Credit Agreement as requested by BIH, in each case subject to the terms and conditions set forth in the Senior Amendment and Forbearance Agreement; and

WHEREAS, the Company desires that the Note Purchase Agreement be amended on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged), the parties hereto agree as follows:

1.      AMENDMENTS. Subject to the terms and conditions of this Agreement, the Note Administrative Agent and the Purchasers hereby agree to the following amendments subject to the provisions of Section 4 hereof.

(a)     Section 1.1 of the Note Purchase Agreement is hereby amended by adding the following defined terms in the appropriate alphabetical order:

"*First Amendment*" means that certain First Amendment to Subordinated Note Purchase Agreement, Consent and Forbearance Agreement, dated as of the First Amendment Date, by and among the Company, the Note Administrative Agent and the Purchasers party thereto.

"*First Amendment Date*" means October 6, 2023.

"*Merit Sale*" means the sale of substantially all of the assets of Merit Life Insurance Co.

"*SILAC*" means SILAC Insurance Company, a Utah corporation.

"*SILAC Loan and Security Agreement*" means that certain Second Amended and Restated Revolving Loan and Security Agreement, dated as of February 17, 2022, by and among SILAC, as the lender, the Company, as the borrower, and BIH, as the guarantor, as in effect on the First Amendment Date.

"*SILAC Pledged Collateral*" means BIH's investment account number 142212-000, as set forth on Schedule 1 to the SILAC Loan and Security Agreement and all assets in such account.

(b)     The definition of "*Net Cash Proceeds*" in Section 1.1 of the Note Purchase Agreement is hereby amended and restated in its entirety as follows:

"*Net Cash Proceeds*" means, as applicable, (a) with respect to any Disposition by a Person, cash and cash equivalent proceeds received by or for such Person's account, net of (i) reasonable direct costs relating to such Disposition, including, without limitation, legal, accounting and actuarial costs, fees and expenses, and costs, fees and expenses of other advisors in connection with such Disposition and (ii) sale, use or other transactional taxes paid or payable by such Person as a direct result of such Disposition and (b) with respect to any offering of equity securities of a Person or the issuance of any Indebtedness for Borrowed Money by a Person, cash and cash equivalent proceeds received by or for such Person's account, net of reasonable legal, underwriting, and other fees and expenses incurred as a direct result thereof.

(c)     Section 5.1 of the Note Purchase Agreement is hereby amended and restated in its entirety (including its heading) as follows:

5.1 **Mandatory Prepayment of Notes**

(a) If in any applicable jurisdiction, it becomes unlawful for any Purchaser to perform any of its obligations as contemplated by this Agreement or to purchase or maintain its Notes:

   (i) that Purchaser shall promptly notify the Note Administrative Agent upon becoming aware of that event; and

   (ii) to the extent that such Purchaser's Notes have not been transferred pursuant to clause (d) of Section 5.3 (*Right of Replacement or Repayment in relation to a Single Purchaser*), the Company shall repay that Purchaser's Notes by no later than 60 days after the date on which the Note Administrative Agent has notified the Company or, if earlier, the date specified by the Purchaser in the notice delivered to the Note Administrative Agent (being no earlier than the last day of any applicable grace period permitted by law).

(b) If, after the Closing Date, BIH or any Subsidiary shall at any time or from time to time make or agree to make a Disposition, then the Company shall promptly notify the Note Administrative Agent of such proposed Disposition (including the amount of the estimated Net Cash Proceeds to be received by BIH or such Subsidiary in respect thereof and to the extent applicable, the amount of such Net Cash Proceeds to be used for mandatory prepayments under the Senior Credit Agreement) and, promptly upon receipt by BIH or such Subsidiary of the Net Cash Proceeds of such Disposition, the Company shall prepay the Obligations in an aggregate amount equal to 100% of the amount of all such Net Cash Proceeds; **provided** that, (i) notwithstanding the foregoing, the Net Cash Proceeds of the Merit Sale shall be distributed in accordance with the terms of the First Amendment and (ii) prior to Final Payment (as defined in the Intercreditor Agreement) of all obligations under the Senior Debt Documents, such Net Cash Proceeds shall be applied to the Obligations in accordance with the foregoing, solely to the extent Net Cash Proceeds of such Disposition are available after being applied as required under the Senior Credit Agreement. The amount of each such prepayment shall be applied to the outstanding Notes until paid in full. The Company acknowledges that its performance hereunder shall not limit the rights and remedies of the Purchasers for any occurrence of a Change of Control or breach of Section 14.4, Section 14.5 or any other terms of the Note Documents.

(c) Following receipt of notice from the Company of a Disposition under Section 5.1(b), the Note Administrative Agent will promptly notify each Purchaser of its pro rata share of the prepayment. Each Purchaser may decline to accept all (but not less than all) of its pro rata share of such prepayment (such declined amounts, "**Declined Proceeds**") by providing written notice (or in any other manner reasonably acceptable to the Note Administrative Agent) to the Note

3

>>Administrative Agent no later than 5:00 p.m. (New York City time) five Business Days after the date of such Purchaser's receipt of notice from the Note Administrative Agent regarding such mandatory prepayment and in such case, such Purchaser's Declined Proceeds may be retained by BIH or the applicable Subsidiary. If a Purchaser does not give notice to the Note Administrative Agent on or prior to such fifth Business Day informing the Note Administrative Agent that it declines to accept the applicable Declined Proceeds, then such Purchaser will be deemed to have accepted such proceeds.

(d) Each reference to "Section 5.1 (*Illegality*)" in Sections 5.3(c), 5.4(e) and 10.1(a) of the Note Purchase Agreement is hereby replaced with a reference to "Section 5.1(a) (*Mandatory Prepayment of Notes*)".

(e) Section 5.5 of the Note Purchase Agreement is hereby amended by adding the double-underlined text (indicated textually in the same manner as the following example: <u>double-underlined</u>) as set forth below:

> 5.5 **Application of Prepayments**
>
> Any prepayment of Notes pursuant to <u>Section 5.1(b) (*Mandatory Prepayment of Notes*) or</u> Section 5.2 (*Voluntary Prepayment of Notes*) shall be applied pro rata to each Purchaser.

(f) Sections 13.5(a)(ii) and (a)(iii) of the Note Purchase Agreement are each hereby amended by adding the parenthetical "(other than the fourth fiscal quarter)" after the reference therein to "the last day of each fiscal quarter".

(g) Section 13.5 of the Note Purchase Agreement is hereby amended by adding the following clause (c):

> (c) The Company shall deliver to the Note Administrative Agent (i) on or before July 31, 2022, the audited consolidated financial statements of BIH and its Subsidiaries for the 2021 fiscal year, and (ii) on or before December 31, 2023, the audited financial statements of the Company for the 2022 fiscal year.

(h) [<u>Reserved</u>.]

(i) Section 14.1 of the Note Purchase Agreement is hereby amended by deleting "and" at the end of clause (i), renumbering clause (j) as clause (k), and inserting the following new clause (j):

> (j) the guaranty by BIH of the obligations of the Company under the SILAC Loan and Security Agreement in an aggregate amount not to exceed the amount outstanding on the First Amendment Date, being $14,000,000; and

(j) Section 14.2 of the Note Purchase Agreement is hereby amended by renumbering clause (k) as clause (l), and inserting the following new clause (k):

> (k) a Lien in favor of SILAC on the SILAC Pledged Collateral; and

4

2. FORBEARANCE.

2.1 Period. Subject to the terms and conditions of this Agreement, the Note Administrative Agent and the Purchasers shall forbear from exercising their respective rights and remedies under the Note Documents and/or under applicable law, in each case, as a result of the Specified Events of Default (and any other Events of Default directly resulting from the Specified Events of Default (including any requirements to give notice of such Specified Events of Default)) (the "Forbearance") commencing on the Forbearance Effective Date and ending on the Termination Date (the "Forbearance Period"), but only upon satisfaction of the conditions set forth in Section 4 of this Agreement. As used herein, "Termination Date" means the date and time which is the earliest of (a) March 27, 2024 at 5:00 p.m. New York City time (the "Stated Termination Date"), (b) the date on which the Note Administrative Agent on behalf of the Purchasers receives irrevocable payment in full in cash of all of the Obligations under the Note Purchase Agreement, (c) the date the Note Administrative Agent (on behalf of the Purchasers) elects to terminate the Forbearance following cure of all of the Specified Events of Default, (d) the date the Note Administrative Agent elects to terminate the Forbearance Period following the occurrence and during the continuance of a Forbearance Default or (e) the Merit Sale Purchase Agreement is terminated or ceases to be in full force and effect or the Administrative Agent becomes aware that the Merit Sale will not be consummated.

2.2 Optional Termination. The Note Administrative Agent, at the direction of Required Purchasers, may elect to terminate the Forbearance Period by delivering written notice thereof to the Note Parties upon the occurrence and during the continuance of any of the following events after the date hereof (each, a "Forbearance Default"):

(a) the breach by any Note Party (a) of any of its representations or warranties or (b) of any of its covenants or conditions, in each case, set forth in this Agreement; or

(b) the occurrence of an event or condition (other than any of the Specified Events of Default) that constitutes an Event of Default under any of the Note Documents.

2.3 Effect of Forbearance Termination. Immediately upon the Termination Date, the Note Administrative Agent and the Purchasers may exercise their respective rights and remedies under the Note Documents and this Agreement, without the requirement of any further notice or other action (other than written notice to the Loan Parties of the termination of such forbearance as required by Section 2.2) by the Note Administrative Agent or the Purchasers. The Note Parties agree not to contest any such lawful exercise by the Note Administrative Agent or the Purchasers of such rights and remedies. All of the Note Administrative Agent's and the Purchasers' respective rights and remedies hereunder or under the other Note Documents and this Agreement are cumulative. Notwithstanding the termination of the Forbearance for any reason whatsoever, the Note Administrative Agent and the Purchasers shall be entitled to retain all of their respective rights and benefits under this Agreement, including with respect to any representation, acknowledgment, confirmation, release of liabilities, promises, covenants, or agreements by the Note Parties which in all respects shall, unless expressly stated otherwise, survive any such termination.

2.4 Forbearance Covenants. In order to induce the Note Administrative Agent and the Purchasers to extend the Forbearance, and as express conditions thereof, but without limiting the generality of the provisions of the Note Purchase Agreement, the Note Parties agree that:

(a) The Note Parties shall consummate the Merit Sale on or prior to March 27, 2024 (provided that, such date may be extended for an additional 30 days, with notice from the Company to the Note Administrative Agent, certifying that such extension is necessary to comply with regulatory requirements or obtain necessary regulatory approvals) (such date, the "<u>Required Merit Sale Date</u>") on terms substantially the same as those set forth in the Merit Sale Purchase Agreement provided to the Note Administrative Agent pursuant to clause (b) below.

(b) Promptly following the execution thereof, the Note Administrative Agent shall have received a copy of the purchase agreement with respect to the Merit Sale (the "<u>Merit Sale Purchase Agreement</u>").

(c) The Note Parties shall promptly deliver to the Note Administrative Agent and the Purchasers notice of the occurrence of any of the following events related to the Merit Sale and copies of all correspondence and filings related thereto: (i) the Form A filing, (ii) any regulatory timelines, (iii) the date of any public hearings, and (iv) any feedback or correspondence from any regulator.

(d) The Note Parties shall cause their senior management to hold meetings via telephone on the 15th day of each month or such other date on which the parties mutually reasonably agree, commencing November 15, 2023, at a mutually agreeable time, with the Note Administrative Agent and Purchasers to discuss the progress of the Merit Sale and any other matters reasonably requested by the Note Administrative Agent and Purchasers.

(e) Promptly upon receipt of the Net Cash Proceeds of the Merit Sale, BIH shall apply the Net Cash Proceeds to the payment of the following obligations:

(i) <u>first</u>, to pay all legal costs and expenses required to be paid (A) by BIH pursuant to Section 11.13 of the Senior Credit Agreement and (B) by the Company pursuant to Section 9.4 of the Note Purchase Agreement;

(ii) <u>second</u>, if necessary, to deposit cash into the Reserve Account (as defined in the Senior Credit Agreement) so that the amount in the Reserve Account is at least equal to $11,250,000;

(iii) <u>third</u>, to payment of outstanding cash interest (but excluding interest accrued at the Default Rate) for the periods ending June 30, 2023, September 30, 2023, and December 31, 2023, ratably among the Purchasers in proportion to the respective amounts payable to them;

(iv) <u>fourth</u>, to payment of that portion of the Senior Obligations constituting unpaid principal of the Senior Loans, ratably among the Senior Lenders in proportion to the respective amounts payable to them under the Senior Credit Agreement; and

(v) <u>fifth</u>, if the Minimum Reserve Amount (as defined in the Senior Credit Agreement) has been reduced to an amount less than $11,250,000 pursuant to Section 6.13 of the Senior Credit Agreement, the excess amount in the Reserve Account (as defined in the Senior Credit Agreement) will be used to pay that portion of the Senior Obligations constituting unpaid principal of the

>>Senior Loans, ratably among the Senior Lenders in proportion to the respective amounts payable to them under the Senior Credit Agreement.

(f) The Company shall on or prior to October 31, 2023 file a uniform commercial code amendment or termination of the Balanced Management UCC-1 Filings (as defined in Schedule I hereto) or cause such filings to be filed in form and substance effective to terminate such Balanced Management UCC-1 Filings.

(g) On or before December 31, 2023, the Note Administrative Agent shall have received the reviewed financial statements for BIH for the fiscal year ending December 31, 2022, in the form and substance required by Section 13.5(a)(iv) of the Note Purchase Agreement.

3. CONSENT. Subject to the terms and conditions of this Agreement (including the satisfaction of the conditions set forth in Section 4 hereof), the Note Administrative Agent and the Purchasers hereby (a) consent to the Borrower's obligations under the SILAC Loan and Security Agreement (including the pledge of the SILAC Pledged Collateral thereunder) notwithstanding the requirements of Section 14.7 and/or Section 14.11 of the Note Purchase Agreement and (b) agree to the Merit Sale Consent; provided that the Merit Sale Consent is subject to compliance with the requirements set forth in Sections 2.4(a), (b), (c) and (e).

4. CONDITIONS PRECEDENT. This Agreement shall become effective on the date that each of the conditions precedent set forth in this Section 4 shall have been satisfied, and notice thereof shall have been given by the Note Administrative Agent to the Company and the Required Purchasers. None of the terms, conditions or provisions contained in this Agreement is intended to be enforceable or interpreted, or shall be construed, against any of the parties hereto in the event that the conditions precedent set forth in this Section 4 are not satisfied (or waived by the Note Administrative Agent and the Required Purchasers) on or before September 27, 2023, time being of the essence; in such event, this Agreement shall be null and void (except for the provisions of this Section 4 and Section 5.4), and each of the parties in all respects shall be returned to the respective positions each occupied prior to the execution of this Agreement, all as if this Agreement had never been executed and delivered.

4.1 Receipt of Documents. The Note Administrative Agent shall have received this Agreement duly executed by the Company, the Note Administrative Agent, and the Required Purchasers.

4.2 [Reserved].

4.3 Compliance with Warranties, No Default, etc. After giving effect to this Agreement, the following statements by the Company shall be true and correct (and the Company, by its execution of this Agreement, hereby represents and warrants to the Note Administrative Agent and each Purchaser that such statements are true and correct as at such times):

>(a) the representations and warranties set forth in Section 12 of the Note Purchase Agreement and in the other Note Documents are true and correct in all material respects as of the date hereof (other than as they specifically relate to the Specified Events of Default), except to the extent the same expressly relate to an earlier date, in which case such representations and warranties shall be and remain true and correct as of such earlier date, and except to the extent any representation and warranty is qualified by "material", "Material Adverse Effect" or similar language, in which case, such representation and warranty shall be true and correct in all respects; and

7

(b)   no Default or Event of Default (other than the Specified Events of Default) has occurred and is continuing.

5.   MISCELLANEOUS.

5.1   Continuing Effectiveness, etc. This Agreement shall be strictly limited to its terms. In this Agreement, the Purchasers waive no Default or Event of Default (including the Specified Events of Default), whether presently or subsequently existing. Except as otherwise expressly provided for herein (including the Forbearance), the Note Administrative Agent and the Purchasers hereby fully preserve all of their rights, powers and remedies against the Note Parties and any other Person or such Person's property, including the right to act immediately upon the occurrence of any Default or Event of Default other than the Specified Events of Default. In addition, and except solely as provided herein (including the Forbearance), nothing contained herein shall be deemed to be a waiver or abandonment of any Default or Event of Default (including the Specified Events of Default) or of any right, power or remedy available to the Note Administrative Agent or any Purchaser under any Note Document, applicable law or otherwise, whether against any Note Party or any other Person, and each such right, power and remedy is hereby specifically and expressly reserved, whether any such right, power or remedy relates to any obligation incurred or property transferred before the date of this Agreement, during the Forbearance Period, or subsequent to the occurrence of any Forbearance Default, including the right to seek judgment against any Note Party, to foreclose its interest in any Collateral held by any Agent or in which any Agent has a security interest or other lien or to take any other action permitted under the Note Documents and applicable law. This Agreement shall be deemed to be (i) an amendment to the Note Purchase Agreement, and the Note Purchase Agreement as amended hereby, shall remain in full force and effect and is hereby ratified, approved and confirmed in each and every respect and (ii) a Note Document, and each other Note Document is hereby ratified, approved and confirmed in each and every respect. After the effectiveness of this Agreement in accordance with its terms, all references to the Note Purchase Agreement in the Note Documents or in any other document, instrument, agreement or writing shall be deemed to refer to the Note Purchase Agreement as amended hereby. Except as expressly modified in this Agreement, all of the terms, provisions and conditions of the Note Purchase Agreement, as heretofore amended, shall remain unchanged and in full force and effect.

5.2   Headings. Section headings used in this Agreement are for reference only and shall not affect the construction of this Agreement.

5.3   Execution in Counterparts. This Agreement may be executed in any number of counterparts, and by the different parties hereto on separate counterpart signature pages, each of which shall constitute an original, and all such counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Agreement by telecopy, emailed .pdf or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement and such counterpart shall be deemed to be an original hereof.

5.4   Incorporation of Note Purchase Agreement Provisions. The provisions of Sections 1.2, 26, 31.1, 31.2, 31.3, 32 and 33.1 of the Note Purchase Agreement are incorporated herein by reference as if fully set forth herein, *mutatis mutandis*.

6.   RELEASE; INDEMNIFICATION.

6.1   Release. In further consideration of the Note Administrative Agent's and the Purchasers' execution of this Agreement, each Note Party, individually and on behalf of its successors (including any trustees acting on behalf of such Note Party, and any debtor-in-possession with respect to such Note Party),

8

assigns, subsidiaries and affiliates, hereby forever releases the Note Administrative Agent, each Purchaser and each of their respective successors, assigns, parents, subsidiaries, and affiliates, officers, employees, directors, agents and attorneys (collectively, the "**Releasees**") from any and all debts, claims, demands, liabilities, responsibilities, disputes, causes, damages, actions and causes of actions (whether at law or in equity), and obligations of every nature whatsoever, whether liquidated or unliquidated, whether matured or unmatured, whether fixed or contingent that each Note Party has or may have against the Releasees, or any of them, which arise from or relate to any actions which the Releasees, or any of them, have or may have taken or omitted to take in connection with the Note Purchase Agreement or the other Note Documents prior to the date hereof (including with respect to the Obligations, any Collateral and any third parties liable in whole or in part for the Obligations). This provision shall survive and continue in full force and effect whether or not the Note Parties shall satisfy all other provisions of the Note Purchase Agreement (as amended by this Agreement) or the other Note Documents.

6.2    Related Indemnity. Each Note Party hereby agrees that its release of the Releasees set forth in Section 6.1 shall include an obligation to indemnify and hold the Releasees, or any of them, harmless with respect to any and all liabilities, obligations, losses, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever incurred by the Releasees, or any of them, whether direct, indirect or consequential, as a result of or arising from or relating to any proceeding by, or on behalf of any Person, including officers, directors, agents, trustees, creditors, partners or shareholders of such Note Party or any parent, subsidiary or affiliate of such Note Party, whether threatened or initiated, asserting any claim for legal or equitable remedy under any statutes, regulation, common law principle or otherwise arising from or in connection with the negotiation, preparation, execution, delivery, performance, administration and enforcement of this Agreement or any other document executed in connection herewith; provided, that no Note Party shall be liable for any indemnification to a Releasee to the extent that any such liability, obligation, loss, penalty, action, judgment, suit, cost, expense or disbursement results from the applicable Releasee's gross negligence or willful misconduct, as finally determined by a court of competent jurisdiction. The foregoing indemnity shall survive the payment in full of the Obligations and the termination of the Note Purchase Agreement and the other Note Documents (in each case as amended by this Agreement).

7.    Representation and Covenant Regarding SILAC Pledged Collateral.  The Company hereby (i) represents and warrants to the Note Administrative Agent that the investment account holding the SILAC Pledged Collateral holds 6,279,959 shares of RQIH LN as of the date hereof and (ii) agrees not to cause or permit any additional shares of RQIH LN to become SILAC Pledged Collateral, except for such additional shares representing dividends or other distributions received upon the SILAC Pledged Collateral.

8.    Default Interest.  The Company hereby acknowledges and agrees that (i) certain of the Specified Events of Default occurred and have been continuing since June 30, 2022 and (ii) notwithstanding anything to the contrary in the Note Purchase Agreement or any other Note Document, interest on the outstanding amount of the Notes shall be deemed to have accrued at the Default Rate and in accordance with Sections 6.2(b) and (c) of the Note Purchase Agreement for the period commencing on June 30, 2022 and shall continue to accrue at the Default Rate and in accordance with such Sections until the date on which each Specified Event of Default shall have been waived in accordance with Section 28 of the Note Purchase Agreement or are remedied or otherwise cease to be continuing.  For the avoidance of doubt, the payment of such default interest is subject to the Intercreditor Agreement and shall not be paid until the Senior Indebtedness (as defined in the Intercreditor Agreement) is Finally Paid (as defined in the Intercreditor Agreement).

[*Signature Pages Follow*]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

**777 PARTNERS LLC,**
as Company

By _____
Name  Steven W. Pasko
Title  Co-Managing Partner

**LEADENHALL CAPITAL PARTNERS LLP**,
as Note Administrative Agent

By  */s/ Craig Gillespie*
Name  Craig Gillespie
Title  Head of Life & Alternative Credit Portfolio Management

**LEADENHALL LIFE II DAC**,
through its agent, Leadenhall Capital Partners LLP,
as Purchaser

By _____/s/ Craig Gillespie_____
    Name: Craig Gillespie
    Title:   Head of Life & Alternative Credit Portfolio Management

**LEADENHALL LIFE SMA III ICAV**,
through its agent, Leadenhall Capital Partners LLP,
as Purchaser

By _____/s/ Craig Gillespie_____
    Name: Craig Gillespie
    Title:   Head of Life & Alternative Credit Portfolio Management

**LEADENHALL LIFE IV DAC**,
through its agent, Leadenhall Capital Partners LLP,
as Purchaser

By _____/s/ Craig Gillespie_____
    Name: Craig Gillespie
    Title:   Head of Life & Alternative Credit Portfolio Management

**SITKA ICAV**,
through its agent, Leadenhall Capital Partners LLP,
as Purchaser

By _____/s/ Craig Gillespie_____
    Name: Craig Gillespie
    Title:   Head of Life & Alternative Credit Portfolio Management

SCHEDULE I

**SPECIFIED EVENTS OF DEFAULT**

1. Certain Events of Default have occurred and are continuing under Section 15.1(b) of the Note Purchase Agreement as a result of the Company's failure to deliver BIH's audited financial statements and a Compliance Certificate for the fiscal year ended December 31, 2022 as a result of the violation of Sections 13.5(a)(ii), (a)(iv), (a)(vi) and (a)(xvi) of the Note Purchase Agreement and (b) the Company's failure to deliver a copy of the business plan for each of the Insurance Subsidiaries for the fiscal year ending December 31, 2023 in violation of Section 13.(a)(xi) of the Note Purchase Agreement.

2. Certain Events of Default have occurred and are continuing under Section 15.1(a)(ii) of the Note Purchase Agreement as a result of the Company's failure to timely pay to the Note Administrative Agent, for the benefit of the Purchasers, the interest payments on the Notes which became due and payable on each Interest Payment Date of June 30, 2023 and September 29, 2023, in violation of Section 6.3 of the Note Purchase Agreement, and the continuance of such failures for three or more Business Days after the applicable due dates therefor.

3. Certain Events of Default have occurred and are continuing under Section 15.1(b) of the Note Purchase Agreement as a result of BIH entering into and providing a secured guaranty pursuant to that certain Second Amended and Restated Revolving Loan and Security Agreement dated as of February 17, 2022, by and among SILAC Insurance Company, the Company, as the borrower, and BIH, as the guarantor, in violation of Sections 14.1, 14.2, 14.7 and 14.11 of the Note Purchase Agreement.

4. Certain Events of Default have occurred and are continuing under Section 15.1(d) of the Note Purchase Agreement as a result of the Company's breaches of the representations and warranties set forth in Section 12.14 and Section 12.21 of the Note Purchase Agreement, solely to the extent breached due to the other Events of Default described in this Schedule I and the underlying facts and circumstances.

5. An Event of Default has occurred and is continuing under Section 15.1(e) of the Note Purchase Agreement as a result of BIH pledging investment account number 142212-000 to SILAC Insurance Company as collateral for the guaranty of BIH under the SILAC Loan and Security Agreement, in violation of Section 14.2 of the Note Purchase Agreement.

6. Certain Events of Default have occurred and are continuing under Section 15.1(f) of the Note Purchase Agreement as a result of each of the other Events of Default described herein and the underlying facts and circumstances, in each case to the extent constituting an "Event of Default" under the Senior Debt Documents.

7. Certain Events of Default have occurred and are continuing under Section 15.1(c) of the Note Purchase Agreement with respect to the Company having pledged its equity interest in BIH to Balanced Management, LLC and authorized Balanced Management, LLC to file UCC-1 financing statements relating to the Company's equity interest in BIH (collectively, the "***Balanced Management UCC-1 Filings***").